# Motion to Vacate, Set Aside, or Correct a Sentence
# By a Person in Federal Custody

## (Motion Under 28 U.S.C. § 2255)

### Instructions

1. To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2. You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6. If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7. In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8. When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

   Clerk, United States District Court for
   Address
   City, State Zip Code

   If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9. **CAUTION: You must include in this motion all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

AO 243 (Rev. 01/15)                                                                                                  Page 2

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT**

**SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| United States District Court | District | |
|---|---|---|
| **Name** *(under which you were convicted):* | | Docket or Case No.: |
| Place of Confinement: | Prisoner No.: | |
| UNITED STATES OF AMERICA | **Movant** *(include name under which convicted)* | |
| V. | | |

**MOTION**

1.  (a) Name and location of court which entered the judgment of conviction you are challenging: _____

    _____

    _____

    _____

    (b) Criminal docket or case number (if you know): _____

2.  (a) Date of the judgment of conviction (if you know): _____

    (b) Date of sentencing: _____

3.  Length of sentence: _____

4.  Nature of crime (all counts): _____

    _____

    _____

    _____

    _____

    _____

5.  (a) What was your plea?  (Check one)

        (1)  Not guilty  ☐          (2)  Guilty  ☐          (3)  Nolo contendere (no contest)  ☐

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or
    what did you plead guilty to and what did you plead not guilty to?  _____

    _____

    _____

    _____

    _____

6.  If you went to trial, what kind of trial did you have?  (Check one)    Jury ☐    Judge only ☐

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☐    No ☐

8.  Did you appeal from the judgment of conviction?    Yes ☐    No ☐

9.   If you did appeal, answer the following:

(a)  Name of court: _____

(b)  Docket or case number (if you know): _____

(c)  Result: _____

(d)  Date of result (if you know): _____

(e)  Citation to the case (if you know): _____

(f)  Grounds raised: _____

_____

_____

_____

_____

_____

_____

(g)  Did you file a petition for certiorari in the United States Supreme Court?     Yes   ☐          No  ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

10.   Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

Yes ☐          No ☐

11.   If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

     Yes ☐     No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(b)   If you filed any second motion, petition, or application, give the same information:

(1)   Name of court: _____

(2)   Docket of case number (if you know): _____

(3)   Date of filing (if you know): _____

(4)   Nature of the proceeding: _____

(5)   Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

     Yes ☐     No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(c)   Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)   First petition:     Yes ☐     No ☐

(2)   Second petition:     Yes ☐     No ☐

(d)   If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

_____

_____

_____

12.   For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

AO 243 (Rev. 01/15)                                                                                                    Page 5

**GROUND ONE:** _____

_____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(b)  **Direct Appeal of Ground One:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐         No ☐

(2)  If you did not raise this issue in your direct appeal, explain why: _____

_____

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐         No ☐

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3)  Did you receive a hearing on your motion, petition, or application?
Yes         No

(4)  Did you appeal from the denial of your motion, petition, or application?
Yes ☐         No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
Yes ☐         No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this

issue: _____

_____

_____

_____

_____

**GROUND TWO:** _____

_____

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(b)   **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐          No ☐

(2)   If you did not raise this issue in your direct appeal, explain why: _____

_____

(c)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3)   Did you receive a hearing on your motion, petition, or application?

      Yes ☐          No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

      Yes ☐          No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

      Yes ☐          No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐      No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:

    _____

    _____

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐      No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐      No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐      No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐      No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    _____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this

issue: _____

_____

_____

_____

_____


**GROUND FOUR:** _____

_____

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


(b)   **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐          No ☐

(2)   If you did not raise this issue in your direct appeal, explain why:

_____


(c)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐          No ☐


(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐          No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐          No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐          No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

14.   Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?          Yes ☐          No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

AO 243 (Rev. 01/15)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the you are challenging:

(a) At the preliminary hearing: _____

_____

(b) At the arraignment and plea: _____

_____

(c) At the trial: _____

_____

(d) At sentencing: _____

_____

(e) On appeal: _____

_____

(f) In any post-conviction proceeding: _____

_____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

_____

_____

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?        Yes ☐        No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes ☐        No ☐

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?        Yes ☐        No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

   A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of –

   (1)   the date on which the judgment of conviction became final;

   (2)   the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

   (3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

   (4)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 01/15)                                                                                                                    Page 13

Therefore, movant asks that the Court grant the following relief: _____

_____

or any other relief to which movant may be entitled.



_____
Signature of Attorney (if any)



I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion
under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ .
                                                                        (month, date, year)



Executed (signed) on _____ (date)



_____
Signature of Movant


If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

_____

_____

_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NOS. 12-cr-20291-ALTONAGA
15-cv- _____

ALINA FEAS,

     *Petitioner/Defendant,*

     Vs.

UNITED STATES OF AMERICA,

     *Respondent/Plaintiff.*

_____/

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
VACATE CONVICTION AND SENTENCE PURSUANT TO 28 USC § 2255**

Petitioner, Alina Feas, by and through her undersigned counsel and pursuant to 28 U.S.C.
§ 2255, respectfully request that this Court vacate her conviction and sentence, and in support
thereof states:

**I.**

**STATEMENT OF THE CASE AND FACTS**

A Grand Jury in this District returned a Superseding Indictment that charged Petitioner
with one count of conspiracy to commit health care fraud, 18 U.S.C. §1349, and four counts of
health care fraud, 18 U.S.C. §1347 (Count 7).[1]

Petitioner entered into a Plea Agreement with the United States under which she agreed
to plead guilty to Counts 1 and 7 of the Superseding Indictment in exchange for the

---

[1] *U.S. v. Feas,* Case No. 12-cr-20291-Altonaga (DE 322).

Government's agreement to seek dismissal of Counts 8 through 10.[2] (DE 468). Petitioner entered a guilty plea on May 7, 2013.  A true and correct copy of the Transcript of the Change of Plea Hearing is attached hereto as Exhibit "**A**."

During the plea colloquy, the Court did not inform— or inquire whether Petitioner understood— that if she answered any of the questions falsely, her answers may later be used against her in a prosecution for perjury.  Fed. R. Crim. P. 11(b)(1)(A). *See also* Ex. **A**.  In further violation of Rule 11, the Court did not inform Petitioner of the Court's authority to order restitution or the Court's obligation to impose a Special Assessment. *See,* Fed. R. Crim. P. 11(b)(1)(K) and (L) and  Ex. **A**.

Nevertheless, the Court accepted Petitioner's plea and adjudged her guilty. Ex. **A** at p. 21. On July 25, 2013, Petitioner was sentenced to a term of 135-months imprisonment consisting of 120 months as to Count 1 and 15 months as to Count 7, to be served consecutively, ordered to pay a $200 Special Assessment and Restitution in the amount $24,104,431.24.[3]

On February 14, 2014, Petitioner filed a Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 alleging that her former counsel provided ineffective assistance of counsel at virtually every critical stage of the case.[4]

This Court denied Petitioner's § 2255 motion and declined to issue a Certificate of Appealability (COA).[5]

In an associated case, *U.S. v. Rousseau, et. al*., Case No. 13-cr-20505-Scola (hereinafter "*Rousseau I"*), the Court granted a defendant's motion to produce Petitioner as a defense witness

---

[2] *Id.*  (DE 468).

[3] *U.S. v. Feas,* Case No. 12-cr-20291-Altonaga (DE 535).

[4] *Feas v. U.S.,* Case No. 14-cv-20564-Altonage (DE 1 and 4).

[5] *Id.* (DE 36).

on October 29, 2014. The Court issued a writ to compel Petitioner's attendance at trial. *Rousseau I,* (DE 275 and 278).

On November 17, 2014, counsel for the defendant, Roger Rousseau, Samuel J. Rabin, Esq., advised Allan Medina, AUSA and the Court that he would call Petitioner to testify the following day - November 18, 2014. *Rousseau I,* (DE 400-8).

Thirty minutes later, AUSA Medina called counsel for Petitioner, Benson Weintraub, Esq., as evidenced in the following e-mail exchange between Messrs. Rabin and Medina.

Mr. Medina,

This afternoon I advised you … that [Petitioner] would be my first witness. I was disappointed to learn that as soon as court was recessed for the day you wasted no time in contacting her counsel ***threatening to charge her with perjury should she testify***. I consider your threats to [Petitioner] (through her counsel) to be contempt of court, or worse, obstruction of justice. Please be advised that I plan to bring this matter before the court tomorrow morning ***so you can explain why you attempted to intimidate a defense witness and prevent her from testifying.***

Samuel J. Rabin, PA

As evidenced below, in response to Mr. Rabin's email, AUSA Medina did not deny threatening Petitioner with a perjury charge.

Sam—

If you conclude this issue is necessary to bring up to the Court tomorrow, we will respond in front of the judge.

Allan J. Medina.

A true and correct copy of the email exchange between Messrs. Rabin and Medina is attached hereto as Exhibit "**B**." (Emphasis added.)

The following day, Judge Robert N. Scola, Jr. convened an evidentiary hearing at which time Mr. Rousseau's counsel, Mr. Rabin, examined Mr. Medina and the undersigned. A true and correct copy of the Transcript of Evidentiary Hearing is attached hereto as Exhibit "**C**."

The following testimony ensued:

[**Mr. Rabin questioning AUSA Medina**]

Q.      … [w]hen did you first realize that Dr. Rousseau was going to call [Petitioner] as a witness?

A.      Yesterday.

Ex. **C** at p. 183

…

Q.      So [Petitioner's] been listed as a defense witness since October 29th. You never made any attempts to contact her attorney or [Petitioner] direct—well, you would never contact [Petitioner] directly, correct?

A.      I would not.

Q.      Right. You know she's represented.

A.      I do.

Q.      So you know that the only way to contact her is through her counsel, right?

A.      Yes.

Q.      So you made no attempts to contact [Petitioner] or her counsel from October 29th until yesterday [November 18th].

A.      Correct.

Q.      … And between 5:30 and 6 o'clock [on November 17th] you contact[ed] Mr. Weintraub?

A.      I did.

Q.      … And at that point in time, did you essentially tell him that if [Petitioner] testifies, we think she's going to be committing perjury?

A.      What I said was— first off, the conversation started, because again, I had not heard from Mr. Weintraub at all…What I did ask him was, are you aware that Mr. Rabin is calling [Petitioner] to testify? And if in fact that happens, there's a possibility that she'd be perjuring herself. That was in light of the fact that in 2255 proceedings, there was significant representations, an affidavit and also even backing up a plea colloquy before Judge Altonaga, where Judge Altonaga asked

4

thorough questions about her role in the conspiracy and what she did to participate in it...I wanted to inform Mr. Weintraub that the possibility could exist, if in fact she did testify, for perjury. And when that happened, he actually asked, is this a threat? And I said no, it was not.

Q.      ... Mr. Weintraub had been the lawyer that prosecuted the 2255, so he was aware of everything that occurred there, right?

A.      Yes.

Q.      Yet you still felt the need, according to your testimony, to  call  him  up after you knew that she was going to be a witness on the eve of her testimony and again advise him that, you know, she could be committing perjury if she testifies tomorrow, correct?

A.      Like I said, Mr. Rabin, I was unaware whether or not he was aware that [Petitioner] was going to testify. Up until that point I had not heard from Mr. Weintraub. My understanding was, I'm representing her in a 2255 context. If he was going to say I'm not representing her, then I would have informed the Court, Judge, you might need to have counsel assigned. That is why minutes after our short conversation about this issue, I followed up with Mr. Weintraub to just confirm, are you representing [the Petitioner]? He did in fact say he was. And that was it.

…

Q.      Mr. Weintraub said to you, wait a minute, are you threatening me? When you mentioned perjury, didn't he say to you are you threatening me, are you threatening my client?

A.      I was surprised by that reaction and I said, no, I was not...

Q.      And then you called him back, right?

A.      I called back again to make sure, obviously, because this is a witness who came before the Court and testify under oath, possibly perjure herself...

Q.      ... You're certainly aware that a prosecutor's threat of perjury has a potential chilling effect on a witness, aren't you?

A.      That's why I would never make a threat.

Q.      Okay, what you perceived as not making a threat. But what you perceived as not making a threat certainly could be perceived by somebody else as a threat, right?

A.      Well, I know Mr. Weintraub is an experienced attorney. I was having a professional conversation with him and just explaining what the issues could be. I was trying to be not only, you know, an officer of the Court and just make it clear so that nothing is happening and jeopardize [Petitioner].

Q.      So you think that you need to explain to this experienced…defense lawyer, then, legal issues regarding potential perjury because why?

Ex. **C** at pps. 184 – 89.

[**Mr. Rabin questioning Mr. Weintraub**]:

Q.      Did there come a point in time yesterday that you received a phone call from Mr. Medina?

A.      Yes, sir.

Ex. **C** at p. 192.

…

Q.      … Could you just describe for the Court the contents of that phone call?

A.      Mr. Medina stated that he understood that [Petitioner] was planning to testify at this trial and ***he stated matter of factly that if she does testify, it would be perjury***, and I should be aware of that.

Q.      … So it was a discussion— was it a give and take discussion or was it more of like an admonition like you were describing?

A.      It was an admonition…

Ex. **C** at  196.

…

Q.      During the conversation, did you ask him whether he was threatening you or [Petitioner]?

A.      Oh, yes, yes. When he raised his voice, I said are you threatening me?

Q.      … Well, did you believe at any time during that conversation, that Mr. Medina was trying to do— be a responsible person, and give you like, you know, helpful advice or did you view it more as a threat?

A.      Sir, I don't need the Government's advice. I don't think it was helpful. I don't think it was gratuitous or kind. ***It was clearly an effort, in my view, to intimidate either me or [Petitioner] or both***.

6

> Q.      As a result of the conversation, did you communicate the conversation you had with Mr. Medina to your client?
>
> A.      Yes. I felt duty-bound to communicate the nature and tone of the conversation from Mr. Medina to me regarding her anticipated testimony today. I did so. And consequently, she advised me that she no longer wished to testify as a defense witness.

Ex. **C** at pps. 197-98. (Emphasis added.)

> [**Mr. Rabin questioning Petitioner**]:
>
> Q.      … Did you receive some information from Mr. Weintraub or your son regarding a conversation that Mr. Weintraub had with Mr. Medina?
>
> A.      Yes.
>
> Q.      … What were you told?
>
> A.      … I was told that Mr. Medina was— ***called my attorney and he threaten me*** that if I come to court, he would charge me with perjury.

Ex. **C** at p. 211.  (Emphasis added.)

In *Rousseau I*, the jury failed to reach a verdict as to several defendants.[6] A retrial was specially set on Judge Scola's trial calendar for August 10, 2015 (hereinafter *"Rousseau II"*).[7]

In *Rousseau II*, the Court again issued a writ of habeas corpus *ad testificandum* at a defendant's request directing the US Marshal to bring Petitioner before the Court to provide testimony. *Id*. (DE 562). In response, the Government filed a Motion In Limine requesting, *inter alia*:

> (1) a pretrial hearing (a) to determine whether, and to what extent, Petitioner will be unavailable to testify at trial and (b) to determine whether Petitioner has a well-founded basis for assertion of the Fifth Amendment privilege, and

---

[6] *Rousseau I* (DE 331).

[7] *Rousseau I* (DE 368).

(2) that if the Court admits Petitioner's testimony in *Rousseau I*, portions of said testimony should be excluded, specifically, "testimony concerning 'threats' supposedly made against [Petitioner]" by DOJ Attorney, Mr. Medina.

At the August 10, 2015 hearing in *Rousseau II*, the Government concurred with Petitioner that no further testimony was required of Petitioner:

> MR. MEDINA: Your Honor, to be clear, once the omnibus motion        by      the Government was filed, [Petitioner's counsel] subsequently filed his own motion putting forth on the record her intention to assert her Fifth Amendment privilege.

A true and correct copy of the Transcript of the August 10, 2015 hearing is attached hereto as Exhibit "**D**" at p. 3-4.

Further, the court found that Petitioner's "prior testimony will be admissible." *Id*. The Court then addressed what Mr. Medina characterized as a "subtle issue" – threatening to charge a defense witness with perjury:

> MR. MEDINA: … what, if anything, should either go back to  the  jury  as  far  as [Petitioner's] transcript or what should be read out loud?... And the only thing that the Government believes is not relevant are 19 lines within the transcript.

Ex. **D** at p. 16.

…

> THE COURT: There are comments about her receiving information through her son about threats by you that she would be charged with perjury.

Ex. **D** at p. 16-7.

…

> THE COURT: All right. So I am going to deny your request to— your objections to those lines. I think the witnesses—the fact that, again, it's not—these statements are not admitted for the truth of what was being said. ***If some witness is willing to come forward and testify, even in spite of knowing that they might be charged with perjury. I think that goes to her credibility and her bias***, just like if she had been promised something good, okay, then you could say, well, that affects her credibility…

Ex. **D** at p. 18. (Emphasis added).

8

## LEGAL ARGUMENT

## I.

### THIS PLEADING DOES NOT CONSTITUTE A "SECOND OR SUCCESSIVE" MOTION UNDER 28 USC § 2255 BECAUSE AUSA MEDINA'S MISCONDUCT OCCURRED WELL AFTER THE INITIAL MOTION WAS DENIED

First and foremost, this is not a "second or successive petition" despite Petitioner's prior application for relief under 28 U.S.C. § 2255. Generally, § 2255(h) bars second or successive petitions unless certified by a United States Court of Appeals to fall under one of two narrow exceptions. *Id*. However, there is a well-settled exception to the second or successive rule that expressly authorizes a § 2255 movant to restart the one-year limitation period "'[i]f… the purported defect did not arise, or the claim did not ripen, until after conclusion of the previous petition.'" *Stewart v. U.S.*, 646 F. 3d 856, 863-65 (11th Cir. 2011). *See also Panetti v. Quarterman*, 551 U.S. 930, 943-44 (2007)(The term "second or successive" "is not self-defining and it does not refer to all habeas petitions filed second or successively in time."). The discovery of a new fact "triggers a fresh one-year statute of limitations under § 2255(f)(4)." *Stewart*, 646 F. 3d at 858 (citing *Johnson v. U.S.*, 544 U.S. 295, 302 (2005).[8]

The term "second or successive" remains a term of art that must be given meaning by reference to both the body of case law developed before the enactment of AEDPA and the policies that prompted AEDPA's enactment." *Medberry v. Crosby* 351 F. 3d 1049, 1062 (11th Cir. 2003). AEDPA's restrictions on second or successive motions are meant to forestall abuse of the writ, *see e.g., Felker v. Turpin*, 518 U.S. 651, 664 (1996), "by, for instance, barring successive motions raising habeas claims that could have been raised in earlier motions where

---

[8] *Johnson* held that "the vacatur of a state conviction of a predicate conviction is a new 'fact' that forms the basis of a challenge under 28 USC § 2255 and triggers a fresh one-year statute of limitations under 2255…" 544 U.S. at 302.

there was no legitimate excuse for failure to do so, see *McClesky v. Zant*, 499 U.S. 467, 493-95 (1991)." *Stewart,* 646 F. 3d at 859.

On November 18, 2014, three months after this Court decided Petitioner's first-in-time § 2255 motion, Rousseau's counsel examined AUSA Medina who confirmed that he called the undersigned, counsel for Petitioner, the previous evening to advise that Petitioner's testimony, should it be given, would constitute perjury. *See* Ex. **B** and **C** at pp. 184-89.  Accordingly, AUSA Medina's threat of prosecution for perjury— even before Petitioner actually testified— "did not ripen, until after conclusion of the previous petition" – August 12, 2014.[9]  *Stewart, supra*.

Thus, this Court's failure to warn Petitioner at the Change of Plea proceeding that her responses could be used against her in a prosecution for perjury did not prejudice Petitioner until AUSA Medina's aforesaid threats on November 17, 2014. *See U.S. v. Pinto*, 838 F. 2d 1566, 1568 (11th Cir. 1988)(*per curiam*)("This Court has consistently held that a failure to warn under Fed. R. Crim. P. 11(c)(5) is not a sufficient basis for attacking a plea *absent a threat of prosecution for perjury or some other showing of prejudice*.")(emphasis added).  *See also* Ex. **B** and **C** at pp. 184-89.

In other words, it was not until AUSA Medina threatened Petitioner, that Petitioner's Rule 11 claim ripened and this Court's failure to abide by Rule 11 resulted in manifest prejudice affecting Petitioner's substantial rights. In contrast to the abuse of writ scenarios contemplated by the AEDPA and *McClesky, supra*, Petitioner could not have raised this meritorious claim in her initial § 2255 motion. Thus, as in *Stewart*, Petitioner's claim falls within the "small subset of unavailable claims ***that must not be categorized as successive.*" *Leal Garcia v. Quarterman*, 573 F. 3d 214, 222 (5th Cir. 2009). (Emphasis added.)

---

[9] *Feas v. U.S.,* Case No. 14-cv-20564-Altonage (DE 36).

Based upon the foregoing authorities, it is clear that Petitioner need not seek prior permission from the Eleventh Circuit to file the instant pleadings in this Court. Moreover, Petitioner has one-year from discovery of the new fact, (i.e., AUSA Medina's threat of perjury prosecution against Petitioner), or until November 17, 2015, within which to file a timely § 2255 motion on that basis. Since Petitioner's Motion to Vacate and this Memorandum have been filed before November 17, 2015, they are timely.

Furthermore, this Court's Rule 11 error constitutes a "complete miscarriage of justice" and was "inconsistent with the rudimentary demands of fair procedure," and is thus redressable via collateral attack. *See U.S. v. Vonn*, 535 U.S. 55, 64 (2002) (quoting *U.S. v. Timmreck*, 441 U.S. 780, 783 (1979)). As discussed in more detail *infra* Part II.C., the Court's failure to warn Petitioner caused manifest prejudice because, but for the Court's error, Petitioner would not have pled guilty. *See* Ex. **E**.  Additionally, in contrast to the defendant in *Timmreck*, Petitioner alleges far more than a mere formal or technical violation of Rule 11. Despite its basis in Rule 11, the error has constitutional implications because it undermined the knowing and voluntary nature of Petitioner's plea. Thus, Petitioner's claim is cognizable under 28 U.S.C. § 2255.

## II.

### THE COURT'S VIOLATION OF RULE 11 CONSTITUTED PLAIN ERROR THAT AFFECTED PETITIONER'S SUBSTANTIAL RIGHTS SUCH THAT HER CONVICTION AND SENTENCE MUST BE VACATED

### A.    Introduction

Because Petitioner's former counsel neglected to object to the Court's violation of Rule 11 at the Change of Plea proceeding, this claim is subject to plain error review. *See U.S. v. Olano,* 507 U.S. 725, 733 (1993).  *See also,* Ex. **A**. To demonstrate plain error, a 2255 petitioner must show that the Court committed error that is plain and that affected Petitioner's substantial

rights. *Olano,* 507 U.S. at 732-34. If the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," the Court may exercise its discretion to correct the forfeited error. *Id.* at 737.

### B.      The District Court Committed Plain Error By Failing to Comply With Rule 11

The Supreme Court has held that "[d]eviation from a legal rule is 'error' unless the rule has been waived." *Id.* at 732-33. Furthermore, such error is plain if the error is "clear' or, equivalently, obvious.'" *Id.* at 734. Expanding upon the definition of plain error in the context of Rule 11 violations, the Eleventh Circuit stated that "[w]here Rule 11 explicitly, specifically, and plainly requires that a court inform the defendant of something, it is plain error for the Court not to do so." *U.S. v. Lejarde-Raja,* 319 F. 3d 1288, 1290 (11th Cir. 2003). "[A] district court's failure to address a core concern of Rule 11 constitutes plain error." *Id.*

In the case *sub judice*, it is clear that the Court's failure to warn Petitioner that her Rule 11 statements were subject to the penalty of perjury— a core concern under Rule 11— constitutes plain error. See *U.S. v. Moriarty,* 429 F. 3d 1012, 1019 (11th Cir. 2005)(noting that to ensure compliance with the third core concern – that a defendant understands the consequences of her plea – the court is required to inform the defendant of the Government's right in a prosecution or perjury, to use against the defendant any statement that he gives under oath).

Furthermore, Rule 11 "explicitly, specifically, and plainly" requires the Court to advise a defendant of "the government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath." Fed. R. Crim. P. 11(b)(1)(A). Unlike a case where the law may be unsettled, Rule 11's language is clear and unambiguous. Thus, the Court plainly erred in failing to give the required Rule 11 warnings to Petitioner. *See* Ex. **A**.

### C.   The Court's Failure to Advise Petitioner of the Consequences Of Her Plea Affected Her Substantial Rights

To demonstrate that a plain error affected her substantial rights in a Rule 11 context, Petitioner "must show a reasonable probability that, but for the error, [s]he would not have entered the plea." *U.S. v. Dominguez-Benitez,* 542 U.S. 74, 83 (2004).  In *Olano*, the United States Supreme Court held that an effect on substantial rights under the plain error rule has the same meaning that it has under the harmless error rule.[10] 507 U.S. at 734. It ordinarily means that the error "must have been prejudicial" which in turn means that it "must have affected the outcome of the proceedings." *Id*.

In its determination of whether a defendant's substantial rights were violated in a Rule 11 context, the Eleventh Circuit has held that a district court must address three core concerns of Rule 11 to ensure that a defendant's plea of guilty is knowing and voluntary.

> A court accepting a guilty plea must comply with Rule 11 and specifically address three '*core principles'* ensuring that a defendant (1) enters his plea free from coercion, (2) understands the nature of the charges, and (3) **understands the consequences of his plea.** *United States v. Jones,* 143 F.3d 1417, 1418-19 (11th Cir. 1998)(*per curiam*).

*Moriarty,* 429 F. 3d at 1019.  In addressing the third core concern, the Eleventh Circuit held as follows:

> To ensure compliance with the third concern, Rule 11(b)(1) provides a list of rights and other relevant matters about which the court is required to inform the defendant prior to accepting a guilty plea, including the right to plead not guilty (or persist in such a plea) and to be represented by counsel; the possibility of forfeiture; the court's authority to order restitution and its obligation to apply the Guidelines; **and the Government's right in a prosecution for perjury, to use against the defendant any statement that he gives under oath**.

---

[10] Insofar as the "substantial rights" component is concerned, the only difference between the plain error rule and the harmless error rule is that the former requires the defendant to prove that the error had an effect on substantial rights while the latter requires the Government to prove that the error did not have an effect on substantial rights. *See Vonn*, 535 U.S. at 62-63.

*Id*. (Emphasis added). *See also U.S. v. Pinto*, 838 F. 2d 1556, 1568 (11th Cir. 1988)(*per curiam*)("This court has consistently held that a failure to warn under Fed. R. Crim. P. 11(c)(5) is not a sufficient basis for attacking a plea ***absent a threat of prosecution for perjury <u>or some other showing of prejudice</u>** which Pinto has not made*."). *Id*. (Emphasis added).

The record in this case amply demonstrates that the Court failed to address Rule 11's third core concern and that this failure violated Petitioner's substantial rights.  As stated in *Pinto*, the Court's failure to comply with Rule 11 coupled with AUSA Medina's threat to charge Petitioner with perjury prejudiced Petitioner.  *See Pinto*, 838 F. 2d at 1568.

Furthermore, Petitioner desired to go to trial and would have done so but for this Court's Rule 11 error: "I would not have entered a plea of guilty but for the Court's aforementioned failure to warn that my statements were subject to the penalty of perjury." A true and correct copy of Petitioner's Affidavit is attached hereto as Exhibit "**E**."  Furthermore, Petitioner later testified during the *Rousseau I* trial (a true and correct copy of Petitioner's testimony during the *Rousseau I* trial is attached hereto as Exhibit "**F**") that she was only following counsel's advice in proceeding with the guilty plea:

Q.      … Why did you plead guilty to that crime?

A.      That was my attorneys' recommendation. I want to go to trial, but they recommended me to sign the plea.

[…]

Q.      How could you go in front of a federal judge after being placed under oath and say I'm guilty when it wasn't true?

A.      I answered yes to the questions. I was following what my attorneys recommended me to do.

*Id.* at 33 and 39. [11]

Simply stated, the Court did not advise Petitioner of the consequences of her plea by skipping the required advice of the Government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath.  In other words, the Court failed to observe Rule 11, and this failing was obvious.  So was the prejudice to Petitioner, having had no explanation by the Court, AUSA Medina and her own counsel of the consequences of her plea.[12]  The Court's acceptance of Petitioner's plea speaks to the prejudice of an unknowing plea, to which the Court's indifference was an affront to the integrity of the judicial system.[13]  Furthermore, the omitted warning would have made the difference required by the standard of reasonable probability; it is simple to see that the warning would have resulted in Petitioner not entering a plea and going to trial.  *See,* Ex.  **F**.

Accordingly, informed by the entire record, the Court's plain Rule 11 error affected Petitioner's substantial rights and the possibility of a different result "is sufficient to undermine confidence in the outcome" of this Court's proceeding. *Dominguez-Benitez,* 542 U.S. at 83.

**D.     The Court Should Correct the Plain Forfeited Error that Seriously Affected the Fairness, Integrity, or Public Reputation of Judicial Proceedings**

The standard that should guide the exercise of remedial discretion under Rule 52(b) was articulated in *U.S. v. Atkinson*, 297 U.S. 157 (1936). The court of appeals should correct a plain

---

[11] *See also, Feas v. U.S.,* Case No. 14-cv-20564-Altonage (DE 4) ("But for the specific acts and omissions of counsel, Petitioner would not have plead guilty"); *Id.* (DE 33) ("But for Messrs. Egleston and Kubiliun, complete and utter failure in familiarizing themselves with the facts and the law, Petitioner was denied her constitutional right to make an informed decision regarding entering a plea").

[12] Indeed, counsel's failure to object to this Court's lack of warning on this issue shows as such. Petitioner was thus left altogether unaware of the impact that her statements at the change of plea hearing may have, and therefore, did not understand the consequences of her plea. *See Moriarty*, *supra*.

[13] *See* Benchbook for U.S. District Court Judges, p. 70 (6th ed. 2013) (advising district judges to "Ask the defendant: Do you understand that you are no under oath and if you can answer any of my questions falsely, your answers may later be used against you in another prosecution for perjury or making a false statement?").

forfeited error affecting substantial rights if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 *citing U.S. v. Atkinson*, 297 U.S. 157 (1936). The role of the plain error doctrine has always been to empower courts, especially in criminal cases, to correct errors that seriously affect the "fairness, integrity or public reputation of judicial proceedings." *Atkinson*, 297 U.S. at 160. Furthermore, an error may "seriously affect the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence. *Olano*, 507 U.S. at 736-37.

When a court fails to inform a defendant of her Rule 11 rights and nothing in the record indicates that such defendant is aware of these rights, the court "will not infer to a defendant knowledge of [her] Rule 11 constitutional rights." *U.S. v. Hernandez-Fraire,* 208 F. 3d 945, 951 (11th Cir. 2000). Further, a court's "failure to inform strikes at the heart of what Rule 11 was designed to prevent— the unknowing and unintelligent waiver of constitutional rights." *Id.*

The attached transcripts (and the whole record) show that Petitioner was not advised, among other things, of the Government's right, in a prosecution for perjury or false statement, to use against Petitioner any statement that she gave under oath during the Change of Plea Hearing or the Sentencing Hearing. The record further demonstrates that at no time prior to or after the Change of Plea Hearing, Petitioner was advised by the Court, AUSA Medina or her prior counsel that her answers may later be used against her in a prosecution for perjury. Accordingly, Petitioner cannot be presumed to know that her statements could be the subject of a future perjury prosecution. Petitioner cannot be said to have *knowingly, voluntarily, and intelligently* assented to answering this Court's questions during the Change of Plea hearing.

Errors that call into question the validity of a defendant's plea harm the judicial system as whole.  Therefore, such errors "seriously affect the fairness, integrity or public reputation of judicial proceedings." *See Olano, supra.*

Accordingly, the Court's deficient Rule 11 colloquy seriously affected the fairness, integrity or public reputation of judicial proceedings.  Further, the Rule 11 colloquy was inconsistent with rudimentary demands of fair procedure and constituted a complete miscarriage of justice.

### E. Prosecutorial Threats To a Putative Defense Witness To Prevent Her From Testifying is Conduct That Clearly Attacks the Integrity and Reputation of this Court

The act of a prosecutor threatening a defense witness with perjury to prevent her from testifying in a judicial proceeding is conduct that clearly attacks the integrity and reputation of the court. ***The Eleventh Circuit considers such misconduct so malignant that it results in automatic reversal.*** *Demps v. Wainwright,* 805 F. 2d 1426, 1433 (11th Cir. 1986)("Substantial interference with a defense witness's free and unhampered choice to testify violates due process rights of the defendant. *When such a violation of due process rights occurs, **a court must reverse the conviction without regard to prejudice to the defendant**.*"). *Id.* (emphasis added). *See also U.S. v. Goodwin,* 625 F. 2d 693, 703 (5th Cir. 1980)(noting that a prosecutor's conduct in threatening a witness is "intolerable."). **This *per se* rule is intended to deter prosecutorial misconduct**. *See U.S. v. Hammond*, 598 F. 2d 1008 (5th Cir. 1979).

In summary as to this point, the evidence plainly establishes that on the eve of Petitioner's testimony in *Rousseau I*, AUSA Medina called undersigned counsel and clearly— and without equivocation— threatened that Petitioner would be charged with perjury if she testified based on her Rule 11 colloquy. Accordingly, this Court's failure to warn Petitioner that

her responses at the Rule 11 hearing could be used against her in a prosecution for perjury coupled with AUSA Medina's conduct not only resulted in plain error but has significantly affected the integrity of judicial proceedings.

## IV.
## CONCLUSION

Petitioner's Motion may not, under any reasonable calculus of construction, be deemed an impermissible "second or successive petition" because the claim did not ripen until after Petitioner's § 2255 motion was filed and denied.

And critically, the Court failed to administer the perjury warning required by Rule 11(b)(1)(A) at Petitioner's Change of Plea proceeding resulting in the manifestation of abject prejudice based on the Government's recent threats of prosecution for perjury based on such Rule 11 responses. This significant omission violated Petitioner's substantial rights.

The case law holding such errors harmless reflect only those situations where the defendant had not been threatened with prosecution for perjury or actually prosecuted. Based on the Assistant United States Attorney's specific testimony in *Rousseau I*, the threat is real and palpable. Thus Petitioner need not await further proceedings before asserting these claims.

For these and other reasons consistent with the fair administration of justice, Petitioner's plea must be vacated and she be given the opportunity to re-plead.

Respectfully submitted,

**BENSON WEINTRAUB, Esq.**
*Counsel for Petitioner Feas*
1 E. Broward Blvd., Suite 700
Ft. Lauderdale, FL. 33301
954.334.1066
weintraub.benson@gmail.com

By:      /s/ Benson Weintraub
**BENSON WEINTRAUB**
FL. Bar. 0486418

## CERTIFICATE OF SERVICE

I CERTIFY that the foregoing Memorandum was served upon all counsel of record and filed via ECF this 8th day of November, 2015.

By:      /s/ Benson Weintraub

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                      CASE NO. 12-20291-CR
 3

 4   UNITED STATES OF AMERICA,      Miami, Florida

 5             Plaintiff,           May 7, 2013

 6        vs.                       9:29 a.m. to 9:55 a.m.

 7   ALINA FEAS,                    Courtroom 12-2

 8             Defendant.           (Pages 1 to 21)

 9   _____

                          CHANGE OF PLEA
10        BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                  UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13

14   FOR THE GOVERNMENT:   ALLAN J. MEDINA, ESQ.
                           ASSISTANT UNITED STATES ATTORNEY
15                         99 Northeast Fourth Street
                           Miami, Florida 33132
16                         Tel: (202) 257-6537
                           E-mail: Allan.medina@usdoj.gov
17

     FOR THE DEFENDANT:    SCOTT EGLESTON, ESQ.
18                         Law Office of Scott Egleston
                           12000 Biscayne Boulevard, Suite 220
19                         Miami, Florida 33181
                           Tel: (305) 892-8088
20                         E-mail: Scotteglestonatt@bellsouth.net

21

     REPORTED BY:          STEPHANIE A. McCARN, RPR
22                         Official Court Reporter
                           400 North Miami Avenue
23                         Twelfth Floor
                           Miami, Florida 33128
24                         (305) 523-5518
                           E-mail: Stephanie_McCarn@flsd.uscourts.gov
25
```

Exhibit "A"

I N D E X

DIRECT   CROSS   REDIRECT   RECROSS

WITNESSES FOR THE GOVERNMENT:

--      --      --       --

WITNESSES FOR THE DEFENDANT:

--      --      --       --

EXHIBITS MARKED & ADMITTED IN EVIDENCE       MARKED   ADMITTED

--       --

MISCELLANEOUS

PAGE

Proceedings.......................................   3
Court Reporter's Certificate.....................  21

 1          (The following proceedings were held at 9:29 a.m.)

 2               THE COURT:  United States and Alina Feas.

 3               Counsel, please state your appearances.

 4               MR. MEDINA:  Good morning, Your Honor.  Allan Medina

 5     on behalf of the United States.

 6               MR. EGLESTON:  Your Honor, good morning.  Scott

 7     Egleston on behalf of the defendant Alina Feas.

 8               THE COURT:  Ms. Feas, good morning.

 9               THE DEFENDANT:  Good morning.

10               THE COURT:  Please raise your right hand.

11          (The Defendant was sworn.)

12               THE COURT:  Ms. Feas, I am going to be asking you some

13     questions this morning in order to accept your change in plea

14     from a plea of not guilty to a plea of guilty to Counts 1 and 7

15     of the superseding indictment.

16               If at any time you do not understand any of my

17     questions, please let me know and I will try to clarify the

18     question for you.  Also if at any time you would like to speak

19     with your attorney and consult with him off the record, let me

20     know that and we will pause to give you an opportunity to do

21     so.

22               All right?

23               THE DEFENDANT:  Okay.

24               THE COURT:  Please state your full name.

25               THE DEFENDANT:  Alina Feas.

1    THE COURT:  How old are you?

2    THE DEFENDANT:  Fifty-three.

3    THE COURT:  How far did go in school?

4    THE DEFENDANT:  Well, I'm a doctor in psychology and

5    then I completed some college.

6    THE COURT:  And what country are you a citizen of?

7    THE DEFENDANT:  I'm sorry?

8    THE COURT:  What country are you a citizen of?  What

9    is your citizenship?

10    THE DEFENDANT:  I'm a U.S. citizen.

11    THE COURT:  Ms. Feas, have you ever been treated for a

12    mental illness or for an addiction to narcotic drugs?

13    THE DEFENDANT:  No.

14    THE COURT:  Have you taken any drugs or alcohol in the

15    last 48 hours?

16    THE DEFENDANT:  I'm taking prescribed medication for

17    depression and anxiety.

18    THE COURT:  Does that medication affect your volition

19    or your ability to understand what's happening here this

20    morning?

21    THE DEFENDANT:  No.

22    THE COURT:  Do you believe that you have any mental or

23    physical condition or illness that prevents you from

24    understanding what's happening here?

25    THE DEFENDANT:  No.

1        THE COURT:  Mr. Egleston, in your opinion is your

2    client competent to enter a guilty plea?

3        MR. EGLESTON:  Yes, Your Honor.

4        THE COURT:  Ms. Feas, prior to today, did you receive

5    a copy of the superseding indictment containing the written

6    charges against you?

7        THE DEFENDANT:  Yes.

8        THE COURT:  Have you fully discussed that indictment

9    and the case in general with Mr. Egleston as your attorney?

10        THE DEFENDANT:  Yes.

11        THE COURT:  Are you fully satisfied with the counsel,

12    the representation and the advice that you have received from

13    your attorney?

14        THE DEFENDANT:  Yes.

15        THE COURT:  I said before that you plead guilty to

16    Counts 1 and 7.  Count 1 charges you with knowingly and

17    willfully conspiring and agreeing with others to violate 18

18    U.S. Code, §1347; that is, to execute a scheme to defraud a

19    health care benefit program effecting commerce, Medicare; and

20    to obtain by false and fraudulent representations and promises

21    the money and property owned by and under the custody and

22    control of the health care benefit program in connection with

23    the delivery of and payment for health care benefits, items and

24    services in violation of Title 18 U.S. Code, §1349.

25        Count 7 charges that in connection with the delivery

1    of and payment for health care benefits, items and services,

2    you knowingly and willfully executed a scheme and artifice to

3    defraud Medicare, a health care benefit program effecting

4    commerce, and to obtain by means of false and fraudulent

5    pretenses, representations and promises, the money and property

6    owned by and under the custody and control of that health care

7    benefit program in violation of 18 U.S. Code, §1347 and 2.

8            Ms. Feas, do you understand these two charges?

9            THE DEFENDANT:  Yes, I do.

10            THE COURT:  And, Mr. Medina, could you please set

11    forth the elements of these offenses?

12            MR. MEDINA:  Yes, Your Honor.  For Title 18 United

13    States Code, §1349, the elements are as follows:  That two or

14    more persons in some way agree to accomplish a shared and

15    unlawful plan as charged in the superseding indictment, and

16    that the defendant, Ms. Alina Feas, knew the unlawful purpose

17    of the plan and willfully joined in it.

18            For Title 18 United States Code, §1347, the elements

19    are:  That in connection with the delivery of and payment of

20    health care benefits, items and services, that the defendant

21    knowingly and willfully executed and attempted to execute a

22    scheme and artifice to defraud Medicare, which is a health care

23    benefit program under Title 18 United States Code, §24(b), and

24    that as part of the scheme, the defendant obtained by means of

25    material -- materially false and fraudulent pretenses,

1   representations and promises, money and property owned by and

2   under the custody and control of said health care benefit

3   program.

4           THE COURT:  Thank you.

5           Mr. Egleston, do you agree that that's an accurate

6   statement of the elements?

7           MR. MEDINA:  I do.

8           THE COURT:  And would you please state the steps you

9   have taken to familiarize Ms. Feas with the charges against

10  her, the government's evidence, her defenses, her right to

11  proceed to trial and the consequences of a guilty plea.

12          MR. MEDINA:  Your Honor, I have had this case since

13  its inception when the government knocked on Ms. Feas's door.

14  She was not arrested originally.  I have been with her since --

15  every process from the volunteering up until today's hearing.

16          Ms. Feas actually has my cell number and we have been

17  in constant contact with respect to this.  I'm talking nights,

18  weekends, whenever she needs to speak to me with respect to

19  this case, we have been in constant contact.

20          We have talked about her trial and her chances of

21  success in trial.  I have explained to her that I have tried

22  many cases, I have tried cases in front of you, and that if

23  that's the decision that she wishes to take, she is certainly

24  in capable hands for me to try this case for her.

25          We have gone over the evidence, we have gone over her

 1  defenses.  And I have talked to her about the codefendants in

 2  this case that have been before this Court, and that we have

 3  gone over their plea agreements, we have gone over their

 4  sentences, we have gone over everything with respect to all the

 5  details surrounding this case.  And given everything that has

 6  been presented to me and everything that I know about this

 7  case, we have had numerous, numerous, numerous discussions on

 8  how to proceed.

 9          Ms. Feas has completely accepted responsibility for

10  her actions in this case and knows that it is the just and only

11  thing to do is to plead guilty to these charges.

12          THE COURT:  Thank you.

13          And, Ms. Feas, is that your understanding as well?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Ms. Feas, do you have in front of you a

16  copy of your written plea agreement that shows your signature

17  on Page 14 with the date of April 16?

18          THE DEFENDANT:  Yes.

19          THE COURT:  All right.  Did you have the opportunity

20  of reading this agreement and discussing it fully with your

21  attorney before you signed it?

22          THE DEFENDANT:  Yes.

23          THE COURT:  What I am going to do is I'm going to go

24  over this plea agreement with you.  I won't be reading it, but

25  we'll simply go over some of the more essential terms to assure

1     myself that you fully understand it and that your plea is

2     voluntary.

3           I will begin with Paragraph 2, and that paragraph is

4     concerned with how your sentence will be arrived at.

5           After I accept your plea of guilty here this morning,

6     I will order from the court's probation office that a

7     presentence investigation report be prepared.  We will all

8     receive copies of that report prior to your sentencing hearing,

9     and your attorney will have the opportunity of presenting any

10    written objections to the information that is contained within

11    the report.  I will address those objections at your sentencing

12    hearing.

13          One of the sections of the report will address the

14    federal sentencing guidelines.  By applying the guidelines to

15    your offense conduct and based upon your history, we will see a

16    range of sentencing produced from a low to a high end that the

17    guidelines suggest as a reasonable sentence.

18          At your sentencing hearing, I will orally announce

19    what I believe is your applicable guideline range and it may be

20    different from what we first see in the presentence report.

21          After I identify the advisory sentencing guideline

22    range, I go on to consider and apply other statutory criteria.

23    So at the end of this process, the sentence that I impose may

24    end up being higher than or lower than the sentence produced

25    under the guidelines.

1    I have the authority to sentence you up to the

2    statutory maximum on these offenses, and you may not withdraw

3    your plea of guilty as a result of a sentence imposed.

4    Do you understand and agree?

5    THE DEFENDANT:  Yes, I do.

6    THE COURT:  In Paragraph 3, you are informed that the

7    maximum possible sentence you may receive on each of these

8    counts is ten years' imprisonment as well as supervised

9    released of up to three years and a fine of up to the greater

10    or $250,000 or twice the pecuniary gain or loss resulting from

11    your offense conduct.

12    Do you understand and agree?

13    THE DEFENDANT:  Yes.

14    THE COURT:  In Paragraph 5, as a result of your plea,

15    you will be excluded from Medicare, Medicaid and all federal

16    health care programs and you agree to execute all necessary

17    documents to effectuate this exclusion given 60 days of

18    receiving the documents.

19    Do you understand and agree?

20    THE DEFENDANT:  Yes.

21    THE COURT:  In Paragraph 7, you are agreeing to

22    cooperate with law enforcement.

23    In Paragraph 8, you are agreeing to provide a complete

24    and accurate personal financial statement.

25    And in Paragraph 9, provided that you commit no new

1    offenses and that you continue to demonstrate an affirmative

2    recognition and acceptance of personal responsibility for your

3    conduct, the government will recommend at sentencing that you

4    receive a three-level reduction for your acceptance of

5    responsibility.  There are three conditions outlined in

6    Paragraph 9 that you must satisfy in order for the government

7    to make that recommendation.

8            Do you understand and agree?

9            THE DEFENDANT:  Yes.

10           THE COURT:  In Paragraph 11, the U.S. reserves the

11   right to evaluate your cooperation.  And if it was of such

12   quality and significance to the investigation of other criminal

13   matters as to warrant a downward departure from the sentence

14   advised by the guidelines, then the U.S. may file a motion

15   before you are sentenced at the time of your sentencing or even

16   after you have been sentenced advising me of your assistance

17   and recommending a sentence reduction.

18           And under Paragraph 12, you are informed that I am

19   under no obligation to grant such a motion if it, in fact, is

20   filed.

21           Do you understand and agree?

22           THE DEFENDANT:  Yes, I do.

23           THE COURT:  In Paragraph 13, you agree that the

24   following facts are true:  First, that your participation in

25   the conspiracy to defraud a government health care program

1   resulted in a loss of approximately $56,298,900.

2           Next, that the scheme involved sophisticated means.

3           Next, that you were a manager or supervisor but not a

4   leader or organizer of criminal activity that involved five or

5   more participants and was otherwise extensive.

6           Do you understand and agree?

7           THE DEFENDANT:  Yes.

8           THE COURT:  In Paragraph 14, you and the government

9   will recommend that I impose a sentence within the advisory

10  sentencing guideline range produced by application of the

11  sentencing guidelines.  You will jointly recommend that I

12  neither depart upward nor downward under the guidelines when

13  determining your advisory range in the case and that there are

14  no factors or circumstances that would suggest that propriety

15  of my granting any variance.

16          Furthermore, at the time of sentencing, the government

17  will recommend to me that I sentence you at the low end of your

18  applicable guideline range.

19          Do you understand and agree?

20          THE DEFENDANT:  Yes, I do.

21          THE COURT:  In Paragraph 15, you and the government

22  agree that under the guidelines, the base offense level is a

23  Level 6, that that level is increased by 24 levels because the

24  actual or intended loss was approximately $56,298,900.  The

25  figure represents the fraudulent billings for health care items

1    and services that were submitted to the Medicare program by

2    Health Care Solutions Network in the states of Florida and

3    North Carolina during your employment there; that your offense

4    level should be increased by two levels because the offense

5    involves sophisticated means; that the offense level should

6    then be increased by three levels because you were a manager or

7    supervisor and the criminal activity involved five or more

8    participants and was otherwise extensive.

9            You and the government reserve the right to argue at

10   sentencing whether your offense level should be increased by

11   another two levels because the offense involved an abuse of

12   trust.  Should I find that the offense involved an abuse of

13   trust, then the offense level would be increased by two.

14           With these agreements, your total unadjusted offense

15   level will be either a 35 or a 37, less 3 for your acceptance

16   of responsibility, means that your total adjusted offense level

17   will be either a 32 or a 34.

18           Do you understand and agree?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Paragraph 20, your sentence has not yet

21   been determined by the Court.  Any estimate of a likely

22   sentence or sentencing range that you may have discussed with

23   your attorney or with others is only a prediction.  There are

24   no promises made to you with regard to a sentence.  I don't

25   have to follow any sentencing recommendation that you and/or

1    the government may make to me.  And should that occur, you may

2    not withdraw your plea of guilty.

3         Do you understand and agree?

4         THE DEFENDANT:  Yes, I do.

5         THE COURT:  In Paragraph 21, you are informed that you

6    have the right to appeal your sentence.  But in exchange for

7    the agreement that you have negotiated with the government, you

8    are waiving your right to appeal your sentence until it exceeds

9    the statutory maximum or is the result of an upward departure

10   or variance from the guideline range that I establish at

11   sentencing.

12        Nothing in the agreement affects the government's

13   right to appeal.  If the government does file a notice of

14   appeal, then you are released from your waiver of appellate

15   rights.

16        You have discussed this appellate waiver provision

17   with your attorney and you are waiving your right to appeal

18   your sentence knowingly and voluntarily.

19        Do you understand and agree?

20        THE DEFENDANT:  Yes, I do.

21        THE COURT:  Ms. Feas, has anyone made to you any

22   promises or assurances other than those promises contained in

23   this written plea agreement to get you to plead guilty?

24        THE DEFENDANT:  No.

25        THE COURT:  Is anyone putting pressure upon you,

1    forcing you or coercing you to plead guilty and agree to these

2    terms?

3              THE DEFENDANT:  No.

4              THE COURT:  Are you pleading guilty to Counts 1 and 7

5    of the superseding indictment because, in fact, you are guilty

6    as charged?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you understand that the offenses to

9    which you plead guilty are felony offenses?  When I accept your

10   plea of guilty, I will adjudicate you guilty.  And as a result,

11   you will suffer the loss of valuable civil liberties.  These

12   include the right to vote, the right to hold office, the right

13   to serve on a jury, the right to possess firearms, and if you

14   are mistaken and you are not a citizen of the United States, it

15   may be used against you to deport you to your native country.

16             Do you understand?

17             THE DEFENDANT:  Yes, I do.

18             THE COURT:  Ms. Feas, I am going to go over with you

19   at this time the constitutional rights that you give up by

20   pleading guilty.  Do you understand that if this case had

21   proceeded to a trial, you would have had the right to be

22   represented by an attorney, the government would be required to

23   bring witnesses to court who would testify in your presence,

24   you would have the right to confront those witnesses and have

25   your attorney cross-examine them, you would have the right to

1    bring witnesses of your own to testify in your defense.  And if

2    those witnesses did not wish to come to court, you could use

3    the Court's compulsory process to get them here.

4           You would have the right to testify and have your

5    testimony be considered like that of any other witness in the

6    case, or you could elect to remain silent.  And if you did so,

7    that could not be used against you in any way.

8           You would be entitled to the presumption of innocence.

9    The government would have to prove the charges against you

10    beyond and to the exclusion of every reasonable doubt, and that

11    is the highest burden of proof that we have in our system of

12    laws.

13           Your case would be tried to a jury consisting of 12

14    members whom you and the government would select.  And if you

15    lost at trial, you would have the right to take an appeal.

16           Do you understand by pleading guilty, you are giving

17    up all of these rights that we associate with trial as well as

18    with appeal?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Ms. Feas, do you have in front of you a

21    document entitled "Agreed Factual Basis For Guilty Plea" that

22    shows your signature on Page 2?

23           THE DEFENDANT:  Yes.

24           THE COURT:  And did you have the opportunity of

25    reading this and discussing it fully with your attorney before

1 you signed it?

2           THE DEFENDANT:  Yes.

3           THE COURT:  So you agree that if this case had gone to

4 trial, the government would be able to prove beyond a

5 reasonable doubt that beginning in November 2004 through

6 February 2011 in Miami-Dade County, Florida, and Henderson

7 County, North Carolina, you knowingly and willfully conspired

8 with others to commit health care fraud; you knowingly and

9 willfully executed and attempted to execute a scheme to defraud

10 Medicare, a health care benefit program effecting commerce; and

11 you obtained by materially false and fraudulent representations

12 money and property owned by and under the custody and control

13 of that health care program.

14           In Florida, Health Care Solutions Network operated

15 community mental health centers at 19355 South Dixie Highway in

16 Miami, 10406 Southwest 186th Terrace in Miami, and

17 13155 Southwest 134th Street in Miami.

18           In North Carolina, Health Care Solutions Network,

19 Inc., of North Carolina operated a community mental health

20 Center at 170 Old Naples Road in Hendersonville, North

21 Carolina.

22           Both HCSN Florida and HCSN North Carolina purported to

23 provide partial hospitalization program services to individuals

24 suffering from mental illness.  But in reality, a majority of

25 the patients attending HCSN at each of the three locations did

1    not qualify for PHP treatment.

2            Is it three locations, Mr. Medina, or four?

3            MR. MEDINA:  It's four, Your Honor, including North

4    Carolina.

5            MR. EGLESTON:  It's three in Miami, Your Honor.

6            THE COURT:  Right.

7            MR. EGLESTON:  And then there is one in North

8    Carolina.

9            THE COURT:  You worked at HCSN Florida as a clinical

10   director of the partial hospitalization program.  In your

11   capacity as clinical director, you oversaw the clinical program

12   and supervised therapists and other HCSN Florida personnel.

13   You also conducted group therapy sessions when therapists were

14   absent.

15           During the conspiracy, you were a licensed clinical

16   psychologist and mental health counselor in Florida and North

17   Carolina.  You submitted claims to Medicare for individual

18   therapy that you purportedly provided to HCSN Florida patients

19   using your personal Medicare provider number knowing that HCSN

20   Florida was simultaneously billing the same patients for PHP

21   services.  You continued to bill Medicare under your personal

22   provider number while HCSN North Carolina simultaneously

23   submitted false and fraudulent PHP claims.

24           At HCSN Florida, you were aware that Armando Gonzalez

25   and others were paying illegal kickbacks to owners and

1  operators of assisted living facilities in exchange for

2  referring patients to that partial hospitalization program.

3  You knew that many of the ALF referrals were ineligible for

4  partial hospitalization payment services because many of the

5  patients suffered from mental retardation, dementia and

6  Alzheimer's.

7          During your employment, you were aware that HCSN

8  Florida personnel were fabricating patient medical records.

9  Many of the medical records were created weeks or months after

10 the patients were admitted for purported PHP treatment and were

11 utilized to support false and fraudulent billing to

12 government-sponsored health care benefit programs, including

13 Medicare and Florida Medicaid.

14         During your employment at HCSN Florida, you signed

15 fabricated PHP therapy notes and other medical records used to

16 support false claims to government-sponsored health care

17 programs.

18         At HCSN North Carolina, you were aware that your

19 coconspirators were fabricating medical records to support the

20 fraudulent claims you were causing to be submitted to Medicare.

21 You were aware that a majority of the fabricated notes were

22 created at the HCSN Florida's facility for patients admitted

23 into the partial hospitalization North Carolina program.  In

24 some instances, you signed therapy notes and other medical

25 records, even though you never provided services at North

1   Carolina partial hospitalization program.

2           During your employment at HCSN North Carolina, you and

3   your coconspirators submitted approximately $56,298,900 in

4   false and fraudulent claims to the Medicare and Florida

5   Medicaid programs.

6           Ms. Feas, are all of these facts true and correct?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Mr. Egleston, are you satisfied that your

9   client understands her rights, what she's giving up today and

10  that there's been a sufficient factual basis for her plea of

11  guilty?

12          MR. EGLESTON:  I do.

13          THE COURT:  Ms. Feas, how do you plead now to Counts 1

14  and 7 of the superseding indictment; guilty or not guilty?

15          THE DEFENDANT:  Guilty.

16          THE COURT:  It is the finding of the Court that the

17  defendant, Alina Feas, is fully competent and capable of

18  entering an informed plea; that she is aware of the nature of

19  the charges and the consequences of her plea based upon her

20  conversations with her attorney and the colloquy before the

21  Court; that the plea of guilty is a knowing and voluntary plea

22  supported by an independent basis in fact containing each of

23  the essential elements of the offenses and that the agreement

24  presented to the Court was voluntarily entered into and is not

25  the result of force, threats or coercion.

1          I also find the defendant has entered her plea with

2     the advice and the assistance of effective and competent

3     counsel.

4          Your plea is, therefore, accepted.  You are now

5     adjudged guilty.

6          And I will have you back in court for your sentencing

7     hearing on Tuesday, July 16 at 9 a.m.

8          Is there anything additional?

9          MR. EGLESTON:  Nothing, further, Your Honor.  Thank

10    you.

11         MR. MEDINA:  Nothing, Your Honor.  Thank you.

12         THE COURT:  Thank you.  You all have a good day.

13      (The proceedings concluded at 9:55 a.m.)

14

15                    C E R T I F I C A T E

16

17       I hereby certify that the foregoing is an

18    accurate transcription of the proceedings in the

19    above-entitled matter.

20

21    _01/03/14__

22      DATE                STEPHANIE A. McCARN, RPR
                            Official United States Court Reporter
23                          400 North Miami Avenue, Twelfth Floor
                            Miami, Florida 33128
24                          (305) 523-5518

25

**From:**       Samuel Rabin <sjr@miamilawyer.com>
**Sent:**       Tuesday, November 18, 2014 12:55 PM
**To:**         Goodyear, Justin
**Cc:**         Medina, Allan; Stewart, Brendan; RICK@rphermida.com; Andrea Lopez;
                albert@albertlevinlaw.com; rpjrlaw@msn.com; juangonzalezlaw@aol.com;
                frank@frankprietolaw.com
**Subject:**    Re: Alina Feas


I will be there.

Samuel J. Rabin Jr., P. A.
800 Brickell Avenue - Suite 1400
Miami, FL 33131-2971
Phone: 305.358.1064
Fax: 305.372.1644
Email: sjr@miamilawyer.com
Website: http://miamilawyer.com

The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.  To reply to us directly, please send an email to sjr@miamilawyer.com.

[This message is from my mobile device.]

On Nov 18, 2014, at 12:40 PM, Goodyear, Justin <Justin.Goodyear@usdoj.gov> wrote:

Sam:

This is to inform you that based on the email chain you provided to us just before the lunch break, we anticipate a substantial likelihood of needing to call you as a witness at the evidentiary hearing.

-Justin

> On Nov 17, 2014, at 8:29 PM, "Samuel Rabin" <sjr@miamilawyer.com> wrote:
>
> I concluded that judicial attention was warranted in my first email.  I was giving you the opportunity to moot the issue in my second email because I would have hoped that upon reflection, you would have concluded that you acted imprudently, improperly, contemptuously and potentially illegally.
>
> Samuel J. Rabin Jr., P. A.
> 800 Brickell Avenue - Suite 1400
> Miami, FL 33131-2971
> Phone: 305.358.1064
> Fax: 305.372.1644
> Email: sjr@miamilawyer.com
> Website: http://miamilawyer.com

1                                    Exhibit "B"

>
> The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.  To reply to us directly, please send us an email to sjr@miamilawyer.com.
>
> -----Original Message-----
> From: Medina, Allan [mailto:Allan.Medina@usdoj.gov]
> Sent: Monday, November 17, 2014 8:25 PM
> To: Samuel Rabin
> Cc: Goodyear, Justin; Stewart, Brendan; RICK@rphermida.com; Andrea Lopez; albert@albertlevinlaw.com; rpjrlaw@msn.com; juangonzalezlaw@aol.com; frank@frankprietolaw.com
> Subject: Re: Alina Feas
>
> Sam-
>
> If you conclude this issue is necessary to bring up to the Court tomorrow, we will respond in front of the judge.
>
> Allan J. Medina
> Trial Attorney
> U.S. Department of Justice
> Criminal Division, Fraud Section
> (202) 257-6537
>
> On Nov 17, 2014, at 6:59 PM, Samuel Rabin <sjr@miamilawyer.com<mailto:sjr@miamilawyer.com>> wrote:
>
> Mr. Medina,
> Through my quick research,  I have located case law that makes it clear that prosecutors cannot threaten defense witnesses with prosecution because they are expected to testify on behalf of a defendant.  I am requesting that you immediately contact Mr. Weintraub  and advise him that your call to him was misguided and you should not have called him and threatened Ms. Feas with any retribution should she testify.  After you have done so, kindly advise me that you have made the call in an attempt to ameliorate the harm done by your first call.  Once you have done so, I will reconsider my intention to bring this matter to the attention of the Court tomorrow morning.  Please govern your actions accordingly Sam Rabin
>
> Samuel J. Rabin Jr., P. A.
> 800 Brickell Avenue - Suite № 1400
> Miami, FL 33131-2971
> Phone: 305.358.1064
> Fax: 305.372.1644
> Email: sjr@miamilawyer.com<mailto:sjr@miamilawyer.com>
> Website: http://MiamiLawyer.com
>
> The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.  To reply to us directly, please send us an email to sjr@miamilawyer.com<mailto:sjr@miamilawyer.com>.
>
> From: Samuel Rabin
> Sent: Monday, November 17, 2014 6:24 PM

> To: Medina, Allan
> Cc: 'Goodyear, Justin'; Stewart, Brendan; RICK@rphermida.com<mailto:RICK@rphermida.com>; Andrea Lopez;
albert@albertlevinlaw.com<mailto:albert@albertlevinlaw.com>; rpjrlaw@msn.com<mailto:rpjrlaw@msn.com>;
juangonzalezlaw@aol.com<mailto:juangonzalezlaw@aol.com>;
frank@frankprietolaw.com<mailto:frank@frankprietolaw.com>
> Subject: Alina Feas
>
> Mr. Medina,
> This afternoon I advised you and shortly thereafter, Judge Scola that Alina Feas would be my first witness.  I was
disappointed to learn that as soon as court was recessed for the day you wasted no time in contacting her counsel and
threatening to charge her with perjury should she testify.  I consider your threats to Ms. Feas (through her counsel) to be
contempt of court, or worse, obstruction of justice.  Please be advised that I plan to bring this matter before the Court
tomorrow morning so you can explain why you attempted to intimidate a defense witness and prevent her from
testifying.
> Sam Rabin
>
> Samuel J. Rabin Jr., P. A.
> 800 Brickell Avenue - Suite № 1400
> Miami, FL 33131-2971
> Phone: 305.358.1064
> Fax: 305.372.1644
> Email: sjr@miamilawyer.com<mailto:sjr@miamilawyer.com>
> Website: http://MiamiLawyer.com
>
> The information contained in this transmission may contain privileged and confidential information.  It is intended only
for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review,
dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended
recipient, please contact the sender by reply email and destroy all copies of the original message.  To reply to us directly,
please send us an email to sjr@miamilawyer.com<mailto:sjr@miamilawyer.com>.
>

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
                        MIAMI DIVISION
                  CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,              NOVEMBER 18, 2014
                                       9:05 A.M.
                  Plaintiff,


         vs.


ROGER ROUSSEAU, et al.,

                  Defendants.      PAGES 2245 THROUGH 2483
```

---

```
                         DAY 10
                   CRIMINAL JURY TRIAL
        BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:    Mr. Allan J. Medina, AUSA
                      Mr. A. Brendan Stewart, AUSA
                      Mr. Justin Goodyear, AUSA
                      U.S. DEPARTMENT OF JUSTICE
                      Criminal Division
                      Fraud Section
                      1400 New York Avenue NW
                      Washington, DC 20530


FOR THE DEFENDANT:    Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)      LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                      800 Brickell Avenue
                      Suite 1400
                      Miami, Florida  33131


FOR THE DEFENDANT:    Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)      LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                      1221 Brickell Avenue # 900
                      Miami, Florida  33131
```

Exhibit "C"

```
APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138
```

```
 1                   I  N  D  E  X

 2    Certificate ------------------------------------- 2483

 3
      HEARING RE: ALINA FEAS' TESTIMONY                 2249
 4
      HEARING RE: ALINA FEAS' TESTIMONY                 2477
 5
      HEARING RE: ALINA FONTS' PASSPORT                 2480
 6

 7                   W I T N E S S
      ON BEHALF OF THE GOVERNMENT:                      PAGE
 8    TERENCE REILLY
      CONT'D CROSS-EXAMINATION BY MR. PRIETO            2251
 9    CROSS-EXAMINATION BY MR. GONZALEZ                 2263
      CROSS-EXAMINATION BY MR. LEVIN                    2275
10    REDIRECT EXAMINATION BY MR. MEDINA                2290

11
      SARAH DA SILVA KELLER
12    DIRECT EXAMINATION BY MR. STEWART                 2292
      CROSS-EXAMINATION BY MR. RABIN                    2325
13    CROSS-EXAMINATION BY MR. HERMIDA                  2330
      CROSS-EXAMINATION BY MR. PRIETO                   2332
14    CROSS-EXAMINATION BY MR. GONZALEZ                 2333
      CROSS-EXAMINATION BY MR. LEVIN                    2338
15

16    SAMUEL J. RABIN, JR. (Outside Jury's Presence)
      DIRECT EXAMINATION BY MR. GOODYEAR                2419
17    CROSS-EXAMINATION BY MS. LOPEZ                    2422

18
      GOVERNMENT RESTS                                  2389
19

20                   W I T N E S S
21    ON BEHALF OF DEFENDANT CRABTREE:                  PAGE
      MARJORIE DEZA
22    DIRECT EXAMINATION BY MR. PALOMINO                2393
      CROSS-EXAMINATION BY MR. STEWART                  2397
23

24    MOTIONS AT THE CLOSE OF THE GOVERNMENT'S CASE IN CHIEF  2399

25              (Index continues on next page)
```

```
 1                        I  N  D  E  X

 2
                         W I T N E S S
 3     ON BEHALF OF DEFENDANT ROUSSEAU:                  PAGE
       ALLAN J. MEDINA (Outside Jury's Presence)
 4     DIRECT EXAMINATION BY MR. RABIN                   2424

 5
       BENSON WEINTRAUB (Outside Jury's Presence)
 6     DIRECT EXAMINATION BY MR. RABIN                   2434
       CROSS-EXAMINATION BY MR. GOODYEAR                 2442
 7     REDIRECT EXAMINATION BY MR. RABIN                 2445
       RECROSS-EXAMINATION BY MR. GOODYEAR               2447
 8
 9     ALINA FEAS
       DIRECT EXAMINATION BY MR. RABIN                   2452
10     CROSS-EXAMINATION BY MR. GOODYEAR                 2458
       REDIRECT EXAMINATION BY MR. RABIN                 2474
11     EXAMINATION BY THE COURT                          2475

12
13                      E X H I B I T S
       COURT EX. NO.:                          OFFERED ADMITTED
14     2  -                                      2451    2452
       3  -                                      2452    2452
15
16
17                      E X H I B I T S
       GOVERNMENT EX. NO.:                      OFFERED ADMITTED
18     188 -                                      2304    2305
19
20                      E X H I B I T S
       DEFENDANT RUIZ EX. NO.:                  OFFERED ADMITTED
21     1-J -                                      2358    2358
       1-K -                                      2359    2359
22     1-O -                                      2339    2339
       1-R -                                      2382    2382
23     1-S -                                      2382    2382
       1-T -                                      2382    2382
24     1-U -                                      2382    2382
       1-V -                                      2353    2353
25     1-W -                                      2361    2361
```

1    (No Jury, Counsel and Defendants Present, 9:05 a.m.)

2         THE COURT:  All right.  Good morning, everyone.

3    Welcome and please be seated.

4         Yes.

5         MR. RABIN:  Judge, yesterday I had advised the Court

6    and your deputy that I was going to be calling Alina Feas as my

7    first witness.  Alina Feas is a cooperating witness with the

8    government who the government has previously essentially

9    accused of not being truthful, threatened her, refused to file

10   a Rule 35, and then when she filed a 2255 in an attempt to

11   withdraw her plea, threatened her again.

12        She's been listed as a defense witness since you've

13   ordered a defense witness list to be disclosed.  Yesterday, I

14   believe, was the first time the government thought for real

15   that I was going to be calling her when they heard that I had

16   requested that she be ordered up.  Between 5:30, when we left

17   court, and 6 o'clock, the prosecutor in this case contacted

18   Ms. Feas's lawyer and again threatened her, and essentially

19   said that if she doesn't -- if she testifies, she could be

20   facing perjury.

21        THE COURT:  If she testifies falsely.

22        MR. RABIN:  Judge, I'm just -- I'm telling you

23   essentially -- and I don't want to get into the facts, because

24   quite frankly --

25        THE COURT:  Okay.  So what do you want me to do?

1          MR. RABIN:  Well, what I want you to do, Judge, I now

2    have a witness who is refusing to testify.  She is my defense,

3    okay?

4          THE COURT:  Okay.

5          MR. RABIN:  And I have plenty of case law that

6    provides the Court with remedies here, but first, you need to

7    have an evidentiary hearing to establish the facts.  I have

8    Ms. Feas's lawyer here.  Ms. Feas is in the back in the lockup.

9          THE COURT:  Okay.  We'll do it later.  We're in the

10   middle of a cross-examination.

11         MR. RABIN:  Well, Judge, but --

12         THE COURT:  Let's go.  Bring in the jury.

13         I'll give you the hearing.  We're not making all the

14   jurors wait right now.

15         MR. RABIN:  I understand that, but it does impact

16   before the next witness testifies, because it impacts how I

17   cross her if this witness is going to testify or not.

18         THE COURT:  I disagree.  Let's go.

19      (Jury Present.)

20         THE COURT:  All right.  Good morning, everyone.

21   Welcome back and please be seated.

22         All right.  We'll pick up where we left off last

23   evening.

24         And Agent, you're still under oath.

25         THE WITNESS:  Yes, sir.

2251

1      MR. PRIETO:  May I query the witness, Judge?

2      THE COURT:  I'm sorry?

3      MR. PRIETO:  May I query the witness?

4      THE COURT:  Yes, sir.

5      MR. PRIETO:  Thank you.

6           Good morning, ladies and gentlemen of the jury.

7           May it please the Court.

8      TERENCE REILLY, GOVERNMENT WITNESS, SWORN PREVIOUSLY

9                CROSS-EXAMINATION (Continuing)

10     BY MR. PRIETO:

11     Q.  Good morning, Agent Reilly.

12     A.  Good morning.

13     Q.  I believe where we left off yesterday I had kind of slapped

14     some documents for you to look at.  But is it fair to say those

15     documents reflected the payments made by HCSN to Ms. Marks?

16     A.  That's correct.

17     Q.  Okay.  And just to recap, is it fair for me to say, based

18     upon your review of all of the banking records, that those

19     checks would reflect a payment to Ms. Marks for a certain

20     number of group therapy sessions provided at a certain rate?

21     A.  Yes, sir.

22     Q.  Okay.

23          MR. PRIETO:  If we could get the ELMO on?

24          THE COURT:  Is this in evidence?

25          MR. PRIETO:  It is not, Judge. It is just a

1    demonstrative aid for the use of the witness.  It's not going

2    to be admitted into evidence, but it is a summary of the bank

3    records.

4    BY MR. PRIETO:

5    Q.  Just for an example, and I'm just picking, while I have it

6    handy there, was 2009, and this is the math that we did, and

7    just we'll go -- use the first entry there.  From 1-3 to 1-16,

8    we had also a total number of days worked, but we have 30 group

9    sessions at the rate at that time was $75 per hour, total paid

10   2425.  So 30 times 75 would equal the 2425.

11   A.  Correct.

12   Q.  And that was the amount of the check that we correlated for

13   that pay period.

14   A.  I agree with that.

15   Q.  Okay.  So basically the math for the paychecks jibes with a

16   number of therapy sessions for a pay rate which I believe

17   fluctuated between 65 to 85 over the years.

18   A.  That's correct.

19   Q.  Okay.  Now, as part of your analysis, I think Mr. Hermida

20   touched on it, but you didn't do any kind of demographic study

21   or demographic analysis of what a standard psychotherapist

22   providing partial hospitalization program therapy would be paid

23   in the Miami area, correct?

24   A.  No.  I just looked at the Health Care Solutions bank

25   accounts.

2253

1    Q.  Okay.  But it's fair to say in different areas of the

2    country perhaps people are paid at different rates for the same

3    job, right?

4    A.  I would imagine so.

5    Q.  And we had talked a little bit about your background when

6    you were an accountant, I believe.  You know, it wouldn't be

7    uncommon for, let's say, the New York office to get paid more

8    or less than perhaps an office in Wichita, Kansas, for example.

9    A.  That would be correct.

10   Q.  Okay.  And again, the FBI, right, a more senior agent

11   probably gets paid a little bit more versus a less senior

12   agent, correct?

13   A.  That's correct.

14   Q.  And I think you guys work on like GS levels and those go up

15   over the years, over time?

16   A.  Yes.

17   Q.  Okay.  And, you know, I'm sure, you know, administrative

18   assistants, legal -- paralegals that work with you guys

19   probably get paid less than the agents, or more depending on

20   their experience as well?

21   A.  They're on a scale as well, yes.

22   Q.  Okay.  So fair to say the chart that was shown by the

23   government showing, you know, therapists being paid X amount

24   for the years and other staff being paid, it's simply that

25   these people have different positions within a company,

2254

1   correct?

2   A.  Yes.

3   Q.  So just to kind of summarize.  So, you know, all the charts

4   that the government showed, the charts that you worked on, it's

5   a kind of clinical, a cold analysis of bank records, correct?

6   A.  Yes.

7   Q.  Okay.  Now, there was some mention, I believe -- and I

8   believe it's in your 302 that you authored, okay? -- that there

9   was a statement that Ms. Marks recognized some patients from

10  her other job and at -- from HCSN, correct?

11  A.  Correct.

12  Q.  Okay.  And were able to verify that she, in fact, did also

13  substance abuse at this other -- at ATC, which is the other

14  company.

15  A.  That was my understanding.

16  Q.  Okay.  So it's not indicated or was never investigated

17  whether or not she recognized patients that may have been

18  perhaps in the substance abuse program that were also receiving

19  partial hospitalization at HCSN, correct?

20  A.  Simply that she recognized patients at both places.

21  Q.  Correct.  And speaking of that, it wouldn't be illegal if a

22  person enrolled in a partial hospitalization program at perhaps

23  a hospital then switches and would receive partial

24  hospitalization treatment at another location after they've

25  finished their cycle there, right?

1    A.   Well, they would have to have an acute episode happen for

2    them to be readmitted into another --

3    Q.   Right.

4    A.   -- partial hospitalization program.

5    Q.   Assuming they qualify -- let me -- let me say that.

6    Assuming they qualify for services, right, they could go from

7    one --

8            MR. MEDINA:  Objection, speculation.

9            THE COURT:  I don't know what the question is.

10    BY MR. PRIETO:

11    Q.   Assuming a patient qualified, because I think that was your

12    problem with my questioning, assuming they qualified for

13    services, right, there's nothing wrong with a patient going

14    from Larkin Hospital to Baptist Hospital to receive partial

15    hospitalization treatment, correct?

16            MR. MEDINA:  Objection, speculation, lacks personal

17    knowledge.

18            THE COURT:  I'm sure he's well able to tell us whether

19    he's able to answer the question or not.  If you can answer the

20    question, tell us the answer.  If you don't know the answer,

21    tell us that you don't know.

22    A.   So the question is if a patient was at a PHP in one

23    program, could they be readmitted into another PHP?

24    BY MR. PRIETO:

25    Q.   Correct.

2256

1   A.  Yes.

2   Q.  Correct.  There's nothing wrong with that.

3   A.  Well, under the circumstances, if they qualify.

4   Q.  If they qualify, right?  And it's not the judgment call of

5   the therapist to determine if a patient qualifies, correct?

6   A.  No, that would be the psychiatrist.

7   Q.  Just going back, substance abuse programs, they're --

8   generally they're not Medicaid and Medicare programs, correct?

9   A.  I'm not sure if they're Medicaid.  They're definitely not

10  Medicare, though.

11  Q.  Okay.  And your investigation didn't reveal whether or not

12  Ms. Marks was aware of her -- of whether her patients were

13  Medicare, Medicaid, privately insured?

14  A.  That's correct.

15  Q.  So she -- you don't know if she was aware or not, right?

16  A.  I do not.

17  Q.  Now, there's some -- now, I believe some of Ms. Marks'

18  checks are actually made out to a company that she formed,

19  correct?

20  A.  Yes, Mental Health Solutions.

21  Q.  And, you know, being a, quote-unquote, independent

22  contractor, there's nothing wrong with a person forming their

23  own company to provide services to different health care

24  providers, correct?

25  A.  No.  That's correct.

1    Q.   Okay.  In fact, it kind of makes sense -- and you have an

2    accounting background, it may make sense tax-wise to do

3    something like that, correct?

4    A.   Yes, does.

5    Q.   They can actually -- at that point you can probably deduct

6    certain things that you couldn't deduct as an employee.

7    A.   Write off business expenses.

8    Q.   Right.  But the downside would probably be, especially

9    today, is the cost of private health care.  It's pretty

10   expensive, right?

11   A.   Yes, it is.

12   Q.   Okay.  So a person that has their own company probably has

13   to buy their own health care, right?

14   A.   Yeah, unless their husband or someone else provides the

15   health care for them.

16   Q.   Right.  So it's -- you know, it's a cost benefit analysis

17   basically of figuring out whether it would be beneficial for

18   one to have their own company, right?

19   A.   Yes.  But Health Care Solutions didn't -- to my

20   understanding didn't provide health benefits to anyone whether

21   they were a contractor or not.

22          MR. PRIETO:  Okay.  One moment.  This has been

23   admitted into evidence.  These are the actual bank records from

24   HCSN.  I'll give the jury a Bates stamp number.

25          THE COURT:  What exhibit are they in?

1          MR. PRIETO:  Government's Exhibit -- the bank records?

2          MS. ZAFERIS:  Which account?

3          MR. PRIETO:  HCSN 2009.

4    A.  It's probably 5171.

5          (Off-the-record discussion.)

6          MR. PRIETO:  I believe it was Exhibit 5171.

7          MS. ZAFERIS:  No, it's Exhibit 14.  The account is

8    5171.

9          MR. PRIETO:  I'm sorry, Exhibit 14, 5171, okay.

10   BY MR. PRIETO:

11   Q.  And just -- I can't even see.  I'm getting old.  Okay.

12   Going to have to zoom in here.  Okay.  We're looking here at it

13   appears to be Check 4397, and this is a check, I believe it's

14   1-9-09, but it's 2009, and it is made out to Mental Health

15   Solutions, correct?

16   A.  That's correct.

17   Q.  I'll try to zoom in a little more.

18       Okay.  And that's the company Ms. Marks has, right?

19   A.  Yes, sir.

20   Q.  Okay.  And that amount -- you know what, I can't even read

21   the amount.  It looks like $1,800 to me?

22   A.  Yeah.  If you look underneath it, it's got the amount.

23   Q.  Oh, excellent.  So specifically in the memo section, right,

24   it has a pay period, correct?

25   A.  Yes.

1   Q.  And there's no indication of a, quote-unquote, "notes"

2   here, is there?

3   A.  No.

4   Q.  Okay.  And rather than go through one by one, every single

5   one, is it fair to say that a review of every single check paid

6   to her reflects a pay period, never an indication of "notes,"

7   correct?

8   A.  That's correct.

9   Q.  Okay.  Finally, as part of your investigation, you

10  indicated that you seized a bunch of -- a warehouse full of

11  boxes, right --

12  A.  Yes, sir.

13  Q.  -- in there?  Now, amongst all those materials that were

14  seized, we're talking -- I mean, we're talking a lot of

15  records, correct?

16  A.  That's correct.

17  Q.  Okay.  And in there, for example, there's like employee

18  manuals?  There was insurance binders for all of the vehicles

19  that were owned by HCSN that picked up patients, correct?

20  A.  That's correct.

21  Q.  There were phone bills, correct?

22  A.  I believe so.

23  Q.  There were patient lists, patient medical records, clearly;

24  a whole bunch of them, right?

25  A.  Yes, sir.

1   Q.   There was invoicing for services provided to HCSN, like

2   trash services and all these kind of things, contracts?

3   A.   Yes.

4   Q.   There was some office supplies, I'm assuming?

5   A.   I'm not sure if there was office supplies in there, but --

6   Q.   Okay.  Well, there were -- let's say there were bills for

7   their computer services?

8   A.   Oh, yeah.

9   Q.   Did you see some of those?

10  A.   Yeah.

11  Q.   Alarm company contracts?

12  A.   Company contracts?

13  Q.   Correct.

14  A.   Yeah.

15  Q.   There was a business -- a business licensing from the

16  county, from the state, correct?

17  A.   Yes, that's correct.

18  Q.   Okay.  So, I mean, there was a lot of stuff here that any

19  normal office would have, right?

20  A.   Yes.

21  Q.   Now, of those materials -- again, I think we've gone over

22  it -- but there was no computer forensics done, correct, in

23  this case?

24  A.   Well, just so you understand, Health Care Solutions wasn't

25  raided by the FBI.  We got these files after Health Care

1    Solutions was closed down by Medicare and there was no

2    computers left in -- from the Miami offices.

3    Q.  Okay.  There was some computers from the North Carolina

4    office, though, right?

5    A.  That's correct.

6    Q.  Okay.  So no computer forensics were done there, right?

7    A.  No.  We had examinations of those computers done.

8    Q.  Okay.  And did that reveal anything about how documents

9    were created and where?

10   A.  No, it didn't.

11   Q.  And there was some interchange of documents between North

12   Carolina and Miami, correct?

13   A.  You know, we couldn't find any emails.  Most of the

14   documents were either Fed-Ex'd up or carried by John Thoen.

15   Q.  Okay.  So there was -- basically, you're saying that

16   computer forensics was not able to be done.

17   A.  Computer forensics was done, but not on the group therapy

18   notes --

19   Q.  Okay.

20   A.  -- or the patient file documents.

21   Q.  Didn't review anything.  So basically all you have to rely

22   on is the paper file itself --

23   A.  Yes, sir.

24   Q.  -- right?  And no handwriting analysis was ever done on any

25   of the group therapy notes, correct?

2262

1    A.  That's correct.

2    Q.  No comparison was done between HCSN sign-in logs and the

3    group therapy notes, correct?

4    A.  Sign-in logs for whom?

5    Q.  The patient sign-in logs.

6    A.  Well, I don't think the patient would sign the group

7    therapy note.

8    Q.  No.  I'm asking if there was not a handwriting comparison,

9    but a comparison between actual attendance versus this forged

10   attendance, correct?

11   A.  Well, they billed for everybody, so --

12   Q.  Well, so the answer to my question is?

13   A.  That -- what's the question again?

14   Q.  The question is:  There was no comparison done between the

15   actual attendance versus nonattendance, right?

16   A.  Of the sign-in sheets?

17   Q.  Correct, sir.

18   A.  Yes.

19   Q.  Okay.  And there's no way that you can tell us which

20   patient was actually there and which wasn't, right?

21   A.  That's correct.

22           MR. PRIETO:  I have nothing further.

23           THE COURT:  All right.  Mr. Gonzalez.

24           MR. GONZALEZ:  Yes, Judge, briefly.

25           Good morning, ladies and gentlemen of the jury.  May

1    it please the Court.  Counsel.

2                      CROSS-EXAMINATION

3    BY MR. GONZALEZ:

4    Q.  Special Agent Reilly, good morning, sir.

5    A.  Good morning, sir.

6    Q.  I don't have to introduce myself to you.  You know, we run

7    into each other here every day.

8        Before I get on with my cross, I need to do a little

9    housekeeping with you.  Do you remember when Ruben Busquets

10   testified, you were in court?

11   A.  Yes.

12   Q.  Remember I asked him if he had ever seen Ms. Fonts being

13   fired from HCSN?

14   A.  Yes, I remember your questioning.

15   Q.  Okay.  Did he tell you that he saw her being fired?

16   A.  I believe he raised concern that she was being punished --

17   or going to be terminated because she was pregnant, I believe,

18   but I don't know if she ever got fired.

19   Q.  Okay.  But there's no way we can tell that now, but did he

20   tell you -- did you write in your 302 that he told you he saw

21   Alina Fonts get fired?

22   A.  Can I re -- can I read that?

23   Q.  If I show it to you, do you think that might refresh your

24   recollection?

25   A.  Yeah.  I just want to make sure.

1     MR. GONZALEZ:  Judge, may I approach the witness?

2     THE COURT:  Yes.

3   BY MR. GONZALEZ:

4   Q.  I underlined it for you.

5   A.  I appreciate that.  Okay.

6   Q.  Does that refresh your recollection as to what it was that

7   you wrote?

8   A.  Yes, sir.

9   Q.  Okay.  And you did write that he said he saw her get fired.

10  A.  That's correct.

11  Q.  Now, do you believe that you made a mistake or Mr. Busquets

12  made a mistake?

13  A.  I stand by my report, so I'm not going to say who made a

14  mistake, but that's what he said on that day.

15  Q.  Okay.  All right.  Now, yesterday you went over a number of

16  documents and checks, and I know you're a CPA.  Did they

17  have -- did they have a payroll department at HCSN?

18  A.  Not to my knowledge.

19  Q.  Who would cut the checks?

20  A.  Well, I'm not sure what exactly you're getting into by

21  payroll, but there was a company, a management company, that

22  was run by Armando Gonzalez and it was -- he would write the

23  checks and sign the checks, I believe.

24  Q.  Now, before I go on, yesterday you also testified that

25  Ms. Fonts had a corporation made.  That's not illegal, is it?

1    A.  No, it's not.

2    Q.  And especially in a case like this, where individuals are

3    being paid on a 1099 basis, that wouldn't be unusual, correct?

4    A.  I'd say it's probably more of the norm.

5    Q.  Okay.  More the norm?  All right.  That's because they're

6    not getting, you know, deducted their taxes or the Social

7    Security or anything of that nature, correct?

8    A.  That's correct.

9    Q.  That's what it means when 1099 and -- you know, you're the

10   CPA, so you have to educate me on this -- it means that you're

11   not really an employee, you're like a contractor, so they pay

12   you right off the top and they don't have to do whatever they

13   do, you know, to deduct money for employees and all those types

14   of things, correct?

15   A.  Yeah, you get a 1099 instead of a W-2.

16   Q.  All right.  Now, let me --

17        MR. GONZALEZ:  Judge, do you mind if I approach the --

18   BY MR. GONZALEZ:

19   Q.  And let me show you --

20        THE COURT:  What if I had said no?  You already went

21   over there.

22   BY MR. GONZALEZ:

23   Q.  Let me show you what has been marked as Defense Exhibit A,

24   which is a very helpful chart that we've been able to introduce

25   here.

 1              THE COURT:  Can you move the microphone a little bit

 2    closer to you?

 3              MR. GONZALEZ:  Of course.

 4              THE COURT:  The microphone.  The microphone.

 5              MR. GONZALEZ:  Do you want me to play with this?

 6              THE COURT:  My translator, Mr. Levin, will --

 7              MR. GONZALEZ:  Oh, okay.  Thank you, Judge.  I get

 8    nervous here.  I apologize.

 9    BY MR. GONZALEZ:

10    Q.  Now, over here, this is a chart of the corporate structure,

11    I believe it was 2010.

12    A.  Yes.

13    Q.  All right.  Now, and over here, there's about 27 employees,

14    if I counted correctly.  Would you say that that's fair?

15    A.  I've never counted it, but I'll trust you.

16    Q.  Okay.  Now, and on top of that, it's not completely

17    accurate.  Ms. Fonts isn't on it.  Keller isn't on it.  Haynes

18    isn't on it.  But it's obvious that there was a lot of

19    employees there, correct?

20    A.  Yes.

21              MR. GONZALEZ:  Judge, thank you.

22    BY MR. GONZALEZ:

23    Q.  Now, was there a department in HCSN which kept employment

24    files?

25    A.  I'm not sure if there was a department there.  They did

1   keep employment files.  I don't know who kept custody of those.

2   Q.  Okay.  So you didn't see any documents, papers which said,

3   I don't know, such and such a person has been promoted to head

4   of some department or the other?

5   A.  There was employment files, but there wasn't any letters

6   like of promotion.

7   Q.  Okay.  So when you promoted Ms. Fonts yesterday to clinical

8   director, it wasn't based on any documents that you found.

9   A.  I think what I said was that she was the de facto acting

10  clinical director.

11  Q.  Okay.

12  A.  I didn't promote her.

13  Q.  So it wasn't like she was promoted and nobody told her.

14  You just believe that she was the de facto acting clinical

15  director, based upon what you saw.

16  A.  Based upon the evidence in the case.

17  Q.  All right.  But you didn't see any business cards with her

18  name on it and clinical director on it or any other documents

19  in a corporate file or an employment file that would suggest to

20  you that she was the clinical director, correct?

21  A.  No, nor would I expect to, because she wasn't qualified to

22  be a clinical director.

23  Q.  And these -- HCSN was run in a pretty ragged manner, from

24  what I can tell, if it's correct, correct?

25  A.  Yes.

1    Q.  I mean, you don't have -- obviously you don't have an

2    employment department.  The owner was the one that signed all

3    the checks, correct?

4    A.  Initially, until he moved to North Carolina.

5    Q.  There was other people who signed checks?

6    A.  Yes.  If you move to the top of your chart, there's an

7    administrator named Daryl Corradino.  He also signed checks.

8    Q.  Okay.  Do you know who cut the checks?

9    A.  Well, when Armando Gonzalez moved to North Carolina,

10   Mr. Corradino did.

11   Q.  But he would just sit there, open up a checkbook and start

12   writing out checks essentially to his entire company on a

13   weekly basis or biweekly basis?

14   A.  I don't know how he did it.

15   Q.  You don't know?

16   A.  No.

17   Q.  He's a government witness.  He has a plea agreement,

18   correct?

19   A.  No, he doesn't.

20   Q.  Not Armando Gonzalez?

21   A.  I thought we were talking about Daryl Corradino.

22   Q.  I'm sorry, I'm talking about Armando Gonzalez.  So

23   Mr. Corradino -- I apologize, Corradino also cut some checks?

24   A.  Yeah, from 2010 around to 2011, when Armando Gonzalez was

25   in North Carolina.

1  Q.  All right.  Now, who would prepare those checks, do you

2  know?

3  A.  Armando had a secretary.  Either him or his secretary

4  would.

5  Q.  Okay.  And so -- all right.  Now, were people being paid by

6  the hour?

7  A.  No.

8  Q.  Were they paid by commission?

9  A.  Well, it depends on the -- I don't necessarily know if they

10 were paid by the hour.  I know that the therapists were paid by

11 the group and I'm not sure how the other employees were paid.

12 Q.  So based -- what you've been able to tell is what you were

13 able to put together from looking at checks that had been

14 cashed sometime later, correct?

15 A.  Yes.

16 Q.  You haven't been able to see employment files, you haven't

17 been able to see any type of documentation that would suggest

18 to you how it was that they came to the conclusion as to how

19 much money to give people.

20 A.  There were independent contractor agreements that we did

21 seize and they did have some rates in there, so -- and there

22 were employment files, but as far as indicating what someone's

23 given rate was, those weren't in the files.

24 Q.  Do you remember seeing any of those agreements in relation

25 to Ms. Fonts?

1   A.   I believe so.

2   Q.   Okay.  All right.  Do you remember what the hourly rate was

3   for her?

4   A.   I can't recall.  I know that her biweekly check was usually

5   around $2,000.

6   Q.   Okay.  All right.  And did you -- okay.  So then the only

7   person who would know exactly what these checks were for and

8   how they were paid and what the idea was behind the amount of

9   money it was paying would be Mr. Gonzalez, correct?

10  A.   That's correct.

11  Q.   Okay.  Now, before I finish up --

12        MR. GONZALEZ:  Excuse me, Judge.

13  BY MR. GONZALEZ:

14  Q.   Let me show you what has been marked, I believe, as

15  Government Exhibit 1005?

16        MS. ZAFERIS:  1000.

17  BY MR. GONZALEZ:

18  Q.   1000.

19        MR. GONZALEZ:  Thank you.

20  BY MR. GONZALEZ:

21  Q.   You put this together?

22  A.   Yes, sir.

23  Q.   Okay.  Now, this is a list of people and the amount of

24  money that they -- that they earned over the period that they

25  were at the HCSN; is that correct?

2271

1    A.  Correct.

2    Q.  But this is not a list of everybody that was working at

3    HCSN during the entire period from 2006 to 2012, right?

4    A.  No, it's not.

5    Q.  This is just the people that you either indicted or you

6    arrested or something of that nature, correct?

7    A.  Yes.  Our witnesses as well.

8    Q.  All right.  You didn't put any of the other people in

9    there?  There might be like 30 other people that were being

10   paid salaries.

11   A.  Yes, there were.

12   Q.  Correct?  Now, let me see if I have this straight over

13   here.  Now, you have on the bottom, Sarah Da Silva, correct?

14   Now, she -- she wrote fake notes and prepared false papers for

15   HCSN, did she not?

16   A.  She never wrote any notes.

17   Q.  Pardon me?

18   A.  She never wrote any notes.

19   Q.  Didn't write that?

20   A.  Excuse me?

21   Q.  Okay.  Lisset Palmero wrote fake notes, correct?

22   A.  No, she never wrote fake notes.

23   Q.  Didn't write fake notes?  Okay.  Ruben Busquets said that

24   he wrote fake notes, correct?

25   A.  Yes, he did.

1  Q.  Okay.  Now, he didn't get any checks with notes on it,

2  right?

3  A.  Well --

4  Q.  Yes or no.

5  A.  Let me clarify when -- the question you asked about fake

6  notes.  He created fabricated notes or cloned notes for

7  patients that were supposed to be in his group.  The notes

8  checks were just complete fabrications for people that weren't

9  in anyone's group.

10  Q.  Wondera Eason created notes and files, correct?

11  A.  You're going to have to clarify those questions because

12  there's a big difference between notes and files.

13  Q.  All right.  Alexandra Haynes created notes and files,

14  correct?

15  A.  Yes, she did.

16  Q.  Okay.  There's no checks for her for that -- that says

17  anything about notes or anything of that nature, correct?

18  A.  No, there isn't.

19  Q.  There's none for Ms. Eason either, correct?

20  A.  Well, I just said that you'd have to clarify the question

21  relating to her.  She did not create fake notes.

22  Q.  Well, I think that you know that Ms. Eason helped create

23  fake files for the white group, correct?

24  A.  Yes, that's correct.

25  Q.  Okay.  You have no checks to her that say anything on the

1    memo that would suggest to you anything about notes or charts

2    or anything of that nature, correct?

3    A.  That's correct.

4    Q.  All right.  Layman, he also admitted to writing fake notes,

5    correct?

6    A.  I don't think Tom Layman ever wrote a note.  He signed

7    them, though.

8    Q.  And he didn't get any checks with notes on it either.

9    A.  No, he didn't.

10   Q.  And of course you have John Thoen, and he obviously didn't

11   get any checks with any notes on it either, correct?

12   A.  No, he didn't.

13   Q.  Okay.  All right.  Now, this list that you put together, I

14   see that Ms. Fonts on the bottom here worked from 2007 to 2009,

15   correct?

16   A.  That's correct.

17   Q.  All right.  And you have her total salary down at one

18   thirty-nine five, correct?

19   A.  Correct, yes, sir.

20   Q.  Now, do you know how many hours she was working there?

21   A.  No, I don't.

22   Q.  You don't.  You can't tell because her paperwork is gone,

23   correct?

24   A.  That's correct.

25   Q.  Now, I'm not the smartest man in the world, sir, but I'd

1    like you to take a look at what is a copy of Government

2    Exhibit -- I believe it's 1001 --

3            MR. GONZALEZ:  Thank you.

4    BY MR. GONZALEZ:

5    Q.  -- I want you to take a look at the line -- you prepared

6    this, correct?

7    A.  That's correct.

8    Q.  All right.  Now, like I said, I'm really not up to modern

9    accounting standards, but can you explain to me how you were

10   able to get from two years total 139,000, to one year 71,000?

11   How is it that you were able to divide 139 by two and come up

12   with 71?

13   A.  I'd love to answer that.  First of all, Ms. Fonts only

14   worked three months in 2007, so that wasn't a full year.  She

15   only worked seven months in 2009, so that's, again, not a full

16   year.  So she didn't really work a full year in '07 or '09.  In

17   2008, she made $74,000.  That was her one full year.  So this

18   was an annualized salary comparison.  And in 2009, she made

19   roughly $48,000 in seven months, so this was roughly -- that's

20   how you come up with the numbers.  They don't lie.

21   Q.  You just came up with that number more or less based upon

22   some formula that you came up with?

23   A.  It was based upon her average salary on a biweekly basis.

24           MR. GONZALEZ:  All right.  Thank you, sir.  I don't

25   have any further questions, Judge.

2275

1    THE COURT:  All right.  Mr. Levin.

2        MR. LEVIN:  May it please the Court.

3        Good morning, ladies and gentlemen.

4                    CROSS-EXAMINATION

5    BY MR. LEVIN:

6    Q.  Good morning, Special Agent Reilly.

7    A.  Good morning, sir.

8    Q.  Now, you, along with Special Agent Cox, went to Blanca

9    Ruiz's residence and took a statement from her.  We've heard

10   that already, correct?

11   A.  Yes, sir.

12   Q.  And do you remember what time you got there?

13   A.  It was early in the morning, probably between 7:00 or 8:00.

14   Q.  Okay.  And do you recall that she was also -- had been

15   sleeping as well and probably had been sleeping --

16   A.  Excuse me?

17   Q.  Do you recall that she had probably been sleeping?

18   A.  I don't know if she was sleeping.

19   Q.  You don't know.  She was wearing her pajamas -- her

20   jammies, as Mr. Rabin likes to say?

21   A.  I don't know what she wears to bed.

22   Q.  Sorry?

23   A.  I don't know what she wears to bed.

24   Q.  Did you see her?

25   A.  Yeah.

2276

1    Q.  What was she wearing?

2    A.  I don't recall, but I don't know if she just got out of

3    bed.

4    Q.  Okay.  But what was she wearing?  You don't recall?

5    A.  No, I don't.

6    Q.  Okay.  You didn't make a note of that.

7    A.  No.

8    Q.  You didn't make a note of the fact that you got there at

9    7:00 or 7:30 either, right?

10   A.  No, we did not.

11   Q.  Okay.  So she let you in her house, right?

12   A.  Yes, sir.

13   Q.  And she -- you don't read her her Miranda rights or

14   anything like that.

15   A.  She wasn't under arrest.

16   Q.  Right.  You don't tell her that, you know, you don't have

17   to speak to us, right?  You don't tell her that, right?

18   A.  She was aware the interview was voluntary.

19   Q.  Okay.  And she spoke to you, right?

20   A.  Yes, she did.

21   Q.  And you are the note taker; is that accurate?

22   A.  That's correct, sir.

23   Q.  And you listened to Special Agent Cox's testimony, right?

24   A.  Yes, sir.

25   Q.  You were sitting right over there next to Mr. Stewart?

1   A.   Yes.

2   Q.   And there was an issue with regard to -- let me rephrase

3   the question.

4        Do you remember what you did the rest of that day after you

5   met with her?

6   A.   I wrote the report.

7   Q.   Are you sure you wrote it on the 23rd?

8   A.   Yeah.   I mean, those 302s are -- that's time stamped by the

9   FBI system.   There's no way I could alter that.

10  Q.   Those are time stamped by the FBI?

11  A.   Yes.

12  Q.   Okay.   So you wrote a report, right?

13  A.   Yes, sir.

14  Q.   Okay.   And when you met with Ms. Ruiz, she had no problem

15  telling you that she had opened up a corporation, correct?

16  A.   That's correct.

17  Q.   She had no problem telling you that while working at HCSN,

18  she got paid with checks payable to Blanca Ruiz and the company

19  that she later incorporated, Health Care Professional Services,

20  correct?

21  A.   Yes.

22  Q.   She was -- she told you that, right?   She told you that she

23  had met with her accountant, right?

24  A.   Yes.

25  Q.   She told you that it was -- it was based on advice from her

2278

1  accountant to save her money on her taxes, right?

2  A.  I believe that's correct.

3  Q.  And as an accountant yourself, you would agree with that,

4  would you not?

5  A.  There's benefits to opening up your own corporation.

6  Q.  Right.  A lot of professionals incorporate themselves,

7  correct?

8  A.  That's correct.

9  Q.  Lawyers, right?

10  A.  Yeah, I'm sure they do some sort of limited liability

11  partnership or something like that, but yeah.

12  Q.  Or a professional association?

13  A.  Yeah.

14  Q.  And lawyers sometimes take trade names as well, right?

15  Like The Ticket Clinic, for example.  That's a law firm, right?

16  A.  Correct.

17  Q.  That's an incorporated business entity, right?

18  A.  I've never looked into it.  I'd imagine so.

19  Q.  You've seen their commercials, have you not?

20  A.  Yes, I have.

21  Q.  What about 311-PAIN, you've heard their commercials, have

22  you not?

23  A.  I've heard them on the radio.

24  Q.  Right.  That's a law firm too, right?

25  A.  I imagine so.

2279

1    Q.  So it's not unusual for professional entities to

2    incorporate themselves.

3    A.  That's correct.

4    Q.  So Ms. Ruiz, she forms a corporation, Health Care

5    Professional Services, and when you meet with her, she tells

6    you that, right?

7    A.  Yes.

8    Q.  So yesterday when you're testifying and you're talking

9    about Government's Exhibit 23, which is the account that she

10   opened, you already knew about that, right?

11   A.  When I went to interview her or if I knew about it

12   yesterday?

13   Q.  Well, on May 23rd of 2013 when you interviewed her, she

14   told you that, right?

15   A.  Yes.

16   Q.  And then when you subpoenaed the bank records some months

17   later -- had you subpoenaed them some months later?

18   A.  I think we subpoenaed them before we went to interview her

19   and the return came after.

20   Q.  Okay.  But she told you about that account.

21   A.  I'm not sure -- I think so.

22   Q.  Wait a second.  Did you not just testify that when you

23   spoke to her, she told you about that account?

24   A.  No, I believe you were telling me about -- you asked me if

25   she opened a corporation and I said yes, she talked about the

1    corporation.  I'm not sure if she told me about the account.

2    That was your question.

3    Q.  Okay.  But she told you that she formed the corporation

4    based upon the advice of her CPA?

5    A.  Yeah.  And logically, I would imagine, since we had the

6    checks, that I knew that there was an account in that company's

7    name.

8    Q.  Okay.  So she opened the account at the Sofisa Bank of

9    Florida, right?

10   A.  That's correct.

11   Q.  And she also indicated on Government's Exhibit 23, she gave

12   you the address of 7191 Southwest 8th Street, right?

13   A.  Yep.

14   Q.  Did you ever go to that location?

15   A.  No, I did not.

16   Q.  Did you ever verify that she had had an office there?

17   A.  No, I did not.

18   Q.  Did you know that she was, like, thinking outside the box

19   and trying to better herself towards the future by opening this

20   company?

21   A.  I can't get into her head.

22   Q.  Right.  And so she opens and says that the business says

23   psychotherapist, right?

24   A.  Yes.

25   Q.  As opposed to registered mental health counselor intern?

1    A.  Correct.

2    Q.  Kind of just like an attorney would say attorney, as

3    opposed to criminal law and personal injury specialist?

4    A.  I guess so.

5    Q.  And she opens the account and deposits into the account a

6    paycheck from Health Care Solutions Network, right?

7    A.  That's correct.

8    Q.  She started by depositing one of her paychecks into the

9    accounts, right?

10   A.  Yes, sir.

11   Q.  So there's nothing sinister about this account, right?

12   A.  Not to my knowledge.

13   Q.  Okay.  This is like a normal procedure, correct?

14   A.  It's a common procedure.

15   Q.  Normal and common, right?

16   A.  To open -- yes.

17   Q.  Now, you did the financial analysis in this case, right?

18   A.  That's correct.

19   Q.  And did you have assistance in doing that?

20   A.  Yes, there were some financial analysts who helped me.

21   Q.  And how many were there?

22   A.  I believe I did some of the counts myself, maybe one or two

23   others.

24   Q.  So we're clear, Government Exhibit 14 is the Sunshine [sic]

25   State bank account for Health Care Solutions Network ending in

1    5171.  Can you estimate to the ladies and gentlemen of the jury

2    how many checks are contained in that exhibit?

3    A.  Hmm, thousands.  I really don't know.

4    Q.  Your first response was "thousands" and then you said "I

5    really don't know."

6    A.  It was a guess.  You know what, I could give you a fair

7    estimate of how many transactions out of the Health Care

8    Solutions Network accounts there were, and there was over

9    20,000, so if you want to divide it by the account, you could

10   give your best guess as well.

11   Q.  All right.  So over 20,000 transactions?

12   A.  Yes, sir.

13   Q.  Over 20,000 checks written?

14   A.  No, because sometimes they do direct deposits and/or direct

15   withdrawals, so sometimes they're not checks.

16   Q.  Okay.

17   A.  And sometimes they're credit -- deposits into the account

18   as well.

19   Q.  Government's Exhibit 15 is the HCSN Sunstate Bank Account

20   ending 7094.  Same question.  Can you estimate the number of

21   checks that you've analyzed from that account?

22   A.  No, I can't.  And just to clarify, when I said over 20,000

23   transactions, that was a combination of all the Health Care

24   Solutions accounts.

25   Q.  Okay.  So we have how many accounts?

1   A.   In the name of Health Care Solutions, there was four.

2   Q.   In the name of Health Care Solutions, there were four?

3   A.   Yes, sir.  There was two out of Sofisa Bank, there was one

4   out of JPMorgan, and then there was the North Carolina account.

5   Q.   All right.  Let's talk about Florida accounts.  How many

6   Florida accounts did they have?

7   A.   Three accounts.

8   Q.   And how many transactions from those three accounts?  Would

9   that reduce the number from 20,000?

10  A.   I'd imagine -- yes, it would.  I really couldn't give you a

11  fair estimate.  I'd imagine between 10,000.

12  Q.   Now, these exhibits, are they contained -- are they in

13  paper?  Do you have them in paper?

14  A.   Yes, we do.

15  Q.   And are they in the courtroom?

16  A.   No, they're not.

17  Q.   Where are they?

18  A.   They're at the FBI office.

19  Q.   Why are they at the FBI office?

20  A.   Because we scanned them and produced them on CD.

21  Q.   How long did it take you to complete your financial

22  analysis in this case?

23  A.   The financial analysis is never done.  You always find

24  something.  But the substantive part of it, I would say upwards

25  of a year, year and a half.  There's a lot of bank records.

1    Q.   Okay.  Do you think you made any mistakes?

2    A.   There's a chance that mistakes were made, yes.

3    Q.   These estimates of salary annualization, do you think you

4    made any mistakes with those?

5    A.   No, sir.

6    Q.   Now, I want to show you a portion of Government's Exhibit

7    21, okay?

8    A.   Yes, sir.

9    Q.   Do you know what I'm referring to, right?

10   A.   When you show it to me, I will.

11   Q.   Okay.

12        THE COURT:  What Bates stamp number is that, in case

13   someone wants to see it later?

14        MR. LEVIN:  Bates stamp number, I'm sorry, Your Honor,

15   000325.

16        THE COURT:  Okay.

17        MR. LEVIN:  Thank you.

18   BY MR. LEVIN:

19   Q.   Do you see this top check here?

20   A.   Yes, sir.

21   Q.   All right.  You can --

22        THE COURT:  Can you zoom in?  Because I can't see it.

23        MR. LEVIN:  You can't see it?

24        THE COURT:  And the jurors are sharing a monitor.  On

25   top.

2285

1      MR. LEVIN:  I'm not good with this.

2      THE COURT:  All the way on top.  On top, on top.

3      MR. LEVIN:  I'm trying to focus it.  Let me focus

4  first.  Sorry, Your Honor.  Thank you.  Now I've got to focus

5  it again.  Okay.  Can you see that, Judge?

6      THE COURT:  Yes.

7  BY MR. LEVIN:

8  Q.  All right.  Do you see that, Special Agent Reilly?

9  A.  Yes, sir, I do.

10 Q.  Okay.  What is this underneath it?

11 A.  It's the same check.

12 Q.  It says No. 2075, date 8-23-2007, amount 2,676.55.  Do you

13 see that?

14 A.  Yes, I do.

15 Q.  But the same check number, No. 2075, says date 8-13-2007.

16 Why is the date different?

17 A.  Well, I'm sure you did your due diligence and checked the

18 statements yourself, but initially the check was returned --

19     MR. LEVIN:  Your Honor, would you admonish the witness

20 not to make comments?

21     THE COURT:  Yes.  Just answer the question.

22 A.  Sorry, sir.

23     The check was returned because it says, return reason,

24 endorsement irregular.  So there was some issue with the

25 endorsement.  But when I went back and checked the bank

1    statement, there was an initial debit to the account and then a

2    credit back for the 2,676.55, and then if you go down -- if you

3    scroll down to the next check -- or excuse me, you could stay

4    on the same check, it was 8-23-07, it is cashed again.  So my

5    analysis took care of that, as far as I accounted for the fact

6    that the check was -- it appears to be issued twice, but it was

7    only issued once.

8    BY MR. LEVIN:

9    Q.  And you have an independent recollection of --

10   A.  Yeah, because when I --

11   Q.  -- (cross-talking) an independent review, out of the 20,000

12   transactions?

13   A.  Yeah, because I was -- I wanted to make sure for our

14   analysis that I had looked at every single check that I was

15   including for the defendants here, and I noticed that myself,

16   so I went and checked the bank statements and checked that it

17   was properly accounted for.

18   Q.  And so you don't know why that notation, which came from

19   the bank, I assume, No. 2075, date 8-13, and No. 2075, date

20   8-23, you don't know why there's a difference in the dates, do

21   you?

22   A.  No, I could only imagine that for this return reason,

23   endorsement irregular, or whatever that reads.  I'm not a

24   hundred percent sure what the reasoning why they had an issue

25   in depositing the check into the Health Care Professional

1    Services account.

2    Q.   By the way, you were making a suggestion about due

3    diligence before, right?

4    A.   Yes, sir.

5    Q.   Do you think I could go to the bank right now and ask them

6    about this particular account?

7    A.   No.

8    Q.   Right.   They wouldn't allow me to do that, would they?

9    A.   No, they wouldn't.

10   Q.   But when you get a subpoena from the federal government,

11   from the FBI, there's no questions asked, right?

12   A.   No, there are questions asked.   I mean, oftentimes if the

13   subpoena is closed, probably today, if I went and asked about

14   that account, they wouldn't allow me access to it either.

15   Q.   Now, when you testified on direct, you said that the

16   61,546.26 from Exhibit 1001, the demonstrative aid, that was a

17   rough estimate.   Those were your words.   Do you remember that?

18   A.   Yes.   It was an annualized amount.

19   Q.   You described it as a rough estimate.

20   A.   Yes, sir.

21   Q.   You knew that Ms. Ruiz was paid by the hour, correct?

22   A.   I was not aware of that.

23   Q.   Okay.   You knew that some of the people that worked there

24   were paid per session, right?

25   A.   Yes.

2288

 1  Q.  And you knew that some of the people there were paid by the

 2  hour.

 3  A.  I just said, I wasn't sure how some of the nontherapists

 4  were paid.

 5  Q.  But you conducted numerous interviews in connection with

 6  this case, right?

 7  A.  Yes.

 8  Q.  Spoke to John Thoen, you spoke to Paul Layman, right?  You

 9  spoke to pretty much everybody, correct?

10  A.  I spoke to a lot of people.

11  Q.  And nobody ever told you that they were paid by the hour?

12  A.  No.  I think they told us that they were salaried.

13  Q.  You don't know whether or not Blanca Ruiz worked any kind

14  of overtime, right?

15  A.  I'm not aware of that.

16  Q.  In analyzing Ms. Ruiz's bank account, you didn't notice any

17  cash deposits, did you?

18  A.  No, I didn't analyze her personal accounts.

19  Q.  You didn't analyze her personal accounts?

20  A.  No, sir.

21  Q.  You had her bank statements, right?

22  A.  Yes, we did.

23  Q.  And you didn't analyze her bank account?

24  A.  No, sir, I didn't.

25  Q.  In conducting this investigation, you didn't find that it

1   would be something that would be important to do to be fair?

2   A.  To be fair?  You know, I was focused on what Health Care

3   Solutions paid to the employees.

4   Q.  You don't know the number of hours Blanca Ruiz worked at

5   Health Care Solutions Network, do you, sir?

6   A.  No, I don't.

7   Q.  You met with Mr. Armando Gonzalez?

8   A.  Yes, sir.

9   Q.  He's a pretty smart guy; would you agree with that?

10  A.  I'm -- I'm not sure how I would characterize him.

11  Q.  Well, do you evaluate people when you meet with them?

12  A.  Yes, I do.

13  Q.  You would agree that he's a very smart man, would you not?

14  A.  In certain aspects, yes.

15  Q.  He's pretty cunning, isn't he?

16  A.  I don't know if I'd agree with that.

17  Q.  Somewhat of an intimidating force?

18  A.  No, not to me.

19  Q.  Well, you're Special Agent Reilly with the FBI.  You're not

20  going to be intimidated by many people, right?

21  A.  I wasn't intimidated by him.

22          MR. LEVIN:  That's all the questions I have.  Thank

23  you, Your Honor.

24          THE COURT:  All right.  Redirect.

25          MR. MEDINA:  Thank you, Your Honor.

1    Ms. Zaferis, can you please pull up Government Exhibit

2    1000.

3                    REDIRECT EXAMINATION

4    BY MR. MEDINA:

5    Q.  Now, Special Agent Reilly, a moment ago you were asked by

6    Mr. Levin how many hours Blanca Ruiz worked.  Do you recall

7    that?

8    A.  Yes, I do.

9    Q.  By looking at this chart, Special Agent Reilly, how many

10   years did Blanca Ruiz work for Health Care Solutions Network?

11   A.  Two years.

12   Q.  And how many years did Alina Fonts work for Health Care

13   Solutions Network?

14   A.  Under two years.  It was two years, calendar years.

15   Q.  Now, with respect to Angela Salafia, how many years did

16   Angela Salafia work for Health Care Solutions Network?

17   A.  Five years.

18   Q.  What about Doris Crabtree, how many years?

19   A.  Five years.

20   Q.  Liliana Marks, how many years?

21   A.  She had a period in '05 and then three years.

22   Q.  And what about Dr. Roger Rousseau, how many years did he

23   work at Health Care Solutions Network?

24   A.  Six years.

25        MR. MEDINA:  Now, Ms. Zaferis, can you please pull up

1   Government Exhibit 1001?

2   BY MR. MEDINA:

3   Q.  Now, Mr. Gonzalez asked you questions about people

4   receiving the notes checks.  Do you remember that?

5   A.  Yes, sir.

6   Q.  And specifically, Mr. Gonzalez asked whether or not

7   Ms. Eason, Wondera Eason, received checks with the "notes" in

8   them.  Do you recall?

9   A.  Yes.

10  Q.  Again, what was Ms. Eason's role in the fraud?

11  A.  She was the director of medical records.

12  Q.  And Mr. Gonzalez also asked you if Mr. Layman received

13  checks with "notes" in the memo line.  Do you recall that?

14  A.  Yes.

15  Q.  And did Mr. Layman receive checks with "notes"?

16  A.  No.

17  Q.  Special Agent Reilly, based on your review of the bank

18  records, your analysis of the bank records, who at Health Care

19  Solutions received checks with "notes" on the memo line?

20  A.  In the East, it was Dana Gonzalez and Gema Pampin, and in

21  the West, it was Alina Fonts and Blanca Ruiz.

22  Q.  Anyone else?

23  A.  No one else.

24  Q.  And based on your investigation, Special Agent Reilly, what

25  were their roles at Health Care Solutions Network?

```
 1    A.  Basically just to document -- document and fabricate
 2    patient files.
 3              MR. MEDINA:  No further questions, Your Honor.
 4              THE COURT:  All right.  Thank you.  You can step down.
 5              Who is your next witness?
 6              MR. STEWART:  The United States calls Sarah Da Silva
 7    Keller.
 8         SARAH DA SILVA KELLER, GOVERNMENT WITNESS, SWORN
 9              THE WITNESS:  My name is Sarah Da Silva Keller.  My
10    last name is spelled D-A S-I-L-V-A, and then Keller is
11    K-E-L-L-E-R.
12              THE COURT:  Okay.  Mr. Stewart.
13                         DIRECT EXAMINATION
14    BY MR. STEWART:
15    Q.  Good morning, Ms. Keller.
16    A.  Good morning.
17    Q.  Did you work at a company called Health Care Solutions
18    Network?
19    A.  Yes.
20    Q.  And when did you start working there?
21    A.  When I was 21, 2006.
22    Q.  How old are you today?
23    A.  30.
24    Q.  Keller, is that your married name?
25    A.  Yes.
```

1   Q.   When you worked at Health Care Solutions Network, did you

2   go by Sarah Da Silva?

3   A.   Yes.

4   Q.   Let's start back with where you went to college.   Where did

5   you go to college?

6   A.   I went to Kaiser University and then to Nova Southeastern

7   University.

8   Q.   And what degree did you get from each of those

9   universities?

10   A.   Kaiser was an associate's in arts and a certification in

11   paralegal, and at Nova, I received my bachelor's in psychology

12   and I began my master's in speech and language pathology, but I

13   was unable to finish.

14   Q.   When did you graduate from Nova?

15   A.   From Nova, 2009.

16   Q.   Was that after you stopped working at Health Care

17   Solutions?

18   A.   Yes.

19   Q.   How long have you lived in the Miami area?

20   A.   Since I was about four.

21   Q.   So let's go back to how you began working at Health Care

22   Solutions Network.   How did you hear about the company?

23   A.   My aunt was Manny Gonzalez's housekeeper.   He mentioned to

24   her that he was looking for a receptionist.   She told him about

25   me and I gave him a call and he called me in for an interview.

1   Q.  Did you actually come in and interview with him personally?

2   A.  Yes.

3   Q.  And did he hire you to work as the receptionist?

4   A.  Yes.

5   Q.  At which location?  Which Health Care Solutions location

6   were you hired to work?

7   A.  West.

8   Q.  Did you primarily work at the West location?

9   A.  Yes.

10  Q.  Did you ever work at another location?

11  A.  I worked at the East for like two weeks.

12  Q.  So back to the West location.  How long did you end up

13  working there?

14  A.  About two years.

15  Q.  So while you were at the West location, who there did you

16  interact with on a regular basis?

17  A.  Blanca, Anna, Tom, Lily, Lisset, John, Alina, Wondera,

18  kitchen staff, drivers.

19  Q.  So just a few clarification questions.  You mentioned

20  Blanca?

21  A.  Yes.

22  Q.  Is that Blanca Ruiz?

23  A.  Yes.

24  Q.  You mentioned Alina.  Did you mean Alina Fonts?

25  A.  Yes.

```
 1    Q.  Did you also work with an individual named Tom Layman?

 2    A.  Yes.

 3    Q.  Now, when you worked in the office, did you speak primarily

 4    in English, Spanish, or both?

 5    A.  Both.

 6    Q.  Were there individuals in the office who you spoke to only

 7    in English?

 8    A.  Yes.

 9    Q.  Was Tom Layman, was he one of those?

10    A.  Yes.

11              THE COURT:  You're saying Tom Layman --

12              MR. STEWART:  Tom Layman?

13              THE COURT:  Tom or Paul?

14              MR. STEWART:  It's, I think, Thomas Paul Layman.

15              THE WITNESS:  Uh-huh.

16              THE COURT:  You knew him by Tom?

17    A.  By Tom.

18    BY MR. STEWART:

19    Q.  Mr. Layman, to your knowledge, did he ever -- did he know

20    how to speak Spanish?

21    A.  No, he did not speak Spanish.

22    Q.  And did you ever see him communicating with Ms. Fonts?

23    A.  Yes.

24    Q.  And when they spoke to each other, were they speaking in

25    English?
```

1    A.   Yes.

2    Q.   And as far as you were aware, did they have any trouble

3    communicating with one another?

4    A.   Not that I'm aware of.

5    Q.   So let's get back then -- let's switch gears.

6         Ms. Keller, have you been convicted of a crime?

7    A.   Yes.

8    Q.   What crime is that?

9    A.   Conspiracy to commit health care fraud.

10   Q.   Did you plead guilty to this offense?

11   A.   Yes.

12   Q.   What did you do that made you guilty of this?

13   A.   I fabricated billing spreadsheets, claiming that patients

14   were being seen at our facility when they weren't physically

15   there.

16   Q.   As part of pleading guilty, did you sign a plea agreement?

17   A.   Yes.

18   Q.   Did your plea agreement require you to cooperate with the

19   government?

20   A.   Yes.

21   Q.   Does that cooperation include testifying at trial?

22   A.   Yes.

23   Q.   What do you understand to be your principal obligation

24   under that plea agreement?

25   A.   To tell the truth of what I remember.

1  Q.  And do you have a sense of what could happen if you don't

2  tell the truth?  For example, here today in court.

3  A.  Yes.

4  Q.  What?  What could happen?

5  A.  I can be charged.

6  Q.  Have you already been sentenced and served time for this

7  crime?

8  A.  Yes.

9  Q.  Are you currently on probation today?

10 A.  Yes.

11 Q.  Back when you started at Health Care Solutions Network,

12 what were your everyday responsibilities, in addition to

13 serving as the receptionist?

14 A.  When the new patients would come in, I would do their

15 intake information, and the first part was the demographic

16 sheet, which is called the face sheet, and I would also have

17 them sign consent forms for the program.

18 Q.  Can you describe what kind of information goes on a face

19 sheet?

20 A.  Patient's name, date of birth, address, phone number,

21 information on any recent hospitalizations.  I believe the

22 diagnosis was also on there.  That's pretty much it.

23 Q.  Now, the information that you put on the forms you were

24 just describing, where did you get that information from?

25 A.  Sometimes it was given to me prior to the patients coming

2298

1    in by a driver or by Marta, Liz, or Joseph.

2    Q.   Did you also meet with patients and receive information

3    from them?

4    A.   Yes.

5    Q.   So for how long during your time at Health Care Solutions

6    Network were you responsible for this type of work?

7    A.   Most of the time that I was there.

8    Q.   I think you mentioned that you sometimes got information

9    from drivers, from kitchen staff.  Did they help you complete

10   these documents that you were describing?

11   A.   Yes, when there was a -- an overload of admissions, like

12   too many patients for me to do on my own, they would help me.

13   Q.   When you met with patients and collected information from

14   them, where in the facility did this happen?

15   A.   Well, when you first walk into the facility, there was like

16   a reception area.  I would either do it there or in like the

17   kitchen area.

18   Q.   I think you mentioned earlier that drivers, kitchen staff,

19   they sometimes helped.  Did they actually meet themselves with

20   patients to collect this information?

21   A.   Yes.

22   Q.   When they met with patients, drivers, kitchen staff, did

23   they also meet in the public areas of the facility, such as the

24   lobby or the kitchen?

25   A.   Yes.

1    Q.   Now, when you were speaking with patients in these public

2    areas, were other patients close enough that they could

3    overhear what you were saying?

4    A.   Yes.

5    Q.   When you were speaking with patients in these public areas,

6    did other employees walk by?

7    A.   Yes.

8    Q.   The forms you were describing, the intake forms, did the

9    patients have to sign the forms?

10   A.   Yes.

11   Q.   Did you have to sign the forms -- did you have to sign the

12   forms as well?

13   A.   Yes, as a witness.

14   Q.   Did you ever sign a form without ever actually seeing the

15   patient yourself?

16   A.   Yes.

17   Q.   Who told you to do that?

18   A.   Wondera.  They would be left on my desk for me to sign.

19   Q.   Were they completed when you signed them already?

20   A.   Yes.

21   Q.   Did you know where the information was coming from?

22   A.   At times, but at times, no.

23   Q.   Okay.  So when you did know where the information was

24   coming from, where was some of the sources of this information?

25   A.   Like when they was given to me, I know that some of the

2300

1    drivers -- I didn't know who exactly would take down the

2    information.  That was the information that they took and they

3    would leave it there.

4    Q.  Why were you signing the forms?

5    A.  Because I was signing as a witness.

6    Q.  By signing as a witness, were you saying that you had met

7    with the patient and that the information in the form is

8    accurate?

9    A.  Yes.

10   Q.  Where in the facility did you sign these forms?

11   A.  At my desk.

12   Q.  So your desk, was it in an office?

13   A.  Yes.

14   Q.  Did other people work in that office?

15   A.  Yes.

16   Q.  Who else worked in that office?

17   A.  Blanca, Anna, Hortensia, Margarita.

18   Q.  By Blanca, do you mean Ms. Ruiz?

19   A.  Yes.

20   Q.  How far from your desk when you were signing these forms

21   did she sit?

22   A.  The desks were separated by like two feet.

23   Q.  If you ever had a complaint about your work in the office,

24   did you share them with other people that you worked with?

25   A.  Yes.

1    Q.  Did you share them with Ms. Ruiz?

2    A.  Yes.

3    Q.  How many days a week did you work in that office?

4    A.  Five.

5    Q.  How many hours a day?

6    A.  Eight.

7    Q.  And did Ms. Ruiz share those hours and those days with you

8    in that office?

9    A.  Yes.

10          MR. STEWART:  Judge, may I approach just for a minute?

11          Tissue.

12          THE WITNESS:  Thanks.

13   BY MR. STEWART:

14   Q.  You mentioned earlier that sometimes there would be a rush

15   of patients.  How did you learn when patients were coming in?

16   A.  I would usually know in advance.  Joseph or Liz would call

17   me, or Joseph would come by and bring over the face sheets for

18   the patients.

19   Q.  Did you know where the patients were coming from?

20   A.  ALFs.

21   Q.  What do you mean by that?  What's an ALF?

22   A.  An assisted living facility.

23   Q.  Can you describe what that is, an assisted living facility?

24   A.  It's a home where elderly people live or mentally ill

25   people live that cannot take care of themselves, so usually

1    they're put there, you know, by their families, or I believe

2    government agencies put them there if they don't have any

3    family.

4    Q.  How did you know that the patients were coming from ALFs?

5    A.  Because on the face sheets that I would receive, they would

6    have the ALF's name and multiple patients, you know, would have

7    the same ALF, you know, residence.

8    Q.  Did you actually ever meet with an ALF owner?

9    A.  There was a time that an ALF owner came to the office

10   looking for Manny.  She was very upset.  You know, we told her

11   that he wasn't there and she kept insisting that she needed to

12   speak to him and she looked very angry and she was with a male

13   as well, I don't know who he was, and after a while, she just

14   left.

15   Q.  Let's talk about the patients.  Did you meet them on a

16   regular basis during your time at the West location?

17   A.  Yes.

18   Q.  Did they ever need help signing the intake documentation

19   that we were discussing?

20   A.  Yes.

21   Q.  Why did they need help?

22   A.  Because some of them were incapable of physically signing

23   for themselves.  Some of them were illiterate and couldn't

24   write their name.  Some of them didn't know where they were, so

25   they were incapable.  (Witness crying).

1    Q.   The ones who were not physically capable of signing, were

2    they too physically weak to be able to sign on their own?

3    A.   Yes.

4    Q.   Does one patient come to mind who was physically too weak

5    to sign on his own?

6    A.   A patient that always comes to mind for me is -- his name

7    was Manuel de la Torre, and he was very weak, and I would have

8    to, you know, grab his hand and like place the pen in his hand

9    and, you know, try to help him write.  But it came to a -- you

10   know, he was so incapable that I would just have him write an X

11   for his name.

12   Q.   What kind of physical condition did he come into the office

13   in?

14   A.   Well, he was very weak.  He could still walk, but you had

15   to assist him.  He could barely see.  He couldn't hear.  I

16   would have to talk to him like very close to his ear or kind of

17   talk to him in his face and, you know, see if he could read my

18   lips, but obviously, he couldn't really see much, so it was

19   very hard to communicate with him.

20   Q.   I'd like to show you a document.

21        MR. STEWART:  Could we bring up Government Exhibit

22   188?  It's not been previously admitted into evidence.  And

23   could we turn over to page 5 of that document, please?

24   BY MR. STEWART:

25   Q.   So Ms. Keller, can you see this document?

1   A.  Yes.

2   Q.  Do you recognize this document?

3   A.  Yes.

4   Q.  What is it?

5   A.  It's a face sheet.

6   Q.  For which patient?

7   A.  For Manuel de la Torre.

8   Q.  Is this the type of document that you would have created,

9   the kind of document we were talking about earlier?

10  A.  Yes.

11  Q.  The face sheet, is it kept as part of a larger patient

12  file?

13  A.  Yes.

14  Q.  Now, these patient files, were they -- during your time at

15  the West location, were they stored there at the office?

16  A.  Yes.

17  Q.  Were they kept in the regular course of business?

18  A.  Yes.

19  Q.  So where was it the regular practice to keep these patient

20  files at the West location?

21  A.  There was a medical records room towards the back of the

22  facility.

23          MR. STEWART:  Your Honor, at this time, the government

24  would move to admit Government Exhibit 188 into evidence.  And

25  ask to be -- to have it published for the jury.

1          THE COURT:  All right.  That will be received in

2     evidence.

3          MR. STEWART:  I'd like to turn next to page 15 of this

4     document.

5     BY MR. STEWART:

6     Q.  Do you recognize this person?

7     A.  Yeah.

8     Q.  Who is this?

9     A.  Manuel.

10    Q.  Is that Mr. de la Torre, the person we were just talking

11    about?

12    A.  Yes.

13          MR. STEWART:  Let's turn over to the next page of this

14    document.

15    BY MR. STEWART:

16    Q.  Is this one of the documents that would have been created

17    when Mr. de la Torre was admitted into Health Care Solutions?

18    A.  Yes.

19    Q.  The witness signature at the bottom, is that your

20    signature?

21    A.  Yes.

22    Q.  Now, the signature near the line that says "Patient

23    Signature," is that the type of X that you were just

24    describing?

25    A.  Yes.

1    Q.   Would you have taken Mr. de la Torre's hand and helped him

2    make that X?

3    A.   Yes.

4    Q.   Is that because he couldn't sign his signature on his own?

5    A.   Uh-huh, yes.

6    Q.   In addition to patients like Mr. de la Torre, who had

7    physical conditions, you also mentioned patients who weren't

8    mentally aware.  Do any of those stand out to you when you

9    think back?

10   A.   Yeah.  There was a patient, her name was Ophelia (sp), and

11   she did not know what day or time it was or why she was even at

12   the facility.  She would sometimes come in and she would see me

13   and she thought I was her niece or her daughter or her sister.

14   You know, any day it could be a different person.  She would

15   always try to leave the facility, so there always had to be a

16   driver like by the door when she was there to make sure that

17   she wouldn't leave.

18        Sometimes she would be disruptive in the group and she

19   wouldn't be able to stay in the group so they would have to sit

20   her in that lobby area that I explained.

21        There was another patient that, you know, she would carry a

22   doll because she thought it was her baby.

23        There was another patient, her name was Lorna, and, you

24   know, she was very disturbed as well, you know.  I don't know

25   if you...

1   Q.   Understanding that you're not a doctor, what kind of

2   conditions did these people appear to be suffering from?

3   A.   Alzheimer's, dementia.

4   Q.   Did you have difficulty communicating with them?

5   A.   I'm sorry?  I didn't hear you.

6   Q.   Did you have difficulty communicating with them?

7   A.   Yeah.

8   Q.   Based on what you observed, could any of these people have

9   participated in a group therapy session?

10  A.   No.

11  Q.   You mentioned that you worked for a short period of time in

12  the East location?

13  A.   Yes.

14  Q.   So for the period of time that you were in the East

15  location, did you observe patients?

16  A.   Yes.

17  Q.   Did the patients in the East location suffer from the same

18  conditions as the patients that you were just describing from

19  the West location?

20  A.   Yes, and most of them had been at the West location.

21  Q.   So what do you mean by that, most of them had been at the

22  West?

23  A.   The patients were recycled.  Once they were in the East

24  location, once they were discharged, they would go to the West

25  location, and vice versa.  When they were in the West location

1   and they were discharged, they would go back to the East

2   location.

3   Q.   So how did you become familiar with this practice of moving

4   patients from the East to the West locations and back and

5   forth?

6   A.   I would get a list of the patients that were being

7   discharged from the East location that were going to be coming

8   to the East location [sic].   There was a certain amount of

9   weeks that each patient can -- you know, depending on the

10  diagnosis, can be admitted into the program.

11  Q.   Who did you speak to about this practice?

12  A.   Well, the information of the discharges and the admissions,

13  that was done by, you know, John Thoen or Liz, but there was

14  like a white board, you know, them white marker boards that

15  were in the office that I stayed in, and there it listed the

16  patients that were being discharged, the patients that were

17  being admitted, and there was also a time where, you know, the

18  amount of weeks, depending on the diagnosis, that the patient

19  can be at the program.

20  Q.   This white board that you're describing, was it in the same

21  office that you shared with Ms. Ruiz?

22  A.   Yes.

23  Q.   We've talked about the patients' mental conditions, their

24  capacities.   I'd like to ask you about the physical condition

25  that you saw patients arrive at the facility in.   So did

1    patients ever arrive in a poor physical condition?

2    A.   Yes.

3    Q.   Okay.  Can you describe that for us?

4    A.   Some of the patients would arrive -- Manuel was one of

5    them -- like urinated or with feces, disheveled, like with, you

6    know, dirty clothes, those conditions.  That's how they were.

7    Q.   When patients arrived in that type of condition, what did

8    you do?

9    A.   I would first try to call Liz or Marta, depending, they

10   worked at different time periods, you know, to have a driver

11   come over and take them back to the ALF, but the ALF wouldn't

12   want them back at that time, so we would, you know, have to try

13   to get them, you know, cleaned up.

14   Q.   You mentioned Liz.  Is that Lisset Palmero?

15   A.   Yes.

16   Q.   You mentioned that you'd have to try to clean them up.  Who

17   did that?  Who cleaned up the patients?

18   A.   Well, I remember that Anna would help, Blanca would help,

19   and the nurse at the time would help.

20   Q.   By Blanca, do you mean Ms. Ruiz?

21   A.   Yes.

22   Q.   After you met with patients during the admission process,

23   where did they go next?

24   A.   To groups.

25   Q.   And how were they assigned to groups?

1    A.   I would assign them.

2    Q.   How would you assign patients to groups?

3    A.   Depending on their age and language.

4    Q.   You said depending on their age, but I wasn't sure if I

5    heard you.

6    A.   Oh, yes, like, you know, the more elderly group, I would

7    put them in one group, and the younger -- you know, the younger

8    age, I would put in another group.  And there was an English

9    group -- you know, two English groups, two Spanish groups.  I

10   think there was a time when there were like five groups.

11   Q.   Before assigning patients to different groups, did you

12   consult with the psychiatrist?

13   A.   No.

14   Q.   Did Ms. Ruiz have a role in the admissions process?

15   A.   She did biopsychosocials.

16   Q.   What's a biopsychosocial?

17   A.   It's a story of, you know, the patient.

18   Q.   When you say "it's a story," what kind of information does

19   it have in it?

20   A.   Their background and pretty much their story -- you know,

21   their story line of what they've gone through and -- you know,

22   it's their background information.

23   Q.   Does it include a history of their mental illness?

24   A.   Yes.

25   Q.   History of their treatment for mental illness?

```
1    A.  Yes.

2    Q.  Did Ms. Ruiz prepare biopsychosocial information for the

3    types of patients that we were just talking about?

4    A.  Yes.

5    Q.  Did she prepare it for patients who weren't mentally aware?

6    A.  Yes.

7    Q.  Did she prepare it for patients with whom you had

8    difficulty communicating?

9    A.  Yes.

10   Q.  Now, when she did this, did she meet with the patients

11   herself?

12   A.  I rarely saw meeting with a patient themselves.

13   Q.  So if Ms. Ruiz wasn't meeting with the patients --

14            MR. RABIN:  Objection, leading.

15            THE COURT:  Sustained.

16   BY MR. STEWART:

17   Q.  If Ms. Ruiz rarely met with the patients when she was

18   preparing this paperwork, where did she get the information to

19   complete these forms?

20   A.  Most of the time the information was pre-received from the

21   East location.  Most of the people that were admitted into the

22   West location were previously seen in the East location, so I

23   know that a lot of the information came from there.

24   Q.  Who was the doctor who worked at the West location?

25   A.  Mendez-Villamil.
```

1    Q.   And did you know the doctor who worked primarily at the

2    East location?

3    A.   Dr. Rousseau.

4    Q.   How often did you interact with Dr. Rousseau?

5    A.   I only saw him a couple of times.

6    Q.   So back to the doctor who worked primarily at the West

7    location.

8    A.   Uh-huh.

9    Q.   During the admissions process, what interaction did you

10   have with that doctor?

11   A.   He would come to the office on Thursdays.  I would take him

12   the face sheets of the new patients.

13   Q.   When you brought him the face sheets for the new patients

14   on Thursday, had some of those patients already been assigned

15   to group sessions by you yourself?

16   A.   Yes.

17   Q.   Were there patients who had been admitted to the PHP

18   program but who never actually showed up for therapy?

19   A.   Yes.

20   Q.   Are you familiar with something called the white group?

21   A.   Yes.

22   Q.   What was it?

23   A.   It was a group that -- a group that was created for the

24   patients that weren't physically coming.

25   Q.   The patient information for these patients, was it kept on

1    a list?

2    A.   Yes.

3    Q.   And who created that list?

4    A.   John created it.

5    Q.   And did you have any responsibility for working with this

6    list?

7    A.   Yes.

8    Q.   What did you do?

9    A.   I kept up with it.  When patients were discharged from the

10   white group, I would take them off.  If patients were admitted

11   that were not going to come or weren't coming, they would be

12   put on.

13   Q.   So who did you talk to about this list?

14   A.   I discussed it in the office.

15   Q.   Who else had a role in maintaining the list?

16   A.   John Thoen.

17   Q.   Were biopsychosocials prepared for individuals who were on

18   the white group list?

19   A.   Yes.

20   Q.   And who would have prepared those at the West location?

21   A.   The caseload of the patients were divided between Anna and

22   Blanca.

23   Q.   The white group list that we've been discussing, was it

24   kept physically somewhere in the office?

25   A.   Yes.  On my desk.

2314

1    Q.  On your desk?

2    A.  Uh-huh.

3    Q.  And what was it kept in?

4    A.  A binder.

5    Q.  Okay.  What else was in the binder with it?

6    A.  The other group lists.

7    Q.  What was on these other group lists?

8    A.  It had the patient's name and then a space for the

9    signature, the date, and the day of the week.

10   Q.  Are these sign-in lists?

11   A.  Yes.

12   Q.  So the other group lists for the other non-white group

13   patients, were those sign-in lists signed?

14   A.  Yes.

15   Q.  Now, the white group list, the sign-in sheet for that list,

16   was it signed?

17   A.  No.

18   Q.  Were you ever asked by anyone during your time at Health

19   Care Solutions to forge a signature for a patient on the white

20   group list?

21   A.  Yes.

22   Q.  Who asked you to do that?

23   A.  John Thoen.

24   Q.  Where were you in the facility when he asked you to do

25   that?

1    A.  At my desk.

2    Q.  Who else was there?

3    A.  Anna, Blanca.  I believe Margarita was there too.

4    Q.  What did he tell you to do?

5    A.  He told me to sign for the patients on the white list and

6    for those that there were no signatures for on the other lists.

7    Q.  By the "other lists," do you mean the other sign-in sheets

8    that you just mentioned before?

9    A.  Yes, 'cause some of them were blank.

10   Q.  The blank locations on the other sign-in lists, did that

11   signify that those patients had been absent on those days?

12   A.  Yes.

13   Q.  So did you ultimately do what Mr. Thoen was asking you to

14   do?  Did you sign for the patients on the white group list?

15   A.  No.  I sat with the binder for around 30 minutes, just

16   contemplating on what to do.  And I remember turning to Anna,

17   she sat right in front of me, and I looked at her and I said,

18   you know, I'm not going to -- I'm not going to do it.  I'm not

19   going to sign it.  I'm going to tell him that I'm not good at

20   forging signatures and I'm just going to give it to him.

21   Q.  Did you actually go back with him --

22   A.  Yes.

23   Q.  -- and tell him that?

24   A.  Yes.

25   Q.  Okay.  Describe your encounter with him for us.

1    A.   I walked to his office where he stood there with Wondera,

2    they were talking, and I told him in front of Wondera, I said,

3    look, I'm not going to do this.  I'm not good at forging

4    signatures.  And he took the binder and said, oh, don't worry

5    about it, don't worry about it, I'll take care of it.

6    Q.   Did you ever see that binder again?

7    A.   Yes.

8    Q.   When did you see it?

9    A.   Wondera left with the binder.

10   Q.   Did you see her leave with the binder on one occasion?

11   A.   No.  She came back and forth for about two weeks.

12   Q.   When would she leave with the binder?

13   A.   When would she leave?

14   Q.   Yeah, what time --

15   A.   At the end of the day.

16   Q.   At the end of the day.  And when would she return with the

17   binder?

18   A.   In the morning.

19   Q.   Did you ever actually physically have the binder back

20   yourself in your possession?

21   A.   Yes.

22   Q.   Did you open the binder and take a look at the signature

23   pages for the white group list?

24   A.   Yes.

25   Q.   Were there signature page -- were there actual signatures

1    on those pages?

2    A.   Yes.

3    Q.   Did you ever work with billing documentation during your

4    time at Health Care Solutions?

5    A.   Yes.

6    Q.   Did you work with the billing spreadsheet which I think you

7    mentioned earlier?

8    A.   Yes.

9    Q.   Can you describe this?  What does this billing spreadsheet

10   have on it?

11   A.   It's a spreadsheet, like an Excel spreadsheet.  It had the

12   patient's name, it had the days of the week, along with the

13   dates, and I would have to put a three next to each name for

14   each day of the week.

15   Q.   So you said you would have to do that.  First, why a three?

16   A.   Because there are three sessions a day, so a three would

17   mean that they were there for the full day.

18   Q.   So by writing three, were you saying that they attended

19   three sessions on that day?

20   A.   Yes.

21   Q.   Again, you mentioned that you had to do it.  Who told you

22   to do it?

23   A.   Marta, John, Manny.

24   Q.   Where did you work with this billing spreadsheet?

25   A.   At my desk.

1    Q.   I'm sorry, I couldn't hear you.

2    A.   At my desk.

3    Q.   At your desk?  Thank you.

4         Was there ever a time when you were told not to put a three

5    next to a patient's name?

6    A.   Yes.

7    Q.   When was that?

8    A.   If the patient was hospitalized.

9    Q.   And why would you not want to put a three next to a

10   patient's name if the patient was in the hospital?

11   A.   Because it would cause double billing.

12   Q.   Can you describe that?  What do you mean by that?

13   A.   If a patient is at the facility and they're at the

14   hospital, how can they be at both places at one time?

15             THE COURT:  All right.  Let's take our morning recess

16   and come back in 15 minutes.

17        (Recess, 10:32 a.m. to 10:50 a.m.)

18             THE COURT:  All right.  Where is Dr. Rousseau?

19             All right.  Bring in the jury, please.

20        (Jury Present.)

21             THE COURT:  All right.  Welcome back, everyone, and

22   please be seated.

23             All right.  Go ahead, Mr. Stewart.

24   BY MR. STEWART:

25   Q.   So, Ms. Keller, before the break we were talking about the

1   billing spreadsheets.

2   A.  Yes.

3   Q.  After you had completed your work on the billing

4   spreadsheet, what happened next with the spreadsheet?

5   A.  I would fax it to the East location, as well as to Donna.

6   Q.  Why did you do that?  Why did you fax it over to the East

7   location?

8   A.  Because they would keep a record of everything.

9   Q.  And Donna, who was Donna?

10  A.  Donna is the biller, the Medicare biller.

11  Q.  Where did she work?

12  A.  I believe it was up north, like Sarasota or something.  It

13  wasn't in Miami.  It was somewhere in Florida, but a little up

14  north.

15  Q.  For a different company did she work?

16  A.  Yeah.  I believe it was her own company.

17  Q.  And why did you send the billing spreadsheet to Donna?

18  A.  Because Donna would then bill Medicare.

19  Q.  Are you familiar with how Ms. Ruiz left Health Care

20  Solutions?

21  A.  She was terminated.

22  Q.  Were you there when that happened?

23  A.  Yes.

24  Q.  Now, before she was terminated, did she have a good working

25  relationship with the therapists?

1    A.  Yes.  There was a short time when she like supervised the

2    therapists.

3    Q.  When she was terminated, did you actually see her after she

4    had received that news?

5    A.  Yes.

6    Q.  Can you describe her for us?

7    A.  She was very upset.  She looked very angry.  She said that

8    she was going to get back at Manny.  She was just very

9    distraught.  And I remember looking at Anna and, you know, we

10   just stayed quiet because we didn't know how to react, and, you

11   know, she just -- she vented and, you know, told us she was

12   going to get back at Manny and that she couldn't believe that

13   this was happening and, you know, eventually she just left and

14   I never saw her again.

15   Q.  Manny, do you mean Armando Gonzalez?

16   A.  Yes.

17   Q.  Did she explain how she was going to get back at Armando

18   Gonzalez?

19   A.  She didn't give specifics.

20   Q.  Now, did there come a point in time during your employment

21   at Health Care Solutions that the company came under Medicare

22   review?

23   A.  Yes.

24   Q.  What's a Medicare review?

25   A.  It's when Medicare reviews the charts to make sure that the

1    information is enough for the patient to be receiving benefits

2    and officially, you know, pay for the patient's benefits.

3    Q.   How did you learn that the company was under review?

4    A.   John Thoen and Manny held a meeting in the office where I

5    was located and told us that they received a letter from

6    Medicare saying that they were going to be on review.

7    Q.   Who else was there during this meeting?

8    A.   Therapists and administrative staff.

9    Q.   Was Ms. Ruiz there?

10   A.   Yes.

11   Q.   Was Ms. Fonts there?

12   A.   Yes.

13   Q.   During this meeting, did Mr. Thoen explain how the company

14   was going to respond to the review?

15             MR. LEVIN:   Objection, leading.

16             THE COURT:   Overruled.

17   BY MR. STEWART:

18   Q.   So let me ask it again.  During this meeting, did Mr. Thoen

19   explain how the company was going to respond to the review?

20   A.   They were going to have to -- you know, once receiving the

21   list of names of the patients that were going to be on review,

22   they were going to have to put together the charts in order to

23   send to review.

24   Q.   Had these patients for whom they were collecting charts

25   already been discharged?

2322

1   A.   Some yes, and some no.  I believe they would do it like on

2   a -- they would give you like a week or two baseline of when

3   you had to submit the information.  They would request certain

4   documents from the chart.

5   Q.   So the patients were either under treatment or discharged;

6   is that correct?  Some fell into one category, some into

7   another?

8            MR. RABIN:  Objection, leading.

9            THE COURT:  Sustained.

10  BY MR. STEWART:

11  Q.   Were some of the patients who Medicare requested additional

12  information for still under treatment at the company?

13  A.   Yes.

14  Q.   Had some of them also been discharged?

15  A.   Yes.

16  Q.   You said that they would have to get the charts together.

17  Why weren't the charts already ready?

18  A.   Because some of them would be missing notes, doctor notes.

19  They were incomplete.

20  Q.   Who helped get the charts ready during the review?

21  A.   I remember Blanca and Anna helping with the

22  biopsychosocials.  Alina Fonts was there.  There was like an

23  office set up for the review and Gema and Dana from the East

24  location would come to the office, and Alina Fonts was there as

25  well, and John Thoen, Wondera.  And I was the one that would

1    also, you know, set up the names that were going to be put

2    under review, the names of the patients.

3    Q.  You mentioned a couple of people there.  Gema.  Is that

4    Gema Pampin?

5    A.  Yes.

6    Q.  You mentioned Dana.  Dana Gonzalez?

7    A.  I'm not aware of her last name, but Dana from the East

8    location.

9    Q.  You mentioned Blanca.  Just to confirm, was that Ms. Ruiz?

10   A.  Yes.

11   Q.  You mentioned that some of the charts had notes missing.

12   How did they create missing notes?

13   A.  On a laptop, they just created them.  How Wondera would

14   collect the notes were, she would use my billing spreadsheet

15   and she would have the billing -- the sign-in sheets to know

16   what patients were from each therapist, and that's how she

17   would request the notes.

18        So there had to be a note accountable for each billing day

19   that they were there, so that's how they would make sure that

20   all the notes were there for the review.

21   Q.  You mentioned that your responsibility was to keep track of

22   certain information.  Can you describe that further?

23   A.  Just when the list of the names would come in, I would, you

24   know, type it up on a Word document on what day each chart

25   needed to be ready in order to send out to Medicare.

1    Q.   You mentioned that Ms. Fonts and Ms. Ruiz assisted in this

2    process.  Did you actually see them working, creating files?

3    A.   Blanca always worked from her desk.  Alina, she worked with

4    Gema and Dana and John Thoen in that office that was set up for

5    the review.

6    Q.   And you had access to that office, did you?

7    A.   Yes.

8    Q.   After the work was done on these files that you were just

9    describing, did John Thoen hold another meeting with the staff?

10   A.   Yes.

11   Q.   What did he say at this meeting?

12   A.   Before the charts were sent out, he just held the meeting

13   and prayed for the charts to pass review.

14   Q.   Now, you worked only for a short period of time at the East

15   location, correct?

16   A.   Yes.

17   Q.   We're not talking now about a prayer in the East.

18   A.   No.

19   Q.   We're talking about a prayer at the West location?

20   A.   Yes.

21   Q.   You were present.

22   A.   Yes.

23   Q.   Who else was there?

24   A.   The administrative staff and Alina Fonts was there.

25   Q.   Did you say Alina Fonts was there?

```
 1    A.  Yes.

 2    Q.  Was Ms. Ruiz also there?

 3    A.  Yes, I remember her there, and Anna.

 4         MR. LEVIN:  I can't hear the answer, Your Honor.

 5    A.  Yes, I remember her there.

 6    BY MR. STEWART:

 7    Q.  There was a prayer.  Who led the prayer?

 8    A.  John Thoen.

 9    Q.  Who else was there?

10    A.  Wondera.  I can't recall if Gema and Dana were there, but I

11    know Wondera was there as well.

12    Q.  So what did they say?  What was the prayer?

13    A.  It was pretty brief.  It was pretty much just for the

14    charts to be able to pass review in order to -- for the charts

15    to be paid for.  Because when you're under review, you don't

16    get paid for it unless the chart is accepted, and if not, you

17    don't get anything.  You know, you don't receive the payment

18    for that time period.

19         MR. STEWART:  No further questions, Your Honor.

20         THE COURT:  All right.  Mr. Rabin.

21         MR. RABIN:  Briefly.  Good morning, ladies and

22    gentlemen.

23                        CROSS-EXAMINATION

24    BY MR. RABIN:

25    Q.  Good morning.  So you go by Ms. Keller or Ms. Da Silva
```

1    Keller?  How do you --

2    A.  Well, I'm married now, so Da Silva Keller.

3    Q.  Okay.  I think that you said that you were only at East --

4    the East location two weeks?

5    A.  About two weeks.

6    Q.  And you said you saw Dr. Rousseau a couple of times?

7    A.  Yeah.  I saw him briefly, and I saw him, I don't know,

8    maybe a couple of times when he would go to the West location

9    to meet with Manny.

10   Q.  Okay.  But of the two weeks that you were at East, you saw

11   him about two times, correct?

12   A.  The times that I remember in my head were when he came to

13   meet with Manny.  Those were the times that are clear in my

14   mind.

15   Q.  Okay.  At East --

16   A.  Uh-huh.

17   Q.  -- you were there two weeks.

18   A.  It must have not been like a couple of times.  Maybe once.

19   I don't recall.

20   Q.  Well, I mean, I'm not challenging you, I'm just saying, I

21   want to make clear, you said you were there a couple of weeks,

22   correct?

23   A.  (Witness nods head up and down.)

24   Q.  Is that yes or no?

25   A.  Yes, yes, I'm sorry.

1  Q.  And you think you saw him a couple of times.  Is that what

2  you testified to earlier?

3  A.  Well, I saw him a couple of times, but the times that are

4  clear in my mind are the times when he came to the West

5  location to meet with Manny.  I don't recall a clear -- a clear

6  in my mind when I saw him at the East location.

7  Q.  Okay.  Now, you met with the government before you

8  testified here today how many times, approximately?

9  A.  I don't have an exact number because I didn't keep it in my

10  head, but about seven times.

11  Q.  Okay.  About seven times.  And how many times did you meet

12  with Mr. Stewart before you testified here today, just with

13  him?

14  A.  About four or five.

15  Q.  Okay.  That's in addition to the seven times where they

16  were asking you questions about Health Care Solutions, correct?

17  A.  Yes.

18  Q.  Okay.  Now, in the seven times that you met with the

19  government, they were asking you questions and they were taking

20  notes down of what you said, correct?

21  A.  Yes.

22  Q.  Okay.  And in those seven times, you never mentioned

23  anything about Dr. Rousseau; is that fair to say?

24  A.  I recognized him in the photos, but I couldn't put two and

25  two together.

1    Q.   Okay.  But there did come a time that you were in jail,

2    right?

3    A.   Yes.

4    Q.   And you were in jail with -- I think you saw Ms. Pampin in

5    jail?

6    A.   Yes.

7    Q.   Without going into what she said, she started to engage you

8    in conversation about Dr. Rousseau, didn't she?

9    A.   Yes.

10   Q.   And that was when, approximately?

11   A.   What do you mean, when I was incarcered?

12   Q.   Approximately when was it that you had this conversation

13   with Ms. Pampin?

14   A.   When I was incarcerated.

15   Q.   Okay.  Approximately when was that?

16   A.   I was -- I turned myself in May 8th of two thousand --

17   we're in '14.  It's been a year and a half.

18   Q.   Okay.  So that we're clear then, you were debriefed or met

19   with the government December -- December 2011; does that sound

20   about right?

21   A.   Yes.

22   Q.   Okay.  Again, a second time in December 2011, so two times

23   in December -- in December of 2011?

24   A.   Okay, yes.

25   Q.   I'm sorry?

1    A.  Yes.

2    Q.  Okay.  And then, I guess, again November 2012?

3    A.  Yes.  I mean, I don't recall exact dates.

4    Q.  I can give you the exact dates if these don't sound right

5    to you, okay?  June of 2012 again?

6    A.  Yes.

7    Q.  February 2013?

8    A.  Yes.

9    Q.  March of --

10   A.  I don't -- I don't remember the exact dates, so I'm saying

11   yes.

12   Q.  Okay.  It's fair to say that in all these debriefings, you

13   never mentioned Dr. Rousseau's name, correct?

14   A.  No.

15   Q.  That's fair, correct?

16   A.  Yes.

17   Q.  Okay.  Now, you ended up getting -- you ended up getting a

18   two-year sentence?

19   A.  Yes.

20   Q.  Okay.  And then the government came in and asked the judge

21   to reduce your sentence?

22   A.  I had a Rule 35.

23   Q.  Who filed that Rule 35?

24   A.  The government.

25   Q.  Okay.  And then you ended up with how much time?

2330

```
1   A.  60 days.

2   Q.  60 days.  And have you already served your 60 days?

3   A.  Yes.

4   Q.  Okay.  So you started out with a two-year sentence, got it

5   down to 60 days, served your 60 days, and now you're on

6   probation, correct?

7   A.  Yes.

8           MR. RABIN:  Okay.  That's all I have.  Thank you.

9           THE COURT:  Mr. Palomino?

10          MR. PALOMINO:  Your Honor, I have no questions of this

11  witness.

12          THE COURT:  Mr. Hermida?

13          MR. HERMIDA:  Yes.

14          Good morning, ladies and gentlemen.

15                          CROSS-EXAMINATION

16  BY MR. HERMIDA:

17  Q.  Ms. Da Silva Keller, you don't know my client?

18  A.  Who is your client?

19  Q.  Ms. Angela Salafia.

20  A.  I'm sorry?

21  Q.  Ms. Angela Salafia.

22  A.  No.

23  Q.  And you worked, I think, at the East location for a little

24  under two weeks?  You said about two weeks?

25  A.  About two weeks.  I don't know exactly.  It was a very
```

1     short time.

2     Q.  Nine days?

3     A.  I don't recall.

4     Q.  When was that?

5     A.  I don't recall either an exact date of when it was during

6     the two years that I worked.

7     Q.  Was it at the beginning of your employment?

8     A.  It was like in the middle.  We had already moved to the

9     bigger West location.

10    Q.  It's safe to say you never sat on any therapists' group

11    therapy session, right?

12    A.  No.

13    Q.  Right.  So it's safe to say you can't tell this jury if my

14    client ever treated Mr. Manuel de la Torre?

15    A.  I don't know who your client is.

16    Q.  Ms. Salafia.

17    A.  I understand, but I don't know who she is.

18    Q.  Do you know -- did you see Mr. Manuel de la Torre at the

19    East location?

20    A.  Yes.

21    Q.  When you were there.

22    A.  I don't remember.  I just know that he was admitted into

23    the East location and the West location both.

24    Q.  Did you see Ophelia at the East?

25    A.  I know that she was admitted in the East --

1    Q.  But did you personally see her?

2    A.  I don't remember exactly who I saw in the East location

3    while I was there during the two weeks.

4    Q.  Did you see personally Lorna at the East location?

5    A.  Yes.

6    Q.  In those six days?

7    A.  Yes.

8    Q.  In whose group therapy room?

9    A.  I don't know, because Lorna wouldn't stay still.  She was

10   always walking around the facility.

11   Q.  Now, you never -- you never saw my client at the West

12   location, did you?

13   A.  No, I don't know who your client is.

14          MR. HERMIDA:  I have nothing further, Your Honor.

15          THE COURT:  Mr. Prieto?

16          MR. PRIETO:  Yes, Judge.

17          Good morning, ladies and gentlemen of the jury.

18          May it please the Court.

19                    CROSS-EXAMINATION

20   BY MR. PRIETO:

21   Q.  Good morning, ma'am.

22   A.  Good morning.

23   Q.  My name is Frank Prieto.  I represent Ms. Marks.  Is it

24   fair to say you don't know my client either?

25   A.  No.  I wouldn't even be able to point her out.

1   Q.  It caught my ear you mentioned somebody named Lily, but

2   you're not referring to my client, Ms. Liliana Marks, correct?

3   A.  Oh, no.

4   Q.  Is that some other therapist who worked at the West?

5   A.  Yes.

6          MR. PRIETO:  Okay.  I have no further questions,

7   Judge.

8          THE COURT:  All right.  Mr. Gonzalez?

9          MR. GONZALEZ:  Thank you, Judge.

10                        CROSS-EXAMINATION

11  BY MR. GONZALEZ:

12  Q.  Ms. Keller, who told you that I was making fun of the

13  prayer group?

14  A.  I'm sorry?

15  Q.  Who told you to come in here and say about the prayer

16  group?

17  A.  I discussed that, that that happened.

18  Q.  You discussed it.  Okay.  Nobody told you that I had been

19  making fun of the prayer group?

20  A.  Absolutely not.

21  Q.  You haven't talked --

22  A.  I don't even know -- I'm sorry, but you just stated your

23  name and I don't even remember what your name is.  I'm sorry.

24  Q.  Juan Gonzalez.  I don't think we've met, have we?

25  A.  No.

1   Q.  All right.  Now, correct me if I'm wrong, the first time

2   you told the government that Alina Fonts was at a prayer group

3   was on 11-9, two weeks ago --

4   A.  Okay.

5   Q.  -- correct?  Is that correct?

6   A.  Yes.

7   Q.  Okay.  That was -- let's see, today is the 18th.  That was

8   last Sunday.

9   A.  Uh-huh.

10  Q.  Correct?

11  A.  Yes.

12  Q.  All right.  And last Sunday, you remembered that you used

13  to hold hands with Alina and pray, led by John Thoen, correct?

14  A.  Yes.

15  Q.  All right.  And you remembered that because who in the

16  government told you that this was important?

17  A.  No one told me it was important.

18  Q.  So then it just came to you after four years, maybe a light

19  from above or something of that nature, that you said, wow, I

20  need to mention to them that there was a prayer group and that

21  Alina was part of it.  Is that what it is?

22  A.  No, I didn't get a ray from above.

23  Q.  Well, how was it that it came to you then?

24  A.  Because we were talking about the situation.  We were

25  talking about what happened and they asked if any other people

1    were there.

2    Q.  Uh-huh.  All right.  Did they say Alina was there?

3    A.  They didn't tell me Alina was there.

4    Q.  You know, when you first spoke to him in 2011, when you

5    first spoke to Mr. Cox in 2011, you didn't even mention Alina's

6    name then.

7    A.  There are a lot of things that came to me afterwards.

8    There were times that I would leave the meeting and things

9    would come to me and I would, you know, call my attorney and

10   let her know.  It's a lot of information.

11   Q.  I got it.  Okay.  So then things that happened in 2007, you

12   couldn't remember in 2011, but these things became more vivid

13   to you and more memorable to you now in 2014, is that it?

14   A.  As time passes, you start remembering different things,

15   different things that happened.

16   Q.  Of course.  Now, you received -- the government made sure

17   that you only received 60 days in jail?

18   A.  Absolutely not.

19   Q.  No?

20   A.  That was something that was unheard of.  That's something

21   that I did not expect myself.

22   Q.  Okay.  But you're pretty happy about that, aren't you?

23   A.  I think anybody would be grateful.  I'm grateful, extremely

24   grateful.

25   Q.  No, I understand that.

1   A.   But it wasn't the government that gave me 60 days.

2   Q.   No?

3   A.   No, it was not.

4   Q.   But they went before Judge Cooke and spoke very well of

5   you?

6   A.   And that is not what they asked for.  I was not there, but

7   according to my family, the government definitely did not ask

8   the judge to grant me with 60 days.

9   Q.   But they went to court and they spoke -- so you weren't

10  even there.

11  A.   I was not there.  My family was there.  I was incarcerated.

12  Q.   All right.  You don't know what happened.

13  A.   I'm telling you -- well, I'm believing with what my family

14  said and what my attorney said.

15  Q.   Right.  So then what somebody told you is what you're

16  telling us today?

17  A.   What my attorney said that represented me in court.

18  Q.   And obviously, the government placed a motion for you and

19  everybody was really happy for you and then you got out with 60

20  days.

21  A.   Yeah, they placed the motion for me, and if I'm not

22  mistaken, it was a 40 percent reduction, which would have been

23  18 months, and my attorney, I know, did not ask for 60 days

24  either.  That was something that was the grace of God and the

25  judge granted it for me.

1    Q.  Okay.  Good.  God helped you?

2    A.  Definitely.  I have absolute assurance of that.

3    Q.  Okay.  I understand that.  All right.  So then, obviously

4    last Sunday is when you informed the government that you

5    remembered --

6    A.  Uh-huh.

7    Q.  -- that there was a prayer group and --

8    A.  It wasn't a prayer group.  It was just a prayer, like a

9    brief prayer.

10   Q.  Just a brief prayer.

11   A.  Yes.

12   Q.  And Mr. Thoen was leading that prayer.

13   A.  Yes.

14   Q.  Okay.  Now, am I correct in that Alina didn't work there in

15   the West as long as you worked there?

16   A.  I'm sorry?

17   Q.  Alina Fonts --

18   A.  Uh-huh.

19   Q.  -- didn't work at the West as long -- the entire time that

20   you were there?

21   A.  I believe I left and she stayed.

22   Q.  You believe that?  You're not sure?

23   A.  I'm pretty sure.  I left and she stayed.

24   Q.  Did you tell -- did you tell Julie Rivera at a certain

25   point that on, let me see, September 3rd of 2013, did you tell

1    her that Fonts was not employed at HCSN-West the entire time

2    that you worked for the HCSN-West?

3    A.  Yeah, because I started working in 2006.  I believe she

4    came towards the end of my employment there.  I left and she

5    stayed.

6           MR. GONZALEZ:  Okay.  All right.  I have nothing

7    further, Judge.

8           THE COURT:  Mr. Levin.

9                        CROSS-EXAMINATION

10   BY MR. LEVIN:

11   Q.  Good morning, ma'am.

12   A.  Good morning.

13   Q.  Now, you've testified in a court of law before, have you

14   not?

15   A.  Yes.  Have I testified before?

16   Q.  Right.

17   A.  Yes, yes.

18   Q.  And I know you were rather emotional on your direct

19   examination, but your tears seem to have subsided since the

20   defense attorneys got up here and started asking you questions.

21   A.  Well, during the break, I was able to recuperate.  I think

22   it's very difficult for me to talk about my responsibility and

23   then what I did, it's very hard for me to accept, and that's

24   why I get emotional, because it's hard to -- it's hard to

25   admit.

```
 1    Q.  Let me bring you back to happier times.

 2              MR. LEVIN:  Your Honor, pursuant to stipulation, I

 3    would be introducing into evidence Defense Exhibit 1-O.

 4              THE COURT:  Give me a second.

 5              MR. LEVIN:  Yes, Your Honor.

 6              THE COURT:  Okay.  So 1-O of Defendant Ruiz will be

 7    received in evidence.

 8              MR. LEVIN:  Permission to publish?

 9              THE COURT:  Yes.

10    BY MR. LEVIN:

11    Q.  Who is that?

12    A.  That's me, and she was like a medical assistant.  She would

13    help in the kitchen and with the patients.

14    Q.  And that's you?

15    A.  Yes, it is.

16    Q.  And you were 21 back then?

17    A.  I was 21, yeah, when I started.

18    Q.  Where did you grow up, ma'am?

19    A.  In Miami.

20    Q.  You come from a religious background, correct?

21    A.  Yes, I do.

22    Q.  And you got this job through your aunt, who was Armando

23    Gonzalez's housekeeper?

24    A.  Yes.

25    Q.  And have you -- had you met Mr. Gonzalez before you went to
```

1    work there?

2    A.  No.

3    Q.  Now, you met with the agents in this case, as Mr. Rabin

4    brought out, a number of times, about seven times; is that

5    correct?

6    A.  I don't remember an exact number, but yes, I've met with

7    them.

8    Q.  Well, let's just go through the dates again, just so it's

9    real clear.  December 14th of 2011, correct?  Does that sound

10   about right?

11   A.  Yes.

12   Q.  And then a week later on the 21st, 2011, right?

13   A.  Yes.  I don't remember exact dates, but I know I met with

14   them in December of 2011.

15   Q.  Okay.  And then again January 11th of 2012, a couple of

16   weeks after that?

17   A.  Okay.  I mean, like I said, I don't remember exact dates.

18   Q.  Okay.  But it's about seven times, right?

19   A.  Yes, I believe.

20   Q.  All right.  And it wasn't until -- as Mr. Gonzalez brought

21   out, it wasn't until November the 9th of 2014, which was about

22   six days after this trial began, when you told the agents that

23   my client was present for some kind of a prayer session,

24   correct?

25   A.  Yes, yes, correct.

1   Q.  And you met with Special Agent Cox, right?

2   A.  I've met with him before.

3   Q.  I'm asking you on that day, on November the 9th, 2014,

4   approximately nine days ago --

5   A.  Yes.

6   Q.  -- you met with Special Agent Cox, correct?

7   A.  Yes.

8   Q.  And you had met with him before, correct?

9   A.  Yes.

10  Q.  You met with him a number of times before, right?

11  A.  I don't remember how many times before.

12  Q.  But you've already indicated that you met with the agents

13  at least seven times, right?

14  A.  Yes.

15  Q.  Starting as early as December of 2011, right?

16  A.  Yes.

17  Q.  And it wasn't until nine days ago that you told them that

18  my client, Blanca Ruiz, was present for a prayer session,

19  correct?

20  A.  Yes.

21  Q.  In fact, you thought my client's name was Barbara back in

22  2011, did you not?

23  A.  That was the first day that I went in -- I can -- I can

24  explain that.  That was the first day that I went in and it was

25  very overwhelming.  I went in without any representation.  I

1    was extremely overwhelmed, extremely emotional.  And when they

2    showed me the pictures, I did identify her as Barbara.  When I

3    was driving home, I remembered, hold on, that is not Barbara,

4    that is Blanca.  I called and, you know, once I had an

5    attorney, and we met again.  I explained to them, listen, I

6    misidentified her, this is not Barbara, this is Blanca.

7        So I apologize for that, but it wasn't that I didn't know

8    who she was.  It was just that I was extremely overwhelmed at

9    the time.

10   Q.  So you met with them twice before you actually identified a

11   picture and identified it was Barbara, correct?

12   A.  I don't remember which time after that it was.  I thought

13   it was the time after, but I guess I'm not correct.

14   Q.  So after you got the lawyer is when you were able to get

15   yourself together.  Is that what you're suggesting to the jury?

16   A.  Well, no, that's when I was able to communicate with them

17   again.

18   Q.  By the way, we've never met before, have we?

19   A.  No, we have not.

20   Q.  But we've spoken, haven't we?

21   A.  You called me.

22   Q.  I did.

23   A.  Yes.

24   Q.  And I asked to speak to you.  And what did you say?

25   A.  I said, I don't think you should be contacting me directly

1    because you should have been contacting my attorney.

2    Q.  I didn't know who your attorney was.

3    A.  I didn't know that you didn't know.

4    Q.  You wouldn't speak to me.

5    A.  I thought it would have been on file.  I don't know how

6    this -- how this works.

7    Q.  But you wouldn't speak to me, right?

8    A.  No, I would not.

9    Q.  Why wouldn't you speak with me?

10   A.  Because I've learned from the first time that I'm not going

11   to speak to anybody without representation.

12   Q.  Now, how many children do you have?

13   A.  I have two and I have a stepdaughter.

14   Q.  And how old is your oldest child?

15   A.  He is 10.  He'll be 11 in January.

16   Q.  So when you started working there, you had a baby?

17   A.  Yes, I did.

18   Q.  And you were -- it was a rather emotional time for you back

19   at that time, was it not?

20   A.  Yes, very emotional.

21   Q.  You were having problems with your -- the father of your

22   child, right?

23   A.  Still do.

24   Q.  And you were -- it was a constant source of distraction for

25   you, was it not?

1    A.   There were times where I got emotional at work.  I don't

2    think it was a distraction.  It wasn't an everyday distraction,

3    no.  There were a couple of times where I did get emotional at

4    work.

5    Q.   Are you on medication?

6    A.   No, I'm not on medication.  I only take medication on

7    occasion when I have a migraine.

8    Q.   Right.  Back in 2006, were you on antidepressants or any

9    other kind of medications?

10   A.   No, absolutely not.

11   Q.   Did you seek any kind of psychiatric care?

12   A.   No.

13   Q.   And the problems that you were having with the father of

14   your child was related to child support?

15   A.   Yes.

16   Q.   And his right to visit your child?

17   A.   We would argue about when he would come or sometimes he

18   would just disappear, not come, things like that.  Just

19   visitation, I guess, you know, every other weekend type of

20   situations.

21   Q.   Now, you're friends with a woman named Lisset Mazza,

22   correct?

23   A.   Was, yes.

24   Q.   Was.  You're no longer friends?

25   A.   We no longer communicate for a very long time.

1    Q.   She was a very good friend of yours, wasn't she?

2    A.   She helped me.

3    Q.   She helped you when your mom passed?

4    A.   Well, she was -- my mom passed when I was 17.  I began

5    working when I was 21.  Those were things that I held onto.

6    The passing of my mom is unexplainable, so I remember I would

7    get emotional at times with her.  I believe she also lost her

8    mom and she would talk to me about it and try to help me cope

9    with it.

10   Q.   That's when you became friends, correct?

11   A.   Yes, that's when I became close with her.

12   Q.   And she worked at Health Care Solutions, did she not?

13   A.   Yes, she did.

14   Q.   And she worked at the West location with you?

15   A.   Yes, she did.

16   Q.   And how long did she work there for?

17   A.   I don't know.  She was there before me and then she left a

18   little bit before I left.

19   Q.   She never got in trouble, did she?

20   A.   I don't know.  I have no idea of what's going on with her.

21   I promise you, I do not know.  I do not know.  I do not look up

22   anybody, I do not seek to see what anybody has -- is going

23   through or has gone through.  I don't know.

24   Q.   You know she didn't get indicted in connection with this

25   case.

1    A.   I don't know.  And I have not asked.

2    Q.   But you know that she went and opened her own PHP, right?

3    A.   I do know that, yes.

4    Q.   When was the last time you spoke to her?

5    A.   Oh, many years ago.  I don't even know.  Before I even got

6    married.  I've been married almost six years.  I haven't talked

7    to her in a very long time.

8    Q.   Now, there was a census sheet that was one of your

9    obligations, one of your jobs, right?

10   A.   The admissions and discharges?

11   Q.   No, a census sheet.  You know what a census sheet is?

12   A.   Where the admissions and the discharges are?  Is that what

13   you're talking about?  Or are you talking about the sign-in

14   sheets?

15   Q.   Right.  Admissions and discharges.

16   A.   Yes.

17   Q.   That was one of your responsibilities, correct?

18   A.   For a time period.

19   Q.   And you did that with John Thoen?

20   A.   Yes, he did it.

21   Q.   And Mr. Gonzalez.

22   A.   Well, he would oversee it.  He didn't really do it.

23   Q.   Right.  Now, you ultimately sent billing spreadsheets to

24   the biller, right?

25   A.   Yes.

1   Q.  And you kind of guessed that this person, the biller,

2   Donna -- do you know her last name?

3   A.  Hmm.  I don't remember.

4   Q.  You kind of guessed where she lived?

5   A.  I know it was up north.  Something with an S, I think.

6   Q.  Well, do you remember speaking to the agents --

7   A.  I know it's area code 239.  I remember that.

8   Q.  Okay.  You said Sarasota on direct examination.  Do you

9   remember that?

10  A.  'Cause that's -- it's an S and that's the one I think of,

11  but I know -- I remember the area code was 239.

12  Q.  Right.  But you said it's something with an S moments

13  ago --

14  A.  Yes.

15  Q.  -- right?

16  A.  I think so, yes.

17  Q.  Okay.  And you remember meeting with the agents on December

18  the 19th of 2011, correct?

19  A.  I know I met with them in December, yes.

20  Q.  And do you remember telling them that the biller was named

21  Donna and was located in Fort Myers?

22  A.  Oh, okay.  I don't know.  I just know it's an area code 239

23  and I don't know why S comes to mind.

24  Q.  You don't know why you guessed that it was Sarasota, right?

25  A.  I don't know.  It's too much information.

1  Q.  And you don't know why you guessed it was Fort Myers back

2  in December of 2011, right?

3  A.  I know it's area code 239.  I don't remember the exact

4  city.

5  Q.  But back in December of 2011, you said Fort Myers to the

6  agent, did you not?

7  A.  I don't remember.

8  Q.  Perhaps if I showed you a report, it might refresh your

9  recollection.

10  A.  I mean, yes, you can show me.

11        MR. LEVIN:  May I approach, Your Honor?

12        THE COURT:  Yes.

13        MR. LEVIN:  One moment, Your Honor.

14  A.  Yes, I see that I said Fort Myers.

15  BY MR. LEVIN:

16  Q.  So today you said it's Sarasota, then you said it was Fort

17  Myers, and now, really all you remember is that it was area

18  code 239.

19  A.  I know that it was area code 239 because I remember dialing

20  that number over and over again.  I just couldn't remember the

21  city.

22  Q.  So why did you tell them Fort Myers?

23  A.  Because that's what I remembered at the time.  That's what

24  came to my mind.  I don't remember the city.  I just know that

25  it's 239.

1    Q.   But on direct examination, you remembered the city of

2    Sarasota.

3    A.   That's what I stated, but I don't -- I don't remember the

4    city.  I didn't think it was that much of a -- I don't know.  I

5    just -- I didn't know the city.  I didn't remember the city.  I

6    just know that it's area code 239.

7    Q.   Is there anything else you want to correct in your

8    testimony?

9    A.   No.

10   Q.   Now, you testified in a prior proceeding in connection with

11   these matters, correct?

12   A.   Yes.

13   Q.   And you were asked questions about the so-called white

14   group, were you not?

15   A.   Yes.

16   Q.   And you were asked what the white group was in that

17   previous proceeding, were you not?

18   A.   Yes.

19   Q.   And you said that that was a list that you created with the

20   patients that were not attending, physically attending the

21   facility, but were being billed for.  Do you remember that?

22   A.   Yes.

23   Q.   How did you become aware of the white group, you were

24   asked.  Do you remember being asked that?

25   A.   Yes.

1   Q.  And you said John Thoen.

2   A.  Yes.

3   Q.  Do you remember that?

4   A.  Yes.

5   Q.  Never mentioned anything about Blanca Ruiz in that prior

6   proceeding.  Not that it was about Blanca Ruiz, but you never

7   mentioned anything about Blanca Ruiz, right?

8   A.  No.  It wasn't about her.

9   Q.  I understand that.  But you did meet with the FBI on

10  February the 20th of 2013, did you not?

11  A.  February the 20th of 2013.  I don't remember exact dates,

12  like I said.

13  Q.  It was one of the seven times that you met with them,

14  right?

15  A.  Yes.

16  Q.  And you were asked questions about the so-called ghost

17  group or white group, right?

18  A.  White group, yes.

19  Q.  Okay.  And the binder for the white group was kept at your

20  desk, you told them, right?

21  A.  Yes.

22  Q.  And on one occasion, John Thoen asked you to forge

23  signatures, right?

24  A.  Yes.

25  Q.  And did you forge signatures?

1    A.   No.  I kept it at my desk and then I went to him and told

2    him that I wasn't going to do it.

3    Q.   But somebody else forged signatures?

4    A.   Yes.

5    Q.   Gema Pampin?

6    A.   I don't know about Gema Pampin.

7    Q.   Donna Gonzalez?

8    A.   Dana?  I don't know about her.

9    Q.   Dana.  Dana Gonzalez?

10   A.   I don't know.

11   Q.   What about Lisset?

12   A.   I don't know.  The...

13   Q.   Were you going to say something?

14   A.   No, no, it's fine.

15   Q.   Okay.  When you were speaking to the agents, you told them

16   that the HCSN employees that you knew were aware of the ghost

17   group were John Thoen, Wondera Eason, Tom Layman, and Anna last

18   name unknown.  Right?

19   A.   That who knew about the white group?

20   Q.   Right.  Who knew about the white group.

21   A.   Everyone knew about the white group.  It was in the binder.

22   Q.   But those were the names that you told them about back in

23   February of 2013.

24   A.   Maybe I didn't name all the administrative staff.

25   Q.   You didn't mention Blanca Ruiz being aware of the white

1    group or ghost group, did you?

2    A.  At that time, I guess I didn't.

3    Q.  And you said that your memory seems to improve with time.

4    You're starting to remember things?

5    A.  Well, just things come to me.

6    Q.  They just come to you now eight years later; is that your

7    testimony, basically?

8    A.  Certain details come to me now, or come to me during -- you

9    know, once I would meet with them, there were things that I was

10   unclear about, and then when I would leave, that I would

11   continue thinking about it, it would come to me.  You know,

12   like when you forget somebody's name and then you leave that

13   person and then you're like, oh, that's their name, things like

14   that.

15   Q.  Like Barbara and Blanca.

16   A.  Exactly.

17   Q.  In truth and in fact, you didn't even know her last name,

18   did you?

19   A.  I couldn't say at the time.

20   Q.  You couldn't, at that time, say her last name.

21   A.  No.  When meeting with the -- with the government,

22   especially the -- you know, the first few times, it was

23   extremely overwhelming.  I was extremely emotional, you know?

24   And things would just come to me later when I was more calm.

25   Q.  Or would things be told to you later?

1  A.  Things were not told to me.  I was asked, but things were

2  not being told to me.

3  Q.  And your testimony is that you were able to come up with

4  the name Blanca Ruiz on your own.

5  A.  Yes.

6  Q.  Nobody corrected you to say, oh, are you talking about

7  Blanca Ruiz?

8  A.  No.

9  Q.  That never happened.

10  A.  No, they did not tell me her name.

11  Q.  You testified that Marta, John, and Manny talked about the

12  spreadsheets.

13  A.  Yes, and -- yes.

14  Q.  Anything else you want to say?

15  A.  No.

16  Q.  Who is Marta?

17  A.  Marta was -- she worked at the East location.  She was like

18  the -- I guess the office manager.

19       MR. LEVIN:  Your Honor, by stipulation, Defendant Ruiz

20  would move into evidence Exhibit 1-V as in Victor.

21       THE COURT:  All right.  That will be received in

22  evidence.

23       MR. LEVIN:  Permission to publish?

24       THE COURT:  You may.

25  BY MR. LEVIN:

2354

1    Q.  Who is the lady in the middle?

2    A.  It looks like Margarita.

3    Q.  Margarita?  Who's Margarita?

4    A.  She was a therapist.

5    Q.  What's her last name?

6    A.  I don't know.  I don't remember.

7    Q.  You worked with her -- that's you on the left, is it not?

8    A.  Yes, it is.

9    Q.  How often did you sit next to her?  Every day?

10   A.  Yes, every day for some time.

11   Q.  For about two years?

12   A.  No.  She came after I started.

13   Q.  When did you start?

14   A.  2006.

15   Q.  When did she come?

16   A.  I don't know, maybe a year, year and a half later.  I'm not

17   sure.

18   Q.  You worked inches away from this lady.

19   A.  Yes.

20   Q.  About 24, to be exact -- or approximately.  You're about

21   two feet away from her, right?

22   A.  Yes.

23   Q.  And all you can identify her as is Martha?

24   A.  Oh, no, no.

25   Q.  Or Margarita?  What did you say her name was?

1   A.   Yeah, this looks like Margarita.

2   Q.   You're not sure who that is?

3   A.   It doesn't look like -- I remember Marta with more of a

4   grayish hair.

5   Q.   So you're saying that that lady who sat next to you for at

6   least a year, you're saying her name is Margarita and you're

7   not even sure if that's her, right?

8   A.   Well, I'm just a little confused because you were

9   mentioning Marta, but this looks like Margarita.

10   Q.   Forget about Marta.  That's my mistake.

11   A.   Oh, okay.  So you were mentioning Margarita.

12   Q.   Forget about Marta.  Yes.  I mentioned Marta.  Who's Marta,

13   by the way?

14   A.   That's who I said was an office manager at the East.  But

15   this doesn't look like Marta, this looks likes Margarita, and

16   she was a therapist at the West.  Yes, at the West.

17   Q.   Okay.  This lady is Margarita?

18   A.   That's who it looks like.  I mean, the picture is a little

19   fuzzy.  And Marta also had hair like this, that's why I'm a

20   little confused, but that looks like Margarita.

21   Q.   Does that help?

22   A.   It still looks fuzzy, but yeah, that looks like Margarita.

23   Q.   Margarita.  What's her last name?

24   A.   I don't remember her last name.

25   Q.   Don't remember her last name.  Sat next to you, two feet

1  away at work for at least a year; would you agree with that?

2  A.  I think it was less than a year.  But we didn't go by last

3  names.

4  Q.  40 hours a week, five days a week, you don't know her last

5  name.  She sat two feet away from you.

6  A.  I don't recall her last name.

7  Q.  Now, this is you on the left, right?

8  A.  Yes, it is.

9  Q.  Do you remember you had some problems remembering in your

10 debriefing whether or not you had a laptop or a desktop?

11 A.  Yes.

12 Q.  Does that help you refresh your recollection as to whether

13 you used a laptop or a desktop?

14 A.  I said I didn't remember it being a desktop, that I was

15 pretty sure it was a laptop.  That's what I remember.

16 Q.  You're working on a laptop there, right?

17 A.  Yes, I am.

18 Q.  And what's behind you there?

19 A.  The white board.

20 Q.  Let me show you what's in evidence as Blanca Ruiz's

21 Exhibit 1-A.  Do you recognize that?

22 A.  Yes.  I think -- I think this is the first location.  I

23 think this was the first West location.

24 Q.  Did you work there?

25 A.  Yes.

1    Q.   Now, you said that the West came under review at some point

2    in time, right?

3    A.   Yes.

4    Q.   And that there was an office that was set up to do the

5    review?

6    A.   Yes.

7    Q.   And you said that Blanca just stayed at her desk and did

8    her work, correct?

9    A.   Blanca did not work on the review in that office that was

10   set up.  She had her own desk in the office where -- in that

11   same office that we previously just saw.  She's just at a

12   different angle.

13   Q.   (Photo shown on ELMO.)

14   A.   In that office.

15   Q.   She stayed in this office.

16   A.   Yes.

17   Q.   So when the review office was set up, I think you said it

18   might have been the -- I don't know what you said, in the

19   kitchen maybe?

20   A.   No.  It was by the kitchen.  There was -- it was like a

21   warehouse, so it was like in the garage area.

22   Q.   Okay.

23   A.   There was like an office set up there.

24   Q.   Blanca did not participate in the review, right?

25   A.   I know she did biopsychosocials.

2358

1    Q.   She stayed in this office at her desk, correct?

2    A.   She stayed at that office at her desk and there was an

3    office set up for the review as well, because Alina Fonts

4    didn't have a desk, didn't have an office.  Neither did Gema or

5    Dana have an office in that facility.

6    Q.   Did you not testify on direct examination that when you

7    went into the office to do the reviews, Blanca stayed at her

8    desk?

9    A.   Yeah, she stayed at her desk.

10   Q.   Thank you.

11            MR. LEVIN:  Your Honor, by stipulation, we would move

12   into evidence Blanca Ruiz's Exhibit 1-J.

13            THE COURT:  All right.  That's in evidence.

14            MR. LEVIN:  Permission to publish.

15            THE COURT:  Yes.

16   BY MR. LEVIN:

17   Q.   Ma'am, do you recognize this paragraph?

18   A.   Those are two -- I don't recognize so much the lady on the

19   right, but she was a patient, the one sitting.

20   Q.   Right.  The one sitting is a patient?

21   A.   Yes.

22   Q.   What about the one to her left?

23   A.   I don't recall her face very much.

24   Q.   But you recognize the lady sitting as a patient?

25   A.   Yes.

1    Q.  Did you have any interaction with her?

2    A.  I had interaction getting their -- you know, the consents

3    signed.

4    Q.  I can't hear you, ma'am.

5    A.  I had interaction with the patients getting the consent

6    forms signed.

7    Q.  Do you have a specific recollection of meeting with that

8    woman?

9    A.  She looks familiar to me, like I know she's a patient.  I

10   just can't see, you know, a picture in my mind where I'm

11   getting her consents.  But it very well could have.

12   Q.  Was she a proper patient for a partial hospitalization

13   program?

14   A.  I don't recall.

15           MR. LEVIN:  Your Honor, by stipulation, Blanca Ruiz

16   would move into evidence 1-K.

17           THE COURT:  Okay.

18           MR. LEVIN:  Permission to publish.

19           THE COURT:  Yes.

20   BY MR. LEVIN:

21   Q.  Do you recognize this photograph?

22   A.  I recognize the people.  I don't recognize when it was

23   taken.

24   Q.  Okay.  Who is this lady here?

25   A.  She is a nurse.

1    Q.  And what's her name?

2    A.  Marielena, Mariela, something like that.

3    Q.  Can you -- can you repeat that?  I'm sorry.

4    A.  Mariela or Marielena, something of that nature.

5    Q.  Okay.  Mariela or Marielena.

6    A.  Yes.

7    Q.  You don't know her last name.

8    A.  We didn't go by last names.

9    Q.  So you didn't go by last names, so how is it that you

10   ascertained Blanca Ruiz's last name?

11   A.  Blanca is somebody that I was very close to.  I know her

12   last name.

13   Q.  But you're saying that at work, you didn't go by last

14   names.

15   A.  No.

16   Q.  And what about this gentleman here?

17   A.  John.

18   Q.  John?

19   A.  John, yes.

20   Q.  Do you know his last name?

21   A.  John Thoen.

22   Q.  So you know John Thoen's last name?

23   A.  Yes.

24   Q.  You know his last name from the various meetings you've had

25   with the agents, correct?

1    A.   No, I just -- I know John Thoen.  There were certain people

2    that I was closer to that, you know, I knew, you know, on a --

3    pretty much on a personal level, and they're just the people

4    that you're closer to and you end up knowing more about them.

5        Mariela was -- or Marielena was there during the morning

6    times.  You know, she was a nurse.  She wasn't in the same

7    office.  John Thoen was somebody that I interacted with daily.

8    You know, it's just certain people you know a little more

9    about.

10           MR. LEVIN:  Your Honor, by stipulation, I'd move into

11   evidence Ruiz Exhibit 1-W.

12           THE COURT:  Okay.

13           MR. LEVIN:  Permission to publish.

14           THE COURT:  Yes.

15   BY MR. LEVIN:

16   Q.   Do you recognize the individuals depicted in this photo?

17   A.   Hortensia and Walter.

18   Q.   Hortensia is this -- the lady there?

19   A.   Yes.

20   Q.   And this is Walter?

21   A.   Yes.

22   Q.   Do you know either of their last names?

23   A.   Hortensia, I can't remember.  Walter, I can't remember at

24   this time.  I'm sorry.

25   Q.   Now, Hortensia, she wasn't charged in connection with this

2362

1    case, was she?

2    A.   I'm sorry?

3    Q.   She wasn't charged in connection with this case, was she?

4    A.   I don't know.

5    Q.   You don't know who was charged in this case, right?

6    A.   Only the people that -- the only people I know of is the

7    people that I have -- like Wondera, John Thoen, and we were

8    arrested at the same time.  I know Manny, but I don't know

9    everybody that was or the people that haven't been or weren't,

10   I don't know.

11   Q.   What about Anna de la Nuez?

12   A.   Anna?

13   Q.   Anna.

14   A.   I know Anna.

15   Q.   How do you know her?

16   A.   She worked in the same office as Blanca and I.

17   Q.   She wasn't arrested in this case, was she?

18   A.   I don't know.

19   Q.   You don't know that either?

20   A.   I don't know.

21   Q.   Okay.  Now, your understanding with regard to your plea

22   agreement is if you don't tell the truth, you can be charged?

23   A.   Yes.

24   Q.   Charged with what?

25   A.   Not telling the truth.

1   Q.  Okay.  Perjury?

2   A.  Yeah.  Is that what it's called?

3   Q.  Do you have a lawyer?

4   A.  Yes.

5   Q.  Did your lawyer counsel you?  Did your lawyer counsel you?

6   A.  Yes.

7   Q.  Did your lawyer give you legal advice?

8           MR. STEWART:  Objection, Your Honor.

9   BY MR. LEVIN:

10  Q.  I'm not asking what the advice was.  I'm asking whether she

11  got counsel.

12          MR. STEWART:  Same objection.

13          MR. MEDINA:  Objection.

14          THE COURT:  Overruled.

15  BY MR. LEVIN:

16  Q.  Did you get counsel from your lawyer?

17  A.  Yes.

18  Q.  Okay.  You've had this lawyer since, what, your third

19  meeting with the FBI?

20  A.  She came in after my first meeting.  I don't remember

21  exactly what meeting she started attending with me.

22  Q.  Well, you previously testified that after your first couple

23  of meetings when you were extremely nervous, you then got a

24  lawyer and then that's when you started to feel more collected.

25  A.  I did.

1    Q.  That's my word.

2    A.  I had another lawyer previous to Brittney.

3    Q.  Oh, you had one lawyer before Brittney.

4    A.  Yes, that went with me, you know, the other time that I had

5    to go, and then I switched to Brittney.

6    Q.  When you say Brittney, you're talking about Brittney -- is

7    it Horstman?

8    A.  Horstman.

9    Q.  Horstman.  When did you leave Health Care Solutions?

10   A.  2008.

11   Q.  Now, who is Marta?

12   A.  We're talking about Marta now?  Marta?

13   Q.  Who was she?

14   A.  She was the, like, office manager at the East location.

15   Q.  And she trained you, did she not?

16   A.  To do the billing spreadsheet.

17   Q.  Right.  Did she train you to fabricate the billing

18   spreadsheet?

19   A.  She told me I had to put a 3 for everyone unless they were

20   in the hospital, to put an H.

21   Q.  She was never charged either, was she?

22   A.  I don't know.

23   Q.  What about Lisset Palmero, did you have a relationship with

24   her?

25   A.  She replaced Marta, yes.

2365

1    Q.   How did you get along with her?

2    A.   Okay, I guess.

3    Q.   You said that -- give me one second.  Did you say that

4    Ms. Ruiz was a supervisor of therapists?

5    A.   For a short time -- sorry, for a short time when they were

6    getting the North Carolina facility set up, there were times

7    where Manny and John Thoen were both out.  During that time,

8    Blanca would supervise the therapists and Wondera the staff,

9    like the kitchen staff, and she would take responsibility for

10   that.

11   Q.   So Blanca supervised the kitchen staff?

12   A.   No, no, no, no, the therapists.  And then Wondera would

13   supervise the other administrative staff, as well as the

14   kitchen staff and, you know, the medical assistants, the woman

15   in the picture that you previously saw.

16   Q.   So Blanca never supervised any therapists.

17   A.   Yes, she did.

18   Q.   Who did she supervise?

19   A.   Lisset.

20   Q.   Lisset was a therapist?

21   A.   Yes, because there's a Lisset Mazza and there's a Lisset

22   Palmero.  Lisset Palmero was from the East location.  Lisset

23   Mazza was a therapist at the West location.

24   Q.   Okay.  Who else?

25   A.   (Coughing.)

```
 1   Q.  Do you need some water?

 2   A.  No, I have some.  It's just --

 3       Lily, Lisset, Ruben, Alina, I think those were the four

 4   that were there during that time.

 5   Q.  So your testimony is that Blanca Ruiz supervised Ruben

 6   Busquets?

 7   A.  Yes.  There was a time period, remember, when both of them

 8   were out, when John Thoen and Manny were out in North Carolina.

 9   Q.  You had indicated that some of the patients soiled

10   themselves?

11   A.  Yes.

12   Q.  That doesn't necessarily mean that they're not PHP

13   eligible, does it?

14   A.  When they're to a point of their health where they're

15   incapable of knowing whether they have to go or not, I think

16   that's where the -- you know, the line is crossed.  These

17   people were so elderly, they just didn't -- they didn't know

18   when they had to go and they would go, you know?  A lot of them

19   would wear diapers.

20   Q.  You're not a psychotherapist, are you?

21   A.  No, I'm not.

22   Q.  You were basically a receptionist, were you not?

23   A.  Yes.

24   Q.  Now, you indicated that Blanca did biopsychosocials?

25   A.  Yes.
```

1    Q.   And she did them in a room there with a nurse, did she not?

2    A.   I'm sorry?

3    Q.   She did them in a room with a nurse, did she not?

4    A.   No, she did it at her desk.

5    Q.   Did it at her desk.

6    A.   Yes.

7    Q.   Let me show you what's in evidence as Ruiz's Exhibit 1-B.

8    Do you recognize this?

9    A.   Yes.

10   Q.   What is that?

11   A.   A desk.  The desk -- one of the desks in the office where

12   we worked.

13   Q.   Is that where the biopsychosocials took place?

14   A.   No.  Oh, I'm sorry, that's a nursing bed.  This is a

15   nurses' office.

16   Q.   It's a nurses' office, right?

17   A.   Yes.

18   Q.   Did biopsychosocial assessments take place in the nurses'

19   office?

20   A.   No, they did not.

21   Q.   And you're certain of that.

22   A.   Yes.

23   Q.   You're aware that Ms. Ruiz is just an intern, right?

24   A.   I am.

25   Q.   You were aware of it at that time, too, right?

1    A.  Yes, I am.

2    Q.  You talked about Dr. Villamil.  Do you remember that?

3    A.  Yes.

4    Q.  And he would come to the West location every Thursdays?

5    A.  Yes.

6    Q.  And he would sign files, right?

7    A.  I don't know if he would sign files.  I would give him the

8    face sheets for the new admissions.

9    Q.  Okay.  And how long did he stay at the West location?

10   A.  An hour or two.

11   Q.  An hour or two?

12   A.  Yeah.

13   Q.  Did you watch him come in and watch him leave?

14   A.  He would arrive around 9:30, 10:00, and he would leave at

15   like lunchtime, before lunchtime, before the clients'

16   lunchtimes, which I believe, if I'm not mistaken, was like

17   12:00.

18   Q.  What day of the week did he come?

19   A.  Thursdays.

20   Q.  And did you see Ms. Ruiz give him files to sign?

21   A.  I don't recall.

22   Q.  Did you work in the same office with her?

23   A.  Yes.

24   Q.  She was within your sight, right?

25   A.  Yes.

1   Q.   And you don't remember her bringing files for Dr. Villamil

2   to sign?

3   A.   I don't remember.

4   Q.   Do you know what the paparazzi is?

5   A.   A paparazzi?

6   Q.   Right.

7   A.   People that take pictures?

8   Q.   Right.

9   A.   Yes.

10  Q.   Did you ever see any kind of like paparazzi-like procession

11  when Dr. Villamil would come to the office, with people running

12  over to him, getting him to sign files?  Are you looking at the

13  government table for any particular reason?

14  A.   No, I was looking at the lights --

15  Q.   Oh, okay.

16  A.   -- because I'm trying to think of a -- I mean, I don't

17  remember people running to him with files.

18  Q.   You don't remember that.

19  A.   No.

20  Q.   And had people --

21  A.   I know that he was in there working.  I mean, he was --

22  when I would walk in there and give him face sheets, I would

23  see files, but I wouldn't see who would go and who would give

24  it to him or -- I mean, his office wasn't where my office was.

25  You would have to go, you know, into another hallway, so --

1  Q.  But the people that would bring him files worked with you,

2  right?

3  A.  I mean, the people -- yeah, I mean, the files that were

4  there were from the facility.

5  Q.  And had there been any kind of like paparazzi procession

6  with people gathering files and running to see Dr. Villamil for

7  his signature, you certainly would have remembered that, right?

8  A.  I remember seeing files on his desk.  I don't know who

9  would put them there or how it would go about.  He would only

10  come on Thursdays, so --

11  Q.  If there was a paparazzi-like procession of people running

12  to meet with Dr. Villamil to sign files, that's something you

13  would have certainly noticed, correct?

14  A.  I didn't see anybody running.  I mean, he was -- it's more

15  like patients wanting to hound him and see him.

16  Q.  Patients.

17  A.  Yeah.

18  Q.  Patients would want to meet with Dr. Villamil.

19  A.  They would request when they would see him.

20  Q.  Now, you recall the day that Ms. Ruiz was fired.

21  A.  Yes, I do.

22  Q.  And she was upset, she was angry, correct?

23  A.  Yes, she was very upset.

24  Q.  And she said that, according to you, she was going to get

25  back at Manny?

1    A.   Yes.

2    Q.   But you don't remember specifically what she said.

3    A.   She didn't say specifics.

4    Q.   You testified about a meeting I believe John Thoen had

5    organized with Mr. Gonzalez advising staff that the West was

6    under review?

7    A.   Yes.

8    Q.   And where did that meeting take place?

9    A.   In that office that we were at, our office.

10   Q.   Where in your office?

11   A.   Right -- he just stood there inside the office.

12   Q.   In the office that you sat?

13   A.   Yes.

14   Q.   Where your desk was?

15   A.   Yes.

16   Q.   And who was present for that meeting?

17   A.   There were therapists there, Alina Fonts, Lisset, Lily,

18   Ruben, Hortensia, Margarita, Blanca, Anna, myself, and I think

19   that's about it.

20   Q.   Are you talking about this office?

21   A.   Yes.

22   Q.   It's not a very big office, is it?

23   A.   No, it's not.  Therapists were actually sitting on the

24   floor.

25   Q.   So there were about 16 people stuffed into this office --

1    A.   Yes.

2    Q.   -- is what you're basically telling us?

3    A.   Yes, and there were therapists sitting on the floor.

4    Q.   And that's certainly something anybody in attendance would

5    remember, right, people sitting on the floor?

6    A.   I remember.

7    Q.   Well, I mean, you'd have to -- if you tried to get up,

8    you'd have to walk over bodies; would you agree with that?

9    A.   Yeah, we -- well, I mean, you're seeing half of the office.

10   There's another half that you're not seeing as well.

11   Q.   Is this the same office in the background?  Is that it?

12   A.   Yes.

13   Q.   Is that the other half we're not seeing?

14   A.   I mean, you're seeing partial of the other half.

15   Q.   All right.  So there are about 16 people in this room,

16   including my client?

17   A.   Yes.

18   Q.   And you have a specific recollection of that day?

19   A.   I remember that day.

20   Q.   Did you ever tell the agents about that meeting?

21   A.   Yes.

22            MR. LEVIN:   One moment, Your Honor.

23   BY MR. LEVIN:

24   Q.   So is nine days ago when, for the first time, you told the

25   agents about the prayer over the files?

1    A.   It wasn't the first time I told them about the prayer.

2    Q.   Didn't you testify before that it was the first time you

3    had told them about praying over the files?

4    A.   That may have been the first time I mentioned Blanca, but

5    it wasn't the first time I mentioned the prayer.

6    Q.   Okay.  So you had told them about the prayer before.

7    A.   Yes.

8    Q.   But when you told about them -- when you had told them

9    about the prayer before, Blanca was not there, right?

10   A.   We weren't talking about Blanca at that time.

11   Q.   Well, you were talking about everybody when you were

12   meeting with the FBI, right?

13   A.   During the time that we spoke about it, it was regarding

14   another case that I went to testify for.

15   Q.   Well, they asked you who was present, did they not?

16   A.   I believe so.  I don't remember.

17   Q.   You didn't limit -- you didn't limit it to just whatever

18   you were talking about at that particular time, did you?

19   A.   Well, that was the focus.

20   Q.   Right.  The focus.  Just like nine days ago it was the

21   focus, and that's the very first time you said Blanca was

22   present in some so-called prayer meeting, right?

23   A.   Yes.

24   Q.   Had you been keeping track in this trial in terms of like

25   when it started?  Had your lawyer --

1    A.   What do you mean, when it started --

2    Q.   Yeah.  Do you know when this case started?

3    A.   The case?

4    Q.   This trial, sorry.

5    A.   Like a week ago, week and a half?

6    Q.   How do you know that?

7    A.   Because my attorney let me know.

8    Q.   When you testified in a prior proceeding, was your lawyer

9    in the courtroom?

10   A.   I'm sorry?

11   Q.   When you testified in a prior proceeding --

12   A.   No.

13   Q.   You heard the answer -- you heard the question the first

14   time.

15   A.   Well, I didn't hear the first part.  Was my lawyer present

16   during the last time I testified?

17   Q.   Yes.

18   A.   No, she was not.

19   Q.   You had heard my question initially, hadn't you?

20   A.   I didn't hear the beginning of it.

21   Q.   You're taking a little -- you're taking time to think about

22   your answers, right?

23   A.   I'm not taking time.  I didn't hear the first part of the

24   question.

25   Q.   You heard the part "lawyer in the courtroom"?

1    A.   Prior proceeding.

2    Q.   You got the impression, being around Mr. Gonzalez, that he

3    was kind of like a mafia guy.

4    A.   They gave that impression.

5    Q.   Who is "they"?

6    A.   John Thoen and -- pretty much John Thoen.  He would mention

7    that like Manny had connections with people in high places or

8    he had like a cousin that was some form of -- in some form of

9    politics or something.

10   Q.   So -- but was it your impression that he was like a

11   mafioso?  Did you ever use that word before?

12   A.   Yes.  When I -- when I left Health Care Solutions, I didn't

13   want anybody to know because I wasn't sure how -- if he was

14   involved in that or how involved he was.  I just didn't want to

15   take any chances.

16   Q.   The question I asked was:  Did you ever use the word

17   mafioso before.  That was the question I asked.

18   A.   Yes.  I didn't know if he was some type of mafioso.

19   Q.   Ma'am, the question was, have you ever used --

20   A.   Yes.

21   Q.   -- the word mafioso before?

22   A.   Yes, I said yes.

23   Q.   Okay.  Do you recall meeting with the agents in June 7th of

24   2012, describing Mr. Gonzalez as like mafioso?

25   A.   I know I mentioned that.  I don't remember when.

1    Q.   Would you like to review the report to see if it refreshes

2    your recollection?

3    A.   If you would like me to review it.  I know I've said that.

4    Q.   Okay.  Now, you did your intakes on your laptop?

5    A.   Yes.

6    Q.   And there was a template that was created for the intake?

7    A.   After some time.

8    Q.   There's nothing sinister about a template, right?  There's

9    nothing wrong with a template, right?

10   A.   I don't think so.

11   Q.   Are you working now?

12   A.   Yes, I am.

13   Q.   Where do you work?

14   A.   Aviation.

15   Q.   Sorry?

16   A.   An aviation company.

17   Q.   You're not in the mental health field anymore?

18   A.   No.

19   Q.   Are you allowed to be in the mental health field?

20   A.   No.

21   Q.   Did you go to school to be a therapist?

22   A.   No.

23   Q.   A speech therapist?

24   A.   Yeah, a speech.  Well, I started.  I couldn't finish.

25   Q.   Couldn't finish because --

```
1    A.  Of my arrest.

2    Q.  And where did you go -- do your undergrad?

3    A.  I'm sorry?

4    Q.  Where did you do your undergraduate work?

5    A.  In Nova Southeastern University.

6    Q.  And what degree did you earn there?

7    A.  A bachelor's in psychology.

8    Q.  Do you know a guy named Alex from HCSN?

9    A.  A driver?

10   Q.  Right, a driver.

11   A.  Yeah, there was a guy named Alex, a driver.

12   Q.  Did he come into your office sometimes to make sure

13   patients wouldn't leave?

14   A.  What do you mean into my office?

15   Q.  Well, did you state on -- during your testimony that

16   certain patients would leave?

17   A.  He would stand by the door, by the front door where the

18   lobby.

19   Q.  Right.  And he would prevent people from leaving, right?

20   A.  Yeah.

21   Q.  So they didn't leave, people didn't leave.  You said before

22   that they left.

23   A.  No, there were times that they would leave if he wasn't

24   there present at the time.  I think it was after a situation

25   that occurred is when they started making a driver -- it wasn't
```

1   always Alex, it was a driver that would have to stand there --

2   well, sit, they had a chair right by the door -- in order to

3   prevent patients from leaving.

4   Q.  Now, were you married when you were working there?

5   A.  No.

6   Q.  Was your boyfriend the computer guy?

7   A.  Yes.

8   Q.  Is this your husband now?

9   A.  Yes.

10  Q.  Mr. Keller?

11  A.  Yes.

12  Q.  What's his first name?

13  A.  Shawn.

14  Q.  So John Keller?

15  A.  No, Shawn.

16  Q.  Excuse me, Shawn Keller, he was the computer guy at HCSN.

17  A.  Well, he would come in on -- you know, occasionally.  He

18  wasn't there like on a daily basis.  Whenever there was any

19  type of -- like the printer wasn't working or, you know, things

20  of that nature.

21  Q.  Did he help create the template?

22  A.  No.

23  Q.  Did he help make the billing spreadsheets?

24  A.  No.

25  Q.  He just fixed computers when they were broken.

1    A.   Exactly.

2              THE COURT:  Do you have more than a minute or two?

3              MR. LEVIN:  Probably not.  Probably not.  I'm winding

4    it up.  I'm wrapping it up.

5              THE COURT:  I have a 1 o'clock hearing, so I have to

6    give my court reporter lunch.

7              MR. LEVIN:  I've got two or three questions.

8              THE COURT:  You can have as much time as you want.

9    We'll just do it after lunch.

10             MR. LEVIN:  I'll just do it after lunch.  I don't want

11   to -- I'll do it after lunch.  That's fine.

12             THE COURT:  So are you all getting pizza today?  So

13   you want to come back at 1:30 instead of 1:45 or do you still

14   want 1:45?  You pick.

15             JUROR:  1:30.

16             THE COURT:  One voice said 1:30.  All right.  See

17   everybody back at 1:30.

18        (Jury not present.)

19             THE COURT:  Please be seated, everyone.  We're here in

20   open court outside the presence of the jurors, but everybody

21   else is here.  If Mr. Levin finishes in a few minutes, how much

22   redirect do you have?

23             MR. STEWART:  I guess it would depend on the final

24   questions, but at this point in time, we don't have any

25   redirect.

1       The witness is actually still here, Your Honor.

2       THE COURT:  Okay.  And she can hear the schedule.

3       MR. STEWART:  That's fine.  Of course.

4       THE COURT:  And then you're going to be resting?

5       MR. MEDINA:  That's correct, Your Honor.

6       THE COURT:  All right.  And how long do you think it's

7  going to take to argue the Rule 29s?

8       MR. RABIN:  I anticipate they'll be brief.

9       MR. PALOMINO:  Very brief.

10      THE COURT:  Okay.  And if we have an evident --

11      MR. GONZALEZ:  (Cross-talking) if I have to argue, it

12  will be, which I don't think I should, but --

13      THE COURT:  If we have an evidentiary hearing on the

14  issue relating to Ms. Feas, who would be called at that

15  hearing?

16      MR. RABIN:  I would call Ms. Feas, Mr. Weintraub, and

17  Mr. Medina.

18      THE COURT:  Mr. Weintraub is her lawyer?

19      MR. RABIN:  Correct.

20      THE COURT:  Where is he?  He's here, okay.  So we can

21  do that right after -- and how long is that hearing going to

22  take?

23      MR. RABIN:  I have some documents to introduce and

24  testimony of Ms. Feas.  I anticipate probably we could do it

25  within an hour.

2381

 1          THE COURT:  When you say Ms. Feas -- first you said

 2   Ms. Feas, Mr. Weintraub, and Mr. Medina, and then just now, you

 3   said Ms. Feas.  So are you going to put on all three witnesses?

 4          MR. RABIN:  Right.  But I don't believe any of them

 5   are going to be extremely long.

 6          THE COURT:  I know.  But in your estimate, you said

 7   Ms. Feas is an hour.  You mean all three witnesses, an hour?

 8          MR. RABIN:  I'm saying all three because the issue is

 9   relatively narrowly defined, so I believe I can probably put on

10   everything I need to put on within an hour.

11          THE COURT:  And do you agree with that time estimate,

12   Mr. Medina?  Are there any other witnesses you would be calling

13   on that issue?

14          MR. MEDINA:  No, Your Honor.  No other witnesses.

15          THE COURT:  Does anybody have any case law they want

16   to give me now so when I have the hearing, I know what --

17          MR. RABIN:  Absolutely.

18          THE COURT:  -- questions are relevant or not relevant

19   so I can look at those over lunch?

20          MR. RABIN:  Absolutely.  We have case law for the

21   Court.

22          MR. MEDINA:  Your Honor --

23          THE COURT:  I'm going to have several cases myself,

24   but let me just -- give me whatever you want me to consider and

25   I'll read it over lunch.

```
 1        MR. RABIN:  Okay.  Perfect.

 2        THE COURT:  Okay.  All right.  We'll see everybody

 3   back at 1:30 -- well, that's not true.  Carly and I will be

 4   back at 1:00.

 5      (Recess, 12:12 p.m. to 1:35 p.m.)

 6        MR. STEWART:  Your Honor, would you like the witness

 7   to return to the stand at this time?

 8        THE COURT:  Yes.

 9      (Jury Present.)

10        THE COURT:  All right.  Welcome back, everyone, and

11   please be seated.

12        All right.  Mr. Levin.

13        MR. LEVIN:  May it please the Court.

14        Ladies and gentlemen, good afternoon.

15   BY MR. LEVIN:

16   Q.  Ma'am, just a few more questions.

17        MR. LEVIN:  Your Honor, by stipulation, Blanca Ruiz

18   would move into evidence Exhibit 1-S as in Sam.

19        THE COURT:  All right.  1-S is in evidence.

20        MR. LEVIN:  Also, stipulation 1-T, 1-U, 1-R, and I

21   think V is already in evidence.

22        THE COURT:  B as in boy?

23        MR. LEVIN:  No, V as in victory.

24        THE COURT:  Yes, it is.  All right.  So all those

25   exhibits are in evidence.
```

1        MR. LEVIN:  Thank you, Your Honor.  Permission to

2    publish.

3        THE COURT:  Yes.

4        MR. LEVIN:  Thank you.

5    BY MR. LEVIN:

6    Q.  Ma'am, we had spoke of this picture earlier.  The gentleman

7    in the back, I don't believe I asked you about him.  Who is

8    that?

9    A.  I don't recall.  I'm trying to figure out who that is.  I

10   believe he was a therapist that was there for a short time.

11   Q.  Do you know his name?

12   A.  I don't.

13   Q.  You believe he was a therapist, I believe you said?

14   A.  Yes, for a short time.  He must have been there for a very

15   short time because I just don't...

16   Q.  I'm sorry?

17   A.  I don't recall.  Like the face looks familiar as a

18   therapist that was there for a -- must have been a short time

19   because I don't recall his name or anything.

20   Q.  Okay.  Let me show you 1-S.  Do you recognize these

21   individuals?

22   A.  I think they're both therapists, but I don't remember

23   neither name.

24   Q.  You think they're both therapists, but you don't remember

25   their names.

1    A.  Oh, no, she was not a therapist.  She was a friend of Manny

2    Gonzalez's wife and she -- she would like buy things for the

3    facility, like food and so forth.  She was not a therapist.

4        And him, I believe he was a therapist, but I do not

5    remember his name.

6    Q.  All right.  So he was a therapist?

7    A.  I don't recall his name.

8    Q.  Okay.  And do you know how long he worked there?

9    A.  It must have been a short time as well.

10   Q.  Must have been a short time as well?

11   A.  Yes, because I don't, like, recall his name.  Like he

12   wasn't someone that I interacted with daily, on a daily basis

13   much time.  If not, I would have remembered his name.

14   Q.  How about the lady sitting in the background, does she look

15   at all familiar?

16   A.  She was one of the like medical assistants and she would

17   help with the kitchen as well.

18   Q.  What was her name?

19   A.  I believe her name is Mayra.  I'm not too sure.

20   Q.  How long did she work there?

21   A.  I don't recall exactly.

22   Q.  Now, this office wasn't like -- it was one floor, right?

23   It was all one floor.

24   A.  Yeah, it was one floor.

25   Q.  It wasn't like there was an upstairs, right?

1    A.   No.

2    Q.   And this lady who worked in the kitchen, that would have

3    been like right next to your office, right?

4    A.   Yes.

5    Q.   And you don't remember her name and you don't know how long

6    she worked there.

7    A.   I mean, I don't recall exact dates.  I believe her name is

8    Mayra.

9    Q.   But you're really guessing right now, aren't you?

10   A.   It's not that I'm guessing.  It's that that's what comes to

11   mind, Mayra.

12   Q.   Who is the gentleman in the forefront?

13   A.   Ruben.

14   Q.   Do you know his last name?

15   A.   Busquets, Busquets, Busquets (pronouncing)?

16   Q.   Are you sure -- you're sure of that, right?

17   A.   I think that's how you pronounce it, Busquets.

18   Q.   Okay.  And the lady seated at the table?

19   A.   Lisset Mazza.

20   Q.   And that was a woman that you had befriended approximately

21   four years before you started working there?

22   A.   Before?

23   Q.   Right.

24   A.   No, no, not before.  While I worked there.  I said my mom

25   passed away when I was 17 and those were still things that I

1  was coping with, and she helped me, you know, deal with some --

2  some days I felt emotional and, you know, she would talk to me

3  about it, but I did not befriend her four years prior, no.

4  Q.  Do you remember speaking with the agents on December 21st

5  of 2001?

6  A.  2001?

7  Q.  Excuse me, 2011.

8  A.  I mean, I know I spoke to them in December, like I

9  mentioned.

10  Q.  Right.  Do you remember telling the agent that you

11  established a relationship years ago with Lisset Mazza after

12  your mother died?

13  A.  Years ago must have been years ago from 2011, but not years

14  ago prior to my employment there.  I did not know Lisset prior

15  to my employment at Health Care Solutions.

16  Q.  Did you socialize with her?

17  A.  At work?  Yes.

18  Q.  Did you socialize with her after work?

19  A.  I went to a Halloween party because her birthday is near

20  Halloween, I went one time, and we would have lunch together on

21  occasion, but it wasn't like consecutively, you know.  It was

22  once in a while.

23  Q.  What about the lady, referring again to Ruiz's Exhibit 1-T,

24  in the background with the turquoise top?

25  A.  Anna.

1   Q.   What's her last name?

2   A.   De la Nunez?

3   Q.   I'm sorry?

4   A.   De la Nunez?

5   Q.   De la Nunez?

6   A.   I don't -- I am not sure.

7   Q.   And can you tell who this is over here?

8   A.   Yes, Hortensia.

9   Q.   And do you know her last name?

10   A.   No, I'm sorry.

11   Q.   This lady right here --

12   A.   Uh-huh.

13   Q.   -- who is that?

14   A.   Anna.

15   Q.   Anna who?

16   A.   I forgot her last name too.

17   Q.   You forgot her last name?

18   A.   Yes.  Let me --

19   Q.   Okay.  Who else can you identify in this picture?

20   A.   Ruben, Blanca.  I don't recall his name.

21   Q.   You don't remember him?

22   A.   I mean, he looks familiar, but I just can't recall his

23   name.  That's the same picture.

24   Q.   Same -- it's a different picture.

25   A.   No, no, I mean, I've seen this picture previously.

1    Q.   Right.

2    A.   Oh, okay.

3    Q.   Is this man, this man?

4    A.   Yes.

5    Q.   And you don't know his name?

6    A.   I don't recall.

7    Q.   Now, finally, when you looked at photographs that the FBI

8    showed you, you identified Blanca's photograph as Barbara,

9    right?

10   A.   At first, but then I called and, you know, I explained to

11   them that I -- I was mistaken, that her name was not Barbara,

12   it was Blanca.

13   Q.   Right.  And you also did not know her by her last name at

14   that time.

15   A.   It probably didn't come to me at that time, just like it

16   didn't click to me that her name was Blanca and not Barbara.

17   It's...

18   Q.   So somehow her name came to you.

19   A.   Yes.

20   Q.   And your testimony is that it was not provided to you in

21   any of the seven debriefings that you had with the government.

22   A.   It was not provided to me.

23           MR. LEVIN:  That's all the questions I have.  Thank

24   you, Your Honor.

25           THE COURT:  All right.  Redirect?

1    MR. STEWART:  No redirect, Your Honor.

2    THE COURT:  All right.  You can step down.

3    THE WITNESS:  Thank you.

4    THE COURT:  Thank you.

5    Who is the next witness for the government?

6    MR. MEDINA:  The government rests, Your Honor.

7    THE COURT:  All right.  Let me see the attorneys at

8    sidebar to talk about scheduling.

9    (Sidebar Conference:)

10    THE COURT:  Okay.  I want to make sure we have enough

11   time to get whatever information I need to make the proper

12   ruling on the issue relating to Ms. Feas.  I don't want to rush

13   that.  You know me, I don't want to waste time either, but I

14   also don't want to have the jurors say come back in an hour and

15   then it takes us three hours.  So I just want to make sure --

16    MR. GOODYEAR:  Your Honor, we would submit that an

17   evidentiary hearing is a significant event that's just not

18   warranted.  Having reviewed the cases on which Mr. Rabin is

19   relying, there's not even an allegation of something

20   approaching what's contained in the case law.  On that basis,

21   we would submit that at most -- we would submit that a ruling

22   is possible based solely on a proffer that we're going to

23   provide you, and should you disagree with that, we would ask

24   for the time to brief the issue before an evidentiary hearing

25   begins.

1         THE COURT:  We're not going to take the time to brief

2     the issue.  I mean --

3         MR. GOODYEAR:  And just to be clear, the cases

4     Mr. Rabin submitted to the Court are cases in which either one

5     of two things have happened.  Either the cases ruled in favor

6     of the government on the issue of intimidation or they're cases

7     that involved direct contact with a witness.

8         There's only one case that I saw -- there's only one

9     case anybody submitted to the Court that involves

10    attorney-to-attorney communications, and that was a case that

11    had nothing to do with a discussion of the potential for

12    perjury.  Instead, it was a case where a prosecutor called an

13    attorney for a potential witness and reminded the witness of

14    her Fifth -- reminded the -- told the attorney that he might

15    want to remind the witness of her Fifth Amendment option.

16    Clearly a different -- I mean, that's a prosecutor stepping

17    into the role of giving legal advice to the client.  This was

18    not that.  This was --

19        THE COURT:  How do I know what it is unless there's an

20    agreed set of facts?

21        MR. GOODYEAR:  Well, again, we think that we can

22    proffer a set of facts to you, and we would be surprised if

23    Mr. Rabin disputed them, about what the nature of the

24    conversation was and the fact that there was a particularized

25    basis here.  This was not a generalized shot across the bow.

1    There was a particularized basis based on -- based on Ms. Feas

2    having completely reversed herself 180 degrees from where she

3    was.

4              THE COURT:  Does anybody have any other witnesses we

5    can use today?

6              MR. PALOMINO:  I have one witness here, Your Honor, a

7    very short character witness, take about 10, 15 minutes at the

8    most.

9              MR. PRIETO:  I have one scheduled to come tomorrow

10   morning, Judge.  I mean, she could come -- I'm at the Court's

11   pleasure.  If you want to do it today, we'll do it today.

12             THE COURT:  We have to do the Rule 29.

13             MR. RABIN:  Judge, here's my suggestion.  I wouldn't

14   agree to a proffer from the government, quite frankly.  I think

15   that there's too many moving parts to this regarding Ms. Feas

16   and the effect that it had on her.  This was direct contact

17   with a witness through her attorney.  Mr. Medina knows he could

18   not, in any other way, have direct contact with her, so he had

19   to do it through her attorney, knowing that he had an

20   obligation to have contact with her.  So to the extent that the

21   prosecutor thinks that wasn't direct contact, there's case law

22   on that as well.  This was intended to intimidate this witness

23   and have that effect on her and that's what the evidence --

24             THE COURT:  I don't want to hear arguments about the

25   nature --

 1          MR. RABIN:  I'm not arguing now.  I'm just saying --

 2    so that's why I'm saying, I can't -- I'm responding to his

 3    argument that it's not ripe for a proffer.  I believe it would

 4    be most -- the most wise use of time, so we could kind of keep

 5    in order, is let the jury go, do our Rule 29s, do the

 6    evidentiary hearing, start tomorrow morning, and go straight

 7    through.

 8          THE COURT:  Can we agree to hold off the Rule 29

 9    arguments until we take his witness?

10          MR. RABIN:  That's fine.  We could do that too.

11          ALL COUNSEL:  That's fine.

12          MR. RABIN:  I have no problem with that.

13          THE COURT:  Okay.

14       (Before the Jury.)

15          THE COURT:  All right.  Members of the jury, when the

16    government rests in a criminal case, there are some legal

17    matters I need to take up with the attorneys.  They are going

18    to take some time.  But there is a witness that's here, so to

19    accommodate that witness, they don't have to come back

20    tomorrow, we're going to take that witness's testimony at this

21    time, and then we'll take a break to consider those legal

22    issues.

23          So who is the witness?

24          MR. PALOMINO:  Marjorie Deza, Your Honor.

25          THE COURT:  Okay.

```
 1              MARJORIE DEZA, DEFENDANT CRABTREE WITNESS, SWORN
 2              THE WITNESS:  My name is Marjorie Deza.  My last name
 3    is D-E-Z-A.
 4              THE COURT:  All right.  Mr. Palomino.
 5              MR. PALOMINO:  May it please the Court.
 6                          DIRECT EXAMINATION
 7    BY MR. PALOMINO:
 8    Q.  Good afternoon, Ms. Deza.
 9    A.  Good afternoon.
10    Q.  Please tell the ladies and gentlemen of the jury a little
11    bit about your educational background.
12    A.  Okay.  I graduated as a psychology in Peru a few years ago
13    and I did all over again my profession here and I graduate as a
14    doctor in psychology.
15    Q.  And what school did you get -- attend to get that doctorate
16    in psychology?
17    A.  In Peru, it's called Pontificia Universidad Católica and
18    here was Carlos Albizu.
19    Q.  Okay.  Do you know an individual by the name of Doris
20    Crabtree?
21    A.  Yes.
22    Q.  And please tell the ladies and gentlemen of the jury, how
23    do you know Ms. Crabtree?
24    A.  I met her in a workplace at Miami Behavioral Health Center.
25    We were therapists there.  Then she become my supervisor.
```

1    Q.  And what year was this?

2    A.  2001.

3    Q.  2001?

4    A.  Uh-huh.

5    Q.  And how long did you work together with Mrs. Crabtree?

6    A.  Up to 2005.

7    Q.  Okay.  And during that time period while you were working

8    at -- was it Miami Behavioral?

9    A.  Uh-huh.

10   Q.  Is that a yes?

11   A.  Yes.  I'm sorry.

12   Q.  Okay.  Did you become familiar with an individual by the

13   name of Ruben Busquets?

14   A.  Yes.

15   Q.  And how did you get to know Mr. Busquets?

16   A.  He was a therapist also at Miami Behavioral.

17   Q.  And was Mr. Busquets fluent in the English language?

18   A.  No.

19   Q.  Did he have problems with the English language?

20   A.  Yes.

21   Q.  Okay.  Did Mr. Busquets, while you were working there at

22   Miami Behavioral with him, did he ever have any problems as far

23   as turning in his paperwork?

24   A.  Yeah, he had problems with being on time and turning in the

25   paperwork.

1    Q.  And did his language barrier affect his paperwork --

2    A.  Yes.

3    Q.  -- as far as you can --

4    A.  Yes, big time.

5    Q.  And during this time period, I believe you said that there

6    came a point in time where Mrs. Crabtree was your supervisor.

7    A.  Yes, she was my supervisor.

8    Q.  During the time period that she was your supervisor at

9    Miami Behavioral, did she ever request that you perform any act

10   which you thought was improper or illegal?

11   A.  Not at all.

12   Q.  Did she ever request you make any unwarranted changes in

13   any of the paperwork that you prepared?

14   A.  No.

15   Q.  Did there come a point in time, while working at Miami

16   Behavioral, where you became her supervisor?

17   A.  Yes.

18   Q.  And did you have an opportunity to review her paperwork at

19   her work when you were her supervisor?

20   A.  Yes.

21   Q.  During the review of that paperwork, did you find anything

22   improper, such as cloned notes or fabricated notes?

23   A.  No, never.

24   Q.  Throughout the years that you have known Mrs. Crabtree,

25   have you developed an opinion regarding her moral character?

1  A.   Yes.

2  Q.   And could you please let the ladies and gentlemen of the

3  jury know what that opinion is?

4  A.   She is a very -- a person with very high standards, moral

5  standards.  As a professional and as a person, as a human

6  being, she is a very caring, warm, very professional, and she

7  takes very seriously her work with her patients and her

8  profession.

9  Q.   Did you ever see her interact with her patients?

10  A.   Yes.

11  Q.   Was she compassionate towards her patients?

12  A.   Yeah, she was very empathetic and very compassionate.  Her

13  patients loved her.

14  Q.   And how did her patients respond to her?

15  A.   Very -- in a very positive way.  They felt that she was

16  there for her -- for them and she helped them a lot.  She even

17  used to go more than what she was expected to.

18  Q.   She would go beyond the call of duty?

19  A.   Yes, yes.

20        MR. PALOMINO:   Thank you.  At this time I have no

21  further questions, Your Honor.

22        THE COURT:   All right.  Mr. Rabin, any questions?

23        MR. RABIN:   No, sir.

24        THE COURT:   Mr. Hermida?

25        MR. HERMIDA:   No, sir.

2397

```
1          THE COURT:  Prieto?
2          MR. PRIETO:  No, sir.
3          THE COURT:  Mr. Gonzalez?
4          MR. GONZALEZ:  No questions, Judge.
5          THE COURT:  Mr. Levin?
6          MR. LEVIN:  No, Your Honor.
7          THE COURT:  All right.  The government, Mr. Stewart.
8                         CROSS-EXAMINATION
9   BY MR. STEWART:
10  Q.  Just a few short questions.  Are you familiar with a
11  company called Health Care Solutions Network?
12  A.  By name.
13  Q.  Have you actually worked at Health Care Solutions Network?
14  A.  No.
15  Q.  Have you ever gone to the facility?
16  A.  No.
17  Q.  Have you had any professional contact with Ms. Crabtree
18  since you stopped working with her in 2005 at Miami Behavioral?
19  A.  No.
20  Q.  Did you work with her while she was at Health Care
21  Solutions?
22  A.  No.
23  Q.  Do you know the owner of Health Care Solutions, Armando
24  Gonzalez?
25  A.  No.
```

1   Q.   Do you know anyone else who worked at Health Care

2   Solutions?

3   A.   No.

4           MR. STEWART:  Thank you.

5           THE COURT:  All right.  Any redirect?

6           MR. PALOMINO:  No redirect, Your Honor.

7           THE COURT:  All right.  Doctor, you can step down.

8   Thank you.

9           THE WITNESS:  Thank you.

10          THE COURT:  All right.  Members of the jury, we have a

11  disagreement among all of us involving the legal issues in

12  terms of how long it's going to take.  Some people think it's

13  going to be fairly short, some people think it's going to be

14  fairly long.  I hate to have you wait around for an hour and

15  then realize it really is going to take longer than that and

16  then we don't get to you for the rest of the day.

17          So to make sure I have enough time to devote to the

18  legal issues and not waste any of your time, I'm going to give

19  you the rest of the day off.  That way, we don't have to rush

20  and we'll take all the time we need.  If it takes an hour, then

21  I'll feel badly that I let you go to use the time, but if it

22  takes three hours, I'll be less stressed out than knowing that

23  you're sitting there waiting to come in.  So we're going to

24  recess for you all right now.

25          Let's see, tomorrow is Wednesday.  I don't have

1    anything else other than the trial tomorrow, so we'll get

2    started promptly at 9 o'clock tomorrow morning.  Okay.  So

3    remember you've heard now the government's case, but you

4    haven't heard all of the evidence in the case, and most

5    importantly, you haven't heard my instructions, so please don't

6    discuss the case.  All the other instructions apply and we'll

7    see you back tomorrow morning at 9 o'clock.  All right?

8         (Jury not present.)

9         THE COURT:  All right.  Please be seated, everyone.

10   We're here in open court outside the presence of the jurors,

11   but everybody else is here and the government has rested.  Any

12   motions on behalf of Dr. Rousseau?

13        MR. RABIN:  Yes, Judge.  We would rule for a Rule 29

14   judgment of acquittal based upon the government's failure to

15   establish proof beyond a reasonable doubt that Dr. Rousseau

16   willfully engaged in fraud.

17        We believe that the government's expert witness called

18   in this case is probably the best exculpatory evidence to

19   establish that fact, and if you take each of the acts that the

20   government alleges was committed by Dr. Rousseau, almost point

21   by point, the government's own expert said that those are not

22   violations of law on Medicare, and that as a result, we believe

23   that the government has failed to establish violations of

24   Medicare law.  We believe that the government has failed to

25   establish intent on the part of the doctor to commit violations

1  of that law.  The government has failed to establish his

2  willfulness in that regard.  And as to -- that's as to Count 1.

3        As to the specific fraud counts, which are Counts -- I

4  believe it's 2 and 3.  Judge, as to Counts 2 and 3, while the

5  government established Dr. Rousseau's involvement vis-a-vis

6  billing in those two counts, the government did not establish

7  that it was fraudulently done, and as a result, as to those two

8  counts, we would submit that a Rule 29 is appropriate as well.

9        THE COURT:  All right.  Mr. Palomino.

10        MR. PALOMINO:  Judge, I'm moving for a judgment of

11  acquittal on behalf of Doris Crabtree.  I don't think the

12  government has presented sufficient evidence to show that she

13  intentionally and willfully participated in this conspiracy.

14        Also, as to the substantive counts, what was shown

15  were the group therapy notes.  On cross-examination, the agent

16  was not able to establish that those group therapy notes were

17  in fact authored by my client.  There has been no evidence of

18  any sort of handwriting expert or anyone to say that that in

19  fact was her signature on those group therapy notes, and again,

20  they in fact do not know -- have not presented anyone to this

21  Court to say that she in fact fabricated not only those notes,

22  but any group therapy notes in this particular trial.

23  Therefore, I believe that a judgment of acquittal is

24  appropriate for Count 1 and for Counts 6 and 7.

25        THE COURT:  All right.  Mr. Hermida?

1            MR. HERMIDA:  Yes, Your Honor.  Ms. Salafia motions

2    the Court for the entry of a judgment of acquittal pursuant to

3    Rule 29.  It's our belief, Judge, that the government has

4    failed to present sufficient proof from which any rational

5    juror could conclude that Ms. Salafia is guilty as to the

6    conspiracy count and the two substantive counts.  Specifically,

7    as to the conspiracy count, Judge, it's not a crime to be

8    merely associated with criminals or to be in a place while a

9    crime is being committed.  I would cite to *U.S. versus Herrera*

10   *Gonzalez*, 263 F.3d 1092.

11           And Mrs. Salafia's mere participation in a scheme

12   whose ultimate purpose she was completely unaware of is

13   insufficient to sustain a conspiracy conviction, *U.S. versus*

14   *Sliwo*, 620 F.3d 630.  This is a Sixth Circuit case from 2010.

15           And finally, as to the two substantive counts, Judge,

16   the false claim or false statement counts, Mrs. Salafia would

17   argue that in the absence of any connecting or corroborating

18   facts or circumstances -- and this was aggravated in the

19   presentation that the government put on, Judge, where we

20   basically were left with at least three to four government

21   witnesses who admitted falsifying and otherwise altering

22   documentation.  Resemblance identification of a signature alone

23   will not sustain the beyond a reasonable doubt standard

24   essential to conviction, and I argued by analogy *United States*

25   *versus Ezzell*, 644 F.2d 1304.  It's a Ninth Circuit case from

 1     '81, still good law.  And *United States versus Johnson*,

 2     427 F.2d 957.  It's Fifth Circuit 1970, still good law.

 3               THE COURT:  All right.  Mr. Prieto.

 4               MR. PRIETO:  Yes, Judge.  On behalf of Ms. Marks, we

 5     move the Court for a judgment of acquittal under Rule 29.

 6     Judge, the government has failed to present sufficient evidence

 7     under which any rational jury could find my client guilty.  I

 8     would adopt Mr. Hermida's arguments and case law.  The only

 9     substantive issue would be the alleged allegation by agents

10     that my client admitted to false -- not falsifying, but signing

11     a document.

12               In light of the testimony presented by the other

13     witnesses, that evidence is contradicted by the rampant fraud

14     that was committed by others, which were witnesses presented by

15     the government, and there's nothing solid or that a jury could

16     rely upon to convict my client for either Count 1, conspiracy,

17     one, that she knew of any -- the existence of any conspiracy,

18     two, that she actively participated or even passively

19     participated in a conspiracy, and the fact that any of her acts

20     furthered the conspiracy.

21               As to Counts 10 and 11, the government has also failed

22     to present sufficient evidence with regard to the signatures on

23     those documents.  Although the government claims they were

24     acknowledged by my client, clearly the government has not been

25     able to present any testimony sufficient, or legal expert

1    witness testimony regarding those signatures, and in light of

2    the testimony of even their witnesses, and I would just

3    highlight to the Court even the government witness, George

4    [sic] Thoen, indicated that he had heard that these therapists,

5    meaning myself -- well, Ms. Marks, Ms. Crabtree, and

6    Ms. Salafia, were not involved in the fraud, and I think that's

7    supported by the evidence.  As such, we'd move for judgment of

8    acquittal on those grounds.

9         THE COURT:  All right.  Mr. Gonzalez.

10        MR. GONZALEZ:  Judge, I'm going to start with Counts 4

11   and 5, which are the substantive counts.

12        THE COURT:  Give me one second.  Yes, sir.

13        MR. GONZALEZ:  Yes, Judge.  Counts 4 and 5, which are

14   the substantive counts, but I believe my argument will bleed

15   into the conspiracy count, especially in the lack of proof that

16   was provided.  If you remember, those are the two counts where

17   they stated that a lady named Petrona de la Torre was treated

18   by my client and that a document, a group therapy note, was

19   submitted by her which was either inappropriate or was in some

20   way falsified.

21        Number one, they did not prove that my client treated

22   this person, that my client signed that paper, or that my

23   client was ever in the same room with her, number one.

24        And if you remember, Special Agent Cox specifically

25   told you that the signatures did not appear the same and that

1    he could not tell the jury that my client had treated her, and

2    there is, in fact, no testimony at all that my client was even

3    in the same room with this woman ever, number one.

4          Number two, and I think more importantly, is the fact

5    that part of the proof which was supposed to come out of the

6    government in this case is that that woman was not appropriate

7    for care at the PHP.  That is a -- that particular diagnosis, I

8    believe, has to be provided in the form of competent evidence.

9    There was no evidence here from anybody who knows what they're

10   talking about or anybody that has a basis to say that Petrona

11   de la Torre was not a proper PHP candidate.  Therefore, there's

12   absolutely no evidence that any fraud was committed.

13         I believe that they would have had to have put on a

14   medical doctor or something of that nature to review her

15   records, somebody who knew something about her to review the

16   records and tell you that it was inappropriate for her to be in

17   a PHP program.  That did not happen specifically as to Petrona

18   de la Torre.

19         So on both of those -- on both of those bases, one,

20   that they didn't prove that my client had any dealings with

21   her; and two, that they didn't prove the underlying basis of

22   the charge, which is that the woman did not properly qualify

23   for PHP, on both those grounds, they did not prove it, they

24   didn't even attempt to prove it, you should JOA those two

25   counts.

1          In terms of the general conspiracy, I think my

2   argument goes further in that as well.  There was no proof

3   here, competent proof, that any of these patients, any of the

4   people that you heard about, was improperly treated.  Yes, they

5   said generally that some people shouldn't have been there, but

6   it wasn't the professionals who said that.  In fact,

7   Mr. Triplett said the exact opposite.  It was office workers

8   and management who told you generally that some people didn't

9   need to be there.

10          In order for you to be able to sustain this charge,

11   they would have needed to bring competent evidence before you

12   that some psychiatric determination had been made that specific

13   patients were not appropriate for this program.  That didn't

14   happen either.

15          You're left then -- you are left then with the charge

16   that false notes were submitted.  I haven't seen one note that

17   has been introduced in this case to you, to the jury, to

18   anybody else, that was attributed to my client that was in any

19   way proven to be falsified.  Well, forget about proven to be

20   falsified.  Any note whatsoever from her was introduced in this

21   case.  In order for you to hold that she conspired, you would

22   have to hold that she obviously participated in some way in

23   producing a false note.  There was no notes.  Therefore, you

24   can't even judge whether one of those notes was false or not.

25          By all those reasons, Judge, I think a JOA is clearly

1  in order for Ms. Fonts.  There was no competent evidence that

2  she participated on the two substantive counts.  That's the

3  easier call.

4       And then on the other one, there's no evidence that

5  she participated in both, or the either/or allegations that the

6  government said, which is, one, that she treated a patient that

7  shouldn't have been treated; or two, that she presented some

8  kind of a falsified note.

9       THE COURT:  All right.  Mr. Levin?

10       MR. LEVIN:  Yes.  May it please the Court.  I'd like

11  to adopt all argument of counsel -- sorry, Your Honor.

12  Pursuant to Rule 29, on behalf of Blanca Ruiz, we would move

13  for a judgment of acquittal in that it's our belief that a

14  reasonable trier of fact could not find from the record

15  evidence in this case beyond a reasonable doubt the guilt of

16  Ms. Ruiz.

17       The government has failed to establish -- she's only

18  named in Count 1 of the indictment, the conspiracy charge.  The

19  government has failed to prove the element of willfulness and

20  intent on behalf of Blanca Ruiz.  There's been blanket

21  assertions that she created false notes.  However, there's been

22  nothing to suggest that those false notes, looking at the

23  evidence in the light most favorable to the government, were

24  ever submitted for billing to Medicare.  There have just been

25  witness after witness that have talked about fraud being

1    committed at Health Care Solutions Network, but not with any

2    specificity towards necessarily Mrs. Ruiz in this case.  And

3    for those reasons, Your Honor, I would ask that the Court grant

4    a judgment of acquittal.

5              THE COURT:  All right.  Mr. Medina.  Or Mr. Goodyear?

6              MR. GOODYEAR:  Thank you, Your Honor.  I'll just deal

7    with these briefly and if the Court would like further

8    information on any one particular defendant, we're happy to

9    provide that.

10             Initially, I mean, to take the therapists as a group,

11   there was repeated testimony -- I'll just cite Lisset Palmero's

12   testimony.  She would review the absent patients, determine who

13   was in a hospital or deceased or, for some other reason, ought

14   not to be billed for, and unless someone fell into that

15   category, she would go tell therapists and she said that -- she

16   named each of the therapists who are defendants here

17   individually from the East as therapists whom she told, yes, go

18   ahead and create a group therapy note for that patient who was

19   absent, and she said each of those patients [sic] proceeded to

20   do that.  That was, of course, corroborated by Ruben Busquets,

21   who said that that was exactly how he interacted with her.  In

22   addition, you have -- just a moment, Your Honor.  Also -- so

23   that goes to therapists creating group therapy notes for absent

24   patients.

25             The other issue, of course, with respect to therapists

1    is for patients who are actually in their group on those days,

2    creating group therapy notes that inaccurately described both

3    the conditions of the patients who were in their groups, their

4    suitability for PHP services, and what was actually going on in

5    their therapy sessions.

6         And on that point, again, of course, you have the

7    testimony of Ruben Busquets, who gave very clear testimony on

8    how it worked at both the East and the West, where initially he

9    would describe accurately what was going on in his therapy

10   sessions.  He would describe accurately that patients were

11   benefiting from PHP.  He would describe accurately that

12   patients were sleeping in his therapy sessions.  And he was

13   given very clear instructions by Alina Feas, don't do that.

14   Submit me revised notes.  And after a while, he caught on and

15   he acknowledged that he proceeded to submit inaccurate notes.

16        And that, coupled with the repeated testimony of

17   multiple witnesses, who described the conditions they saw among

18   the patients generally at Health Care Solutions, that they

19   were -- that they had difficulty communicating, that they often

20   didn't know where they were, and that they had these -- that

21   they had conditions consistent with severe Alzheimer's and

22   severe dementia, really corroborates that story from Ruben

23   Busquets and amply supports, of course, a jury finding that the

24   patients in all the East therapists' group therapy notes were

25   not suitable for PHP and the true group therapy simply could

1    not be conducted in those sessions.  Despite that, there is no

2    group therapy note written by any of those group therapists

3    that described conditions like that and described difficulties

4    with group therapy.  So that's the therapists in the East, Your

5    Honor.

6            As to Dr. Rousseau, you have the specific evidence of

7    him being present when Alina Feas gave Lisset Palmero

8    instructions on whiting out documents, changing the drugs, the

9    prescription drugs that incoming patients were listing as

10   having been prescribed for them, and that he was present when

11   those instructions were given and that he was present when

12   Lisset Palmero acted on those instructions and handed a

13   whited-out changed document back to Alina Feas.

14           And of course, you have the testimony of his awareness

15   of the kickbacks, his involvement in suggesting to Frank

16   Pabon -- sorry, in introducing to Frank Pabon, to Manny

17   Gonzalez, and being present when Manny Gonzalez explained that

18   if Frank Pabon started referring patients to Health Care

19   Solutions, there would be an incentive.  And his subsequent --

20   once Mr. Pabon began making those referrals, his checking in

21   with Mr. Pabon to see whether or not he was being, in

22   Mr. Pabon's words, taken care of.

23           And, of course, his having initiated -- his having

24   suggested to Mr. Pabon that he would -- that there was an

25   opportunity to make similar referrals to a different PHP, New

1    Era, and his having been present when the head of that PHP --

2    his having, first of all, described that potential relationship

3    as one that would be similar to what was going on at Health

4    Care Solutions and his having been present when the owner of

5    that PHP explained to Mr. Pabon that he could refer patients

6    there and get an incentive.

7         And then, of course, you have the repeated testimony

8    of how rarely Mr. -- Dr. Rousseau actually consulted with

9    patients, how often patients would be admitted without

10   Dr. Rousseau having seen the patient before admission, and how

11   he would sign documents blindly or with very minimal review of

12   the documents that were presented to him on the occasions when

13   he did come into Health Care Solutions.

14        As to Ms. Fonts, you have -- perhaps some of the

15   strongest evidence is, of course, the documentary evidence,

16   which are the checks with "notes" in the memo line and very

17   clear testimony from both Gema Pampin and Dana Gonzalez that

18   they received similar checks.  And what those checks were for

19   and what those checks meant was, here's a check for your work

20   on creating completely fabricated group therapy notes that we

21   can submit to Medicare.

22        There are only -- as we heard repeatedly just in the

23   last day and a half, only four people received checks like

24   that.  It was Gema Pampin, Dana Gonzalez, Ms. Fonts, and

25   Ms. Ruiz.

1              In addition, with respect to Ms. Fonts, you have her

2       having approached John Thoen about hiring her son to create

3       documents, and Mr. Thoen's recollection of a very specific

4       conversation with her about the importance of if someone is

5       going to be working here, they have to know how to write

6       creatively, and her saying to Mr. Thoen, don't worry, he knows

7       how to write creatively, and that, of course, goes to her own

8       intent and knowledge of the fraud.

9              Mr. Gonzalez mentioned Petrona de la Torre and

10      suggested that there's some issue with that count because the

11      government has failed to show that she was inappropriate for

12      PHP.  That's incorrect.  Through Ms. Coffey, the government's

13      summary witness, Ms. Coffey testified that that patient,

14      Petrona de la Torre, had a 2008 diagnosis for Alzheimer's in

15      the Medicare data, so that count is also amply supported

16      against Ms. Fonts.

17             In addition, there was also testimony from John Thoen

18      and -- at least from John Thoen that she created the documents

19      for the white list patients in the West.

20             And finally, Your Honor, as to Ms. Ruiz, again, John

21      Thoen said she was also responsible for documentation of the

22      white list patients in the West.  You have the testimony about

23      the day that she was fired from Mr. Thoen, talked about going

24      to Medicare, telling them what was going on at Health Care

25      Solutions.

1          And actually, I'm just remembering, I haven't even

2     talked about the admissions by several of these defendants.

3     Ms. Ruiz, of course, you have her admission to the FBI agents

4     about her knowledge of kickbacks, an additional point that

5     amply supports the counts against her.

6          There was documentary evidence with respect to

7     Ms. Ruiz, documents about the white list that specifically had

8     her name on it, and showed her responsibility for that part of

9     the fraud.  And again, as to Ms. Ruiz, one of the four people

10    who received checks with "notes" in the memo line that were

11    specifically for wholly fabricated notes.

12          Thank you, Your Honor.

13          THE COURT:  I just have a question about Counts 4 and

14    5 relating to Petrona de la Torre.  So you have record evidence

15    that she had Alzheimer's as of 2008, but you also have

16    Dr. Triplett, who said the fact that somebody has Alzheimer's

17    doesn't necessarily mean that they're inappropriate.  What

18    other evidence is there to conclude that she was either an

19    inappropriate patient or that the documents that were created

20    for Counts 4 and 5 were fraudulently submitted?

21          MR. GOODYEAR:  In addition, Your Honor, you have the

22    fact that those are cloned documents, and the issue there is

23    that -- you know, I know there's been a suggestion that that

24    signature was forged, but the issue there is that during that

25    time period, from January 2009 to July 2009, the fact is the

1    people who were doing the forgeries were not around.  You had

2    Mr. --

3             THE COURT:  I'm not concerned about the issue of the

4    signature.  That's up to the jury.

5             MR. GOODYEAR:  Well, but then, Your Honor, it's based

6    on the fact of the forgery.  It's based on the jury's permitted

7    to make an inference that it is just exceedingly unlikely that

8    the patient response/benefit was exactly the same on that day

9    as it was however many days before.  And it's not just the

10   quotation.  It's the fact that you have the quotation that's

11   apparently identical and, by some miracle, what the patient was

12   doing in therapy on that day is exactly the same as it was

13   before, Your Honor.

14            THE COURT:  Was there --

15            MR. GOODYEAR:  And if I may have a moment, Your Honor.

16       (Off-the-record discussion.)

17            MR. GOODYEAR:  And relatedly, that there was not

18   proper documentation -- that's a claim that was submitted to

19   Medicare, and the cloned notes, there just was not proper

20   documentation of that claim at the time it was submitted to

21   Medicare, Your Honor.

22            THE COURT:  But I know that you're saying that the

23   note in Count 4 is identical to the note in Count 5, right?

24            MR. GOODYEAR:  Correct.

25            THE COURT:  So therefore, there's a clear inference

1    you could draw that the note in Count 5 was fraudulently done.

2           MR. GOODYEAR:  Correct.

3           THE COURT:  So that would establish to me enough for

4    Count 5.  But I know there was also a chart that showed the

5    origination of a quote and then how many times it was later

6    used.  Is there a therapy note from before March 25th as to

7    Count 4 that's identical to the note?  Like, how do we know

8    that the note in March 25th wasn't the real note and,

9    therefore, when it was reshown or reused for the April 1st,

10   that shows April 1st is fraudulent because it's identical?  How

11   do we know that the first one is fraudulent also?

12          MR. GOODYEAR:  Your Honor, I don't know the answer to

13   the specific question of whether there is an earlier one that

14   is identical.  What I would say is that, you know, in general,

15   there's evidence of cloning, not just within a patient's chart,

16   but from a completely different patient's chart.  So the answer

17   to that question is difficult to answer because it could easily

18   be from a different patient's chart.  What we have seen -- I

19   mean, the cloning itself is evidence that in general, the notes

20   simply did not support what was going on in therapy.

21          THE COURT:  Right.  But the definition of cloning is

22   you take a note -- again, it may or may not be from a

23   legitimate earlier note, but the basic cloning is you take a

24   note from a real session, either from this patient or another

25   patient, and then clone it and just cut and paste it into

1    another one.  So clearly, the second time you use it is

2    fraudulent, but it doesn't necessarily mean that the first time

3    you used it, it was fraudulently done.  So how do we know in

4    Count 4 that it was fraudulently done?  Just because it's

5    identical to Count 5.

6          MR. GOODYEAR:  In addition -- so, Your Honor, I think

7    there are a number of factors.  There is the fact -- so there

8    is the fact that repeated testimony about the unsuitability of

9    patients for this type of therapy and the conditions they had

10   and what was actually going on in the therapy sessions.

11          In addition, there's testimony from John Thoen about

12   how, during that time period again, January 2009 to July 2009,

13   there were virtually no patients in the West.  There simply

14   were not -- there were not nearly the number of patients that's

15   supported by the large number of group therapy notes that are

16   continuing to be written during that time.  And that is an

17   additional basis that would permit the jury to infer that even

18   a cloned note that appears to be sort of the first -- as far as

19   we can tell at this point, specifically is the first version of

20   a cloned note, that even a note like that is false, Your Honor.

21          THE COURT:  All right.  I'm going to deny the motion

22   for judgment of acquittal as to Counts 1, 2, 3, and 5 through

23   11.  I think there's sufficient evidence in the light most

24   favorable to the government to establish a prima facie case as

25   to each of the elements of each of those offenses.  I'll give

1    the government until tomorrow morning before the jurors come

2    back to figure out if they have some other evidence as to

3    Count 4 that they're not articulating to me at this point.  So

4    I'll reserve as to Count 4 and deny as to all the other ones.

5              Let's take up the issue relating to Ms. Feas.  So

6    Mr. Rabin, this is your issue.  Go ahead.

7              MR. RABIN:  All right.  Judge, there's two witnesses I

8    want to start off with, Mr. Weintraub first and then the

9    in-custody witness, Ms. Feas.

10             THE COURT:  Okay.  Why do we need to hear from

11   Ms. Feas, because if whatever communication was -- my

12   understanding is a communication that was made was between the

13   prosecutor and her attorney.

14             MR. RABIN:  Well, we would need to hear from her on

15   the issue of --

16             THE COURT:  If I find that there was nothing improper

17   said or wasn't legally -- what difference does it make what she

18   thinks?

19             MR. RABIN:  If you were to make that finding, then I

20   assume it wouldn't matter what effect it had on her.

21             THE COURT:  So shouldn't we take that other testimony

22   first to find out what was said between Mr. Weintraub and

23   Mr. Medina and whoever else?

24             MR. RABIN:  I think that those two would be the first

25   two to talk about the actual communications.  No problem with

 1    that.  I'll call Mr. Weintraub first then.

 2              THE COURT:  Since Mr. Medina is one of the lawyers,

 3    why don't we call him first and Mr. Weintraub can wait outside.

 4              MR. GOODYEAR:  Your Honor, can I raise one issue?

 5              THE COURT:  Yes.

 6              MR. GOODYEAR:  Based on an email chain that Mr. Rabin

 7    provided to us during the lunch break, we believe there's a

 8    significant likelihood that Mr. Rabin himself may need to be a

 9    witness at this hearing, and based on that, we have concerns

10    about him advocating whatever -- he hasn't made a motion,

11    but --

12              THE COURT:  How would he be a witness?

13              MR. GOODYEAR:  Sorry?

14              THE COURT:  How would he be a witness?

15              MR. GOODYEAR:  There's an email chain that makes clear

16    that he had conversations about -- on Saturday of last weekend,

17    he spoke to Ms. Feas at the FDC.  And the email chain makes

18    clear that he had conversations with her about what he would

19    call a threat and what we would call the possibility that she

20    might wind up indicted for perjury.  He had those conversations

21    with her on Saturday.

22              So part of the government's contention on this motion,

23    Your Honor, is that whatever information was provided last

24    night, it was no different from information she already had on

25    Saturday, and Mr. Rabin is an important witness to that

1    information provided to her on Saturday.

2              THE COURT:  So what do you want me to do?

3              MR. GOODYEAR:  To the extent -- again, the

4    government's view is there's no need for an evidentiary hearing

5    and this should proceed on a proffer basis because it raises

6    exactly these types of issues.  But to the extent there's going

7    to be an evidentiary hearing --

8              THE COURT:  Why don't we put on Mr. Rabin first so you

9    can present whatever you think his testimony should be and

10   Ms. Lopez can do his cross.  That way he's done as a witness

11   and he can participate in the rest of the hearing.

12             MR. GOODYEAR:  That's fine, Your Honor.

13             THE COURT:  All right.  So, Mr. Rabin.

14             MR. RABIN:  Okay.

15             THE COURT:  Come on.

16             MR. RABIN:  I would ask Mr. Medina to step out as

17   well, then, since I guess the rule is invoked.

18             THE COURT:  Well, I thought his testimony was dealing

19   with his conversations with Ms. Feas, not his conversations

20   with Mr. Medina.

21             MR. GOODYEAR:  Correct.

22             THE COURT:  So that's not going to affect Mr. Medina's

23   testimony because he wouldn't have been present.

24             MR. RABIN:  My conversation with Ms. Feas relates to

25   what she told me about her conversations with Mr. Medina.

1        THE COURT:  Okay.

2        SAMUEL J. RABIN, JR., GOVERNMENT WITNESS, SWORN

3                    DIRECT EXAMINATION

4   BY MR. GOODYEAR:

5   Q.  Good afternoon, Mr. Rabin.

6   A.  Good afternoon.

7   Q.  Did you participate in an interview with Alina Feas at the

8   FDC on Saturday of last weekend?

9   A.  I did.

10  Q.  Were you leading that interview?

11  A.  I would say I was leading the interview, yes.

12  Q.  Who else was there?

13  A.  My associate, Andrea Lopez, Ms. Feas's attorneys, Benson

14  Weintraub, and Jerry Feas, her son.

15  Q.  And about how long did the meeting last?

16  A.  I got there -- I got there late because I left my wallet in

17  my office, so we were supposed to be there at I want to say

18  10:00, and I got there around 10:30, 10 -- 10:30 -- 10:15,

19  10:30.

20  Q.  Okay.

21  A.  And we were there until about -- no, maybe it was later.

22  You know, honestly, the time, I don't recall.  But I think I

23  was there for a total of about two hours, though.  I don't

24  remember what time it started.  And I did get there a little

25  late.

1   Q.   You got there a little late.  So had the meeting commenced

2   without you before you arrived?

3   A.   I'm sure there was some discussion.  Obviously, I don't

4   know the details of it because it kind of like started over

5   when I got there.

6   Q.   Okay.  And did you discuss with Ms. Feas during this

7   meeting anything about the possibility that her testifying on

8   behalf of Dr. Rousseau might result in a perjury charge against

9   her?

10  A.   No, I did not -- I did not -- the answer is perjury came

11  up, but not the way you're stating it.

12       Here's how it came up.  Ms. Feas had -- Dr. Feas had told

13  me that she had met with Mr. Medina on three prior occasions

14  during debriefing sessions, and that at least in each one of

15  those, Mr. Medina was telling her he didn't believe her.  And

16  on the third one, the interview was terminated because he

17  essentially just accused her of being a liar.

18       And then she filed a Rule 2255 motion to withdraw her plea

19  with her new counsel, and again Mr. Medina had called her

20  lawyer.  And again, Mr. Medina had called her lawyer after the

21  2255 had been filed and said that everything in there is a lie

22  and essentially castigated her lawyer for filing the 2255.

23       And when I heard that litany of facts, I told her, well,

24  you could expect that the same thing could happen again, that,

25  you know, the government's going to go after you.  When I

1    thought it would come out would be cross-examination.  The

2    government is going to go after you for, you know, saying that

3    you're lying because you're now testifying.

4    Q.  Did you -- did you tell her that the government would

5    threaten her with perjury during that meeting?

6    A.  Again, what I told her is what I just told you.  That based

7    on this litany, this -- this serious, serial allegations by

8    Mr. Medina, I expected that there would be allegations against

9    her when she was testifying that you're committing perjury and

10   that, you know, that -- well, I don't know what else could come

11   from that, but certainly I told her that that accusation could

12   be made.

13   Q.  Mr. Rabin, during that meeting, did you tell her that the

14   government would threaten her with perjury?

15   A.  The answer -- my best answer is what I just told you.

16   That's the best way --

17   Q.  Was that a yes or a no, what you just told me?

18   A.  I told her the allegation of perjury would probably be made

19   against her, correct.

20   Q.  Did you use the word "threaten"?

21   A.  That I don't remember.  I don't remember if I used the word

22   "threaten."  I know it's in my email, but I don't know if I

23   used it with her.

24   Q.  Well, that was my next question.  So do you remember

25   stating in an email message to Benson Weintraub last night that

1  "At that meeting, I told her that the government would be angry

2  at her and possibly threaten her with perjury"?

3  A.  Absolutely, that was my email.

4  Q.  Okay.  But do you remember -- but now you're saying you

5  don't remember whether or not you used the word "threaten" in

6  the meeting with Ms. Feas.

7  A.  My best recollection is I told her that the government

8  would accuse her of perjury or threaten her with perjury or

9  make an allegation of perjury.  I don't remember the exact

10  word.  But I told her that she was going to, you know, incur

11  the government's wrath, so to speak, and to be prepared for

12  that.

13          MR. GOODYEAR:  Okay.  Nothing further, Your Honor.

14          THE COURT:  All right.  Ms. Lopez, any questions?

15          MR. RABIN:  Really?  I didn't expect this.  Can I

16  object to her questioning me?  (Laughs).

17          MS. LOPEZ:  No.  Just a few questions.

18                    CROSS-EXAMINATION

19  BY MS. LOPEZ:

20  Q.  Mr. Rabin, was that email verbatim of what you said on

21  Saturday?

22  A.  No.

23  Q.  Was it exactly what you said on Saturday?

24  A.  No, it couldn't have been.  It was just -- yesterday --

25  what happened was --

1        THE COURT:  Would it have been better to have a

2   tape-recording so we would know exactly what was said?

3        (Laughter.)

4        THE WITNESS:  Absolutely, Judge.  100 percent, I agree

5   with that.

6   A.  The answer is that events moved very quickly yesterday from

7   the time we left court to the time Mr. Medina made the first

8   phone call to Mr. Weintraub, then Mr. Weintraub contacted me,

9   and there were emails going -- flying back and forth

10  essentially in two separate chains.  I had an email chain going

11  with Mr. Medina, I had an email chain going with Mr. Weintraub,

12  and, you know, I was doing my best to paraphrase events as they

13  were going on.  I wasn't attempting to be precise or, you know,

14  recall exact wording but, you know, just the gist of things.

15  BY MS. LOPEZ:

16  Q.  And had Ms. Feas been threatened before --

17  A.  Yes.

18  Q.  -- by the government?

19  A.  Yes.  Ms. Feas had been threatened -- as I indicated

20  earlier, Ms. Feas had been threatened or accused of committing

21  perjury in at least one of three debriefings by Mr. Medina and

22  when she filed her 2255.  So at least -- at least on two prior

23  occasions that I was made aware of, and possibly more.

24  Q.  And just as a hypothetical, if I warn you that someone is

25  going to threaten you, does that make my -- does that make an

1    actual threat any less threatening?

2    A.  No.  Obviously, me telling her that she could get

3    threatened by the government is -- does not carry the fear

4    factor, if you will, of the government actually making the

5    threat.

6    Q.  So a warning isn't the same thing as the government calling

7    you and actually threatening you, correct?

8    A.  I don't believe it would be.

9              MS. LOPEZ:  Okay.  Thank you.

10             THE COURT:  Any of the defendants have any questions

11   of Mr. Rabin?

12             MR. PALOMINO:  No, Your Honor.

13             MR. HERMIDA:  No, Your Honor.

14             MR. PRIETO:  No, Your Honor.

15             MR. RABIN:  Sit down.

16        (Laughter.)

17             MR. GONZALEZ:  No, Judge, I don't have any questions.

18             MR. LEVIN:  No, Your Honor.

19             THE COURT:  All right.  Thank you, Mr. Rabin.

20             All right.  Mr. Medina.

21        ALLAN J. MEDINA, DEFENDANT ROUSSEAU WITNESS, SWORN

22                       DIRECT EXAMINATION

23   BY MR. RABIN:

24   Q.  Good afternoon, Mr. Medina.

25   A.  Good afternoon.

2425

1   Q.  All right.  You are intimately familiar with Alina Feas,

2   correct?

3   A.  Yes.

4   Q.  You have had how many occasions to meet with her and speak

5   with her?

6   A.  I think I've met with her approximately three times.

7   Q.  Okay.  How many debriefings did you participate in with

8   her?

9   A.  I want to say around three.  Not all of them.

10  Q.  During one -- at least one of those debriefings, did you

11  accuse her of lying?

12  A.  I don't recall specifically.  I know that there was a time

13  when we stopped the meeting, which is common practice, because

14  of evidence we were showing her and in my opinion and the

15  agent's opinion she was minimizing her role.

16  Q.  Okay.  And that would have been the last debriefing?

17  A.  I don't recall exactly which one it was.

18  Q.  Well, do you remember having debriefings with her after you

19  terminated --

20  A.  I don't.  All I remember is that we put a hold with

21  Ms. Feas at FDC in anticipation of having her cooperate.  Her

22  plea agreement was still valid.  Nothing was withdrawn.  So she

23  was at FDC potentially cooperating with the government.

24  Q.  Okay.  So you recall at least one debriefing where you

25  terminated it because you believed she was minimizing, correct?

```
1   A.  Yes.

2   Q.  Did you actually tell her in any of her debriefings "we

3   think you're lying" or words to that effect?

4   A.  I don't recall that.

5   Q.  Okay.  You're not saying you did or you didn't, you just

6   don't remember?

7   A.  I don't recall saying that.

8   Q.  Okay.  Are you saying that you didn't?

9   A.  I recall not saying that.  I did not say that.

10  Q.  Okay.  Did there come a point in time when her lawyer filed

11  a 2255?

12  A.  Yes.

13  Q.  Okay.  Did you contact her lawyer after the 2255 was filed?

14  A.  I did.

15  Q.  And what -- did you tell him that you believed that she was

16  committing perjury in the accompanying affidavits to the 2255?

17  A.  No, I did not.

18  Q.  What did you tell him?

19  A.  I called Mr. Weintraub because, like I said, Ms. Feas was

20  at FDC, we anticipated using her as a cooperating witness,

21  nothing had changed, and I called him because up until that

22  point, Mr. Weintraub had not called me to say there were any

23  questions or issues as to Ms. Feas's cooperation.  When I made

24  that clear, when I questioned Mr. Weintraub of why the 2255 was

25  filed, he said, well, it was my mistake.  I thought that you
```

1    weren't going to use her and cooperate her, so that's why I

2    filed the 2255.  I said that was not the case, that's why I in

3    fact had Ms. Feas at FDC on hold, to continue to use her as a

4    cooperating witness.

5    Q.  How much time had passed from the time he filed the 2255

6    and the last time you had met with Ms. Feas?

7    A.  I don't recall exactly.  I don't recall.

8    Q.  About seven months?  Does that sound about right?

9    A.  I don't recall, I really don't.

10   Q.  So it's your recollection that you never told Mr. Weintraub

11   that the affidavit that she attached to the 2255 was a lie, was

12   perjury.

13   A.  That's not my recollection.

14   Q.  Okay.  Just like it wasn't your -- and you have no

15   recollection of doing it in any of the debriefings as well,

16   correct?

17   A.  That's correct.

18   Q.  Okay.  Then there came a point in time -- now, when did you

19   first -- when did you first realize that Dr. Rousseau was going

20   to call her as a witness?  When did you first know that for

21   certain?

22   A.  Yesterday.

23   Q.  Right.  And that was -- I mean, she had been listed from

24   what date?  Do you know the date she had been listed from?

25   A.  I don't believe -- I think, Mr. Rabin, you told me that you

1   filed a supplemental witness list, I believe, but I don't

2   recall exactly.

3   Q.  You would accept my representation if I tell you she was

4   listed since October 29th, the original witness list, wouldn't

5   you?

6   A.  If that was the case, yeah.

7   Q.  I mean, I could show it to you, but the record is the

8   record.

9           THE COURT:  I have it here.  It's October 29th.

10  BY MR. RABIN:

11  Q.  Okay.

12  A.  Okay.

13  Q.  So she's been listed as a witness since October 29th.  You

14  never made any attempts to contact her attorney or Ms. Feas

15  direct- -- well, you would never contact Ms. Feas directly,

16  correct?

17  A.  I would not.

18  Q.  Right.  You know she's represented.

19  A.  I do.

20  Q.  So you know the only way to contact her is through her

21  counsel, right?

22  A.  Yes.

23  Q.  Okay.  So you made no attempts to contact Ms. Feas or her

24  counsel from October 29th until yesterday, fair enough?

25  A.  Correct.

1    Q.   Then yesterday you heard me -- I told you directly that I
2    was going to be calling her, correct?
3    A.   Yes.
4    Q.   And I then told the judge that I was going to be calling
5    her, correct?
6    A.   Yes.
7    Q.   And you also heard me tell his courtroom deputy to have her
8    here today, correct?
9    A.   Yes.
10   Q.   Okay.  We recessed court at 5:30?
11   A.   I believe so.
12   Q.   Okay.  And between 5:30 and 6 o'clock you contacted
13   Mr. Weintraub?
14   A.   I did.
15   Q.   Okay.  And at that point in time, did you essentially tell
16   him that if she testifies, we think she's going to be
17   committing perjury?
18   A.   What I said was -- first off, the conversation started,
19   because again, I had not heard from Mr. Weintraub at all except
20   for the conversation when the 2255 was filed.  What I did ask
21   him was, are you aware that Mr. Rabin is calling Alina Feas to
22   testify?  And if that in fact happens, there's a possibility
23   that she'd be perjuring herself.  That was in light of the fact
24   that in the 2255 proceedings, there was significant
25   representations, an affidavit and also even backing up a plea

1   colloquy before Judge Altonaga, where Judge Altonaga asked

2   thorough questions about her role in the conspiracy and what

3   she did to participate in it.

4        The 2255 was denied.  My name was not mentioned at all in

5   the 2255.  It was Mr. Parente, I believe.  And when it was

6   denied, the order and recommendation specifically said that

7   Ms. Feas cannot disavow what she made under oath to Ms. -- to

8   Judge Altonaga.

9        So I called yesterday, knowing that the idea that she

10  already lied under oath and disavowed or tried to disavow, and

11  it was denied, I wanted to inform Mr. Weintraub that the

12  possibility could exist, if in fact she did testify, for

13  perjury.  And when that happened, he actually asked, is this a

14  threat?  And I said, no, it was not.  I just wanted to inform

15  you of what could happen, not knowing what could come out on

16  direct examination.

17       It was a cordial conversation.  Mr. Weintraub said, well,

18  I'm confident she will not perjure herself.  And that's how the

19  conversation ended.

20  Q.  In fact, Mr. Weintraub had been the lawyer that prosecuted

21  the 2255, right?

22  A.  Yes.

23  Q.  Okay.  So he knew full well what had happened in the

24  hearing before Judge Altonaga, correct?

25  A.  Yes, but I --

1   Q.  Okay.  So --

2   A.  Yes, but I mentioned -- because on your testimony, you

3   mentioned my name in a 2255 scenario, so I wanted to clarify

4   that record.

5   Q.  I mentioned -- say that again?

6   A.  There was a 2255 with respect to alleged threats I had made

7   and that was not the case.  My name is not mentioned in the

8   2255.

9   Q.  I mentioned your name with respect to threats?

10  A.  Yes, you did, during your examination.

11  Q.  Well, you contacted Mr. Weintraub at some point in time

12  after the 2255 was filed and said that you believed that she

13  was lying in it, right?

14  A.  No, I did not say that.

15  Q.  Okay.  Well, all right.  That's your best recollection.

16  A.  It is.

17  Q.  Okay.  In any event, Mr. Weintraub had been the lawyer that

18  prosecuted the 2255, so he was aware of everything that

19  occurred there, right?

20  A.  Yes.

21  Q.  Yet you still felt the need, according to your testimony,

22  to call him up after you knew that she was going to be a

23  witness on the eve of her testimony and again advise him that,

24  you know, she could be committing perjury if she testifies

25  tomorrow, correct?

1   A.   Like I said, Mr. Rabin, I was unaware whether or not he was

2   aware that Ms. Feas was going to testify.  Up until that point

3   I had not heard from Mr. Weintraub.  My understanding was, I'm

4   representing her for a 2255 context.  If he was going to say

5   I'm not representing her, then I would have informed the Court,

6   Judge, you might need to have counsel assigned.  That is why

7   minutes after our short conversation about this issue, I

8   followed up with Mr. Weintraub to just confirm, are you

9   representing Ms. Feas?  He did in fact say he was.  And that

10   was it.

11   Q.   You characterized it as a cordial conversation.

12   A.   Yes.

13   Q.   Mr. Weintraub said to you, wait a minute, are you

14   threatening me?  When you mentioned perjury, didn't he say to

15   you, are you threatening me, are you threatening my client?

16   A.   I was surprised by that reaction and I said, no, I was not,

17   and he then said, okay, well, I'm confident she will not

18   perjure herself, and that's how the conversation ended.

19   Q.   And then you called him back again, right?

20   A.   I called back again to make sure, obviously, because this

21   is a witness who can come before the Court and testify under

22   oath, possibly perjure herself, I wanted to make absolutely

23   certain that Mr. Weintraub was in fact representing Ms. Feas in

24   this context, not the 2255 scenario.

25   Q.   Mr. Medina, you're an experienced prosecutor, are you not?

1   A.   I'm somewhat experienced.

2   Q.   How long have you worked for the Department of Justice?

3   A.   Since 2012.

4   Q.   Okay.  You're certainly aware that a prosecutor's threat of

5   perjury has a potential chilling effect on a witness, aren't

6   you?

7   A.   That's why I would never make a threat.

8   Q.   Okay, what you perceived as not making a threat.  But what

9   you perceived as not making a threat certainly could be

10  perceived by somebody else as a threat, right?

11  A.   Well, I know Mr. Weintraub is an experienced attorney.  I

12  was having a professional conversation with him and just

13  explaining what the issues could be.  I was trying to be not

14  only, you know, an officer of the Court and just make it clear

15  so that nothing is happening and jeopardize Ms. Feas.

16  Q.   So you think that you needed to explain to this experienced

17  prosecutor -- this experienced defense lawyer, then, legal

18  issues regarding potential perjury because why?

19  A.   Well, because in the context of the 2255 scenario, when

20  that was filed, at no point when Mr. Weintraub became counsel

21  did he reach out to me to get a full understanding of where

22  Ms. Feas was as far as cooperating.  Whether or not -- sorry.

23  At that time, she was at FDC, full intentions to cooperate,

24  Ms. Feas.  So I found it odd at the time that no communications

25  were had between him and me.  So I wanted to make abundantly

```
 1   clear that there were communications last night.
 2            MR. RABIN:  If I may have a moment, Judge.
 3            THE COURT:  Yes.
 4        (Off-the-record discussion.)
 5            MR. RABIN:  That's all I have.
 6            THE COURT:  One second.  Okay.  Any questions by any
 7   of the other defense counsel?
 8            MR. PALOMINO:  No, Your Honor.
 9            MR. HERMIDA:  No, Your Honor.
10            MR. PRIETO:  No, Your Honor.
11            MR. GONZALEZ:  No, Your Honor.
12            MR. LEVIN:  No, Your Honor.
13            THE COURT:  All right.  And by the prosecution
14   counsel?
15            MR. GOODYEAR:  No, Your Honor.
16            THE COURT:  Okay.  Thank you.
17            THE COURT:  Do you want to call Mr. Weintraub?
18            MR. RABIN:  Yes.
19        BENSON WEINTRAUB, DEFENDANT ROUSSEAU WITNESS, SWORN
20                      DIRECT EXAMINATION
21   BY MR. RABIN:
22   Q.  Could you state your name, please.
23   A.  Benson Weintraub.
24   Q.  And how are you employed?
25   A.  I'm an attorney.
```

2435

1   Q.  What type of law do you practice?

2   A.  I practice federal criminal defense.

3   Q.  How long have you been a federal criminal defense attorney?

4   A.  About 34 years.

5   Q.  Is that all?

6   A.  Yes, sir.

7   Q.  Okay.  Did you have occasion to begin representing Alina

8   Feas?

9   A.  I did.

10   Q.  Approximately when?

11   A.  Approximately a year ago.

12   Q.  Okay.  At the time that you started representing her, where

13   was her case?  What was going on?

14   A.  She had already been sentenced, had previously been

15   represented by other counsel, and so at my advice, counsel, and

16   representation, in connection with a motion to vacate sentence

17   under 28 U.S.C. 2255.

18   Q.  At the time that you started representing her, was she

19   still attempting to cooperate with the government?

20   A.  No, she was not.

21   Q.  Did you participate in any debriefing sessions with her

22   regarding her cooperation?

23   A.  I did not.

24   Q.  Were you made aware by her of those debriefing session --

25   what occurred during those debriefing sessions?

1   A.  Yes, I was.

2   Q.  Did she advise you as to whether or not she had ever been

3   threatened by the prosecutor?

4   A.  What time frame are you referring to?

5   Q.  During the time she was attempting to cooperate with the

6   government.

7   A.  I don't recall that there were threats as such.  However,

8   the government was extremely displeased with the nature of her

9   responses during the debriefings.

10  Q.  Okay.  And do you recall whether or not any of the

11  debriefing sessions were terminated?

12  A.  Yes.  During the third debriefing, I believe that

13  Mr. Parente, the special attorney from Department of Justice

14  who was heading that particular proffer session, summarily

15  dismissed Dr. Feas from the proffer session, stating that he

16  did not need her or want her and that he did not believe her.

17  Q.  Okay.  Was Mr. Medina present for that session?

18  A.  I'm unaware of that.

19  Q.  Okay.  Did there come a point in time when you prepared a

20  pleading, a 2255?

21  A.  Yes, sir.

22  Q.  Okay.  And did that have an affidavit from Ms. Feas

23  attached --

24  A.  Yes.

25  Q.  -- as part of --

1   A.  The 2255 was supported by an affidavit by Dr. Feas of at

2   least seven or eight single-spaced pages.

3   Q.  All right.  And prior to filing it, did you have any

4   contact with the prosecutor in the case?

5   A.  I did not.

6   Q.  Okay.  After filing it, did you have any contact with the

7   prosecutor in the case?

8   A.  Yes.  Almost immediately after the 2255 was filed, I

9   received a telephone call from Mr. Medina, expressing shock and

10   disbelief over the filing of a 2255, because he thought that

11   Dr. Feas was going to be cooperating with him.

12   Q.  Okay.  And did he characterize or say -- make any comments

13   about the actual affidavit?

14   A.  I believe that the affidavit was referred to as a false

15   document.

16   Q.  Okay.  And did you have any discussion with him about why

17   you filed it or why you believe that she was not cooperating

18   with the government?

19   A.  Yes, I did.  She had been sentenced approximately seven

20   months earlier.  Dr. Feas was self-surrendered to FDC Miami,

21   notwithstanding her designation to Coleman.  She was designated

22   temporarily to FDC in order to ostensibly cooperate, but during

23   the seven months that she was at that facility, she was never

24   interviewed or contacted by the government.

25   Q.  And what did that lead you to conclude, as her attorney?

1   A.   Well, based on the fact that other codefendants on the case

2   who were cooperating were being interviewed by the government

3   at that time, it led me to believe that Dr. Feas's cooperation

4   was no longer needed or wanted by the government.

5   Q.   All right.  So after you filed the 2255, you had how many

6   conversations with Mr. Medina?

7   A.   After the 2255 was filed, I had one conversation, which

8   I've just described --

9   Q.   Right.

10  A.   -- until yesterday, at which point I received another call

11  from Mr. Medina.

12  Q.   Well, before that, did you have an actual hearing on the

13  2255?

14  A.   No, we did not have a hearing.

15  Q.   Okay.  Well, so there was no court hearing then.

16  A.   That's correct.

17  Q.   I guess Judge Altonaga's ruled on the pleadings?

18  A.   Yes.

19  Q.   You received a copy of the order?

20  A.   I did.

21  Q.   Mr. Medina received a copy of the order or somebody from

22  the government?

23  A.   Yes.

24  Q.   Okay.  Did you understand the order?

25  A.   Yes.

1   Q.   Did you need Mr. Medina to explain that order to you?

2   A.   Of course not.

3   Q.   Okay.  And did Mr. Medina, in the -- up until yesterday,

4   did he ever call you up to discuss the order or trying to

5   explain it to you?

6   A.   No.

7   Q.   Okay.  Yesterday, by the way, did we meet with your

8   client -- when I say "we," me, myself, and Andrea Lopez, my

9   associate, did we meet with you and your client on Saturday at

10  FDC?

11  A.   Yes.  With my consent, you requested and received

12  permission to interview my client in my presence, and you did.

13  Q.   Okay.  And when we were there, did your client agree to

14  testify?

15  A.   Yes, she did.

16  Q.   Okay.  And during that meeting, did your client describe

17  for me the fact that she had been threatened by Mr. Medina on

18  prior occasions?

19  A.   I wouldn't characterize it as her saying that she was

20  threatened.  I would suggest that she was referred to in a

21  disparaging manner by the government during her proffer

22  sessions.

23  Q.   Okay.  All right.  Disparaging in terms of not being

24  honest?

25  A.   Yes, sir.

1    Q.   Okay.  Fair enough.  Now, yesterday -- and we met with her

2    on Saturday, you said, and she agreed to testify, correct?

3    A.   That is correct.

4    Q.   All right.  Did there come a point in time yesterday that

5    you received a phone call from Mr. Medina?

6    A.   Yes, sir.

7    Q.   Okay.  Approximately what time was that?

8    A.   I had just arrived at the Fort Lauderdale airport from

9    Baltimore at around 6:00 p.m., and shortly thereafter, while I

10   was in the parking lot, I received a call from Mr. Medina.

11   Q.   Okay.  Could you describe for the Court the contents of the

12   phone call?

13   A.   Mr. Medina stated that he understood that my client was

14   planning to testify at this trial, and he stated matter of

15   factly that if she does testify, it would be perjury, and I

16   should be aware of that.

17   Q.   Okay.  So was it a discussion -- was it a give and take

18   discussion or was it more of like an admonition like you were

19   describing?

20   A.   It was an admonition.  Because I've been around the block a

21   couple of times and I don't have to listen to this crap from a

22   prosecutor, sir.

23   Q.   Did you respond to Mr. Medina when he said that to you?

24   A.   Yes.

25   Q.   What did you say to him?

2441

1    A.   I said she's going to testify truthfully.

2    Q.   Okay.  And did you say anything else to him?

3    A.   That's about it.

4    Q.   During the conversation, did you ask him whether he was

5    threatening you or your client?

6    A.   Oh, yes, yes.  When he raised his voice, I said, are you

7    threatening me?

8    Q.   So you're saying he raised his voice.  So this conversation

9    was not just a normal conversational tone discussion?

10   A.   I didn't think it was a normal conversation from the

11   beginning of the conversation, because I don't think he had any

12   business calling me.

13   Q.   Okay.  Well, did you believe, at any time during that

14   conversation, that Mr. Medina was trying to do -- be a

15   responsible person and give you like, you know, helpful advice

16   or did you view it more as a threat?

17   A.   Sir, I don't need the government's advice.  I don't think

18   it was helpful.  I don't think it was gratuitous or kind.  It

19   was clearly an effort, in my view, to intimidate either me or

20   my client or both.

21        THE COURT:  Did Mr. Medina ask you if you were

22   representing Ms. Feas in anything beyond just the 2255?

23        THE WITNESS:  He asked me if I was continuing to

24   represent Dr. Feas, and I indicated I am.  I am presently

25   representing her in the Eleventh Circuit in a certificate of

1  appealability issue and, of course, I'm counseling her with

2  regard to this matter.

3  BY MR. RABIN:

4  Q.  As a result of the conversation, did you communicate the

5  conversation you had with Mr. Medina to your client?

6  A.  Yes.  I felt duty-bound to communicate the nature and tone

7  of the conversation from Mr. Medina to me regarding her

8  anticipated testimony today.  I did so.  And consequently, she

9  advised me that she no longer wished to testify as a defense

10  witness.

11  Q.  And what intervening fact was there from the time I left

12  FDC on Saturday until she made the decision not to testify,

13  other than Allan Medina's phone call to you?

14  A.  Nothing, sir.

15         MR. RABIN:  If I could have a moment, Judge.  That's

16  all I have.

17         THE COURT:  Any other defense want to ask questions?

18         ALL COUNSEL:  No.

19         THE COURT:  All right.  Mr. Goodyear?

20                    CROSS-EXAMINATION

21  BY MR. GOODYEAR:

22  Q.  Good afternoon, Mr. Weintraub.

23  A.  Good afternoon, sir.

24  Q.  So you just said there was no intervening fact, other than

25  Mr. Medina's conversation, that caused your client to change

1    her mind about testifying; is that correct?

2    A.   Yes, sir.

3    Q.   Are you sure about that?

4    A.   Yes, sir.

5    Q.   Can you think of anything else that might have happened in

6    between the time of that conversation and her decision not to

7    testify that encouraged her to decide not to testify?

8    A.   Nothing that I'm aware of, because I had no contact with

9    her between that time.

10   Q.   Did she have a conversation with her son in between the

11   conversation with Mr. Medina and her decision not to testify?

12   A.   Her son is an attorney in my law firm and, yes, she did

13   have a conversation with him.

14   Q.   Okay.  And following that conversation, did you learn that

15   she had decided not to testify?

16   A.   That's correct, sir.

17   Q.   Okay.  I'd like to go back to something you said --

18          THE COURT:  Let me just ask, I don't know what my

19   legal ruling is going to be, but assuming the case is going

20   forward and Mr. Rabin wants to call her as a witness, I mean, a

21   witness doesn't have the ability to say, I don't want to

22   testify.  So if she's brought here before the jury, if she says

23   that she doesn't want to testify, what does that mean?  She's

24   going to not say anything?  She's going to invoke the Fifth

25   Amendment?  What does that mean?

1        THE WITNESS:  As a result of discussions I had with

2   Mr. Rabin, he said that he would withdraw the subpoena if she

3   did not choose to testify under these circumstances -- I'm

4   sorry, with Mr. Rabin.

5        THE COURT:  Okay.

6        MR. RABIN:  Could I clarify that?

7        THE COURT:  Yes.

8        MR. RABIN:  Okay.  I was advised that based upon

9   Mr. Medina's conversation with Mr. Weintraub, that she would

10  have to assert the Fifth.  Based upon that representation, I

11  obviously have an obligation to advise the Court of a witness

12  intending to take the Fifth and do not believe I could -- I

13  could compel her against her Fifth Amendment.  That's, I think,

14  a more accurate statement, at least from my perspective.

15  A.  Yes, sir.

16  BY MR. GOODYEAR:

17  Q.  You testified about a debriefing that you said was

18  terminated by Mr. Medina.  Do you remember that?

19  A.  No, I don't.  I believe I said it was terminated by

20  Mr. Parente.

21  Q.  I apologize, by Mr. Parente.  But do you remember that

22  testimony?

23  A.  Yes.

24  Q.  Okay.  And you were asked if you were present and you said

25  you were unaware that you were.  Just to clarify, you weren't

1    at that debriefing, were you?

2    A.  No, I don't believe I said that I was at that proffer.

3    Q.  I think your answer was, "I was unaware."

4    A.  I was not at that proffer.  I had not begun my

5    representation at that time, sir.

6    Q.  Thank you.  When Mr. Medina called you after the 2255, at

7    that time her cooperation agreement had not been terminated,

8    correct?

9    A.  It's never been terminated, sir.

10   Q.  And she was at the FDC, correct?

11   A.  Yes, sir.

12            MR. GOODYEAR:  Okay.  One moment, Your Honor.

13        (Off-the-record discussion.)

14            MR. GOODYEAR:  Nothing further, Your Honor.

15            THE COURT:  Any redirect?

16            MR. RABIN:  Briefly.

17                      REDIRECT EXAMINATION

18   BY MR. RABIN:

19   Q.  You were just asked if the cooperation agreement had been

20   terminated.  Are you aware of prosecutors formally terminating

21   cooperation agreements?  Are you aware that they do that or

22   they have a method to do that?

23   A.  I'm unaware of that, sir.

24   Q.  In fact, how do prosecutors typically, quote/unquote,

25   terminate a cooperation agreement?

1    A.   They just don't use the witness.

2    Q.   And did you have indications in this case from the time you

3    started representing Ms. Feas that the government was not going

4    to be using Ms. Feas as a witness?

5    A.   I drew that conclusion, sir, yes.

6    Q.   Based on what?

7    A.   Based on the fact that she had been at FDC on writ for a

8    period of at least seven months, during which time her

9    codefendants who did testify in this trial were being

10   interviewed by the government and she was not.

11   Q.   Did you also factor in how her last debriefing with the

12   government had ended?

13   A.   Absolutely.  The government did not believe her.  They made

14   disparaging comments toward her, and it was my impression they

15   had no intention of using her as a witness, notwithstanding

16   Mr. Sullivan's -- Mr. Medina's call to me after the 2255 was

17   filed, expressing such disbelief.

18   Q.   Okay.  The prosecutor just asked you whether or not you

19   were aware of any other intervening facts between the time that

20   I left on Saturday and when you spoke to Mr. Medina and then

21   related to your client, were you aware of any other facts that

22   could have been the reason for her declining to cooperate.  Do

23   you remember?

24   A.   Yes, I do.

25   Q.   In fact, you had occasion to meet with your client this

1  morning at 8:30 in the morning, didn't you?

2  A.  I did.

3  Q.  And I was present for that meeting?

4  A.  You were.

5  Q.  And was your client asked whether she would be willing to

6  continue to testify?

7  A.  She was.

8  Q.  And did she answer that question?

9  A.  She did.

10  Q.  What did she say?

11  A.  She stated that she was very sorry, but she was intimidated

12  by the government and she was not going to risk being

13  prosecuted for perjury, as Mr. Medina had suggested that might

14  be possible.

15  Q.  And did she indicate any other reason why she didn't want

16  to testify, other than that?

17  A.  No, sir.

18         MR. RABIN:  That's all I have.

19         MR. GOODYEAR:  Your Honor, may I ask one recross,

20  based on something the witness just said?

21         THE COURT:  Okay.

22                     RECROSS-EXAMINATION

23  BY MR. GOODYEAR:

24  Q.  Did Ms. Feas say this morning that her decision was based

25  on what you just said, which was the prosecutors having

1    indicated that a perjury charge might be possible?  That's what

2    you just said, correct?

3    A.  No, that's not what I said.

4    Q.  All right.  You didn't just say that --

5    A.  I did not say it the way you phrased it, sir.

6    Q.  Did Ms. Feas say this morning that her understanding was

7    the prosecutor had said a perjury charge might be possible?

8    A.  Yes.

9    Q.  Okay.  But that's not how you characterized what Mr. Medina

10   told you on the stand when you testified just now; is that

11   right?

12   A.  I'm sorry?

13   Q.  When you testified on direct examination with Mr. Rabin,

14   that's not how you characterized what Mr. Medina said, that it

15   might be possible, correct?

16   A.  I'm unaware of that, sir.

17   Q.  You don't remember how you testified on direct?

18   A.  I don't know what that specific response was.

19   Q.  Okay.  So let me just see if I have any notes here.  Let me

20   withdraw that.

21        Do you recall saying on direct examination that on the

22   phone with you, Mr. Medina told you if she does testify, it

23   would be perjury?

24   A.  Yes, sir.

25   Q.  That's what you said?

1    A.   Yes, sir.

2    Q.   And that's what you say you can recall Mr. Medina saying.

3    A.   Yes, sir.

4    Q.   Okay.  But Alina Feas said this morning her understanding

5    was if she testified, a perjury charge might be possible.

6    That's what you just confirmed, correct?

7    A.   Perhaps I spoke improvidently, sir.

8    Q.   Which time did you speak improvidently, Mr. Weintraub?

9    A.   When I spoke in the permissive tone, saying it may have

10   been possible.

11             MR. GOODYEAR:  Nothing further, Your Honor.

12             THE COURT:  All right.  Thank you.  You can step down.

13             THE WITNESS:  Thank you, Judge.

14             THE COURT:  Who is your next witness?

15             MR. RABIN:  It would be Alina Feas, Judge, but you, I

16   guess, have --

17             THE COURT:  Well, let's bring her out.  Is she going

18   to testify?

19             MR. RABIN:  She'll testify on this issue, sure.

20             THE COURT:  Well, and this issue includes

21   cross-examination on this issue.

22             MR. RABIN:  I'm sorry?

23             THE COURT:  On this issue includes cross-examination.

24             MR. RABIN:  I understand that, Judge.

25             THE COURT:  And someone's credibility is always

1    subject to fair cross-examination, like whether they've lied to

2    federal judges in the past during a plea colloquy in agreeing

3    to a set of facts.  So is she going to -- if she's going to

4    testify -- okay, if the government puts on their witness, I'm

5    not going to let them put it on unless the witness is going to

6    fully answer all the questions on cross-examination to fully

7    test their credibility.  So is she going to answer all those

8    questions, like when you stood in front of Judge Altonaga and

9    this set of facts was read to you, do you agree that those were

10   truthful and --

11            MR. RABIN:  It's my understanding she will, Judge.

12            THE COURT:  All right.  Let's bring her out.

13            And Mr. Weintraub is in the courtroom, so I guess if

14   you have -- are you going to advise her whether to answer or

15   not answer a particular question, based upon her Fifth

16   Amendment privilege?

17            MR. WEINTRAUB:  If I may, Your Honor.  May I step by

18   the jury box?

19            THE COURT:  Yes.  You should take probably a different

20   position.  Maybe you should sit in the middle of that first

21   row.  You see there's a microphone there.  That way you can use

22   the microphone if you -- hopefully you won't have to interject,

23   but if you do, then don't hesitate.

24            Have we been back since 1:30 without a break?  Have we

25   been here -- I don't want to lose my new court reporter in her

 1   first trial, so let's take a ten-minute recess and we'll come
 2   back.
 3        (Recess, 3:13 p.m. to 3:25 p.m.; Jury Present:)
 4           THE COURT:  All right.  Thank you.  Be seated.  We're
 5   missing a couple of lawyers.  Right?  Mr. Palomino and
 6   Mr. Levin.
 7        (Pause.)
 8           THE COURT:  All right.  Everybody's here, and --
 9           MR. LEVIN:  Sorry, Your Honor.
10           MR. GONZALEZ:  Your Honor, do you mind if I sit in the
11   back of the jury box as well so I can hear everything that's
12   going on?
13           THE COURT:  Yes.
14           MR. GONZALEZ:  Thank you.  Yes means you don't mind?
15   Thank you.
16           THE COURT:  All right.  Ma'am, if you could please
17   stand and raise your right hand to be sworn.
18           ALINA FEAS, DEFENDANT ROUSSEAU WITNESS, SWORN
19           THE COURT:  All right.  Mr. Rabin, go ahead.
20           MR. RABIN:  Judge, just as a housekeeping matter
21   before I start, I want to introduce two exhibits, if I could.
22   I've already provided them to the government and the Court.
23   The first one -- the first exhibit is an email chain between
24   Mr. Medina and myself that occurred last night after court.
25   The Court has a copy of it.  Obviously, Mr. Medina has a copy

1    of it.  That would be my first exhibit.

2           And the second exhibit would be an email chain between

3    me and Mr. Weintraub that occurred last night after court.

4           THE COURT:  Okay.  So those will be -- what are they

5    going to be?  You want to make them Court Exhibit 2 and 3.  I

6    think Court Exhibit 1 was the 302 and the handwritten notes

7    that I reviewed in camera to see if there was any other

8    exculpatory information --

9           MR. RABIN:  Okay.

10          THE COURT:  -- which I don't think I ever announced

11   that.  So I'm announcing now that I made an in camera review.

12   There was no exculpatory information, which is why I didn't

13   hand those over, but those are now sealed as Court Exhibit

14   No. 1.  So those two email streams will be Court Exhibit Nos. 2

15   and 3 for the purpose of this hearing.

16          MR. RABIN:  You have -- you have them.  Do you want me

17   to give you another set or --

18          THE COURT:  No.

19          MR. RABIN:  Okay.

20                        DIRECT EXAMINATION

21   BY MR. RABIN:

22   Q.  Could you please state your name?  Could you tell us your

23   name?

24   A.  Alina Feas.

25   Q.  Okay.  And where are you presently living?

1   A.   I'm living in Coleman Camp.

2   Q.   Okay.   Prison camp?

3   A.   Yes.   It's a prison camp.

4   Q.   Serving a sentence?

5   A.   135 months.

6   Q.   Okay.   Did you and I -- were you writted down here from

7   Coleman?

8   A.   Yes.

9   Q.   Do you know who writted you down here?

10  A.   No.

11  Q.   Okay.   Did there come a time after you were writted down

12  here that I met with you?

13  A.   No.

14  Q.   Did I meet with you?

15  A.   Yes.

16  Q.   When?

17  A.   Saturday.

18  Q.   Okay.   And do you remember about how long we spent

19  together?

20  A.   Maybe around two hours.

21  Q.   Okay.   At the conclusion of that meeting, did I ask if you

22  would be willing to testify on behalf of Dr. Rousseau and the

23  other defendants in this case?

24  A.   Yes.

25  Q.   Okay.   And what -- what did you say to me?

1   A.  Yes.

2   Q.  Okay.  Now, during that meeting, did you tell me whether

3   you had ever been threatened by the prosecutor or a prosecutor

4   in connection with this case?

5   A.  No.

6   Q.  Okay.  Had you ever been threatened during any of your

7   debriefings by a prosecutor?

8   A.  No.

9   Q.  Okay.  Had you ever had a debriefing terminated?

10  A.  Yes.

11  Q.  Okay.  What -- what debriefing was that?

12  A.  It was the -- the first one that I have after -- the first

13  one that I have after the -- I was arrested.  It was in -- I

14  believe it was February, the middle of February.

15  Q.  Okay.  Do you know why it was terminated?

16  A.  Because according to the -- to the prosecutor, I was no

17  helpful --

18  Q.  Okay.

19  A.  -- for the trial.

20  Q.  All right.  Did there come a point in time after that that

21  you, your lawyer -- or you hired a lawyer to file a 2255?

22  A.  Yes.

23  Q.  Okay.  And when was that?

24  A.  That was by the end of the year.

25  Q.  Okay.  And after that was filed, did you have some

1   information as to whether or not you had been accused of lying

2   as a result of the 2255?

3   A.  No.

4   Q.  Okay.  Did your lawyer say anything to you about the things

5   you said in the affidavit or the 2255 pleadings, the prosecutor

6   saying anything to him about them?

7   A.  I'm sorry.  Repeat the question.

8   Q.  Yes.  Did the -- did your lawyer tell you anything about

9   what the prosecutor had said to him about your pleadings, the

10  2255 pleadings, or your affidavit?

11  A.  Repeat it again.  I don't understand the question, I'm

12  sorry.

13  Q.  Okay.  After the 2255 was filed, did Mr. Weintraub ever

14  talk to you about any conversations he had with the prosecutor

15  about your 2255 pleading or motion?

16  A.  No.

17  Q.  Okay.  Did -- after you and I met on Saturday, did you

18  receive some information from Mr. Weintraub or your son

19  regarding a conversation that Mr. Weintraub had with

20  Mr. Medina?

21  A.  Yes.

22  Q.  Okay.  What were you told?

23  A.  That was last night.  I was told that Mr. Medina was --

24  called my attorney and he threaten me that if I come to court,

25  he would charge me with perjury.

1    Q.  Okay.  And who told you that?

2    A.  My son.

3    Q.  Okay.  And where did your son obtain the information from?

4    A.  From my attorney.

5    Q.  Okay.  And did there come a time that you and I met this

6    morning?

7    A.  No -- well, yes.

8    Q.  Okay.  And was Mr. Weintraub present?

9    A.  Yes.

10   Q.  And your son present?

11   A.  Yes.

12   Q.  And Ms. Lopez?

13   A.  Yes.

14   Q.  Okay.  And did I ask you if you -- if you were still

15   willing to testify?

16   A.  I was afraid.

17   Q.  Okay.  Did I ask you --

18   A.  Yes.

19   Q.  -- if you were still willing -- okay.

20   A.  Yes.

21   Q.  I know you're nervous, but you got to let me finish the

22   question before you answer, okay?

23   A.  Yeah.

24   Q.  Do you understand?

25   A.  Yes.

1    Q.   Okay.  This morning when I met with you, did I ask you if

2    you were still willing to testify?

3    A.   Yes.

4    Q.   Okay.  And what did you tell me?

5    A.   No.

6    Q.   And did you tell me why?

7    A.   Because I was afraid.

8    Q.   Okay.  And why were you afraid or why are you afraid?

9    A.   Because the information I received from my attorney

10   yesterday.

11            MR. RABIN:  Okay.  If I could have a moment, Judge?

12        (Off-the-record discussion.)

13   BY MR. RABIN:

14   Q.   Have you ever been accused of lying before by anybody from

15   the government?

16   A.   No.

17   Q.   Or not telling the truth?

18   A.   Well, yes, during the interviews.

19   Q.   Which interviews?

20   A.   The interview with the government.

21   Q.   Okay.  How many interviews did you have with the

22   government?

23   A.   One at my house and three at Miramar.

24   Q.   Okay.  And how many of those interviews did they accuse you

25   of not telling the truth?

1  A.  I don't remember exactly, but I think in most of them.

2  Q.  Most of them?

3  A.  Yes.

4          MR. RABIN:  Okay.  That's all I have.

5          THE COURT:  Any other defense counsel have questions?

6          MR. PALOMINO:  No, Your Honor.

7          MR. HERMIDA:  No, Your Honor.

8          MR. PRIETO:  No, Judge.

9          MR. LEVIN:  No, Your Honor.

10         THE COURT:  All right.  Mr. Goodyear.

11                  CROSS-EXAMINATION

12 BY MR. GOODYEAR:

13 Q.  Good afternoon, Ms. Feas.

14 A.  Good afternoon.

15 Q.  Do you recall on May 7, 2013, you had a change of plea

16 hearing.  Do you recall that?

17 A.  Yes.

18 Q.  It was before Judge Altonaga?

19 A.  Yes.

20 Q.  And did you plead guilty?  Did you change your plea to a

21 plea of guilty at that hearing?

22 A.  Yes.

23 Q.  What did you plead guilty to at that hearing?

24 A.  Because my attorneys recommended that to me.

25 Q.  Sorry.  Do you remember what counts you pled guilty to at

1    that hearing?

2    A.  I don't remember.

3    Q.  Okay.  Do you recall pleading guilty to one count of

4    conspiracy and one count of health care fraud at that hearing?

5    A.  Yes.

6    Q.  And during that hearing, you said things.  Do you remember

7    that?  Do you remember talking to Judge Altonaga at the

8    hearing?

9    A.  I respond yet.

10   Q.  So --

11   A.  I respond yes.

12   Q.  Judge Altonaga asked you some questions and you responded

13   to them, correct?

14   A.  Yes.

15   Q.  Okay.  And were you under oath at that hearing?

16   A.  I'm sorry?

17   Q.  Had you sworn an oath to tell the truth at that hearing?

18   A.  Yes.

19   Q.  Just like you swore an oath to tell the truth just now?

20   A.  Yes.

21   Q.  And do you remember being asked by Judge Altonaga:  Is

22   anyone putting pressure upon you, forcing you, or coercing you

23   to plead guilty and agree to these terms?

24   A.  I don't remember.

25   Q.  If I showed you a document, might it refresh your

1   recollection about being asked that?

2   A.  If you read it to me?

3   Q.  If I showed you this document, do you think it might

4   refresh your recollection about being asked that question?

5   A.  Yes.

6           MR. GOODYEAR:  Okay.  Your Honor, may I approach?

7           THE COURT:  Yes.

8   A.  I read it.  But I cannot tell if I remembered or not.

9   BY MR. GOODYEAR:

10  Q.  Does the next (indicating) --

11  A.  Yeah.

12  Q.  So does that refresh your recollection about being asked

13  that question by Judge Altonaga?

14  A.  I'm sorry?

15  Q.  Do you remember now being asked that question by Judge

16  Altonaga?

17  A.  No, I don't remember.  I'm reading it now, but I don't

18  remember that day.

19  Q.  And you don't remember saying no -- do you remember saying

20  no in response to that question?

21  A.  I don't really remember.  I cannot tell you.

22  Q.  So you testified earlier that on Saturday you met with

23  Mr. Rabin; is that right?

24  A.  Yes.

25  Q.  What did you talk about?

1          MR. WEINTRAUB:  Objection, work product.

2          THE COURT:  Well, I thought he said with Mr. Rabin.

3    Overruled.

4    BY MR. GOODYEAR:

5    Q.  You can answer.  What did you talk about with Mr. Rabin on

6    Saturday?

7    A.  About the -- about the case, about Dr. Rousseau's case.

8    Q.  And what types of questions did he ask you?  What did you

9    tell him about Dr. Rousseau's case?

10   A.  He was asking me about if I know him.  Basic questions.

11   Q.  Did he ask you any questions about whether or not

12   Dr. Rousseau was involved in fraud?

13   A.  Yes.

14   Q.  What kinds of questions?

15   A.  I don't really remember them now.

16   Q.  Do you remember saying anything to him about your

17   understanding of whether Dr. Rousseau was involved in fraud?

18   A.  I don't remember exactly the words.

19   Q.  What do you remember saying to Mr. Rabin on Saturday?

20   A.  He was asking me if I knew Dr. Rousseau, since when, if I

21   knew if he was involved in what he was charged for.

22   Q.  And what did you say about whether or not Dr. Rousseau was

23   involved in what he was charged for?

24   A.  I say no.

25   Q.  You said no, he was not involved in what he was charged

1  for.

2  A.  Yes.

3  Q.  Is that your testimony today, that Dr. Rousseau was not

4  involved in fraud at Health Care Solutions?

5  A.  Yes.

6  Q.  Did you talk to Mr. Rabin at all about how much time

7  Dr. Rousseau would spend reviewing documents when they were

8  brought to him?

9  A.  About -- repeat the question, please.

10  Q.  On Saturday, did you talk to Mr. Rabin about how much time

11  Dr. Rousseau would spend reviewing documents when they were

12  brought to him at Health Care Solutions?

13  A.  Yes.

14  Q.  What did you tell Mr. Rabin?

15  A.  That the documents were brought to Dr. Rousseau and he was

16  in my office reviewing the documents.

17  Q.  Did you tell Mr. Rabin that Rousseau would blindly sign

18  documents without reading any of them?

19  A.  No.

20  Q.  Did you tell -- did you tell Mr. Rabin that he would spend

21  a significant amount of time reviewing the documents before

22  signing them?

23  A.  I don't know what you're asking me again.  Can you repeat

24  it?  Because --

25  Q.  Did you tell Mr. Rabin that Dr. Rousseau would spend a

1    significant amount of time reviewing documents before signing

2    them?

3    A.  He was in my office.  I don't recall, you know, telling --

4    he was in my office for a time --

5    Q.  Okay.

6    A.  -- signing the documents.

7    Q.  Okay.  Did he review the documents before signing them?

8    A.  He?

9    Q.  Dr. Rousseau, did Dr. Rousseau review the documents before

10   signing them?

11   A.  Yes.

12   Q.  You sure about that?

13   A.  He was in my office.

14   Q.  I understand he was in your office, but are you sure that

15   he reviewed the documents he signed before he signed them?

16   A.  Well, I'm not sure 100 percent but --

17   Q.  Do you recall --

18   A.  -- he spend --

19   Q.  Ms. Feas, do you recall him reviewing the documents he

20   signed before he signed them?

21   A.  Yes.

22   Q.  Do you recall being interviewed by FBI agents on May 15th,

23   2013?

24   A.  I recall the day.

25   Q.  Okay.  Do you recall an interview -- sorry.  Do you recall

 1   being interviewed by the FBI in May 15th, 2013?

 2   A.  Yes, I recall the date.

 3   Q.  Okay.  Do you recall telling the agents that Rousseau would

 4   blindly sign documents without reading any of them?

 5   A.  No.

 6   Q.  You don't recall that.

 7   A.  No.

 8   Q.  If I showed you a document, would it refresh your

 9   recollection about that?

10   A.  Sure.

11          MR. GOODYEAR:  Your Honor, may I approach?

12          THE COURT:  Yes.

13          MR. WEINTRAUB:  Your Honor, can the government

14   identify the document, please?

15          THE COURT:  Yes.

16          MR. GOODYEAR:  Sure.  It's an interview report

17   prepared by an FBI agent of the -- it's a 302 of the interview

18   conducted on that date in 2013.

19   A.  I recall the information that is here, but they are not my

20   answers.

21   BY MR. GOODYEAR:

22   Q.  I'm sorry, do you recall saying --

23   A.  No.

24   Q.  -- that statement to the FBI agents on May 15, 2013?

25   A.  No.

1    Q.  So that didn't happen, you're saying?  That's your

2    testimony today?

3    A.  No, no, no.  I recall the questions asked to me, the

4    leading question asked to me.

5    Q.  And what do you -- do you recall answering those questions?

6    A.  My answers are not reflected here.

7    Q.  So do you recall being asked during that meeting how much

8    time Dr. Rousseau spent reviewing documents when he -- before

9    signing them?

10   A.  Well, the document doesn't say the amount of time he was

11   signing.

12   Q.  Ms. Feas, do you recall being asked in that meeting how

13   much time Dr. Rousseau would spend reviewing documents before

14   signing them; yes or no?

15   A.  No.

16   Q.  Okay.  So do you recall making a statement to the FBI about

17   whether or not -- about how much time Dr. Rousseau would spend

18   reviewing documents before he signed them?

19   A.  No.

20   Q.  You don't recall that.

21   A.  No.

22   Q.  Ms. Feas, do you recall a document called an Agreed Factual

23   Basis For Guilty Plea that you signed on May 7, 2013, as part

24   of your guilty plea?

25   A.  Can I look at it?

1    Q.   Sure.   (Hands witness document.)

2    A.   Yes.

3    Q.   Okay.   And is that your signature on that document?

4    A.   Yes.

5    Q.   And are the statements contained in that document true?

6    A.   I didn't review the statement before I sign it.   It was

7    given to me just two minutes before the court start.

8    Q.   Are the statements contained in that document true?

9    A.   No.

10   Q.   That document is false.

11   A.   Yes, they are.

12   Q.   Okay.   And you -- let me get that back.   And do you recall

13   the judge, Judge Altonaga, reading the facts contained in this

14   document back to you during the hearing?

15   A.   I don't really remember if she read it or not.

16   Q.   But you were -- but you were under oath at that hearing,

17   correct?

18   A.   Yes.

19   Q.   You'd sworn an oath to tell the truth.

20   A.   Yes.

21   Q.   Did you tell the truth at that hearing?

22   A.   No.

23   Q.   Did you lie at that hearing?

24   A.   Yes.

25   Q.   You lied while under oath in a United States court; is that

1  right?

2  A.  I signed the document because my attorney recommended to

3  me.

4  Q.  Did you lie while under oath in a United States court?

5  A.  Yes.

6  Q.  In front of Judge Altonaga?

7  A.  Yes.

8  Q.  Let me ask you this.  On Saturday, did you talk about --

9  with Mr. Rabin on Saturday, did you talk about how much

10  Dr. Rousseau would interact with patients at Health Care

11  Solutions?

12  A.  Yes.

13  Q.  What did you tell Mr. Rabin about that?

14  A.  That he used to go every week, once a week, and he spend

15  most of the day in the center.

16  Q.  And spend most of the day in the center.

17  A.  Uh-huh.

18  Q.  And what were his interactions with patients like when he

19  would come, according to what you told Mr. Rabin on Saturday?

20  A.  He went to my office and started seeing patients.

21  Q.  And were these -- were these medical or mental health

22  consultations with patients in your office, according to what

23  you told Mr. Rabin on Saturday?

24  A.  Yes.

25  Q.  Okay.  Do you recall, at the May 15th, 2013 meeting with

1   the FBI, telling the FBI that you recalled Dr. Rousseau's

2   interaction with patients as being greetings at most?

3   A.  No.

4   Q.  You don't recall saying that to the FBI.

5   A.  No.

6   Q.  Would showing you this report that you saw before refresh

7   your recollection?

8   A.  Yes.

9   Q.  (Hands witness document.)

10  A.  They are not my words.

11  Q.  Those are not your words.  That's your testimony today?

12  A.  They're not.

13  Q.  And did you say anything to that effect to the FBI agents

14  in May 2013?

15  A.  I didn't understand your question.  Can you repeat it?

16  Q.  Did you say anything like that to the FBI agents in

17  May 2013, that Dr. Rousseau would interact with patients as

18  greetings at most?

19  A.  No, I didn't.

20  Q.  What did you tell Mr. Rabin on Saturday about how many

21  patients Dr. Rousseau would see when he came to Health Care

22  Solutions?

23  A.  I don't remember talking about the amount of patients.

24  Q.  Ms. Feas, do you recall a 2255 application that you and

25  your lawyer filed with the Court?

1   A.   Yes.

2   Q.   It's a motion to vacate your conviction and sentence,

3   right?

4   A.   Yes.

5   Q.   Do you recall a sworn declaration that you submitted in

6   connection with -- actually, let me -- let me backtrack for a

7   moment.

8        Are you familiar with something call a white list at Health

9   Care Solutions?

10  A.   No.

11  Q.   You're not familiar with the white list?

12  A.   I -- I learned the term during the interviews.

13  Q.   You learned the term during the interviews.

14  A.   Yes.

15  Q.   But before you began to be interviewed by the government,

16  you had no understanding of what the white list was.

17  A.   No.

18  Q.   Were you familiar with something called the ghost list?

19  A.   No.  I learned both of the terms during my interviews with

20  the government.

21  Q.   Okay.  So do you recall telling the government that the

22  white list was a list of patients for whom group therapy notes

23  were fabricated when patients were absent?

24  A.   No, I didn't.

25  Q.   Did the government ask you about the white list during your

1  interviews?

2  A.  Yes.

3  Q.  What kinds of questions would they ask?

4  A.  If I knew about the list.

5  Q.  And what did you say?

6  A.  That I didn't know about that list.  I didn't know the

7  terms neither.

8  Q.  And you never said during any interview with the government

9  that you understood what the white list was.

10  A.  No, never.

11  Q.  Did you ever tell the government that Dana Gonzalez would

12  fabricate the group therapy notes for the white list and you

13  would sign them?

14  A.  They asked me the question, the leading question.

15  Q.  They asked you a leading question.

16  A.  Uh-huh, with all the information.

17  Q.  And then what did you say?  Yes, that happened, or no, that

18  didn't happen?

19  A.  I tell them that I sign the group notes for her because I

20  was the supervisor for her, but I didn't know that she was

21  fabricating notes.

22  Q.  So you told them, yes, I signed -- so the government asked

23  you a leading question about Dana Gonzalez fabricating group

24  therapy notes and you signing them; is that correct?

25  A.  That was the question.

1  Q.   Yes.  And then you say your recollection -- if I understand

2  you correctly, your recollection is you said, yes, I signed

3  them, but I didn't know Dana Gonzalez was fabricating those

4  notes.  Is that correct?

5  A.   I signed the note, but I didn't know that she was

6  fabricating notes.

7  Q.   You recall saying that to the FBI agents in August of --

8  you recall saying that to the FBI agents in a meeting with the

9  government; is that correct?

10 A.   Yes.

11 Q.   Do you recall telling the government that if patients were

12 absent for two days, the corresponding therapist for each

13 patient would fabricate the group therapy notes?

14 A.   No.

15 Q.   Do you recall a question about that from the government?

16 A.   They asked me the question.

17 Q.   You recall them asking you that question.

18 A.   Yes, the same leading question.

19 Q.   And what -- and what do you recall saying to the government

20 when they asked you that question?

21 A.   I'm sorry, what is --

22 Q.   What do you recall saying to the government when they asked

23 you that question?

24 A.   I answered no.

25 Q.   You answered no.

1    A.   Yeah, that was not true.

2    Q.   So Ms. Feas, just to be clear, when Judge Altonaga read to

3    you from the factual proffer and asked you whether your

4    participation in the conspiracy to defraud a government health

5    care program resulted in the loss of approximately $56,298,900,

6    and you said yes, that was a lie under oath, correct?

7    A.   I don't remember that question.  Can I look at the

8    document?

9    Q.   Sure.  (Hands witness document.)

10   A.   She was going through the first document, right?

11   Q.   Is that your recollection?

12   A.   I'm asking -- you know, this is the document, the

13   transcripts, and she was going through the -- through the

14   previous document that you showed me, right?

15   Q.   Would you like to see the agreed factual basis for plea?

16   A.   From that one.

17   Q.   Would you like me to bring this to you?

18   A.   Yes.

19   Q.   (Hands witness document.)

20   A.   She was reading the factual.

21   Q.   And you agreed with her question when she read -- when she

22   read it to you, correct?

23   A.   Yes.

24   Q.   And that was a lie under oath; is that right?

25   A.   Yes.

1   Q.  And you lied repeatedly to her as she read parts of the

2   factual basis for the plea, correct?

3   A.  I answered yes to the questions.

4   Q.  And those answers were lies, correct?

5   A.  Yes.

6   Q.  Do you remember answering any question of hers and it being

7   the truth at the time you answered it?

8   A.  I don't remember the questions.  I remember, now that you

9   showed me the document, that that was the document she read.  I

10  didn't even read the document before.

11  Q.  Do you remember any questions she asked you during that

12  hearing where you told the truth in response to a question of

13  hers?

14  A.  I don't remember the answers -- the questions she asked me.

15  Q.  So is that a no?

16  A.  To be honest with you, I don't remember the questions she

17  asked me.

18  Q.  So do you remember giving any answer that was the truth?

19  A.  I was answering yes.

20  Q.  And were those lies?

21  A.  Yes.

22  Q.  And again, those were lies under oath in court, correct,

23  Ms. Feas?

24          MR. RABIN:  Asked and answered.

25          THE COURT:  Sustained.

1      MR. GOODYEAR:  Nothing further, Your Honor.

2                 REDIRECT EXAMINATION

3   BY MR. RABIN:

4   Q.  Dr. Feas, why did you plead guilty?

5   A.  Because my attorneys recommended to me.  They told me that

6   was the best and the only thing, you know, the -- that was the

7   way it is.

8   Q.  And did you -- is that why you answered the way you

9   answered in court?

10  A.  Yes.

11  Q.  When you were answering the judge's questions, whose advice

12  were you following?

13  A.  My attorney's.

14  Q.  Now, the prosecutors showed you a series of statements that

15  were made to you -- or that were attributed to you in reports.

16  Do you remember those questions about those reports?

17  A.  Yes.

18  Q.  Okay.  Were those your statements or were those the

19  statements that were made to you in the questions?

20  A.  They were a statement that were made during the questions.

21  Q.  Okay.  And who was asking you those questions when those

22  questions were put to you?

23  A.  Well, I remember the first interview in my house was

24  Mr. Parente.  The second interview was Mr. Parente.  The third

25  and the fourth was Mr. Medina.

1    Q.   Okay.  Were you willing to testify -- up until last night,

2    were you willing to testify for Dr. Rousseau?

3    A.   Yes.

4    Q.   Okay.  As you sit here today, are you willing to testify

5    for Dr. Rousseau?

6    A.   Yes.

7    Q.   You are willing to testify?

8    A.   (No response.)

9         THE COURT:  Let me ask the question a different way.

10   If you were brought back tomorrow, put on the exact same seat,

11   and were asked the same questions that were just asked about

12   what you know about Dr. Rousseau and what you know about some

13   of the other people here, Ms. Fonts, Ms. Ruiz, Ms. Salafia,

14   Ms. Crabtree, Ms. Marks, and also the prosecutors asked you

15   those same questions about whether you did or didn't tell the

16   agents anything, what you answered in front of Judge Altonaga,

17   would you answer the questions the same way in front of the

18   jury?

19        THE WITNESS:  I will answer the questions, but I'm

20   afraid.

21        THE COURT:  Okay.  I mean, the only thing that's

22   different is instead of Mr. Weintraub and Mr. Gonzalez sitting

23   in the jury box, there would be jurors there.  It would be the

24   same -- everybody else would be here and the same types of

25   questions would be asked.  So would you be willing to come and

1    answer the same questions tomorrow?

2          THE WITNESS:  I will answer the question, again, but

3    I'm afraid because the threat that I received last night.

4          THE COURT:  Okay.

5          MR. RABIN:  I have no further questions.

6          THE COURT:  Okay.  So should we bring you -- we'll

7    have you here tomorrow morning at 9 o'clock, then?  Ms. Feas,

8    should we have you brought over tomorrow morning at 9 o'clock

9    to testify?

10         THE WITNESS:  No, because I'm afraid.

11         THE COURT:  I'm just trying to understand what the

12   difference is between -- I mean, you've already answered all

13   these questions under oath today.

14         THE WITNESS:  Uh-huh.

15         THE COURT:  So presumably if the government didn't

16   like your answers, they could do whatever they're going to do

17   based upon what you said in court today.  So if you come back

18   tomorrow, and if what you said today is the truth and you say

19   it again tomorrow, why would you be more afraid tomorrow than

20   you were today?

21         THE WITNESS:  Because I'm afraid about the consequence

22   because the threat I received last night.

23         THE COURT:  All right.  Anybody else have any

24   questions for this witness?

25         MR. RABIN:  I have no other questions.

1           THE COURT:  Okay.  All right.  Thank you.

2       Marshals.

3           THE COURT:  Don't go too far, Mr. Weintraub, because

4    you're going to have to answer one of my questions.

5           MR. WEINTRAUB:  Yes, Your Honor.

6           THE COURT:  Okay.  So we're here in open court.

7    Everybody is here.  The witness is no longer here.  So, I mean,

8    Ms. Feas was basically asked the same -- I mean, more from the

9    prosecutor than from you, Mr. Rabin, but she was asked direct

10   questions about Dr. Rousseau.  She was asked direct questions

11   about what she did say or didn't say to the agents.  She was

12   asked questions about what she did and didn't say to Judge

13   Altonaga.  She never took the Fifth here.  So I don't know -- I

14   don't understand -- I don't see how she would have a legal

15   right to not testify tomorrow.

16          There's a lot of people that don't want -- I think one

17   of the government witnesses said, I don't want to testify, but

18   I have to be here because it's part of my plea.  So she may not

19   want to be here, she may not feel comfortable being here, but

20   unless there's a legal reason why she --

21          MR. RABIN:  Are you putting this question to me?

22          THE COURT:  Yeah.

23          MR. RABIN:  Well, Judge, first of all, I asked her the

24   questions that I thought were relevant to the hearing, not

25   about what she told Dr. Rousseau or what she said about

1    Dr. Rousseau.  I thought the issue really was whether or not

2    she was willing to testify and what the basis of her fear was.

3    There's no question the Court can now see, based upon what her

4    answers are, that she would be a material and important witness

5    for Dr. Rousseau.

6              THE COURT:  Right.

7              MR. RABIN:  I'm advised by her counsel that she does

8    not -- you know, I don't have one-to-one conversations with

9    her.

10             THE COURT:  I don't want to be here tomorrow.  I'd

11   much rather be golfing or playing tennis, okay, but I have a

12   commitment to be here, okay?  So she may not want to be here,

13   but if she answered all these questions -- I mean, first of

14   all, nobody can say, if somebody has material information and

15   the government subpoenas them or the defense subpoenas them,

16   they have to testify unless there's a legitimate privilege

17   against testifying.

18             MR. RABIN:  Judge, if you're putting the question to

19   me, do I want to call her tomorrow, I want to call her

20   tomorrow.

21             THE COURT:  Okay.  So let me ask Mr. Weintraub.  If

22   she's called, how can she not answer these same questions in

23   front of the jury that she answered in front of me?

24             And I don't want you to communicate my discussion to

25   her, because I don't want any more claims that now she's

1   intimidated by the judge.  That's why I waited until she left

2   the courtroom to have this discussion.

3         But, I mean, if she committed perjury, if the

4   government wants to prosecute her for perjury, then she's

5   already said she lied to Judge Altonaga, she's already denied

6   making any of these statements to the agents in the 302s, she's

7   already explicitly exonerated Dr. Rousseau on at least a couple

8   of specific things, so if they wanted to prosecute her, they

9   can do it, based upon what happened in court today.  So I don't

10  understand why she shouldn't be required to come tomorrow.

11        MR. WEINTRAUB:  I do understand the Court's concern.

12  I will speak with Dr. Feas after court today and I anticipate

13  that she'll be available.

14        THE COURT:  Okay.  All right.

15        MR. WEINTRAUB:  Thank you.

16        THE COURT:  So we'll anticipate that she'll be here

17  ready to go.  But do you have other witnesses?

18        MR. RABIN:  I have five other witnesses.

19        THE COURT:  All right.  So have at least a couple of

20  them here in case something else happens, and I want to take

21  advantage of the time with the jurors, okay?  And again, just

22  like Mr. Medina is supposed to tell you when he's getting

23  towards the end, make sure Mr. Palomino and the other lawyers

24  know, you know, reasonably when they can have witnesses, and if

25  you have people here and you have trouble, like them staying

1    and we need to take them out of turn, then try and work with

2    each other to accommodate each other's witnesses.  I don't want

3    people to disappear.

4           Mr. Gonzalez.

5           MR. GONZALEZ:  Are we done with this matter so I can

6    bring up another matter, Judge?

7           THE COURT:  I don't know.  Does anybody else have

8    anything else to say on this matter?

9           MR. GONZALEZ:  Well, I might have something to say

10   about that.  My only suggestion is if I -- and I haven't been

11   involved in this, but if the remedy that was suggested, I think

12   by the case law, is some kind of judicial immunity, then what

13   would be the problem in issuing it now, since she's already

14   been questioned on the stand today, so it would be the

15   opposite.  The fact that she answered questions today would

16   allow you to give her immunity more tomorrow in order to make

17   sure that the defendants get a fair trial.  That would be my

18   suggestion.  Because there's certainly nothing preventing the

19   government now from doing whatever they want and at the same

20   time, you'll be allowing the defendant to get a fair trial.

21          THE COURT:  I'm not going to do that.

22          What's the next suggestion on this issue?  Anything

23   else on this issue?

24          Okay.  You said you had another issue, Mr. Gonzalez.

25          MR. GONZALEZ:  Yes, I have a minor issue.  Based upon

2481

1    the testimony today, I may have -- I may have -- Ms. Fonts'
2    passport may become relevant to the days when she may have been
3    out of the country at a time that might have been suggested by
4    the witness today.  The passport --
5            THE COURT:  Which witness?
6            MR. GONZALEZ:  I believe Ms. Da Silva Keller.
7            THE COURT:  Okay.
8            MR. GONZALEZ:  The passport is in the possession of
9    the pretrial services as part of her bond conditions.  I'd like
10   to ask the Court to allow me to inspect the passport, under the
11   supervision of the Court, of course, and then return it to the
12   Court if it's not necessary -- if it won't be necessary for
13   my -- for the presentation of my case or to introduce it as
14   evidence, if it is.
15           THE COURT:  Okay.  Fine.  Get me an order.  Do you
16   want me to release -- you want me to order pretrial services to
17   release the passport to you personally and I understand that
18   you're going to keep it, review it, if you want it, you'll keep
19   it and bring it to court and introduce it in the trial, and if
20   you're not going to use it, you'll immediately return it to
21   them.
22           MR. GONZALEZ:  Or I'll return it to pretrial services,
23   Judge.
24           THE COURT:  All right, fine.
25           MR. GONZALEZ:  Excellent.  Thank you, Your Honor.

```
 1              THE COURT:  Anything else?
 2              MR. GOODYEAR:  Nothing from the government, Your
 3    Honor.
 4              MR. RABIN:  No, sir.
 5              THE COURT:  Did you have more time to think about
 6    Count 4?
 7              MR. GOODYEAR:  I have not, Your Honor.  But we'll be
 8    prepared for that tomorrow morning, Your Honor.
 9              THE COURT:  Okay.  I'm planning on spending one minute
10    tomorrow morning.  So if you don't have anything else, then it
11    will be --
12              MR. RABIN:  9 o'clock tomorrow morning?
13              THE COURT:  9 o'clock -- well, yes.  Come at two
14    minutes before 9:00 so we can discuss Count 4.
15         (Proceedings adjourned at 4:09 p.m.)
16                        *   *   *   *   *
17
18
19
20
21
22
23
24
25
```

```
 1  UNITED STATES OF AMERICA                    )
                                                ) ss:
 2  SOUTHERN DISTRICT OF FLORIDA                )

 3

 4                  C E R T I F I C A T E

 5       I, Carly L. Horenkamp, Certified Shorthand

 6  Reporter in and for the United States District Court for the

 7  Southern District of Florida, do hereby certify that I was

 8  present at and reported in machine shorthand the proceedings

 9  had the 18th day of November, 2014, in the above-mentioned

10  court; and that the foregoing transcript is a true, correct,

11  and complete transcript of my stenographic notes.

12       I further certify that this transcript contains

13  pages 2245 - 2483.

14       IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15  Florida, this 21st day of April, 2015.

16

17

18                    /s/ Carly Horenkamp

19                    Carly L. Horenkamp, RMR, CRR
                      Certified Shorthand Reporter

20

21

22

23

24

25
```

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF FLORIDA
                        MIAMI DIVISION
                 CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,              AUGUST 10, 2015
                                       9:04 A.M.
                    Plaintiff,


        vs.



ROGER ROUSSEAU, et al.,

                    Defendants.        PAGES 1 THROUGH 20
```

---

```
                         DAY 1
              EXCERPT OF CRIMINAL JURY TRIAL
            (COLLOQUY RE: ALINA FEAS TESTIMONY)
         BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:      Mr. Allan J. Medina, AUSA
                        Ms. Lisa H. Miller, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Fraud Section
                        1400 New York Avenue NW
                        Washington, DC 20530

                        Mr. Bryan D. Fields, AUSA
                        U.S. DEPARTMENT OF JUSTICE
                        271 Cadman Plaza East
                        Room 5084
                        Brooklyn, New York  11201


FOR THE DEFENDANT:      Mr. Joaquin Mendez, Jr., Esq.
(Roger Rousseau)        LAW OFFICES OF JOAQUIN MENDEZ, JR., ESQ.
                        100 S.E. 2nd Street
                        Suite 2700
                        Miami, Florida  33131
```

Exhibit "D"

APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)          LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                          1221 Brickell Avenue # 900
                          Miami, Florida  33131


FOR THE DEFENDANT:        Mr. Oscar S. Rodriguez, Esq.
(Angela Salafia)          OSCAR RODRIGUEZ, P.A.
                          4500 S. LeJeune Road
                          Coral Gables, Florida  33146


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR ALINA FEAS:           Mr. Benson Weintraub, Esq.
                          LAW OFFICE OF BENSON WEINTRAUB, ESQ.
                          1 East Broward Boulevard
                          Suite 700
                          Fort Lauderdale, Florida  33301


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 13-4
                          Miami, Florida  33128
                          (305) 523-5138

 1      (The proceedings held before this time were not ordered

 2   transcribed.)

 3      (No Jury, 9:04 a.m.)

 4         THE COURT:  Also, I see Mr. Weintraub here, who is

 5   Alina Feas's attorney.  Is she here?  Has anybody asked her to

 6   be here today?

 7         MR. WEINTRAUB:  Good morning, Your Honor.  I don't

 8   believe she is in the courtroom.

 9         THE COURT:  Well, I know she's not in the courtroom,

10   but was she brought over by the marshals?

11         MR. WEINTRAUB:  Not that I'm aware of.

12         COURTROOM DEPUTY:  I didn't ask for her.

13         THE COURT:  And how long does it take to get somebody

14   here?  Is it too late to do it this morning?

15         COURTROOM DEPUTY:  I would have to call the marshals

16   and see if they could make a special run.  Normally they prefer

17   from one day to the next, but that's another issue, Judge.

18         MR. MENDEZ:  Your Honor?

19         THE COURT:  Yes.

20         MR. MENDEZ:  Of course, Your Honor, you may have your

21   own concerns, but it's my understanding that the government has

22   agreed that no further colloquy is necessary of Mrs. Feas.

23         MR. MEDINA:  Your Honor, to be clear, once the omnibus

24   motion by the government was filed, Mr. Weintraub subsequently

25   filed his own motion putting forth on the record her intention

1    to assert her Fifth Amendment privilege.  So long as
2    Mr. Weintraub necessarily puts the scope of the Fifth Amendment
3    privilege on the record, i.e., the basis, if it's, for
4    instance, any testimony would be a link in the chain of
5    possible criminal prosecution for perjury, for instance.  If
6    the scope is defined, then I think Mr. Mendez is correct in the
7    sense that we do have two outstanding issues to resolve with
8    respect to, is there going to be a redacted transcript that
9    goes back and also the scope of the impeachment that would be
10   available.  But so long as that's on the record and
11   Mr. Weintraub can set forth what that scope is --
12           THE COURT:  Well, there's not going to be a transcript
13   that goes back because you don't give a transcript of a witness
14   who doesn't appear.  Somebody will read her testimony.  So if
15   there's parts of that that have to be redacted, we can take
16   that up at a different time.
17           So you are agreeing that she would be unavailable as a
18   witness and that her former trial testimony, at least certain
19   parts of it, could be read to the jury during the trial.
20           MR. MEDINA:  We would agree so long as Mr. Weintraub
21   puts the scope on the record.
22           THE COURT:  Mr. Weintraub, come up to a microphone.  I
23   don't know what that means, so...
24           MR. WEINTRAUB:  Thank you, Your Honor.
25           THE COURT:  Okay.  So do you understand what

1   Mr. Medina was saying about the scope of her invocation?

2          MR. WEINTRAUB:  Yes, Your Honor.  Benson Weintraub on

3   behalf of the putative witness, Alina Feas.  I believe that as

4   to virtually each and every question asked by either of the

5   parties in this case, in view of her previous testimony and her

6   testimony at the change of plea colloquy, she would be required

7   to invoke the Fifth Amendment privilege against

8   self-incrimination on a case-by-case basis.  She's not seeking

9   to make a blanket assertion, but I think the assertion is going

10  to be extensive given the nature and scope of her testimony

11  before.

12          THE COURT:  All right.  Does that satisfy you,

13  Mr. Medina?

14          MR. MEDINA:  And just to clarify for the record, the

15  basis of her fear would be with respect to a possible link to a

16  perjury charge?

17          MR. WEINTRAUB:  Absolutely.  We believe that her

18  testimony would be the link, if not the last link, for a

19  prosecution for perjury in this case, Your Honor.

20          MR. MEDINA:  Your Honor, the government is satisfied

21  that the witness, Alina Feas, is unavailable under the Federal

22  Rules of Evidence.

23          THE COURT:  All right.  So then -- well, Jacob is not

24  here.  So she is physically here based upon the writ, so we can

25  quash the writ and send her back --

 1          MR. WEINTRAUB:  Yes.

 2          THE COURT:  -- to wherever her prison is?

 3          MR. WEINTRAUB:  We respectfully ask for the writ to be

 4     discharged and for her to be returned to Coleman expeditiously.

 5          MR. MEDINA:  No objection, Your Honor.

 6          THE COURT:  All right.  So I will find that she is

 7     unavailable based upon her anticipated invocation of her Fifth

 8     Amendment privilege against self-incrimination and that her

 9     prior testimony will be admissible, and if there are any

10     specific parts of it that somebody wants to object to, they

11     can.

12          Yes, Mr. Mendez.

13          MR. MENDEZ:  Yes, and I really don't have much of a

14     dog in this fight, but I do to some extent.  And before we

15     dissolve the writ and expeditiously remove Ms. Feas from the

16     jurisdiction, I'd like Your Honor -- I would like to have the

17     benefit of Your Honor's ruling on some of the motions in limine

18     that are pending concerning the extent of rebuttal evidence

19     that the government may introduce in light of the admissibility

20     of her transcript.

21          Because one of my concerns, as expressed in my motion,

22     we'll get to it at the appropriate time, the government seeks,

23     now that the Court will allow her prior testimony to be read to

24     the jury, the government seeks to bring in all kinds of

25     rebuttal evidence that I say it shouldn't be allowed to do for

1   a number of reasons, one of which is that we won't have

2   Mrs. Feas to help us understand that rebuttal evidence.

3           THE COURT:  Let me ask you a question.  Was she asked

4   in her previous testimony:  Did you tell your prior lawyer X?

5   Because if she wasn't asked that, you can't bring in -- I mean,

6   you can only introduce a prior inconsistent statement to

7   impeach a witness after you have first given the witness an

8   opportunity to agree or disagree with that.  So if she wasn't

9   asked, did you tell Mr. -- what's her attorney, Scott --

10          MR. WEINTRAUB:  Egleston.

11          THE COURT:  Egleston.  Did you tell Mr. Egleston X?

12  If she was asked that question and she said, no, I never said

13  that, then why wouldn't the government be allowed to introduce

14  a witness to impeach her?  That's exactly what the rules of

15  evidence provide.

16          MR. MENDEZ:  But we're getting to that -- getting

17  ahead of ourselves.  The argument, Judge, is they didn't do it.

18  And when you have a situation where they have --

19          THE COURT:  If they didn't do it, then how are they

20  going to bring in the other lawyer?  That's one evidentiary

21  issue.  I don't know what they're going to say.  But how is her

22  physically being required to be at FDC, which is basically a

23  maximum security -- I don't know where she is now, but I've got

24  to believe that it is in a place with better conditions than

25  FDC.  So why, if she's invoking her Fifth Amendment privilege,

```
 1    she's not going to testify -- my ruling on their request for

 2    rebuttal evidence is going to make her waive her Fifth

 3    Amendment privilege?  Why do I want to physically keep her

 4    here?

 5            MR. MENDEZ:  We're talking about this afternoon or

 6    later on this morning.  I think that we're going to get that

 7    issue resolved before lunch today.

 8            THE COURT:  Well, she's not leaving anywhere anyway.

 9            MR. MENDEZ:  That's all I'm saying.  But if we don't

10    get it resolved, my point is that if Your Honor is going to let

11    the government introduce rebuttal evidence over my objection,

12    I'd like to inform her counsel of that and see if --

13            THE COURT:  If she's willing to go to prison for

14    perjury just to help you --

15            MR. MENDEZ:  No, Judge.

16            THE COURT:  -- put on better rebuttal evidence --

17    surrebuttal?

18            MR. MENDEZ:  It may only be a matter of Mr. Weintraub

19    asking her to help me understand the rebuttal evidence so that

20    I can confront the witness.  I've never spoken --

21            THE COURT:  Are you going to allow your witness to

22    speak --

23            MR. WEINTRAUB:  Of course not, Your Honor.

24            THE COURT:  -- to speak to Mr. Mendez and waive the

25    privilege as to her conversation with him?
```

1          MR. WEINTRAUB:  Absolutely not.

2          MR. MENDEZ:  I'm not talking about waiving the

3    privilege.  It might be a matter of saying, Mr. Benson, was

4    that her lawyer, did they -- I don't know.

5          THE COURT:  Well, you can ask him anything you want,

6    but he --

7          MR. MENDEZ:  That's all.  I'm not asking for anything,

8    you know --

9          THE COURT:  Okay.  Well, we'll worry about that later.

10          MR. MENDEZ:  Okay.

11          MR. WEINTRAUB:  Is the writ discharged, Your Honor?

12          THE COURT:  Well, I will discharge the writ today --

13          MR. WEINTRAUB:  Thank you.

14          THE COURT:  -- after the motions in limine unless

15    there's some --

16          MR. WEINTRAUB:  We'll stand by.  Thank you, Judge.

17          THE COURT:  All right.  Thank you.

18      (The proceedings held here (hearing on motions and jury

19    selection begun) were not ordered transcribed.)

20          THE COURT:  Okay.  Let's move on to the next motion.

21    Which motion do you want to take up?

22          MS. MILLER:  Your Honor, if we could move to the

23    404(b)/inextricably intertwined motion next, if that's all

24    right with defense counsel.

25          MR. MENDEZ:  That's fine.  I thought we might take up

1    what's left of the Alina Feas matter since her lawyers are

2    here.

3              THE COURT:  Okay.  Well, let's do that first.

4              MR. SREBNICK:  Your Honor, I will excuse myself.

5    Thank you.

6              THE COURT:  All right.  Thank you.

7         (Mr. Srebnick is no longer present.)

8              MR. MENDEZ:  Judge, I think the parties agree now, in

9    light of Your Honor's finding, that Ms. Feas validly asserted

10   her Fifth Amendment right.  The transcript of her testimony

11   will be read to the jury in one way or another.  There are

12   still a few wrinkles that need to be ironed out.  There's some

13   portions of her testimony -- unobjected-to portions of her

14   direct testimony that the government wishes now to excise.

15             Quite obviously, my feeling is that the transcript

16   should come in in its entirety or should be read to the jury.

17   The parties can, I suppose, pick and choose what they want, but

18   it's my belief that the transcript in its entirety should go in

19   or be read to the jury with the exception of questions that

20   were objected to or where the objections were sustained.  But

21   certainly portions of the direct testimony which the government

22   did not object to at the time and now they find unfavorable

23   upon further reflection, there's no reason to excise those.

24             But that's a slightly different matter than the

25   question of what to do in terms of rebuttal testimony that the

1    government seeks now to introduce.

2            We're all aware of the requirements, the provisions of

3    806 of the Federal Rules of Evidence, but as applied in the

4    particular specific context here, there is no guidance that we

5    can obtain from any courts of appeal.  Neither side has been

6    able to find any authority directly on point where -- I'll

7    phrase the issue this way.  What we have here is former trial

8    testimony being introduced under 804(b)(1) because the

9    declarant is unavailable.  So we have former trial testimony,

10   not other forms of hearsay that are accepted under the other

11   provisions of 804.  We have the testimony of Alina Feas in

12   trial, who was noticed before trial by the defense as a defense

13   witness, testified before Your Honor and before the same

14   prosecution team, which had all the freedom and the ability to

15   cross-examine her as thoroughly as they did, confronted her

16   with her prior admissions before Judge Altonaga, confronted her

17   with the provisions of her plea agreement, and now at the

18   conclusion of her testimony, that they might bring in rebuttal

19   witnesses, decided not to do so, and the case is over.

20           Now, ten months later, I submit, Your Honor, that it

21   would be unfair, under 403 -- and admittedly, this is an issue

22   that's left widely to the Court's discretion.  The

23   admissibility of evidence is an abuse of, you know -- it's a

24   very, very favorable and a very, very discretionary ruling.

25   And so I am appealing to Your Honor's sense of fairness, that

1   after ten months, specifically now when Ms. Feas, if we read

2   her testimony, will not be available to help me confront

3   whatever rebuttal testimony the government seeks to introduce

4   now that it did not do so before, it really ties my hands, ties

5   Dr. Rousseau's hands in a manner that would not have been tied

6   had they attempted to present the evidence back then that they

7   seek to present today.

8           THE COURT:  How?  Let's assume she finished testifying

9   on Thursday and then the government says, okay, now we want to

10  call Mr. Egleston as her lawyer.

11          MR. MENDEZ:  Fine, and then we can go and see her at

12  FDC and find out --

13          THE COURT:  Oh.  She's back at FDC and I'm here in

14  court.  I'm not waiting -- if you say, Judge, can I go speak to

15  Ms. Feas to see what she can help me with?  I would say no,

16  let's go, we're going to the next witness.

17          MR. MENDEZ:  We're assuming that that witness would

18  have come on at 10:00 in the morning instead of 5:00 in the

19  afternoon.  But there's another --

20          THE COURT:  Well, you would be here all day.  You

21  wouldn't be going over to FDC to see her.  It's an unrealistic

22  hypothetical.

23          MR. MENDEZ:  Well, how about the possibility of a

24  surrebuttal?  I know that that's within the Court's discretion,

25  but if she were available as a witness and one --

1    THE COURT:  And she was fully cross-examined about her

2    conversation with a lawyer and then the government put on the

3    lawyer, would I let her -- no, just like I don't let them put

4    people back on the stand just to repeat something.

5    MR. MENDEZ:  We just heard surrebuttal argument by the

6    prosecutor just a moment ago.  Sometimes it's tolerated.  I'm

7    not saying it's a slam dunk, but I'm saying that it's something

8    that could have happened that absolutely cannot happen now.

9    THE COURT:  Right.

10    MR. MENDEZ:  And the government is already beefing up

11    its case in chief in anticipation of the admission of

12    Ms. Feas's testimony with additional witnesses concerning her

13    wrongdoing.

14    THE COURT:  If you had a trial and you didn't win it,

15    are you going to try it the same exact way the next time?

16    Isn't that the definition of insanity?

17    MR. MENDEZ:  And I'm not objecting to that.

18    THE COURT:  Okay.

19    MR. MENDEZ:  I'm not objecting to them improving their

20    case in chief even in anticipation of testimony.  I'm not

21    objecting to that.  I'm objecting to them bringing in rebuttal

22    witnesses and exhibits that they could have and should have

23    done back then if they didn't, and that to do so now, when my

24    hands are tied because she's unavailable as a witness, is

25    unfair.  And the application of 806 under these very specific

 1   circumstances, I submit there's no case on point that gives us

 2   any guidance.

 3            THE COURT:  I don't know what they're going to say.

 4   I'm not saying they can testify or not, but I'm not excluding

 5   them because they weren't listed before or because they weren't

 6   called before or because she's not available now or not.

 7            MR. MENDEZ:  Well, that's the issue.

 8            THE COURT:  So to the extent you're asking me to

 9   exclude them for that reason, I'm denying it.

10            MR. MENDEZ:  Okay.

11            THE COURT:  I'm not saying they can testify because I

12   don't know what they are going to say, but for that reason I'm

13   not excluding them.

14            MR. MENDEZ:  And then whether there are other reasons

15   that Mr. Weintraub or she may have in terms of waiving

16   privilege, I mean, that's -- I don't have any say in that, but

17   that's another layer that may need to be explored at the

18   appropriate time, whether her lawyers would be authorized to

19   come in and publicly contradict and call their client a liar.

20            But I'm just saying that to allow the government --

21            THE COURT:  Wait a second.  She already filed a 2255,

22   right, and doesn't that waive the privilege, where she was

23   attacking her lawyers?  She already testified in front of the

24   jury and further waived the privilege.  So that privilege is

25   gone.  The Fifth Amendment privilege she has now asserted and

15

 1    she has made it clear that she is not going to waive that.

 2              MR. MENDEZ:  I have no standing to assert any

 3    attorney-client privilege she may have, but I do think that

 4    these are issues that are going to come up.

 5              THE COURT:  Only if you introduce her testimony.  You

 6    can choose not to introduce her testimony if you think the

 7    rebuttal is that devastating.

 8              MR. MENDEZ:  And they can choose to grant her immunity

 9    if they really want to hear what she wants to say.  But they're

10    not doing that and I can't get her to testify.

11              The government can say, you know what, we guarantee

12    immunity from perjury prosecution.  We want to have her come in

13    here and testify.  They're not doing that.  And it's just a

14    matter -- Judge, you've got the issue.  This came as no

15    surprise to the government ten months ago.  Now, ten months

16    later --

17              THE COURT:  So you think that the government should

18    give somebody who admittedly knowingly lied to a federal judge

19    during the plea colloquy, you think the government should give

20    that person immunity?

21              MR. MENDEZ:  I'm saying this issue could be avoided if

22    they did.

23              THE COURT:  Everything could be avoided if they would

24    just dismiss the case.  We could all go home.

25              MR. MENDEZ:  Well, I have no objection to that.

 1    Judge, you get the issue.  I think ten months for them to get

 2    their ducks in a row and do things that -- evidence that they

 3    could have presented before --

 4            THE COURT:  I have already ruled on that.

 5            MR. MENDEZ:  Okay.

 6            THE COURT:  What's the next motion?

 7            MR. MEDINA:  Your Honor, just on the one subtle issue

 8    that I think is still pending, is what, if anything, should

 9    either go back to the jury as far as Ms. Feas's transcript or

10    what should be read out loud?  I've handed up Ms. Feas's

11    testimony from the last trial.  I've provided copies to each of

12    counsel of record here.  And the only thing that the government

13    believes is not relevant are 19 lines within the transcript.  I

14    can read the pages and the lines for the record.  It's page

15    2519.

16            THE COURT:  Hold on.  Yeah.

17            MR. MEDINA:  Lines 19 to 25.  That should be

18    highlighted.  Page 25- --

19            THE COURT:  Who is talking here?  Who is the

20    questioning person?

21            MR. MEDINA:  I believe it's Mr. Rabin's direct

22    examination of Ms. Feas.  Page 2520, lines 1 through 4 and 23

23    through 25.  Page 2521.

24            THE COURT:  These are all comments about her receiving

25    information through her son about threats by you that she would

1    be charged with perjury.

2           MR. MEDINA:  Yes, Your Honor.  And there's three

3    reasons why I believe it's not relevant.  The first is that

4    those particular statements that are contained within the

5    transcript have no bearing as to whether or not these

6    defendants on trial committed conspiracy to commit health care

7    fraud.  There's no relevance as to that information.  So under

8    401, 402, and bleeding into my second point, 403 would keep it

9    out because of the prejudicial value that substantially

10   outweighs the relevance, because those statements about threats

11   in and of itself goes toward more of a jury nullification issue

12   that is absent from factual evidence particularly focused on

13   these charges in the indictment.

14          And finally, the third point, Your Honor, is that, I

15   think you just alluded to it, Ms. Feas was not even a witness

16   to these particular statements.  There's, you know, a

17   conversation that I had with Mr. Weintraub.  Then he had a

18   conversation with Ms. Feas's son, which then got relayed, you

19   know, thirdhand to Ms. Feas.

20          At the end of the day, Your Honor, the jury hears to

21   make credibility determinations on live testimony.  Here, we

22   recently learn that a witness is unavailable, and won't be able

23   to make those credibility decisions, and once you insert

24   information about alleged threats that a witness was not even a

25   witness to or of, it becomes irrelevant and should be excluded

1   under 401, 402, and 403.

2          Other than that, Your Honor, the government has no

3   issue with any other portion of the transcript going into the

4   record.

5          THE COURT:  All right.  So I am going to deny your

6   request to -- or your objections to those lines.  I think the

7   witnesses -- the fact that, again, it's not -- these statements

8   are not admitted for the truth of what was being said.  If some

9   witness is willing to come forward and testify, even in spite

10  of knowing that they might be charged with perjury, I think

11  that goes to her credibility and her bias, just like if she had

12  been promised something good, okay, then you could say, well,

13  that affects her credibility.  So I think it is relevant.  If

14  you want some kind of limiting instruction in terms of how that

15  should be considered, I'll consider that, but I'm not redacting

16  those comments.

17         Again, the jurors are not getting this transcript.

18  When a witness doesn't appear live, that gives unfair advantage

19  to any witness to have a transcript in there.  So just like any

20  other witness, you're going to read it, you can figure out how

21  the lawyer is going to be the lawyer playing the part of

22  Mr. Rabin and your associate or one of the other lawyers can be

23  Ms. Feas, or however you want to do it, but it is going to be

24  read to the jury.  They are not getting the transcript.

25         MR. MEDINA:  Thank you, Your Honor.

1          MR. MENDEZ:  Thank you, Your Honor.

2          MR. WEINTRAUB:  Your Honor, may I ask again that the

3     writ be discharged as to Ms. Feas?

4          THE COURT:  Yes.

5          MR. WEINTRAUB:  Thank you very much, Judge.

6          THE COURT:  I will now discharge the writ as to

7     Ms. Feas.  She can be sent back to her designated institution.

8          MR. WEINTRAUB:  Thank you, Your Honor.

9                    *   *   *   *   *

```
1  UNITED STATES OF AMERICA              )
                                         ) ss:
2  SOUTHERN DISTRICT OF FLORIDA          )

3

4               C E R T I F I C A T E

5      I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 10th day of August, 2015, in the above-mentioned court;

10 and that the foregoing transcript is a true, correct, and

11 complete transcript of my stenographic notes.

12     I further certify that this transcript contains

13 pages 1 - 20.

14     IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15 Florida, this 28th day of August, 2015.

16

17

18                    /s/ Carly Horenkamp

19                    Carly L. Horenkamp, RMR, CRR
                      Certified Shorthand Reporter

20

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. :

**ALINA FEAS**,

     Petitioner,

v.

**UNITED STATES OF AMERICA**,

     Respondent.

_____/

### <u>AFFIDAVIT OF ALINA FEAS</u>

| | |
|---|---|
| State of Florida | ) |
| Sumter County | ) |

BEFORE ME, the undersigned authority, personally appeared Alina Feas who being duly sworn, did depose and state as follows:

1.    My name is Alina Feas. I am the Petitioner in the above-styled case. I am over 21 years of age and otherwise competent to make this Affidavit under oath. The matters set forth in this Affidavit are based on my personal knowledge.

2.    A grand jury returned an a Superseding Indictment that charged me with one count of conspiracy to commit health care fraud, 18 U.S.C. s. 1349 and four counts of health care fraud, 18 U.S.C. s. 1347. At arraignment, I entered a plea of not guilty. *U.S. v. Feas*, Case No.: 1:12-cr-20291-CMA-10 (DE. 295 & 322).

3.    A change of plea hearing was held on May 7, 2013, where I entered a plea of guilty. During the plea colloquy, this Court did not inform – or inquire whether I understood – that if I answered any of the Court's questions falsely, my answers may latter be used against me in a prosecution for perjury. *U.S. v. Feas*, Case No.: 1:12-cr-20291-CMA-10 (DE 583).

4.    I would not have entered a plea of guilty but for the Court's aforementioned failure to warn that my statements were subject to the penalty of perjury.

5.    On November 17th, 2014, through my attorney, AUSA Allan Medina threatened to charge me with perjury.

Exhibit "E"

FURTHER AFFIANT SAYETH NAUGHT.

_Alina Feas_

**ALINA FEAS**

SWORN TO AND SUBSCRIBED before me on this _24_ day of October, 2015.

_____✓_____ Personally known to me.

_____ Presented _____ as identification.

_Amartinez_

Notary Public, State of Florida, at Large.

My Commission Expires _July 13, 2018_

SEAL



A. MARTINEZ
MY COMMISSION # FF 140394
EXPIRES: July 13, 2018
Bonded Thru Notary Public Underwriters

2484

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 13-20505-CR-SCOLA

UNITED STATES OF AMERICA,                    NOVEMBER 19, 2014
                                             8:57 A.M.
                    Plaintiff,


        vs.


ROGER ROUSSEAU, et al.,

                    Defendants.        PAGES 2484 THROUGH 2672
_____

                         DAY 11
                  CRIMINAL JURY TRIAL
        BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:     Mr. Allan J. Medina, AUSA
                       Mr. A. Brendan Stewart, AUSA
                       Mr. Justin Goodyear, AUSA
                       U.S. DEPARTMENT OF JUSTICE
                       Criminal Division
                       Fraud Section
                       1400 New York Avenue NW
                       Washington, DC 20530


FOR THE DEFENDANT:     Mr. Samuel J. Rabin, Jr., Esq.
(Roger Rousseau)       LAW OFFICES OF SAMUEL J. RABIN, ESQ.
                       800 Brickell Avenue
                       Suite 1400
                       Miami, Florida  33131


FOR THE DEFENDANT:     Mr. Rene Palomino, Jr., Esq.
(Doris Crabtree)       LAW OFFICES OF RENE PALOMINO, JR., ESQ.
                       1221 Brickell Avenue # 900
                       Miami, Florida  33131

APPEARANCES (continued):


FOR THE DEFENDANT:        Mr. Ricardo P. Hermida, Esq.
(Angela Salafia)          LAW OFFICES OF RICARDO P. HERMIDA, ESQ.
                          55 Merrick Way
                          Suite 212
                          Coral Gables, Florida  33134


FOR THE DEFENDANT:        Mr. Frank A. Prieto, Esq.
(Liliana Marks)           LAW OFFICE OF FRANK A. PRIETO, P.A.
                          One Northeast 2nd Avenue
                          Suite 200
                          Miami, Florida  33132


FOR THE DEFENDANT:        Mr. Juan De Jesus Gonzalez, Esq.
(Alina Fonts)             LAW OFFICES OF JUAN DE JESUS GONZALEZ
                          10631 N. Kendall Drive
                          Suite 150
                          Miami, Florida  33176


FOR THE DEFENDANT:        Mr. Albert Z. Levin, Esq.
(Blanca Ruiz)             LAW OFFICES OF ALBERT Z. LEVIN, P.A.
                          Courthouse Tower
                          40 NW 3rd Street
                          Suite 200
                          Miami, Florida  33128


COURT REPORTER:           Carly L. Horenkamp, RMR, CRR
                          U.S. DISTRICT COURT
                          400 N. Miami Avenue, Room 12-3
                          Miami, Florida  33128
                          (305) 523-5138

1                          I N D E X

2     *Certificate* ------------------------------------- 2672

3
      HEARING RE: MOTION FOR JOA AS TO COUNT 4         2488
4
      HEARING RE: FERNANDO MENDEZ-VILLAMIL             2557
5

6                        W I T N E S S
7     ON BEHALF OF DEFENDANT ROUSSEAU:                 PAGE
      ALINA FEAS
8     DIRECT EXAMINATION BY MR. RABIN                  2496
      CROSS-EXAMINATION BY MR. GOODYEAR                2524
9     REDIRECT EXAMINATION BY MR. RABIN                2548

10
      FERNANDO MENDEZ-VILLAMIL, M.D.
11    DIRECT EXAMINATION BY MS. LOPEZ                  2561
      CROSS-EXAMINATION BY MR. GONZALEZ                2571
12    CROSS-EXAMINATION BY MR. LEVIN                   2573
      CROSS-EXAMINATION BY MR. MEDINA                  2576
13    REDIRECT EXAMINATION BY MS. LOPEZ                2595

14
      RAUL MESA
15    DIRECT EXAMINATION BY MS. LOPEZ                  2605
      CROSS-EXAMINATION BY MR. MEDINA                  2609
16

17    MAGDALENA AVERHOFF, M.D.
      DIRECT EXAMINATION BY MS. LOPEZ                  2612
18    CROSS-EXAMINATION BY MR. MEDINA                  2614

19
      JOSEPH THEVENIN, M.D.
20    DIRECT EXAMINATION BY MS. LOPEZ                  2618
      CROSS-EXAMINATION BY MR. MEDINA                  2620
21

22    MARIO CUERVO, M.D.
      DIRECT EXAMINATION BY MS. LOPEZ                  2658
23    CROSS-EXAMINATION BY MR. MEDINA                  2661
      REDIRECT EXAMINATION BY MS. LOPEZ                2667
24

25                (Index continues on next page)

1                         **I  N  D  E  X**

2
                         **W I T N E S S**
3  ON BEHALF OF DEFENDANT RUIZ:                        PAGE
   MELISSA BECHER
4  DIRECT EXAMINATION BY MR. LEVIN                     2622
   CROSS-EXAMINATION BY MR. STEWART                    2626
5  REDIRECT EXAMINATION BY MR. LEVIN                   2629

6
   MARIA DE LA MERCEDES GIOL
7  DIRECT EXAMINATION BY MR. LEVIN                     2632
   CROSS-EXAMINATION BY MR. STEWART                    2634
8

9
   JURY INSTRUCTION CONFERENCE                         2637
10
   COURT ADVISES DEFENDANTS OF RIGHT TO TESTIFY        2651
11

12

13

14

15                        **E X H I B I T S**
   GOVERNMENT EX. NO.:                        OFFERED ADMITTED
16  1023 -                                       2593    2594

17

18

19

20                        **E X H I B I T S**
21  DEFENDANT ROUSSEAU EX. NO.:                 OFFERED ADMITTED
   RR-A -                                         --     2499
22

23

24

25

 1          (No Jury, Counsel and Defendants Present, 8:57 a.m.)

 2          THE COURT:  All right.  Good morning, everyone.

 3   Welcome.  Be seated.  Okay.  Not everyone is here, but

 4   Ms. Fonts and her attorney are here, so that was the one issue

 5   we were -- I had kept under advisement until this morning, so

 6   what additional information, if any, do you have concerning

 7   Count 4?

 8          MR. GOODYEAR:  Thank you, Your Honor.  So Count 4, to

 9   be clear, it's important to clarify this, Count 4 is unlike

10   Counts 6 through 11 --

11          THE COURT:  Hold on.

12          MR. GOODYEAR:  -- in that it is not based on --

13   specifically on cloned notes.  In fact, it's not based on any

14   notes at all specifically.

15          THE COURT:  Right.

16          MR. GOODYEAR:  It's based on -- and again, this is the

17   difference between Counts 6 and 11.  It is based on actual

18   claims that were submitted to Medicare.  And specifically,

19   Count 4 is based on a claim for service on March 25th, 2009.

20          THE COURT:  All right.

21          MR. GOODYEAR:  What's clear is that the evidence in

22   the record supporting that count is in fact quite significant,

23   and it really does start, Your Honor, with the testimony of

24   Mr. Thoen, who talked quite specifically in his testimony about

25   that time period of January 2009 to July 2009.  And Mr. Thoen

1    said:  "Basically, all the patients that were in the West side

2    as of 2009 would have been in a white group, okay?  They

3    actually wouldn't have said white group, but they never showed

4    up.  There were no patients there.  The entire time that we

5    were there, from January 1st to the end of July 31st, they

6    might have shown up three times, all right, in specific

7    incidents that created them to actually come in for them to get

8    services.  So you would have to create everything from

9    scratch."

10        And then later on Mr. Thoen says, "She was" -- and

11   he's referring to Alina Fonts here -- "She was, at that time,

12   the clinical coordinator and responsible for running groups.

13   There were no -- I was there.  There was no patients when I was

14   there, okay?  They needed to be created.  There was no patients

15   that came in.  We didn't see -- I don't remember one that we

16   saw for an evaluation while we were there at the center."

17        Later on, he was asked:  "Now, a moment ago you said

18   that as of January 2009, Alina Fonts was responsible for

19   creating documentation for the partial hospitalization program

20   billings, correct?

21        "Correct."

22        The next question was:  "When we say that, meaning

23   intake documents, group therapy notes, things of that nature?"

24        And he says:  "Everything other than the medical --

25   excuse me.  Everything other than the medical, the medication,

1   the nurses' portion, and the changes within medication."

2            And in fact, there was specific corroboration of what

3   Mr. Thoen said in the charts that are contained within the

4   Petrona de la Torre file, which is the basis for both Counts 4

5   and 5.

6            And if we could pull up Bates Stamp page 6 of that

7   exhibit, which is Government Exhibit 104.  So what you have --

8   so what you have here, Your Honor, is a biopsychosocial

9   assessment, and it shows a signature line for Hortensia --

10  sorry, Florencia Larrain.  And the reason that's significant is

11  because Mr. Thoen went on to state that during this same time

12  frame, Alina Fonts told him, we're just going to sit there and

13  use Florencia's stamp and I'll write the notes as if she were

14  here and we'll stamp it that way.

15           And then later on in his testimony he actually said

16  there came a point when even though she was writing the notes,

17  she actually stopped using the Florencia stamp, which explains

18  why this one is actually unsigned.

19           "In the end of -- somewhere toward the end of June,

20  she came up to me and she told me if I could speak to

21  Mr. Layman in order to get him to start signing the progress

22  notes.  And I asked her why.  And she said, well, because

23  Florencia had now taken a new job and she was working at

24  another partial hospitalization setting and she needed Tom to

25  start signing her notes because she no longer could use

1    Florencia's signature."

2           So, and I would just add one more point about

3    Alzheimer's and that diagnosis, which I brought up yesterday

4    and Your Honor responded to.  Again, there's evidence in the

5    record from Ms. Coffey that this patient was diagnosed with

6    Alzheimer's in 2008, and the point is not whether or not it

7    could be appropriate for a patient with a mild case of

8    Alzheimer's to receive PHP treatment, the point is whether that

9    gets documented and whether the files are accurate, and there

10   is no record in this patient file of a dementia or an

11   Alzheimer's diagnosis, and that is what supports the count,

12   Your Honor.

13          So to sum up, the issue, and this is really the case

14   for both Counts 4 and 5, it's not so much that one specific

15   note was cloned, it's that Alina Fonts was creating a

16   fictitious file and a fictitious story about a patient who

17   simply wasn't coming into the clinic, and by creating that

18   fictitious file, she caused to be submitted claims to Medicare

19   that were themselves false, Your Honor.

20          THE COURT:  All right.  Mr. Gonzalez?

21          MR. GONZALEZ:  Judge, I believe he's kind of making

22   the argument for me on this particular count.  Now, I mean, I

23   know he's making, you know, I mean, some things up out of thin

24   air, but I think you have to have some evidence that she worked

25   on the file.  Now, just stating that she was there at the time

1    and somebody's opinions, which wasn't even any of the

2    witnesses, it was the FBI agents, that she was acting clinical

3    director, which is not even a therapist, is not enough for you

4    under those circumstances, Your Honor.

5          Now, yesterday you pointed out that if one of them was

6    cloned, that means that one of them had to have been correct.

7    That's at the very least --

8          THE COURT:  I didn't say that one of them had to be

9    correct.  I said one of them could be correct.

10         MR. GONZALEZ:  It could be correct.

11         THE COURT:  Right.

12         MR. GONZALEZ:  But they haven't -- they really haven't

13   shown, which I think was my initial point, they haven't shown

14   the basis of the diagnosis of Petrona, they haven't shown that

15   she wasn't there, that she was there.  All of this stuff is all

16   argument, no evidence.  It's all hat, no cattle on their end.

17         And I know that you paid very close attention.  I want

18   you to try to remember when it was that anybody in this case,

19   out of the witness stand or in any other documents that were

20   presented, said anything about Alina being involved with

21   Petrona de la Torre.  Absolutely not.

22         And in fact, the evidence was the opposite.  The

23   evidence was that she had not signed the paper, that it wasn't

24   her signature on the paper.

25         So you have not only -- not only the lack of evidence,

1   but you have the conflict of evidence on that as well, where

2   the evidence shown was against it.

3           I would suggest to you, obviously I think you have to

4   JOA one of the counts, but I would suggest that you reconsider

5   it, based upon the government's argument this morning, and JOA

6   both counts, which is the proper ruling at this time.

7           THE COURT:  Okay.  All right.  I think it's a highly

8   circumstantial case, but I think in the light most favorable to

9   the government there is enough evidence to establish a

10  prima facie case as to each of the essential elements of

11  Count 4, so I'll deny the motion for judgment of acquittal as

12  to Count 4.

13          Do you still plan on calling Ms. Feas?

14          MR. RABIN:  Yes, sir.

15          THE COURT:  Where is she?  Are the marshals here?

16          MR. MEDINA:  Your Honor?

17      (Off-the-record discussion.)

18          THE COURT:  Yes, Mr. Medina.

19          MR. MEDINA:  Your Honor, in the meantime, with respect

20  to Mr. Rabin's witness, Dr. Fernando Villamil, I recently

21  became aware of the fact that in a recent case before Judge

22  Martinez, Case No. 14-Criminal-20052, counsel for the

23  government raised to Judge Martinez the possibility, because

24  he's not represented or the government still believes he's not

25  represented, that Your Honor should possibly admonish him of

1    his Fifth Amendment rights, in light of the fact that he is an

2    unindicted coconspirator and subject to multiple

3    investigations.  I don't believe Mr. Villamil --

4            THE COURT:  Did he testify in front of Judge Martinez?

5            MR. MEDINA:  He in fact did not testify.  This was

6    just in anticipation of him coming to testify.  But I think the

7    main reason was he was not -- I don't think he had counsel in

8    that case and at this point I'm not aware if he has counsel

9    today.  So I just wanted to raise that issue with Your Honor.

10          THE COURT:  Are you calling Dr. Villamil?

11          MR. RABIN:  Yes.

12          THE COURT:  Does he have counsel?

13          MR. RABIN:  I have not had any contact, but my

14    associate has, and she advises me that he does not have

15    counsel.

16          MR. GONZALEZ:  Judge, as a matter to clarify, just in

17    a general point, are all defense witnesses subject to

18    indictment in the future so that I can maybe, you know, have

19    them see a lawyer before they even show up here?

20          THE COURT:  When you have a serious question that you

21    want me to respond to, I'll respond to it.

22          MR. GONZALEZ:  It seems like every witness that comes

23    up is in danger of --

24          THE COURT:  The one yesterday that testified as a

25    character witness for --

1          MR. GONZALEZ:  Oh, so character witnesses do not need

2     to be advised of counsel under the circumstances.  I want to

3     make sure I speak to counsel.  From what I'm hearing from the

4     government --

5          THE COURT:  I'll say it again.  If you have a serious

6     inquiry that you want to make of the Court, okay, and not some

7     sarcastic comment, I'm here to rule.

8          MR. GONZALEZ:  I'll withdraw it, Judge.

9          THE COURT:  Are all the jurors here?

10         COURT SECURITY OFFICER:  Yes, sir.

11         THE COURT:  Is Ms. Feas on her way up, Jacob?

12         COURTROOM DEPUTY:  Yes, Judge.

13         THE COURT:  How long did they say it would take her to

14    get here?

15         COURTROOM DEPUTY:  I'll call again.

16         MR. RABIN:  I understand she definitely is downstairs.

17         THE COURT:  I know, but she was supposed to be here at

18    9 o'clock.

19         COURTROOM DEPUTY:  Should be here.

20       (Off-the-record discussion.)

21         THE COURT:  All right.  Bring out the jury.

22       (Jury Present.)

23         THE COURT:  All right.  Good morning, everyone.

24    Welcome back and please be seated.

25         All right.  Who is the next witness for Dr. Rousseau?

1     MR. RABIN:  Yes, Judge.  We would call Alina Feas to

2  the stand.

3          THE COURT:  All right.

4          ALINA FEAS, DEFENDANT ROUSSEAU WITNESS, SWORN

5          COURT REPORTER:  Please be seated.  Please state your

6  full name, spell your last name for the record, and please use

7  the microphone.

8          THE WITNESS:  My name is Alina Feas.

9          THE COURT:  Can you spell your last name, please?  Can

10  you spell your last name, please?

11         THE WITNESS:  Feas, it's F-E-A-S.

12         THE COURT:  All right.  Mr. Rabin.

13         MR. RABIN:  Good morning, ladies and gentlemen.

14                        DIRECT EXAMINATION

15  BY MR. RABIN:

16  Q.  Are you a doctor?

17  A.  Yes.

18  Q.  What type of doctor are you?

19  A.  Neuropsychology.  It's clinical psychology with

20  concentration in neural.

21  Q.  Could you tell the members of the jury about your

22  educational background, please.

23  A.  I went to medical school in Cuba, and after I came here to

24  the United States, I gain my doctorate in clinical psychology,

25  with concentration in neural psychology, and then I went for a

1    post-doctoral in clinical psychopharmacology.

2    Q.  Okay.  Where are you presently living?

3    A.  I live in Coleman Camp.  It's a prison here in Florida.

4    Q.  And did you go to trial or did you plead guilty?

5    A.  I pled guilty.

6    Q.  Okay.  Now, where did you work prior to your arrest and

7    incarceration?

8    A.  Prior, I was working in my private practice only.

9    Q.  Okay.  And before that, were you working for Health Care

10   Solutions Network?

11   A.  Yes.

12   Q.  Okay.  Could you tell the members of the jury when you

13   started working at Health Care Solutions Network?

14   A.  I started working June 2005.

15   Q.  And when did you work there till?

16   A.  To the beginning of -- it was January 2011.

17   Q.  And what was your job at Health Care Solutions Network?

18   A.  I was the clinical director to run the groups and the

19   clinical part of the program.

20   Q.  What does it mean to be the clinical director?  What was

21   your job?

22   A.  Well, it means -- my duties were after the patients were

23   evaluated and the diagnosis was given, I was responsible for

24   separating them according to the diagnosis and the level of

25   functioning and the language they speak.

2498

1   Q.  Okay.  How many different offices did Health Care Solutions

2   have?

3   A.  Can you repeat the question, please?

4   Q.  Sure.  How many different offices did Health Care Solutions

5   have?

6   A.  Offices?

7   Q.  Or clinics, either way.  However you -- how many different

8   locations was there?

9   A.  Oh, location.

10  Q.  Yes, I'm sorry.

11  A.  They had two in Miami and after a few years they opened one

12  in North Carolina.

13  Q.  All right.  And where was the billing done from?

14  A.  The billing?

15  Q.  Yes.

16  A.  I have no idea.  I was not in the clinic.

17  Q.  You were not involved in billing?

18  A.  No.

19  Q.  Was billing -- which of the locations did you work at?

20  A.  I worked in the location in the East.

21  Q.  Okay.  Did that become known as Health Care Solutions East?

22  A.  Yes.

23  Q.  Okay.  So there was an East, a West, and then after three

24  years you said a North Carolina.

25  A.  Yes.

2499

1  Q.  Okay.  As far as you know, was the billing done from any of

2  those locations?

3  A.  I don't know.

4  Q.  Okay.  Well, can you say whether or not it was done from

5  the East?

6  A.  Well, in the East were not.

7  Q.  Okay.  It was not done in the East.

8  A.  No.

9  Q.  All right.  Now, by the way, just so the jury knows, when

10  is the first time you and I met?

11  A.  We met on Saturday.

12  Q.  Okay.  Was that the first time we met?

13  A.  Yes.

14  Q.  Okay.  And how much time did we spend together?

15  A.  Like two hours.

16  Q.  Okay.  You have a plea agreement in this case with the

17  government?

18  A.  Yes.

19  Q.  Okay.  Let me show you what I've marked as RR-1.

20      MR. RABIN:  May I approach, Judge?

21      THE COURT:  Does the government have any objection?

22      MR. MEDINA:  No objection, Your Honor.

23      THE COURT:  So that will be Exhibit A.

24      MR. RABIN:  Okay, Exhibit A?

25      THE COURT:  A.

```
 1              MR. RABIN:  RR-A or just A?

 2              THE COURT:  RR-A.

 3              MR. RABIN:  Okay.  It's easier to change my 1 to an A.

 4    BY MR. RABIN:

 5    Q.  Okay.  Do you recognize the front of that document?

 6    A.  Yes.

 7    Q.  All right.  Does that appear to be your plea agreement?

 8    A.  Yes.

 9    Q.  All right.  Let me just show you the back page.  Is that

10    your signature?

11    A.  Yes.

12    Q.  All right.  And the date on the agreement, there appears to

13    be two different dates, April 16th, 2013, you and your

14    attorney, and then a prosecutor, the date is 5-7 or May 7th.

15    A.  Yes.

16    Q.  Okay.  Do you know what day you actually signed the

17    document?

18    A.  The 16th of April.

19    Q.  Okay.  Do you know what day you pled guilty?

20    A.  The 7 of May.

21    Q.  I'm sorry?

22    A.  7 of May.

23    Q.  Okay.

24    A.  May 7.

25    Q.  And when was the document -- when was this document
```

2501

1   presented to you?

2   A.  This is the plea agreement?

3   Q.  Yes.

4   A.  I believe it was the 16 -- yeah, the 16 of April.

5   Q.  And who gave it to you to look at?

6   A.  Well, I didn't look at.  My attorneys went over with me.

7   Q.  Were you satisfied with your attorneys?

8   A.  No.

9   Q.  Okay.  Do you feel that they represented you to the best of

10  their ability?

11  A.  No.

12  Q.  Okay.  Can you tell the members of the jury how you

13  obtained your lawyers?

14  A.  Well, one of the codefendant recommended me one attorney.

15  Q.  I'm sorry?

16  A.  One of the codefendants recommended me one attorney.  It

17  came out that she was working with these other two attorneys

18  that I hired.

19  Q.  Okay.  Who was the -- who was your codefendant that

20  recommended the attorney?

21  A.  Gema Pampin.

22  Q.  So the lawyer that you ended up hiring was recommended to

23  you by Ms. Pampin?

24  A.  By her friend.

25  Q.  By her friend.

```
1   A.  (Witness nods head up and down.)

2   Q.  But through Ms. Pampin's friend, you ended up with this

3   lawyer?

4   A.  Yes.

5   Q.  Okay.  Now, you say you worked at Health Care Solutions

6   East.  Were you at East the whole time?

7   A.  I worked there three times a week full time and on Fridays

8   was flexible.

9   Q.  I'm sorry?

10  A.  I work three days a week.

11  Q.  Okay.

12  A.  Full time -- well, the full day, and then I work Fridays,

13  it was flexible.

14  Q.  Okay.  Were you a tough boss?

15  A.  I'm sorry?

16  Q.  Were you a tough boss?  Were you --

17  A.  I don't -- I don't think so.

18  Q.  Okay.  Did you know that according to some people you had a

19  nickname?

20  A.  I didn't know that.

21  Q.  Okay.  Had you ever -- did anybody ever tell you that some

22  people I guess to your face or behind your back referred to you

23  as the Wicked Witch of the East?

24  A.  I didn't know that.

25  Q.  You never heard that before?
```

1    A.   No.

2    Q.   Okay.  What type of work was done at Health Care Solutions

3    East?

4    A.   It was a partial hospitalization program where the patients

5    go in the morning, spend half a day in groups, in therapy or in

6    groups.

7    Q.   Okay.  And was that work being done at Health Care

8    Solutions?

9    A.   Yes.

10   Q.   Were you there to make sure that it was done?

11   A.   I was there the three days that I was -- the entire day,

12   and then on Fridays sometimes in the morning.

13   Q.   Okay.  And did you -- what did you observe?  Did you

14   observe work being done at Health Care Solutions?

15   A.   Yes.

16   Q.   Okay.  Tell the members of the jury what types of work you

17   observed being done there.

18   A.   The groups were running -- was like three or four groups

19   that were running in the morning.  The group lasted for 45

20   minutes, and they have a break like for ten minutes, and then I

21   don't remember it was at the end of the groups or was prior to

22   the last one, they have lunch, and then they start again the

23   group until they finish.

24   Q.   All right.  Were there people that ran the groups?

25   A.   With therapists.

1    Q.  There were therapists that ran the groups?

2    A.  Yes.

3    Q.  Do you remember who some of those therapists were?

4    A.  I remember one of them was Angela Salafia.

5    Q.  Okay.

6    A.  Liliana Marks.  It was Doris Crabtree.  It was more.  It

7    was a male, Ruben.

8    Q.  I'm sorry, what was his name?

9    A.  Ruben.

10   Q.  Do you remember his last name?

11   A.  I don't remember the last name.

12   Q.  Okay.  Was it Busquets?

13   A.  Busquets, yeah.

14   Q.  Okay.

15   A.  And it was his wife.

16   Q.  She also ran a group?

17   A.  Yes.

18   Q.  What was her name, do you remember?

19   A.  I remember the name.  I don't remember the last name.  Her

20   name was Rosa.

21   Q.  Okay.  Did you actually see these groups being run?

22   A.  Yes.

23   Q.  Did you ever have occasion to go in, walk in on the group

24   sessions?

25   A.  Yes.

1   Q.   Okay.  And what was going on when you walked in?

2   A.   They were running.  They were talking.  They were

3   discussing the topics.

4   Q.   Okay.  Did each group or did different groups have

5   different topics to discuss?

6   A.   Yes.

7   Q.   All right.  And did you see -- when you walked in, did you

8   see the groups discussing the topics that were appropriate for

9   what they should be discussing?

10  A.   Yes.

11  Q.   Okay.  The patients that were at Health Care Solutions

12  Network, what types of patients is it your opinion were

13  appropriate for PHP treatment?

14  A.   Any patient that need assistance for any type of mental

15  problems, any type of depression, anxiety, psychosis.

16  Q.   Were the patients at Health Care Solutions East appropriate

17  for PHP?

18  A.   Yes.

19  Q.   Do you recall any patients that were so out of it that they

20  could not participate in the groups?

21  A.   No.

22  Q.   Do you recall any patients that were so psychotic that they

23  would never sit in the groups?

24  A.   No.

25  Q.   Okay.  There's been, during the course of this trial, the

1    mention of some specific names I want to ask you about.  One

2    patient, do you remember a patient by the name of Steve Abbott?

3    A.  Steve, what was the last name again?

4    Q.  Steven Abbott.

5    A.  Oh, yes.

6    Q.  Okay.  What do you remember about Mr. Abbott?

7    A.  He's a very psychotic patient and he was very good in group

8    therapy.

9    Q.  I'm sorry?

10   A.  He has -- he has been a very psychotic patient for years,

11   and -- but he has been very -- he always was good in groups.

12   Q.  Okay.  So do you know what type of psychosis, I guess, he

13   suffered from?

14   A.  He was always delusional and, you know, and paranoid, but

15   when -- when he was taking the medication, he was good.  He

16   was --

17   Q.  Did he, from your observations, benefit from group therapy?

18   A.  Oh, yes.

19   Q.  Okay.  Let me -- some other names of the files that were --

20   do you remember a patient by the name of Alina Duenas -- Ondina

21   Duenas?

22   A.  Yes.

23   Q.  Tell me what she suffered from, if you recall?

24   A.  She was -- she was depressed.  She was very depressed and

25   sometimes she'd get psychotic.  When the depression went really

1  really bad, she went like, you know, hallucinating and being

2  paranoid.

3  Q.  Okay.  Did she participate in groups?

4  A.  Yes.

5  Q.  Did she, from what you observed, benefit from the groups?

6  A.  Yes.

7  Q.  Okay.  Do you remember a patient by the name of Dulce

8  de la Torre?

9  A.  I don't really remember now.

10  Q.  Okay.  Do you know a gentleman by the name of Dr. Roger

11  Rousseau?

12  A.  Yes.

13  Q.  Okay.  Did he work at Health Care Solutions?

14  A.  Yes.

15  Q.  Okay.  What was his position?

16  A.  He was a medical director.

17  Q.  Okay.  And how often did Dr. Rousseau come in to Health

18  Care Solutions?

19  A.  He used to go to the center once a week.

20  Q.  Okay.  Did he come in consistently once a week?

21  A.  Yes.

22  Q.  Okay.  And when he came in to Health Care Solutions, where

23  did he go?  In other words, where did he physically go when he

24  went into the building?

25  A.  He would -- if my office was not being used at that moment,

1    he went into my office to start seeing patients.  He didn't

2    have a place.

3    Q.  I'm sorry?

4    A.  He didn't have a place for him.

5    Q.  Okay.  So he would go to your office?

6    A.  To my office.

7    Q.  Okay.  And what would he do in your office?

8    A.  Well, he would be seeing the patients first during the day.

9    Q.  Okay.  Now, did you have discussions with Dr. Rousseau when

10   he was on the premises about patients?

11   A.  Yes.

12   Q.  Okay.  Tell the members of the jury what types of things

13   you talked about.

14   A.  Well, we always talk about the progress the patient -- if

15   the patient were progressing in groups, the medications they

16   needed, if they needed increased, if they needed decrease in

17   the medications, all type of -- specific treatment for the

18   patients.

19   Q.  Okay.  Did Dr. Rousseau see patients?

20   A.  Yes.

21   Q.  Did Dr. Rousseau review files?

22   A.  Yes.

23   Q.  Okay.  Who would be the people that would present the files

24   to Dr. Rousseau to review?

25   A.  Well, he had the files when he was seeing the patients.

1    Q.   Okay.  But were there also times where people would bring

2    him files to review?

3    A.   There would be the files with the document that had been

4    transcribed for him to sign.

5    Q.   Okay.  And who would bring him those files?

6    A.   It was either Gema Pampin or was myself that she gave it to

7    me.

8    Q.   Okay.  Was there anybody else besides you and Gema Pampin

9    that would be responsible for bringing files to Dr. Rousseau?

10   A.   No.

11   Q.   Okay.  Dana Gonzalez, would Dana Gonzalez ever have to

12   bring files to Dr. Rousseau?

13   A.   No.

14   Q.   Alexandra Haynes, would she ever have to bring files to

15   Dr. Rousseau?

16   A.   Who?

17   Q.   Ms. Haynes, does that name ring a bell to you?  No?

18        How about Ms. Palmero, do you know her?

19   A.   Palmero was the office -- I mean, office manager.

20   Q.   Did she ever bring files to Dr. Rousseau?

21   A.   No.

22   Q.   Okay.  So the only two people that you can recall that had

23   to bring files were you and Gema Pampin --

24   A.   Yes.

25   Q.   -- correct?

1    A.   Correct.

2    Q.   Now, did the files ever have tabs on them to show the

3    doctor where he should sign?

4    A.   Yes.

5    Q.   Okay.  And did that happen often, that the files were

6    tabbed?

7    A.   Yes.

8    Q.   Okay.  Now, you said that Dr. Rousseau was there on what

9    day of the week, was it?

10   A.   I believe was Thursdays.

11   Q.   Okay.  Now, would patients only come in, new admissions

12   come in on Thursdays, or would they come in on other days of

13   the week as well?

14   A.   The patients would come in every day.

15   Q.   Okay.  So what would happen when Dr. Rousseau was not there

16   and a patient came in?

17   A.   The patients were going to the groups.

18   Q.   Okay.  And then what would happen when Dr. Rousseau arrived

19   on his Thursday visit?

20   A.   They will start seeing the patients.

21   Q.   Okay.  And who made the ultimate decision on whether the

22   patients stayed or left HCSN-West -- or East?

23   A.   Dr. Rousseau.

24   Q.   Okay.  So what would happen, for example, a patient came in

25   on Monday and wasn't seen by Dr. Rousseau until Thursday, what

1  would happen on Thursday to that patient?

2  A.  Was seen by Dr. Rousseau and Dr. Rousseau would admit the

3  patient or not.

4  Q.  Okay.  Do you recall times when Dr. Rousseau would not

5  admit patients?

6  A.  Yes.

7  Q.  Where are you presently being held?  I know you said that

8  you're at Coleman, correct?

9  A.  Uh-huh.

10  Q.  Is that a yes?

11  A.  Yes.

12  Q.  Okay.  You have to answer out loud in words because the

13  court reporter is writing down what you say.  Do you

14  understand?

15  A.  Yes.

16  Q.  Okay.  Thank you.  Although you're at Coleman, are you

17  presently being housed somewhere temporarily while you're in

18  Miami?

19  A.  I'm sorry, repeat the question again?

20  Q.  Sure.  Are you presently being housed in Miami somewhere?

21  A.  Yes.

22  Q.  Where?

23  A.  In FDC.

24  Q.  Okay.  And is there anybody else from this case that's

25  housed where you are, that's in the same jail?

2512

1    A.   Yes.

2    Q.   Who is that?

3    A.   It's Gema Pampin, Dana Gonzalez, Lisset Palmero, and the

4    third one is this one that she used to work in North Carolina.

5    Q.   Okay.  So you've named three and then there's a fourth one

6    from North Carolina?

7    A.   Yes.

8    Q.   Okay.  And in addition to yourself.

9    A.   And myself now.

10   Q.   Okay.  Do you hang out with them?  Do you socialize with

11   them over at the jail?

12   A.   No.

13   Q.   Okay.  Are you able to observe what they do?

14   A.   Well, I'm most of the time in my room.

15   Q.   I'm sorry?

16   A.   I stay in my room most of the time.

17   Q.   Okay.  Do you see whether or not they stay in the room most

18   of the time?

19   A.   No, they usually are in the multi-place there talking.

20   Q.   Okay.  Do they -- are they talking with each other or are

21   they talking with other inmates?

22   A.   They are talking to each other.

23   Q.   Okay.  From what you observed, do they spend most of their

24   time together or apart?

25   A.   Most of the time, Palmero, Pampin, and Dana Gonzalez are

```
 1   together.
 2   Q.   The fourth one, you don't remember her name?
 3   A.   The fourth is not always with them.
 4   Q.   Okay.  Do you know her name?
 5   A.   I think it's Ali.
 6   Q.   Alexandra Haynes, does that sound familiar?
 7   A.   Haynes, yeah, but then she get married now, so that's why.
 8   Q.   Okay.  All right.  So the three of them, Pampin, Gonzalez,
 9   Palmero always together, Haynes sometimes?
10   A.   Yes.
11   Q.   Okay.  Now, when did you arrive at FDC?  In other words,
12   did you -- have you been there since the trial began?
13   A.   I arrived on the -- it was Friday, the 7th.
14   Q.   Okay.  So that was the Friday after the first week of the
15   trial, if we started on that Monday, correct?
16   A.   Yes, yes.
17   Q.   Okay.  Now, have you heard any of them come back from --
18   come back from court and talk about their testimony?
19   A.   Just once.
20   Q.   Okay.  And when was that?
21   A.   It was the one from North Carolina, Alex, she was talking
22   to them -- to another girl in the table, and I was passing by,
23   and she was telling them that she was spending like four hours
24   here, that she has been cursed at by the defense attorneys, and
25   that she was so tired.  And then I continued passing so I
```

1    don't --

2    Q.  Okay.  Now, today you testified to the jury that you saw

3    Dr. Rousseau at Health Care Solutions Network East once a week;

4    is that correct?

5    A.  Yes.

6    Q.  Okay.  Did there come a time that somebody who was

7    cooperating with the government in this case told you what you

8    should testify to regarding Dr. Rousseau?

9    A.  Yes.

10   Q.  Okay.  Tell the members of the jury, first of all, who that

11   was.

12   A.  It was when I first came to surrender myself here in --

13   surrender myself here in FDC in August 12.

14   Q.  In what year?

15   A.  2013.  That while she was talking to me, because I didn't

16   want to talk to him, it was Dana Gonzalez, and she went to me

17   and she told me, You have to say that Dr. Rousseau never went

18   there.  And I go, Why are you saying that?  That's not true.

19   And she goes, You better say it, because if you don't say it,

20   somebody's going to say it.

21   Q.  When Dana Gonzalez told you to say that Dr. Rousseau was

22   not there, was she telling you to tell the truth or to lie?

23   A.  It's a lie.

24   Q.  How much time did you get?  What was your sentence?

25   A.  135 months.

1    Q.   Which comes out to eleven years, five months?

2    A.   Yes.

3    Q.   Okay.  Now, do you -- first of all, do you have any chance

4    of getting that reduced from what you understand?

5    A.   I'm sorry?

6    Q.   Do you have any chance of getting that reduced from what

7    you understand?

8    A.   No.

9    Q.   Okay.  Am I able to help you get your sentence reduced?

10   A.   No.

11   Q.   Am I able to do anything that you're aware of, go in front

12   of any judge, file any motion, do anything that can help you in

13   any way get your sentence reduced?

14   A.   No.

15   Q.   So do you have any hope or expectation or dream that I can

16   help you get your sentence reduced by testifying here today?

17   A.   No.

18   Q.   You pled -- were you aware -- strike that.

19        You pled guilty to health care fraud, correct?

20   A.   Yes.

21   Q.   Okay.  And specifically, you pled guilty to health care

22   fraud at Health Care Solutions?

23   A.   Yes.

24   Q.   Did you participate in health care fraud at Health Care

25   Solutions?

```
1    A.   No.

2    Q.   Okay.  Why did you plead guilty to that crime?

3    A.   That was my attorneys' recommendation.  I want to go to

4    trial, but they recommended me to sign the plea.

5    Q.   And did they tell you what you would be able to accomplish

6    if you signed a plea agreement and pled guilty?

7    A.   They were telling me some -- some -- if I cooperate with

8    the government -- and I will always tell them that I have

9    nothing to say to cooperate with the government, but they told

10   me, yes, they want to talk to you and it's better for you to

11   sign the plea than go to trial.

12   Q.   And did you in fact, based on your lawyers' advice, then

13   sign the agreement?

14   A.   Yes.

15   Q.   And did you start going through the process of cooperating

16   with the government?

17   A.   After my plea, I -- they called me twice.

18   Q.   Who is "they"?

19   A.   The government.

20   Q.   Okay.  When you say "the government," did you deal with any

21   specific prosecutors?

22   A.   Yes.

23   Q.   Which prosecutors did you deal with?

24   A.   In the first two interviews, one was in my house and the

25   second one was after I was arrested, was Mr. Parente.
```

1    Q.   Okay.   That's the prosecutor's name that appears on that

2    agreement, on your plea agreement?

3    A.   Yes.

4    Q.   Okay.

5    A.   And then was Mr. Medina.

6    Q.   All right.   And did the prosecutors encourage you to talk

7    to them or did they discourage you in some manner?

8    A.   Can you repeat the question again?

9    Q.   Yes.   Let me rephrase it.   Were the prosecutors happy with

10   what you were telling them?

11   A.   No.

12   Q.   Why not?

13   A.   They were saying that I was lying.

14   Q.   Okay.   And specifically, can you just generally

15   characterize what you were saying that they said was a lie?

16   A.   That was a lie?   That I didn't do anything that was going

17   on in Health Care Solutions, that I was lying, that I didn't

18   know about the kickbacks, that I was lying about knowing of

19   some list that they were mentioning me, like a ghost list, a

20   white list, terms that I learned because they told me, and

21   things like that.

22   Q.   Okay.   Now, when you were having your meetings with the

23   prosecutors, were there FBI agents there?

24   A.   Yes.

25   Q.   Were they taking notes?

1    A.   I don't really remember.

2    Q.   Okay.  Well, did there come a point in time when you read

3    reports that were supposedly reports of your interviews with

4    the prosecutors?

5    A.   Not until Friday.

6    Q.   Okay.  This last Friday?

7    A.   Last Friday.

8    Q.   Okay.  So what you're telling the members of the jury, if

9    I'm clear, is the first time that you ever read any reports

10   that relate to interviews that you had with prosecutors or

11   agents was last Friday?

12   A.   Last Friday, yes.

13   Q.   Okay.  When you read those reports, were they accurate in

14   terms of the things that they said in them that you said?

15   A.   No.

16   Q.   Okay.  Generally, can you tell us what was inaccurate about

17   them?

18   A.   All the questions -- all what is written there are leading

19   questions.  They were giving me the information, but they don't

20   reflect my -- my answers.  It's just what they were asking me

21   in the form of leading questions.  That was the way I saw that

22   as reading.

23   Q.   So you're saying that the questions that you were asked

24   were leading questions.  Is that what you're saying?

25   A.   Uh-huh, yes.

1  Q.  And does the report consist of leading questions or does it

2  consist of your answers in the form -- that are based on the

3  questions that were asked?

4  A.  They are all leading questions.

5  Q.  Okay.  Are the reports accurate or inaccurate?

6  A.  They are not accurate.

7  Q.  Okay.  Now, let me go back and ask you a couple of specific

8  questions about Health Care Solutions, if I could.  Did you

9  ever stand or sit in a location with Dr. Rousseau and have a

10 conversation with Ms. Palmero or anybody else about whiting out

11 certain types of medication that should not be in reports?

12 A.  No.

13 Q.  Did Dr. Rousseau ever have any assistants work with him?

14 A.  Yes.

15 Q.  What type of assistants did he have work with him?

16 A.  He had a nurse practitioner.

17 Q.  Do you remember her name?

18 A.  I remember her first name was Marlene.

19 Q.  Okay.  Now, you and I met, you said, for the first time on

20 Saturday?

21 A.  Yes.

22 Q.  Between Saturday and yesterday, were you advised that your

23 lawyer had received a phone call from a prosecutor regarding

24 you not testifying in this case?

25 A.  Yes.

1    Q.  Okay.  Tell the members of the jury what you know about

2    that.

3    A.  That was a Monday night when I called home and I was

4    talking to my son.

5    Q.  By the way, is your son a lawyer?

6    A.  Yes.

7    Q.  Okay.  Does he work -- does he work -- you have a new

8    lawyer now?

9    A.  Yes, I have my appealing lawyer.

10   Q.  I'm sorry?

11   A.  I have my appealing attorney now.

12   Q.  Okay.  And you're in the process of trying to do what?

13   A.  I file a motion for the 2255.

14   Q.  Okay.  And what do you understand that to be?

15   A.  It's -- it's because I received insufficient counsel in my

16   case, my attorneys just send me for failure.

17   Q.  Okay.  So this is some type of a motion in which you're

18   complaining about your lawyers?

19   A.  Yes.

20   Q.  Okay.  And you have a new lawyer that's helping you do

21   that?

22   A.  Yes.

23   Q.  Okay.  So Monday night you learned what?

24   A.  I learned from my son that my attorney, my new attorney,

25   received a call from Mr. Medina threaten that if I would come

1    here to testify, he will charge me with perjury.

2    Q.  So let me see if I have this accurate.  You have an eleven

3    year, five month sentence, correct?

4    A.  Yes, eleven thirty-five -- yes, 135 month.

5    Q.  Eleven years, five months.  You know that I can't do

6    anything to reduce that.

7    A.  Yes.

8         MR. RABIN:  How is my math, Judge?  I know you're

9    counting.  I see you're counting.

10        THE COURT:  Isn't that three months?

11        MR. RABIN:  Is it eleven and three?

12        THE COURT:  Three months.

13        MR. RABIN:  Oh, okay.  I'm off by two.

14   BY MR. RABIN:

15   Q.  Your sentence is eleven years, five months, or three

16   months?

17   A.  I know it by months.  135 month.

18   Q.  Okay, all right.  So you have a sentence of eleven years

19   and we'll go -- the judge is always right, so eleven years,

20   three months, and you know I can't help you reduce that,

21   correct?

22   A.  Yes.

23   Q.  And then you also know that you've been threatened with

24   perjury by the prosecutors, who can increase your eleven years

25   and three months, right?

1    A.   Yes.

2    Q.   When is the last -- have I offered you anything to get you

3    to come here?

4    A.   No.

5    Q.   When is the last time you spoke to Dr. Rousseau?

6    A.   It was at the end of the year 2012.

7    Q.   So approximately two years ago?

8    A.   Yes.

9    Q.   So Dr. Rousseau hasn't called you up and asked you to come

10   here; is that fair to say?

11   A.   No.

12   Q.   Have any of the defendants in this courtroom contacted you

13   in any way?

14   A.   No.

15   Q.   If you weren't guilty, how could you go in front of a

16   federal judge, swear -- you were placed under oath when you

17   went and pled guilty, correct?

18   A.   Yes.

19   Q.   How could you go in front of a federal judge after being

20   placed under oath and say I'm guilty when it wasn't true?

21   A.   I answered yes to the questions.  I was following what my

22   attorneys recommended me to do.

23   Q.   So you were following the advice of your lawyers and that

24   caused you to basically lie and say you were guilty when you

25   weren't?

1   A.   Yes.

2   Q.   Is there any lawyer that's telling you what you should be

3   saying here today?

4   A.   No.

5   Q.   Are you telling the truth today?

6   A.   Yes, I'm telling the truth.

7           MR. RABIN:   Judge, if I could have a moment, please?

8           THE COURT:   Yes.

9           MR. RABIN:   Thank you.

10      (Off-the-record discussion.)

11   BY MR. RABIN:

12   Q.   You said that you're at Coleman?

13   A.   Yes.

14   Q.   Are there any of the other people from this case at Coleman

15   with you?

16   A.   Yes.

17   Q.   Who is there?

18   A.   Gema Pampin and Lisset Palmero.

19   Q.   Okay.   Now, since you've been in the Federal Detention

20   Center here in Miami, have you been with Dana Gonzalez?

21   A.   I'm sorry?

22   Q.   Have you -- since you've been in Miami, have you been with

23   Dana Gonzalez as well as the others?

24   A.   Yes, in the same place.

25   Q.   Okay.   Have you seen Dana Gonzalez talking to other inmates

1    not related to this case, but other inmates in their own cases,

2    have you seen her talking to some of those inmates?

3    A.  She's always talking to other inmates.

4    Q.  Okay.  And what are the things that she talks to these

5    other inmates about, what types of subjects?

6    A.  She's always talking about -- and I'm referring to the time

7    I came in -- the first time I came in in August 12th, 2013.

8    She's always advising all inmates to plead guilty, to

9    cooperate, to say whatever they have to say just to get out of

10   here as soon as possible.

11           MR. RABIN:  That's all I have.  Thank you.

12           THE COURT:  All right.  Mr. Palomino.

13           MR. PALOMINO:  Your Honor, I have no questions of this

14   witness.

15           THE COURT:  Mr. Hermida?

16           MR. HERMIDA:  No questions on behalf of Mrs. Salafia.

17           THE COURT:  Mr. Prieto?

18           MR. PRIETO:  No questions, Your Honor.

19           THE COURT:  Mr. Gonzalez?

20           MR. GONZALEZ:  No questions, Judge.

21           THE COURT:  Mr. Levin?

22           MR. LEVIN:  No questions, Your Honor.

23           THE COURT:  All right.  Mr. Goodyear.

24                        CROSS-EXAMINATION

25   BY MR. GOODYEAR:

2525

1    Q.  Good morning, Ms. Feas.

2    A.  Good morning.

3    Q.  Do you remember what the first question was that Mr. Rabin

4    asked you?

5    A.  The first question?

6    Q.  Yes.

7    A.  If I'm a doctor?

8    Q.  Yes.  And what did you say?

9    A.  Yes.

10   Q.  Did you agree to surrender your licenses as part of your

11   plea agreement?

12   A.  Yes.

13   Q.  Okay.  So you're not licensed to practice therapy in the

14   state of Florida, correct?

15   A.  I'm not.

16   Q.  Okay.  And you talked with Mr. Rabin about your having pled

17   guilty to a crime in this case, correct?

18   A.  Yes.

19   Q.  And what crimes did you plead guilty to?

20   A.  I pled guilty in -- according to my attorneys, I pled

21   guilty in conspiracy, but then I found out that it was two

22   charges.

23   Q.  What was the second charge you pled guilty to?

24   A.  I don't remember the name.

25   Q.  Okay.  Are you saying you didn't know that you were

1    pleading guilty to a second charge on the day you pled guilty?

2    A.  I found out after my sentencing, actually.

3    Q.  You found out after your sentence.

4    A.  Yes.

5    Q.  So are you saying you didn't know, at the time of your

6    change of plea hearing, that you were pleading guilty to a

7    second charge?

8    A.  No.

9    Q.  When did your change of plea hearing take place?

10   A.  I'm sorry, can you repeat?

11   Q.  When did your change of plea hearing take place?

12   A.  It was May -- May 7, 2013.

13   Q.  Do you remember, who was the judge at your change of plea

14   hearing?

15   A.  Ms. Altonaga.

16   Q.  Do you remember the judge saying to you at that hearing:

17   "I said before that you plead guilty to Counts 1 and 7"?

18   A.  I don't remember.

19   Q.  You don't remember the judge saying that.

20   A.  No.

21   Q.  Do you remember going -- the judge going on to say that

22   "Count 7 charges that in connection with the delivery of and

23   payment for health care benefits, items, and services, you

24   knowingly and willfully executed a scheme and artifice to

25   defraud Medicare, a health care benefit program, affecting

```
 1   commerce, and to obtain by means of false and fraudulent
 2   pretenses, representations, and promises the money and property
 3   owned by and under the custody and control of that health care
 4   benefit program, in violation of 18 U.S. Code 1347 and 2"?  Do
 5   you remember that?
 6   A.  I remember her reading the same way you're reading now.
 7   Q.  So are you saying -- do you remember her reading that?
 8   A.  I remember the reading.
 9   Q.  You remember her reading generally.
10   A.  Yes.
11   Q.  But do you remember her reading about your pleading guilty
12   to Count 7, a health care fraud count?
13   A.  No.
14   Q.  Do you remember her saying, "Do you understand these two
15   charges?"
16   A.  No.
17   Q.  Do you remember saying, "Yes, I do"?
18   A.  I remember answering yes.
19   Q.  You remember answering yes to those questions?
20   A.  Yes.
21   Q.  Okay.  So at that hearing, you recall that you answered yes
22   to a question, "Do you understand these two charges?"  Is that
23   right?
24   A.  Yes.
25   Q.  So then you understood at the hearing that you were
```

1  pleading guilty to two counts, not just one; isn't that right?

2  A.  I don't remember the question.  I was answering yes as I

3  was advised by my attorneys.

4  Q.  Ms. Feas, you were asked the question, "Do you understand

5  these two charges"; is that right?

6  A.  I didn't understand the charges.

7  Q.  But you said "yes, I do"; is that right?

8  A.  Yes.

9  Q.  Had you sworn an oath to tell the truth that day?

10  A.  Yes.

11  Q.  So you lied when you were asked if you understood those two

12  charges; is that correct?

13  A.  Yes.

14  Q.  You lied under oath at that hearing.

15  A.  Yes.

16  Q.  But you were aware at that hearing that there were two

17  charges against you, correct?

18  A.  No.

19  Q.  But you heard the judge's question:  "Do you understand

20  these two charges?"  You understood what "two" meant, right?

21  A.  I didn't -- I didn't hear -- I didn't hear her saying that.

22  I remembered answering yes.

23  Q.  But you don't remember the judge saying, "Do you understand

24  these two charges?"

25  A.  No, I don't remember.

1    Q.  Would a transcript of that hearing refresh your

2    recollection as to whether the judge asked you, Do you remember

3    these two charges?

4    A.  Yes.

5            MR. GOODYEAR:  Your Honor, may I approach?

6            THE COURT:  Yes.

7    BY MR. GOODYEAR:

8    Q.  (Hands witness document.)

9    A.  I'm reading it now, and I remember answering yes as what

10   the advice from my attorneys.  And I read this for the first

11   time in November -- or December, I'm sorry.  And the same

12   thing, I didn't remember that day, a specific day, May 7, but I

13   remembered answering yes to all the questions.

14   Q.  Okay.  But you knew at the time of the hearing that you

15   were pleading guilty to two counts, didn't you?

16   A.  I was pleading guilty and my knowledge of it was one count

17   of conspiracy.

18   Q.  And so you just didn't hear the judge when she said, "Do

19   you understand these two charges"; is that your testimony?

20   A.  Yes, I didn't hear.  I was --

21   Q.  Do you remember the judge on that -- so you were under oath

22   at that change of plea hearing, correct?

23   A.  I'm sorry, what was the question again?

24   Q.  You were under oath at that plea hearing, correct?

25   A.  Yes.

1  Q.  Was it an oath just like the one you took today when you

2  began your testimony?

3  A.  Yes.

4  Q.  And you said earlier, when Mr. Rabin was talking to you,

5  that you were not satisfied with your attorneys.  Do you

6  remember saying that to Mr. Rabin just now?

7  A.  Yes.

8  Q.  Do you remember being asked by Judge Altonaga at that

9  hearing, "Are you fully satisfied with the counsel, the

10  representation, and the advice that you've received from your

11  attorney?"  Do you remember that?

12  A.  I don't remember exactly the words.

13  Q.  Do you remember being asked that question, about being

14  satisfied with your attorney at the hearing?

15  A.  I don't remember.

16  Q.  Do you remember answering yes to that question?

17  A.  I don't remember.

18  Q.  Could you turn to page 5 of the transcript that I handed

19  you before?

20  A.  Yes, I remember my answers.

21  Q.  You remember answering yes to that question?

22  A.  Yes.

23  Q.  Okay.  So your testimony is that you were unsatisfied with

24  the quality of your attorneys on that day, correct?

25  A.  Yes.

1    Q.   You came into that hearing sort of not really wanting to

2    plead guilty, but doing it because of your attorneys, but you

3    didn't really like your attorneys, you didn't think they were

4    doing a good job; is that correct?

5    A.   I'm sorry, I didn't like my attorneys after I realized that

6    I was set up -- they set me for failure.  By then I was totally

7    rely -- relying on them.

8    Q.   At the time of the hearing, were you satisfied with your

9    attorneys or not?

10   A.   Yes.  At that time, yes.  I was just doing whatever they

11   asked me to do.

12   Q.   Do you remember telling Mr. Rabin on your direct testimony

13   that at the time of the change of plea hearing, you were not

14   satisfied with your attorneys?

15   A.   I didn't want to plead guilty.  I want to go to trial.  And

16   they advised me that, you know, that was the way it is, there

17   was no change of that, that that was the best choice to do.

18   Q.   Ma'am, during your -- do you recall during your direct

19   testimony when Mr. Rabin was questioning you saying that you

20   were not satisfied with the quality of your attorneys?  Do you

21   recall that testimony from just 30 minutes ago?

22   A.   Yes.

23   Q.   Were you telling the truth --

24            MR. RABIN:  Excuse me.  Objection.  I think it

25   misstates the evidence.

1    THE COURT:  Overruled.

2    BY MR. GOODYEAR:

3    Q.  Were you telling the truth when you told Mr. Rabin that at

4    the time of your change of plea you were not satisfied with the

5    quality of your attorneys?

6    A.  I don't remember that question exactly about by the time of

7    the plea.

8    Q.  So your testimony now is that at the time of the plea

9    hearing, your attorneys were doing a fine job as far as you

10   were concerned?

11   A.  Not a fine job.  I was just following the advisement.  I

12   didn't know anything about legal.  That was my first time

13   facing legal charges and I just trust them.

14   Q.  Judge Altonaga asked you some other questions at that

15   hearing, didn't she?

16   A.  I'm sorry?

17   Q.  Judge Altonaga asked you some other questions at that

18   hearing, didn't she?

19   A.  Yes.

20   Q.  Do you remember her asking you whether you agreed that the

21   following facts are true:  First, that your participation in

22   the conspiracy to defraud a government health care program

23   resulted in a loss of approximately $56,298,900?

24   A.  I don't remember the exact words and I -- I just remember

25   answering all questions yes.

1    Q.   And were those truthful answers or lies?

2    A.   They were lies.

3    Q.   They were lies under oath.

4    A.   I realize that after I read the transcript.

5    Q.   Are you saying you didn't know at the time that they were

6    lies?

7    A.   I was -- I was answer the question yes because was the

8    answer that my attorneys recommended me to do.

9    Q.   At the time that you were asked whether your participation

10   in a health care fraud resulted in a loss of $56 million, did

11   you believe that your participation in a health care fraud had

12   resulted in a loss of $56 million or not?

13   A.   No.

14   Q.   And so -- but you said yes to that question, correct?

15   A.   Yes.

16   Q.   So that was a lie.

17   A.   Yes.

18   Q.   A lie under oath in court, correct?

19   A.   Yes.  I followed my attorneys' advice all the time.

20   Q.   Do you remember when Judge Altonaga at that hearing started

21   reading to you from the Agreed Factual Basis for Guilty Plea?

22   A.   I remember she start reading the document that I signed

23   just a few minutes before she start reading it.

24   Q.   And what document was that?

25   A.   I'm sorry?

 1    Q.  What document was it that she was reading from?

 2    A.  It was a two pages document.

 3    Q.  And what was contained in the document?

 4    A.  It's like a summary of -- that I understood later.  But

 5    that day, I signed the papers just two minutes before the court

 6    started that day, just in court, inside the court.

 7    Q.  And do you remember Judge Altonaga asking you, "Did you

 8    have the opportunity of reading this and discussing it fully

 9    with your attorney before you signed it?"

10    A.  I don't remember.

11    Q.  Do you remember answering yes to that question?

12    A.  I don't remember the question.  I remembered answering yes

13    to all questions.

14    Q.  Can you please turn to pages 16 and 17 of the transcript?

15    A.  15 and 16.

16    Q.  No, sorry, 16 and 17.  Do you see at the bottom of the page

17    the question the judge is asking?

18    A.  Yes.  I didn't know the name of the document, but I answer

19    yes.

20    Q.  You answered yes to that question, correct?

21    A.  Yes.

22    Q.  And then do you recall the judge went on to read several of

23    the facts that are contained in -- by the way, had you signed

24    this document, the Agreed Factual Basis for Guilty Plea?

25    A.  By then I didn't know the name, and I signed it just two

1   minutes or three minutes before -- we were inside the courtroom

2   and the attorney brought the paper to me and just go, tell me,

3   sign this really quick, and then the judge entered the room and

4   we didn't review it, of course.

5   Q.  Do you recall the judge proceeding to read several of the

6   facts contained in that document to you?

7   A.  She was reading the paper.

8   Q.  And do you recall her -- do you recall her asking you if

9   you agreed that you knowingly and willfully conspired with

10  others to commit health care fraud, you knowingly and willfully

11  executed and attempted to execute a scheme to defraud Medicare?

12  Do you recall that?

13  A.  I don't recall the questions.  I just recall me answering

14  yes.

15  Q.  Do you recall her asking you if you agreed that during your

16  employment at Health Care Solutions Florida, you signed

17  fabricated PHP therapy notes and other medical records used to

18  support false claims to government sponsored health care

19  programs?

20  A.  Again, I don't remember the question.  I remember she was

21  reading and I answered yes to all questions following my

22  attorneys' advice.

23  Q.  And those answers of yes to all those questions were lies

24  under oath, correct?

25  A.  Yes.

1    Q.   So then sometime later you submitted this -- you referred

2    to it with Mr. Rabin -- a 2255 application, correct?

3    A.   Yes.

4    Q.   You were claiming ineffective assistance of counsel; is

5    that right?

6    A.   Yes.

7    Q.   And you wanted to revoke your guilty plea; is that right?

8    A.   Yes.

9    Q.   And was that application denied or granted by the

10   magistrate judge?

11   A.   It was denied.

12   Q.   Do you recall meeting with agents from Health and Human

13   Services on August 2nd, 2013?

14   A.   Meeting with who?

15   Q.   Agents from the Department of Health and Human Services on

16   August 2nd, 2013, Agent Julie Rivera, Agent Henry, Yaden Luna?

17   A.   I remember I had a meeting with Mr. Medina and others --

18   other agents, but I don't know what they were there for.

19   Q.   You don't know what they were there for?

20   A.   No.

21   Q.   Well, were they there to ask you questions about Health

22   Care Solutions?

23   A.   They asked me questions about Health Care Solutions, but

24   you're telling me the name of the agency now.

25   Q.   You don't remember the specific name of the agents.  Do you

1  remember that there were law enforcement agents there at the

2  interview?

3  A.  Yes.

4  Q.  And they asked you questions about Health Care Solutions,

5  correct?

6  A.  Yes.

7  Q.  Did you answer those questions?

8  A.  Yes.

9  Q.  Okay.  So do you remember telling those agents, on

10  August 2nd, 2013, that at the new location of Health Care

11  Solutions East there were approximately 60 patients divided

12  into five groups and that it was crazy, it was very hard to

13  keep patients in the groups?

14  A.  That not my correct answers.

15  Q.  I'm sorry, I couldn't hear you.

16  A.  They are not my correct answers.

17  Q.  Do you recall saying that to the agents on August 2nd,

18  2013?

19  A.  I remember -- what was your question again, please?

20  Q.  Do you recall saying to the agents on August 2nd, 2013,

21  that at the new location of Health Care Solutions East there

22  were approximately 60 patients divided into five groups, and

23  that it was crazy, it was very hard to keep patients in the

24  groups?

25  A.  I don't remember the last part of that being my answer.

1   Q.  If I showed you a report from that -- from that interview,

2   would it refresh your recollection about your statements that

3   day?

4   A.  Yes.

5           MR. GOODYEAR:  Your Honor, may I approach?

6           THE COURT:  Yes.

7   A.  I remember the first part of the question.

8   BY MR. GOODYEAR:

9   Q.  So you remember -- and how did that part go?  What were you

10  asked and what did you say?

11  A.  Okay.  It was the same thing, was a leading question,

12  asking me about -- you know, they were explaining to me there

13  was a lot of patient at Health Care Solution, and I go yes.

14  And they were talking about how the program was running and

15  they were asking if it was true.  And my answer was that we had

16  a lot of patient, that it was crazy.  But the last part, that

17  it was very hard to keep them inside the group, that's not

18  true.  That's not my words.

19  Q.  Where did you learn the term "leading question"?

20  A.  All my life.

21  Q.  All your life you've known what a leading question was?

22  A.  Well, when I grow -- when I learn, you know, I went to

23  college and I know what a leading question is.

24  Q.  You just said that you told them that there were a lot of

25  patients at Health Care Solutions East, correct?

1    A.   Yes.

2    Q.   Do you remember saying to the agents that there were 60

3    patients divided into five groups?

4    A.   I don't remember the number 60.  I remember telling that we

5    had a lot of patients divided in five groups.

6    Q.   So did the agents ask you:  "Were there 60 patients divided

7    into five groups?"  Is that what happened?

8    A.   I don't remember the number.

9    Q.   But are you saying that you were asked a leading question

10   about the exact number of patients and how many groups they

11   were divided into?  Is that your testimony today?

12   A.   I didn't say the 60 -- the number 60.  They told me that

13   there was a lot of patients in Health Care Solution.

14   Q.   Do you recall telling the agents at that meeting that you

15   had told Dr. Rousseau -- let me ask a different question.

16        Do you recall telling the agents at that meeting that

17   Dr. Rousseau had told you to keep the stamp with his signature

18   in your office?

19   A.   Yes.

20   Q.   Was that a leading question or was that a statement that

21   you just made?

22   A.   That was my statement.

23   Q.   That was just a statement you made.

24   A.   Yes.

25   Q.   Okay.  Do you recall telling the agents that you told

1    Dr. Rousseau that everybody had access to your office?

2    A.  I don't remember exactly that words.

3    Q.  Could you turn to page 4 of the report I've given you.

4    A.  Okay.  I remember telling that Dr. Rousseau once asked me

5    to keep the stamp in my office.  The other part of the answer

6    is not mine.  So other Health Care Solution employees didn't

7    use it, I didn't say that.  I remember telling that anyways,

8    everybody had access to my office.  That was the end of it.

9    Q.  You remember telling the agents that everybody had access

10   to your office.

11   A.  Yes.

12   Q.  Do you remember telling the agents that you told

13   Dr. Rousseau that everybody had access to your office?

14   A.  I remember when he told -- he asked me to keep the stamp in

15   my office or -- let's say my office, and I remember telling him

16   that the office was not -- it was always accessible to all

17   employees.  And that was the end of that statement.

18   Q.  Do you remember telling the agents that when you told

19   Dr. Rousseau that other employees had access to your office, he

20   responded that it was okay?

21   A.  No, I don't remember that.  I didn't say that.

22   Q.  Do you remember an earlier interview with government agents

23   on May 15th, 2013?

24   A.  It is here?

25   Q.  No.  But do you remember meeting with government agents on

1  May 15, 2013?

2  A.  Yes, after my plea.

3  Q.  After your plea.

4  A.  Uh-huh, yes.

5  Q.  Your guilty plea.  After your guilty plea, correct?

6  A.  Yes.

7  Q.  Do you remember telling the agents at that interview that

8  Rousseau would come to Health Care Solutions U.S. 1

9  approximately one to two hours per week to sign documents?

10  A.  No.

11  Q.  Do you recall saying that he would blindly sign documents

12  without reading any of them?

13  A.  No.

14  Q.  Do you recall saying that you recalled Dr. Rousseau's

15  interactions with patients as being greetings at most?

16  A.  No, that are not my words.

17  Q.  Can I show you a document that might refresh your

18  recollection?

19  A.  Yes.

20         MR. GOODYEAR:  May I approach, Your Honor?

21         THE COURT:  Yes.

22  BY MR. GOODYEAR:

23  Q.  (Hands witness document.)

24  A.  I remember the agents asking me those questions.

25  Q.  You remember the agents asking you those questions.

1  A.  Exactly.  Asking me about -- you know, if Dr. Rousseau was

2  going just one or two hours a week.

3  Q.  And what did you say?

4  A.  I said that he was going every week, once a week, and spend

5  almost the entire day, five hours, seeing patients.

6  Q.  You recall saying to the agents that he would go once a

7  week and spend the entire day, five hours, seeing patients?  Is

8  that your testimony today?

9  A.  I remember telling them that he was going every Thursday to

10  see the patients and spend there hours seeing patients.  And by

11  the end, he would sign the documents.

12  Q.  Do you recall telling them that Dr. Rousseau was concerned

13  that his signature might have been forged?

14  A.  No.

15  Q.  The bottom -- if you continue reading the rest of that

16  page, does that refresh your recollection about telling the

17  agents that Dr. Rousseau was concerned that his signature might

18  have been forged?

19  A.  He never say that.  He asked me to keep the stamp in my

20  office.  That's what he asked me for.

21  Q.  Do you recall telling the agents on that day that

22  Dr. Rousseau was concerned that his signature might have been

23  forged?

24  A.  No.

25  Q.  Mr. Rabin asked you some questions about seeing Ms. Haynes

1    at FDC talking to some other inmates.  Do you recall that?

2    A.  Yes.

3    Q.  And you said she was talking after she had testified; is

4    that correct?

5    A.  Yes.

6    Q.  And Ms. Haynes testified after Dana Gonzalez in this case,

7    correct?

8    A.  Can you repeat the question again?

9    Q.  Alex Haynes testified after Dana Gonzalez in this case,

10   correct?

11   A.  I don't know.

12   Q.  Do you know whether she testified before or after Gema

13   Pampin?

14   A.  I don't know.

15   Q.  Do you know if she testified before or after Lisset

16   Palmero?

17   A.  I don't know.

18           MR. GOODYEAR:  Your Honor, may I have a moment?

19           THE COURT:  Yes.

20       (Off-the-record discussion.)

21   BY MR. GOODYEAR:

22   Q.  Ms. Feas, at the end of your testimony with Mr. Rabin, you

23   said that you were following the advice of your attorneys to

24   lie.  Do you remember that?

25   A.  I was following my attorneys' advice to sign the plea and

2544

1    to agree with everything that was written on it.

2    Q.   And those were lies, correct?

3    A.   Yes.

4    Q.   Under oath?

5    A.   Yes.

6    Q.   Did you ever say to your attorneys, "Wait a minute, these

7    statements are not true"?

8    A.   Yes, especially when they were -- they were going over it,

9    because they didn't review all the parts of the plea.  They

10   were going over it and I remember asking them to change some of

11   the things, and they just told me nothing can be changed, this

12   is the way it is, and you better sign now because Mr. Medina is

13   getting mad at you.

14   Q.   You told your attorneys these statements are not true.  Is

15   that your testimony today?

16   A.   I -- they went over the plea agreement and I remember

17   asking them to change certain things.  I don't remember exactly

18   what was it.  But I remember them tell me -- telling me, you

19   better sign now because that's the way it is, this is the best

20   choice, this is the best you can do, and it's better for you to

21   sign now because Mr. Medina is getting mad at you.

22   Q.   Ms. Feas, do you recall at the change of plea hearing Judge

23   Altonaga asking you:  "Is anyone putting pressure upon you,

24   forcing you, or coercing you to plead guilty and agree to these

25   terms?"  Do you remember that?

1    A.  I don't remember the questions exactly.

2    Q.  Do you remember answering no to that question?

3    A.  I remember -- well, do you have the paper that you're

4    looking at?

5    Q.  Do you remember answering no to that question?

6    A.  I don't remember the question.

7    Q.  Do you remember -- if I gave you a document, would it

8    refresh your recollection?

9    A.  Yes.

10            MR. GOODYEAR:  Your Honor, may I approach?

11            THE COURT:  Yes.

12   BY MR. GOODYEAR:

13   Q.  (Hands witness document.)

14   A.  Where is it?

15   Q.  (Indicating).

16   A.  I'm reading, but I don't remember that day that question

17   being asked.

18   Q.  And you don't remember -- so you don't remember answering

19   no when the judge asked you if anyone was putting pressure on

20   you or forcing you or coercing you to plead guilty?

21   A.  I don't remember the answer, but I -- you know, I can see

22   that it was not.

23   Q.  And that was a lie, correct, under oath?

24   A.  Yes.

25            MR. GOODYEAR:  Nothing further, Your Honor.

1        THE COURT:  Let me see the lawyers at sidebar before

2    we get to redirect.

3        (Sidebar Conference:)

4        THE COURT:  Okay.  I think every defendant except for

5    Ms. Ruiz listed Ms. Feas as a witness.  So since the other four

6    attorneys chose not to ask her any questions about your

7    clients, I want to make sure that you are affirmatively making

8    the strategic decision not to ask her any other questions as

9    opposed to inadvertently not asking questions.

10       So, Mr. Palomino, is this a strategic decision that

11   you make?  Because she's on the stand now.  So even though you

12   listed her, you're not going to call her as a witness.

13       MR. PALOMINO:  I believe that Mr. Rabin covered the

14   points that I would have elicited from her regarding the

15   therapists, so I think it would be duplicative for me to get up

16   there and ask the questions again, so I'm not asking any

17   questions.

18       THE COURT:  All right.  Mr. Hermida?

19       MR. HERMIDA:  Judge, this has been weeks in the

20   making.  I've spoken to Mr. Rabin about this very issue this

21   very day.  At least three weeks ago when we began prepping.  I

22   think he knows this.  There is just one additional question and

23   we'll discuss that in a few minutes.

24       THE COURT:  What do you mean, that you want Mr. Rabin

25   to ask for you?

1    MR. HERMIDA:  That I want Mr. Rabin to ask for me.

2    THE COURT:  So again, this is your affirmative

3    decision.

4    MR. HERMIDA:  Yes, sir.

5    THE COURT:  Mr. Prieto?

6    MR. PRIETO:  Judge, the same.  We listed her as a

7    witness, you know, with the intent of calling her.  But, you

8    know, we've met, the attorneys have met together.  We have

9    provided the questions we wanted Mr. Rabin -- strategically, we

10   thought it best if one attorney would address the issues with

11   her.  And we have been passing notes.

12   THE COURT:  Okay.

13   MR. GONZALEZ:  Let me talk to my client for just a

14   moment.

15   THE COURT:  Okay.  And Mr. Levin, while he's gone, you

16   didn't list her, but were there any questions?

17   MR. LEVIN:  I have no questions.  Mr. Rabin covered

18   it.  I don't compliment Sam all that often -- Mr. Rabin.

19   MR. RABIN:  Yes, we're making a record here.  Have

20   some respect.

21      (Off-the-record discussion.)

22   THE COURT:  Yes, sir.

23   MR. GONZALEZ:  After consultation with my client, I

24   want Mr. Rabin to ask a specific question.  I'm not going to

25   ask any questions, but I would like for you on redirect --

 1          THE COURT:  You don't have to tell me what it is.  You

 2    can tell him.

 3          MR. GONZALEZ:  Do you want to hear?

 4          THE COURT:  All right.  Yes, go ahead.  That way we'll

 5    know whether he asked it or not.

 6          MR. GONZALEZ:  I want to find out if she knew who the

 7    clinical directors were in the West.

 8          MR. RABIN:  Okay.

 9          MR. GONZALEZ:  And if she ever heard of an intern

10    therapist being promoted to clinical director there.

11          MR. RABIN:  Okay.

12          THE COURT:  Okay.  Thank you.

13          MR. GONZALEZ:  Thank you, Judge.

14       (Before the Jury.)

15          THE COURT:  All right.  Redirect, Mr. Rabin.

16                        REDIRECT EXAMINATION

17    BY MR. RABIN:

18    Q.  Dr. Feas, the first question the prosecutor asked you was,

19    did you surrender your license to practice psychotherapy,

20    correct?  Do you remember that question?

21    A.  Yes.

22    Q.  Does that change the fact -- when you surrendered your

23    license, did you also surrender your education that caused you

24    to become a doctor?

25    A.  No.

1    Q.   Do you still have a doctorate?

2    A.   Yes.

3    Q.   Is it -- even though you're not licensed, is it still

4    appropriate to refer to you as a doctor?

5    A.   Yes.

6    Q.   When you surrendered your license, did they say, listen,

7    we'd like you to surrender your diploma and not refer to

8    yourself as a doctor?  Did they ever do that?

9    A.   No.

10   Q.   Okay.  The prosecutor -- and I'm going to try and just zero

11   in on specific questions when I ask so that -- going back to

12   the questions the prosecutor asked you, okay?

13   A.   Yes.

14   Q.   Okay.  The prosecutor asked you if you told the judge if

15   you were satisfied with your attorneys, and he pointed out that

16   you said at the time that you were.  Do you recall that

17   question and answer?

18        Do you recall the prosecutor showing you the plea colloquy

19   that you had with the judge, when the judge asked you if you

20   were happy with your lawyer?

21   A.   I don't remember the --

22   Q.   Now I'm asking you if you remember the prosecutor just

23   asking you that.

24   A.   Oh, yes, yes.

25   Q.   Okay.  At the time that you were in front of the judge when

1  you were -- when you were following your lawyers' advice, were

2  you happy with your lawyers then?

3  A.   Yes.

4  Q.   Okay.  Did you think that your lawyers were advising you

5  properly?

6  A.   At that moment I rely on them.

7  Q.   Okay.  Did you think that the things that you were doing in

8  front of the judge were necessary in order for you to achieve a

9  goal of getting a lower sentence down the road?

10 A.   Yes.

11 Q.   When did you -- when did you realize that their plan, their

12 advice to you, wasn't right?

13 A.   I realized it the day after the sentencing.  I was

14 sentenced July 25th, 2013.

15 Q.   And you were sentenced to eleven years and three months,

16 135 months?

17 A.   135 month.  And I realized that day -- the day after.

18 Q.   Was there something that happened the day after that caused

19 you to realize it?

20 A.   I'm sorry?

21 Q.   Was there something that happened the day after that caused

22 you to realize it, or was it just the amount of time that you

23 got?

24 A.   It was -- I realized it that day, after, you know, when I

25 started, you know, having thing connected.

1   Q.   The prosecutor asked you a lot of questions about your plea

2   in front of the judge in which you admitted that you were not

3   truthful with the judge because you just answered yes to all

4   her questions, correct?

5   A.   Yes.

6   Q.   Do you remember those?  Were you standing or sitting when

7   you were in front of the judge?

8   A.   I was sitting.

9   Q.   Okay.  Was your lawyer sitting next to you?

10   A.   Yes, one on the right side and the other one on the left

11   side.

12   Q.   Okay.  So it was kind of like you're sitting at a table

13   like this or like that and you have a microphone in front of

14   you and a lawyer on each side of you?

15   A.   Yes.

16   Q.   Okay.  When the judge would ask you questions, were you

17   looking to your lawyers for advice on what you should say?

18   A.   Yes.

19   Q.   Did your lawyers ever stop you at any time and say, now,

20   don't answer it this way or did they just encourage you to go

21   along with the plea?

22   A.   They never stopped.

23   Q.   Okay.  Did you understand that your lawyers were

24   positioning you or trying to get you in a position where you

25   could cooperate with the government?

1    A.  Can you repeat the question?

2    Q.  Yes.  Did you understand your lawyers' plan to be that they

3    wanted you to be able to cooperate with the government?

4    A.  I didn't understand.

5    Q.  Okay.  And ultimately, did you realize that you were --

6    your lawyers were setting up meetings for you to go meet with

7    prosecutors and agents?

8    A.  I'm sorry?

9    Q.  Did your lawyers set up meetings for you with prosecutors

10   and agents?

11   A.  They didn't set that appointment, they just would call and

12   they asked me to go to the interviews.

13   Q.  Okay.  So your lawyers would call you and tell you to go to

14   the interviews, correct?

15   A.  Yes.

16   Q.  So in other words, your lawyers made whatever arrangements

17   they made and then just told you where to go.

18   A.  Yes.

19   Q.  Were your lawyers present at those interviews?

20   A.  Yes.

21   Q.  Did you have discussions with your lawyers about, the

22   prosecutors aren't happy with what I'm saying?

23   A.  Yes.

24   Q.  Was that part of what made you realize that you were not

25   ever going to get any benefit from the government?

2553

1    A.   Yes.

2    Q.   You used the word several times when talking to the

3    prosecutor, do you remember that you used the word -- and I

4    think I've quoted it correctly -- my lawyer set me up for

5    failure?  Do you remember that?

6    A.   Yes.

7    Q.   Tell the members of the jury what you mean by that.

8    A.   Well, I -- that's the way I felt when I realized that

9    everything that we discussed, of the little things that we

10   discussed, it was not the way that I was hoping.  And they

11   didn't investigate my case.  They didn't get any information.

12   I was never presented with the discovery and I never heard that

13   word until I surrendered myself in Miami.  The word discovery,

14   I never, ever heard that word before.  So that's the way I

15   felt, they were just making arrangement to get out of the case.

16   Q.   Did your lawyer -- did you ever have a meeting with your

17   lawyers where you discussed how to defend the case if you were

18   to go to trial?  Did you ever have any kind of discussion like

19   that with them?

20   A.   No.

21   Q.   Did your lawyers ever sit down with you and review what

22   they considered to be or what the government presented to them

23   as any -- of any evidence against you?

24   A.   Never.  I never was presented with any document from the --

25   the government or anything.  And again, I didn't hear about the

1    discovery.  That word I never heard before I surrender here in

2    Miami in August 12, 2013.

3    Q.  You told the prosecutor, in response to some of his

4    questions about the plea -- and I think I wrote this down

5    correctly -- you did not understand the legal system.

6    A.  I didn't.

7    Q.  Had you ever been involved in a court case, any court case,

8    civil, criminal, small claims, big claims, any kind of criminal

9    case or civil case?

10   A.  Never.

11   Q.  Had you ever been in a courtroom before?

12   A.  Yes.

13   Q.  Okay.  Under what circumstance?

14   A.  As an expert in my profession.

15   Q.  Okay.  You told the prosecutor in response to a number of

16   questions that the answers you gave to the judge were the

17   answers that you were advised to give.

18   A.  Yes.

19   Q.  Who advised you to go along with the plea and plead guilty?

20   A.  My attorneys.

21   Q.  Okay.  What were their names?

22   A.  It's David Kubiliun and Scott Egleston.

23   Q.  In response to the prosecutor's questions about the plea,

24   you said, I don't really remember the questions, but I just

25   remember I kept answering yes.

2555

1    A.  Yes.

2    Q.  Okay.  Why is it that you just remember answering yes?

3    A.  Because that's what they're telling me.  They were seated

4    just one on the right and one on the left.

5    Q.  The prosecutor asked you some questions about

6    Dr. Rousseau's stamp.  Do you remember those questions?

7    A.  Yes.

8    Q.  Okay.  Isn't it a fact that Dr. Rousseau asked you to hold

9    his stamp for safekeeping?

10   A.  They asked me to put it in my office because he didn't have

11   any place at that center.

12   Q.  Did Dr. Rousseau trust you?

13   A.  Yes.

14   Q.  Did you trust Dr. Rousseau?

15   A.  Yes.

16   Q.  Do you know who the clinical director was at Health Care

17   Solutions West?

18   A.  Well, I'm not sure.  At the beginning was -- I believe was

19   Layman and then I don't know if they changed to John Thoen.

20   Q.  Okay.  And do you remember if there was ever a time when

21   they had some kind of an intern or interim clinical director?

22   A.  I don't remember.

23   Q.  So the only two names that you remember as clinical

24   directors of West were Layman and Thoen.

25   A.  Yes.

1    Q.  The prosecutor asked you -- towards the end, he asked you a

2    question about Judge Altonaga asking you if anybody ever put

3    pressure on you.

4        Did you feel at the time of the plea that your lawyers were

5    pressuring you or just, you were following what you believed to

6    be at the time good advice?

7    A.  I was following what they advised me.

8           MR. RABIN:  If I could have a moment, Judge, I think

9    I'm done.

10       (Off-the-record discussion.)

11          MR. RABIN:  Judge, that's all I have.

12          THE COURT:  All right.  Thank you.

13          All right.  Let's take our morning recess.  We've been

14   here almost an hour and a half, and come back in 15 minutes.

15   All right?  See everybody in 15 minutes.

16       (Jury not present.)

17          THE COURT:  All right.  We're here in open court

18   outside the presence of the jurors, but everybody else is here.

19   Who your next witness, Mr. Rabin?

20          MR. RABIN:  Judge, I have -- I have a little

21   scheduling issue that's my own creation, but I believed that

22   she was going to be on the stand most of the day, but I have

23   all of my witnesses on hour's standby.  Before I got up to do

24   my redirect, I had my secretary have them all get here.  So I

25   don't know the order in which they're going to arrive, but I

```
 1    have a total of five witnesses, three character, two
 2    substantive, and all short, I believe, relatively short, and my
 3    associate is putting on all five and she can answer questions.
 4    She's handling that.
 5              THE COURT:  Is anybody here now or will be?
 6              MR. RABIN:  No.
 7              THE COURT:  Does anybody else have any other witnesses
 8    here?
 9              MR. HERMIDA:  No, Your Honor.
10              MR. PRIETO:  Judge, I was yesterday going to have my
11    witness here this morning, but then with the turn of events
12    with Ms. Feas, I told her to come tomorrow morning because in
13    the afternoon, she runs the battery intervention program for
14    the state of Florida.  She can't come in the afternoon.  So I
15    have her here tomorrow morning.
16              MR. LEVIN:  I have one coming this afternoon.
17              THE COURT:  And is one of your witnesses that's
18    coming, Mr. Rabin, Dr. Fernando Mendez-Villamil?
19              MR. RABIN:  Yes, Judge.  Fernando Villamil?
20              MS. LOPEZ:  Fernando Mendez-Villamil, yes.
21              MR. LEVIN:  And he's on my witness list as well.
22              THE COURT:  Okay.  And is that the witness the
23    government -- is there any other witness the government thinks
24    should be advised of anything by the Court?
25              MR. MEDINA:  No, Your Honor.
```

1          THE COURT:  So now because we had our issue with

2    Ms. -- you can all sit down.  Thank you.  Since we've had our

3    issue with Ms. Feas, one of the cases talked about how a

4    witness was intimidated by a judge advising them of the

5    possibility, so I'm kind of concerned about what am I going to

6    say and how am I going to say it and why am I going to say it.

7    The person is not in custody, right?  So I mean, they're not

8    entitled to Miranda rights or, I mean, so --

9          MR. RABIN:  Let me shed a little additional light.  I

10   have not dealt with Dr. Villamil, but my associate has, but one

11   of the questions she asked him is, "Do you have a lawyer?"

12   Obviously one of first questions, because she's well trained

13   and ethical.  And he said he didn't and he didn't feel he

14   needed one.  He certainly is aware of the issues swirling

15   around him.  There is no question about that.  He certainly is

16   aware of them because those are the very issues that my

17   associate spoke to him about and he's going to be asked to

18   testify about today, and he affirmatively said he didn't feel

19   he needed a lawyer.

20          And we would object to the Court making any additional

21   inquiry or making any admonitions because, quite frankly, we

22   think that that would, you know, chill his potential testimony.

23          MR. LEVIN:  Your Honor, I would join Mr. Rabin on

24   that.  I was present at the meeting as well and I, as well,

25   advised him that he potentially had exposure based on the

1    testimony, the allegations in this case, and he was totally

2    satisfied and fine speaking with us and indicated a willingness

3    to come and testify.

4          MR. GOODYEAR:  Your Honor, look, we want the defense

5    to be able to present their case.  We don't -- if Your Honor

6    decides not to say anything to Dr. Villamil, we don't object to

7    that.  We wanted to flag the issue, particularly because in one

8    previous case that we're aware of, the government flagged the

9    issue and there was actually no admonishment given, but that

10   was because subsequent to the government's flagging the issue,

11   our understanding is Dr. Villamil apparently decided not to

12   testify.

13         THE COURT:  I mean, is there case law -- you know, I

14   start with what does the U.S. Supreme Court and what does the

15   Eleventh Circuit tell me to do?  So is there case law that says

16   if an unindicted coconspirator is called, that there's some

17   duty on behalf of the Court to advise him of anything?

18   Particularly --

19         MR. GOODYEAR:  I'm not aware of any case law like

20   that, Your Honor.

21         THE COURT:  Okay.  Well, particularly in light of the

22   fact that Mr. Levin did advise him, I'm not going to take any

23   action at this time.

24         MR. RABIN:  And Ms. Lopez.

25         THE COURT:  And Ms. Lopez also was there?  They

 1   advised him separately?

 2          MR. RABIN:  No, they advised him together.  They were

 3   together.  I just wanted her to get due recognition, Judge.

 4          THE COURT:  Okay.  So we'll see you now in ten

 5   minutes, maybe?

 6          MR. RABIN:  Judge, I will let your chambers know as

 7   soon as I have a witness.

 8       (Recess, 10:40 a.m. to 10:58 a.m.)

 9          THE COURT:  All right.  Welcome back, everyone.

10   Please be seated.  All right.  Everybody is here.

11          Mr. Rabin, I understand your witness is going to be

12   here in about a half an hour or so?

13          MR. RABIN:  Change.  He's here.

14          THE COURT:  He's here?

15          MR. RABIN:  Yes, sir.

16          THE COURT:  I just told the jurors to go -- that they

17   can go get a snack or something and come back in 20 minutes,

18   but maybe --

19          MR. RABIN:  I was going downstairs to get water and he

20   walked in, so...

21          COURT SECURITY OFFICER:  They're all still here.

22          THE COURT:  Oh, good.  Bring in the jury.

23          COURT SECURITY OFFICER:  All rise for the jury,

24   please.

25       (Jury Present.)

1          THE COURT:  All right.  Welcome back and please being

2     seated.  Thank you for your patience, members of the jury.

3          And who is the next witness, Mr. Rabin?  Or Ms. Lopez?

4          MS. LOPEZ:  Roger Rousseau calls Dr. Fernando

5     Mendez-Villamil.

6          THE COURT:  All right.  Sir, would you mind standing

7     again for a second and raise your right hand to be sworn?

8      FERNANDO MENDEZ-VILLAMIL, DEFENDANT ROUSSEAU WITNESS, SWORN

9          COURT REPORTER:  Please state your full name for the

10    record, spell your last name, and please use the microphone.

11         THE WITNESS:  Fernando Mendez-Villamil, Mendez

12    M-E-N-D-E-Z, dash Villamil, V-I-L-L-A-M-I-L.

13         MS. LOPEZ:  Good morning, Your Honor, ladies and

14    gentlemen of the jury, and may it please the Court.

15                        DIRECT EXAMINATION

16    BY MS. LOPEZ:

17    Q.  Good morning, Dr. Villamil.  Can you please introduce

18    yourself to the jury?

19    A.  I am a psychiatrist who has been in private practice for

20    over 16 years and I used to be the medical director of one of

21    the PHPs.

22    Q.  Okay.  And --

23         MR. GONZALEZ:  I'm sorry, I'm having trouble hearing.

24    Could everybody speak up a little bit?  Thank you.

25    BY MS. LOPEZ:

1   Q.   Where did you attend medical school?

2   A.   Puerto Rico.

3   Q.   And where did you do your residency?

4   A.   Jackson Memorial.

5   Q.   How long have you been a psychiatrist for?

6   A.   16 years.

7   Q.   Are you familiar with partial hospitalization programs at

8   community mental health centers?

9   A.   Yes.

10   Q.   How many partial hospitalization programs have you worked

11   at?

12   A.   Two.

13   Q.   What are the names of those partial hospitalization

14   programs?

15   A.   The first one, I don't remember the name.  It must have

16   been like in the year of 2000, and then I don't remember the

17   name of the one that I worked for in the Cutler Bay area.  It's

18   something like Health Care Solutions.

19   Q.   Does the name Health Care Solutions Network sound familiar

20   to you?

21   A.   Yes.

22   Q.   Before we get to Health Care Solutions Network, are you

23   familiar with a Dr. Roger Rousseau?

24   A.   Yes.

25   Q.   How are you familiar with Dr. Rousseau?

1    A.   First I met him when I was working for a medical office

2    that rented space out of his office back in 1999 or 2000.

3    Q.   Were you able to see the doctor in his practice as a

4    psychiatrist?

5    A.   Yes.

6    Q.   In your opinion, do you think that he's a conscientious

7    doctor?

8    A.   Yes, he is.

9    Q.   Now, getting back to Health Care Solutions Network.  Do you

10   remember which location you worked at?  Do you remember whether

11   it was called the East or the West location?

12   A.   It must be the West location.

13   Q.   And how did you get the job at Health Care Solutions

14   Network?

15   A.   Dr. Rousseau invited me or recommended me to be the medical

16   director of the PHP to the owner.

17   Q.   Do you remember what year he approached you?

18   A.   Not exactly.  It must have been 2006 or 2007.

19   Q.   And what did he tell you when he approached you?

20   A.   That there was a PHP program that he worked for and that

21   they were starting a new place, a new location, and that he

22   wanted me to be the head of the location.

23   Q.   Do you remember who interviewed you for the position as

24   medical director?

25   A.   Dr. Rousseau introduced me to the owner.

1  Q.  Was there anyone else present at the interview?

2  A.  The owner.

3  Q.  Do you remember the owner's name?

4  A.  Gonzalez, Manuel, Mandy, Manny.

5  Q.  Does Armando Gonzalez sound familiar to you?

6  A.  I'm sorry?

7  Q.  Does the name Armando Gonzalez sound familiar to you?

8  A.  Well, I met him just at the office, not before.

9  Q.  And where did the interview take place?

10  A.  At my private office.

11  Q.  Do you remember when you started working for Health Care

12  Solutions Network?

13  A.  Yes.  It must have been 2006 or 2007.

14  Q.  What was your initial reaction to the facilities at Health

15  Care Solutions Network?

16  A.  It was a small facility.  It was not the facility that they

17  opened later.  They only had like eight or ten patients in the

18  beginning and I thought it was a very organized place in the

19  beginning.

20  Q.  Did anything about the facilities cause concern to you?

21  A.  No.

22  Q.  Could you please describe to the jury the patients at

23  Health Care Solutions Network?

24  A.  Most of the patients either suffered from depression or

25  bipolar disorder or schizophrenia.

1   Q.  Did any of the patients -- did any of the patients soil

2   themselves?

3   A.  No.

4   Q.  Were any of the patients drooling?

5   A.  No.

6   Q.  Did the patients look appropriate for a partial

7   hospitalization program?

8   A.  Yes.

9   Q.  How many times a week would you go to Health Care Solutions

10  Network?

11  A.  Once a week.

12  Q.  Do you remember what day of the week that was?

13  A.  Thursday.

14  Q.  And for how long would you be at Health Care Solutions

15  Network?

16  A.  I was there by the time they opened and I left when they

17  were closing.  So it was an entire day of work.  And at times I

18  couldn't finish on Thursday, so I would go again on Friday

19  mornings or Friday afternoon after my private practice.  I was

20  close by.

21  Q.  Did you see patients at Health Care Solutions Network?

22  A.  Yes.

23  Q.  How much were you paid as medical director at Health Care

24  Solutions Network?

25  A.  $5,000 per month.

1   Q.  Did that seem like a normal pay as a medical director at

2   Health Care Solutions Network?

3   A.  Yes, yes.

4   Q.  Who did you work with primarily at Health Care Solutions

5   Network?

6   A.  Mostly one of the therapists.

7   Q.  Do you remember their name?

8   A.  Yes.  Blanca Ruiz.

9   Q.  Do you remember if she was a therapist or an intern?

10  A.  I remember her as a therapist.

11  Q.  Did you observe any fraud going on at Health Care Solutions

12  Network?

13  A.  No.

14  Q.  Did you have anyone bring you documents to blindly sign?

15  A.  No.

16  Q.  Did you review all the documents that were brought to you?

17  A.  Yes.

18  Q.  Did you ever have a chance to observe group therapy

19  sessions going on?

20  A.  No.

21  Q.  Did you ever come into contact with anyone by the name of

22  John Thoen?

23  A.  I don't remember the names.  I used to work with a lot of

24  people there and I just didn't know their names.

25  Q.  Okay.  That's fair.  How long did you work at Health Care

1    Solutions Network?

2    A.   Approximately for two or three years.

3    Q.   Did you ever learn about any kickbacks being paid for

4    patients who worked at Health Care Solutions -- or for patients

5    being referred to Health Care Solutions Network?

6    A.   No.

7    Q.   Did you ever hear any discussions about inappropriate

8    patients?

9    A.   No.

10   Q.   Did you ever hear any discussion about ghost groups or

11   patients that were being billed for but did not actually go to

12   Health Care Solutions Network?

13   A.   No.

14   Q.   Were you aware that there was a stamp with your name at

15   Health Care Solutions Network?

16   A.   Yes.

17   Q.   Did you allow people to just stamp -- use your stamp to

18   allow inappropriate patients to come in to Health Care

19   Solutions Network?

20   A.   No, I just allow the stamp in case of an emergency, like a

21   phone order that I would have to call and approve.  Then the

22   stamp would serve as my signature.

23   Q.   Did you allow anyone to forge your signature?

24   A.   No.

25   Q.   Were you aware that there were audits that went on in

1    Health Care Solutions Network where files would be -- files

2    would be cleaned up or edited and people would just forge and

3    stamp your signature in them?

4    A.  No.

5          MS. LOPEZ:  Can we bring up Exhibit 164, Government

6    Exhibit 164, page 62, please.

7    BY MS. LOPEZ:

8    Q.  Doctor, does this look like your signature?

9    A.  No.

10   Q.  Did you allow anyone to forge your signature?

11   A.  No.

12         MS. LOPEZ:  Can we bring up page 59, please?

13   BY MS. LOPEZ:

14   Q.  Doctor, does this look like the stamp that they had of your

15   signature?

16         THE COURT:  What part of the document are you

17   referring to?

18   BY MS. LOPEZ:

19   Q.  Oh, I'm sorry, on the bottom of the document.  How do

20   you --

21         THE COURT:  I know, but there's a --

22   A.  That looks real, yes.

23   BY MS. LOPEZ:

24   Q.  Does that look like a stamp or a signature?

25   A.  I wouldn't be able to say.  It looks like the way I would

1  sign with my abbreviations, my name and my last name, but

2  that's not the usual way I sign.

3       THE COURT:  And yours is in the upper right?

4  BY MS. LOPEZ:

5  Q.  Yes, where it says physician signature?

6  A.  (Witness nods head up and down.)

7  Q.  Did you allow anyone to use -- would you allow anyone to

8  use a stamp of your name in admission orders or anything

9  without your permission?

10 A.  No.

11      THE COURT:  Can you put the two documents that you

12 showed next to each other so you could show the jurors the two

13 signatures so you can explain why one is his and why one is

14 not?

15 A.  I'm sorry, you said admission orders?

16 BY MS. LOPEZ:

17 Q.  Yes.

18 A.  Yes, that would be like a phone order, so it would be

19 approved, yeah.

20 Q.  Okay.

21      THE COURT:  It was page 62 and what was the other

22 page?

23      MS. LOPEZ:  It was page 69 and page -- no, it was page

24 62 and page 59.

25      THE COURT:  And it looks like there's two signatures

1   on the one on the left.

2   BY MS. LOPEZ:

3   Q.  Either signature on the left and then the one on the bottom

4   right.

5           THE COURT:  So Doctor, they're saying that the two

6   signatures on the left document are not yours?

7           THE WITNESS:  Those don't look like my signature.

8           THE COURT:  But the one on the right does look like

9   yours?

10          THE WITNESS:  The one on the right looks like the way

11  that I would do my initials in documents, but not the way I

12  sign in regular charts.

13  BY MS. LOPEZ:

14  Q.  So were you aware of any fraud going on in Health Care

15  Solutions Network?  Did anyone tell you about any fraud going

16  on in Health Care Solutions Network?

17  A.  No.

18  Q.  Did Dr. Rousseau ever talk to you about fraud going on in

19  Health Care Solutions Network?

20  A.  No.

21  Q.  Would you have worked at Health Care Solutions Network if

22  you knew that there was fraud going on?

23  A.  No.

24  Q.  So if there was testimony during this trial that there was

25  fraud going on, it would have been done behind your back?

1   A.  I'm sorry?

2   Q.  If there has been testimony during the duration of this

3   trial about fraud going on at Health Care Solutions Network, it

4   would have been done behind your back?

5   A.  Yes.

6   Q.  Without your knowledge.

7   A.  Without my knowledge.

8          MS. LOPEZ:  If I can please have a moment, Your Honor?

9          THE COURT:  Yes.

10         MS. LOPEZ:  No further questions.

11         THE COURT:  All right.  Mr. Palomino?

12         MR. PALOMINO:  Your Honor, I have no questions of this

13   witness.

14         THE COURT:  Mr. Hermida?

15         MR. HERMIDA:  No questions on behalf of Dr. Salafia.

16         THE COURT:  Mr. Prieto?

17         MR. PRIETO:  None on behalf of Ms. Marks, Judge.

18         THE COURT:  Mr. Gonzalez?

19         MR. GONZALEZ:  Briefly, Judge.

20                CROSS-EXAMINATION

21   BY MR. GONZALEZ:

22   Q.  Good morning, ladies and gentlemen.

23     Dr. Villamil, my name is Juan Gonzalez.  I represent Alina

24   Fonts.

25         MR. GONZALEZ:  Alina, stand up for a moment.

 1   BY MR. GONZALEZ:

 2   Q.  Do you recognize her?

 3   A.  Yes, I do remember her face.

 4   Q.  Where do you know her from?

 5   A.  From the PHP program.

 6   Q.  And she was a therapist there?

 7   A.  Yes.

 8   Q.  Okay.  Now, did she ever bring you documents for you to

 9   sign blindly?

10   A.  Meaning without seeing the patient?

11   Q.  That's correct.

12   A.  No.

13   Q.  Okay.  So every document that she brought for you to sign

14   was all appropriately done, correct?

15   A.  Yes.

16   Q.  All right.  You saw the patient and she did her job

17   correctly.

18   A.  Yes.

19   Q.  So if John Thoen says that she --

20          THE COURT:  Don't ask one witness to comment on what

21   another witness said.

22          MR. GONZALEZ:  Okay.

23   BY MR. GONZALEZ:

24   Q.  So everything that she did was appropriate under the

25   circumstances while you were there and while you worked with

1    her, correct?

2    A.  Yes.

3         MR. GONZALEZ:  All right.  Thank you.  I have nothing

4    further, Judge.

5         THE COURT:  All right.  Mr. Levin?

6         MR. LEVIN:  Yes.  May it please the Court.

7                        CROSS-EXAMINATION

8    BY MR. LEVIN:

9    Q.  Dr. Villamil, good morning.

10   A.  Good morning.

11   Q.  We met for the first time about a week ago?

12   A.  Yes.

13   Q.  Prior to that time, you didn't know me and I didn't know

14   you, correct?

15   A.  No.

16   Q.  Now, as you know, I represent Blanca Ruiz.  Do you see her

17   in this courtroom?

18   A.  Yes.

19   Q.  Can you identify her for the jury, please?

20   A.  The first lady wearing a jacket, peach-colored jacket.

21   Q.  Okay.

22        MR. LEVIN:  For the record, indicating Blanca Ruiz.

23        THE COURT:  Yes.

24        MR. LEVIN:  Thank you.

25   BY MR. LEVIN:

1    Q.   Now, Dr. Villamil, you said that you went to Health Care

2    Solutions West location approximately one time a week?

3    A.   Yes.

4    Q.   And you saw Blanca Ruiz there?

5    A.   Yes.

6    Q.   And she was doing the biopsychosocials and the intakes on

7    patients?

8    A.   That's what I understand.

9    Q.   And she would come into your office with files and with

10   patients for you to sign, correct?

11   A.   Correct.

12   Q.   You would never have signed a document unless you saw the

13   patient, correct?

14   A.   Of course.

15   Q.   Let me show you what's in evidence in this case as

16   Exhibit 1-D.

17          MR. LEVIN:  If I could have the ELMO, please.

18   BY MR. LEVIN:

19   Q.   Do you recognize this photograph, sir?

20   A.   Yes.

21   Q.   What does that photo depict?

22   A.   That was my office.

23   Q.   Okay.  And was it there that Blanca would come in with

24   patients and with files for you to sign?

25   A.   Yes.

1   Q.  And you had indicated that she was a therapist.  Is that

2   just a -- do you know whether or not she was licensed or not?

3   A.  I don't know.

4   Q.  Okay.  But that's basically what her title was, therapist.

5   You have to answer out loud.

6   A.  Yes.

7        MR. LEVIN:  Okay.  That's all I have, Your Honor.

8   Thank you.

9        THE COURT:  All right.  Mr. Medina.

10       MR. MEDINA:  Thank you, Your Honor.

11       MR. LEVIN:  Judge, excuse me, I do have one or two

12   more questions.

13       THE COURT:  Okay.

14       MR. LEVIN:  Sorry about that, Mr. Medina.

15  BY MR. LEVIN:

16  Q.  Let me ask you this, sir.  Do you remember, when you were

17  at Health Care Solutions Network, whether or not you would be

18  inundated by therapists coming at you with files to sign?

19  A.  No.

20  Q.  Do you remember any kind of a setting, like a

21  paparazzi-type setting, where the therapists would just be

22  coming to you and like having you sign documents blindly and

23  wildly?

24  A.  No.

25       MR. LEVIN:  Thank you.

1          Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Medina.

3          MR. MEDINA:  Thank you, Your Honor.

4                         CROSS-EXAMINATION

5     BY MR. MEDINA:

6     Q.  Good morning.

7     A.  Good morning.

8     Q.  Dr. Villamil, you testified that you've been a medical

9     director for a partial hospitalization program; is that right?

10    A.  Yes.

11    Q.  And one was Health Care Solutions Network.  Do you recall

12    any others?

13    A.  No, I don't remember the name.

14    Q.  Okay.  Just in general, you understand what a partial

15    hospitalization program is, correct?

16    A.  Correct.

17    Q.  What is a partial hospitalization program?

18    A.  It's a place where patients are referred either from a

19    hospital as a way of making it easier for the patient to go

20    back to their homes as soon as they are stable enough or to

21    avoid hospitalizations.

22    Q.  Okay.  So the idea of a partial hospitalization program is

23    to have a patient get treated, right?

24    A.  Yes.

25    Q.  And get them back to normal status as quick as possible,

1   correct?

2   A.   Yes.

3   Q.   Yes?

4   A.   Yes.

5   Q.   Now, are you saying basically that because someone is

6   depressed or has schizophrenia, they automatically go to a

7   partial hospitalization program?

8   A.   No.

9   Q.   What's the difference?  Why is a partial hospitalization

10  program different, let's say, from outpatient treatment?

11  A.   The difference is a patient that is running the risk of a

12  hospitalization, for example, and then the patient gets

13  hospitalized in order to get therapy and close monitoring,

14  there should be some kind of an event, a trigger, a catastrophe

15  happening to the patient.

16  Q.   So you need an event, a trigger, a catastrophe, something

17  acute, is that the term?

18  A.   Acute, something acute.

19  Q.   Otherwise, outpatient treatment, you know, seeing a

20  psychiatrist like yourself, that's fine, right?

21  A.   Yes, exactly.

22  Q.   But it's this trigger, this acute event, that's when, okay,

23  let's do this partial hospitalization program?

24  A.   Yes.

25  Q.   And it's to avoid, let's say, putting you in an inpatient

1    facility right away.  Let's try this, right?

2    A.  That's right, yes.

3    Q.  Now, as medical director, okay -- and we'll use Health Care

4    Solutions Network, for an example.  What are your

5    responsibilities as medical director?

6    A.  Evaluate the patients, see that they are appropriate for

7    the program.

8    Q.  All right.  Are you ultimately responsible for everything

9    that goes on in that program clinically?

10   A.  Clinically, yes.

11   Q.  Yes, that's right.  So -- okay.  Now, you said that --

12          THE COURT:  Hold on a second.  Don't make comments.

13          MR. MEDINA:  Sorry, Your Honor.

14   BY MR. MEDINA:

15   Q.  So you said that you would go to Health Care Solutions

16   Network about once a week?

17   A.  Once a week.

18   Q.  What would you do when you would go there?

19   A.  I would see the patients as they were brought by the

20   therapists in a private office, evaluate the patient, how the

21   patient was doing, if the patient needed further treatment or

22   if the patient could be discharged.

23   Q.  And approximately how many patients would you see in one

24   sitting?

25   A.  In the beginning, I used to see six or eight patients.

1    Then it went up to something like 40, 45 patients, I think so.

2    Q.  40, 45 patients in one day?

3    A.  Yep, in one day.

4    Q.  How long would these evaluations take place for the 40 or

5    45 patients?

6    A.  10, 15 minutes.

7    Q.  10, 15 minutes, okay.  Did you -- when you were meeting

8    with the patients for 10 or 15 minutes, what are the type of

9    factors or things you're looking for in this scenario?

10   A.  Symptoms, mainly symptoms.  Symptoms, suicide evaluations,

11   stability in the medications.

12   Q.  And then do you gather any background information on the

13   patient?

14   A.  On the patient, it was -- I would get it through the

15   therapist and the biopsychosocials.

16   Q.  Okay.  So that background information was given to you.

17   A.  Was given to me.

18   Q.  By someone like Blanca Ruiz?

19   A.  Yes.

20   Q.  And is that 10- to 15-minute scenario the same for even

21   patients you've never treated before?

22   A.  No.  I mean, a regular evaluation at my private office

23   would be like a 45-minute visit.

24   Q.  Right.  But with respect to Health Care Solutions Network,

25   and those times when you're seeing upwards of 40 patients a

2580

1   day, if there are new patients you've never treated before, are

2   you still seeing them for about 10, 15 minutes?

3   A.   Before seeing the patient, I would go through the history

4   given to me and then I would see the patient for about 10 or 15

5   minutes.

6   Q.   Okay.  So including the review of the patient history, how

7   else would you -- how else would you -- how much more time

8   would you spend?  In total, I'm sorry, reviewing the background

9   information and then evaluating, how much in addition to the 10

10  to 15 minutes?

11  A.   The biopsychosocial could be writing ten minutes.

12  Q.   Now, just to be clear, in those times, like I said, 40 to

13  45 patients in the high end; is that right?

14  A.   Yes.

15  Q.   And not including the review of the biopsychosocials and

16  those materials, your examination would be about 10 to 15

17  minutes?

18  A.   Yes.

19  Q.   Okay.  Just so I understand, let's say using the low end,

20  okay, ten minutes, 40 patients, is that about six and a half

21  hours?

22  A.   Yeah, basically.

23  Q.   All right.  So six and a half hours you spend seeing 40

24  different patients.

25  A.   Yes.

1    Q.  And then 15 minutes per patient, it's about 11 and a half

2    hours you'd spend on the high end.

3    A.  When I was seeing that amount of patients, I had to go at

4    times on a Friday morning, for example, to finish my work.

5    Q.  Okay.  Now, I just want to get an understanding.  So on the

6    high end -- on the low end, it could be about six and a half

7    hours --

8    A.  Yes.

9    Q.  -- you're seeing patients all day, about 40 to 45 patients

10   at Health Care Solutions, correct?

11   A.  Yes.

12   Q.  But on the high end, 15 minutes, if you're using that time,

13   it's possibly 11 and a half -- 11 hours?

14   A.  It would be like ten and a half, ten hours, something like

15   that.

16   Q.  So there's times you spent ten and a half hours possibly at

17   Health Care Solutions on one day?

18   A.  No.  Usually when I had that amount of work, I couldn't --

19   I couldn't finish the job in one day.

20   Q.  Okay.  So you would see the patient and then document it at

21   some point in time?

22   A.  Yes.

23   Q.  Okay.  How much time would you spend -- at what point would

24   you spend documenting --

25   A.  While I was seeing the patient, I would document.  That's

1    the usual work a psychiatrist works.  That's the usual way a

2    psychiatrist would work.  While you're seeing the patient,

3    you're documenting.

4    Q.  Why is it important to document while you're seeing the

5    patient?

6    A.  Basically it's a way of knowing -- documenting why the

7    patient needs the treatment that the patient is getting.

8    Q.  Right.  And it's important to document the patient,

9    especially in a PHP setting, correct?

10   A.  Yes.

11   Q.  And you want to be as accurate as possible while you're

12   seeing the patient, especially if you're seeing maybe 40 to 45

13   patients in a day; is that right?

14   A.  Yes, yes.

15   Q.  Okay.  But you just testified a moment ago that there were

16   times when you would finish the documentation at some point?

17   A.  Yes.

18   Q.  Okay.  Why wouldn't you complete the documentation on that

19   same day when you're seeing the patient, especially if there's

20   40 to 45 patients?

21   A.  Some of the patients were leaving already from the program

22   in the afternoon.

23            THE COURT:  I think he said that he finished seeing

24   the patients the next day.

25            Is that right?

1    A.  At times.  A few times.

2    BY MR. MEDINA:

3    Q.  Okay.  So the patients would come back.

4    A.  Oh, yes.

5            MR. MEDINA:  Sorry, Your Honor.

6    BY MR. MEDINA:

7    Q.  Now, in a partial hospitalization program, are there

8    treatment team meetings that have to go on?

9    A.  Yes.

10   Q.  And what's the purpose of those?

11   A.  Basically discuss the treatment of the patients, why the

12   patient has to stay there in the program.

13   Q.  And who participates in a treatment team meeting?

14   A.  I was not at the treatment meetings.

15   Q.  You were never at a treatment team meeting at Health Care

16   Solutions Network?

17   A.  No.

18   Q.  Okay.  Who would be then responsible, if you're medical

19   director, for the care and treatment of the patient if you're

20   not at the treatment team meetings?

21   A.  I mean, the therapists would be meeting and then they would

22   transmit me the result of the meeting for the patients.

23   Q.  Okay.  What therapists?

24   A.  Discharge of a patient, for example.

25   Q.  So the therapist -- I'm sorry.

1    A.   Let's say a therapist would tell me that in the meeting,

2    they decided that because of my notes, the findings of my

3    notes, and the way they see the patient -- or they saw the

4    patient in a therapy session, that they thought the patient was

5    ready to be discharged.

6    Q.   Now, at what point did you see the patient prior to

7    discharging them?

8    A.   The day that I was discharging the patient.

9    Q.   Okay.  But you and I can both agree -- or can you agree

10   that the medical director is responsible for admissions and

11   discharges, correct?

12   A.   Correct.

13   Q.   Ultimately?

14   A.   Yes.

15   Q.   And they're responsible for the treatment.

16   A.   Yes.

17   Q.   Now, at the treatment team meeting, if you're not there,

18   who is determining the treatment for the patient in this acute

19   state at a partial hospitalization program?

20   A.   I wouldn't be able to say who was determining.  I guess

21   that it was the therapists.

22   Q.   So the therapists are determining the treatment for the

23   patient?

24   A.   Yes, yes.

25   Q.   It wasn't you.

1   A.   No.  Ultimately it was me, but I mean, I had the input from

2   the therapists and I would see the patient and then I would

3   agree or disagree.

4   Q.   Okay.  Are those therapists like Blanca Ruiz?

5   A.   Yes.

6   Q.   And Alina Fonts?

7   A.   Yes.

8   Q.   Okay.  So Blanca Ruiz and Alina Fonts would participate in

9   treatment team meetings with a patient?

10  A.   As far as I understand, they would.

11  Q.   Okay.  And they're with the patient there and the goal is

12  to come up with a treatment plan.

13  A.   Yes.

14  Q.   Right?

15  A.   Yes.

16  Q.   Because the goal of the treatment at a PHP is to get them

17  out as soon as possible to stabilize them?

18  A.   Yes.

19  Q.   Right.  As medical director, you know not to keep a patient

20  in there as long as possible, because you have other options,

21  right?

22  A.   Exactly.

23  Q.   So -- and one of the options could be to put them in a

24  inpatient facility, if they still need more intense care,

25  right?

1    A.   Exactly.

2    Q.   And then the other option, if they're stabilized enough,

3    you wouldn't just keep a patient there to just keep them there.

4    They can go to an outside office.

5    A.   Yes.

6         MR. MEDINA:   Ms. Zaferis, can you please pull up --

7         One second, Your Honor.

8    BY MR. MEDINA:

9    Q.   Dr. Villamil, I'm showing you what's in evidence as

10   Government Exhibit 188.   Do you recall a patient by the name of

11   Manuel de la Torre?

12   A.   No.

13   Q.   Okay.   Is that your signature at the bottom?

14   A.   Yes.

15   Q.   Okay.   Dr. Villamil, does looking at the picture of

16   Mr. de la Torre refresh your recollection?

17   A.   No, no.

18   Q.   Okay.   Now, as medical director at Health Care Solutions

19   Network, is it ever appropriate for someone to be admitted into

20   the program who's deaf or legally blind?

21   A.   No.

22   Q.   No?

23   A.   No.

24   Q.   Is it ever appropriate for someone to be in a program who

25   can't even sign his own name due to physical impairments,

1    issues of that nature?

2    A.   That, I don't know.

3    Q.   What do you mean by that?

4    A.   I don't know legally if that's correct or not.

5    Q.   Okay.  Have you ever admitted a patient into Health Care

6    Solutions that could not sign his own name or was legally blind

7    or deaf?

8    A.   Not that I remember of.

9    Q.   Do you see the sheet in front of you --

10   A.   Yes.

11   Q.   -- dated -- it's Bates No. 017 and the date is March 13,

12   2007?  Do you see that?

13   A.   Yes, I see it.

14   Q.   Okay.  Just to understand the process at Health Care

15   Solutions West when you were working there, at what point were

16   you brought in to evaluate the patients?  What steps happened

17   prior to that?

18   A.   As far as I remember, the patient was prescreened by, I

19   think it was a nurse and then I would continue seeing the

20   patient.

21   Q.   You said prescreened by a nurse.  How do you know that?

22   A.   I know that there was somebody taking care of deciding if

23   the patient was appropriate or not before the patient would be

24   presented to me.

25   Q.   Okay.  So at first, it's not you deciding who's

1    appropriate, it's someone else?

2    A.  I think somebody else was prescreening.

3    Q.  Prescreening, okay.  Are you aware of whether receptionists

4    would gather information from a patient in a reception area?

5    A.  No, not that I remember of.

6    Q.  Would that ever be appropriate?

7    A.  I don't think so.

8    Q.  Why not?

9    A.  That would be against the HIPAA law of privacy, get

10   information in a reception area.

11   Q.  And is it important to keep information like psychiatric

12   information for patients purportedly suffering from acute

13   psychiatric issues, is it important to gather information

14   privately, especially in this instance?

15   A.  Yes, it is.

16   Q.  And why?

17   A.  Again, because of the privacy of the patient.

18   Q.  Are you aware of any time when people like drivers or

19   kitchen staff would also help fill out paperwork at the West

20   location?

21   A.  No.

22           MR. MEDINA:  Ms. Zaferis, in the same exhibit, 188,

23   can you please pull up the Bates number ending in 021.

24   BY MR. MEDINA:

25   Q.  Now, in front of you is an admission screening -- or

1    admission criterion screening.  Do you see that?

2    A.  Yes.

3    Q.  It's Bates No. 021 for the patient Manuel de la Torre.  Do

4    you see that?

5    A.  Yes.

6         MR. MEDINA:  Ms. Zaferis, can you please turn to the

7    next page, 022?

8    BY MR. MEDINA:

9    Q.  And is this the type of document that you were mentioning

10   before, it's the information that would be gathered before you

11   arrived --

12   A.  Yes.

13   Q.  -- to the facility?

14   A.  Yes.

15   Q.  Now, what's the purpose of the admission screening

16   criterion?

17   A.  Deciding if the program -- the PHP would be appropriate for

18   a patient or if the PHP wouldn't be appropriate.

19   Q.  Now, at this stage, Dr. Villamil -- and correct me if I'm

20   wrong -- is this the first step in determining the

21   appropriateness of a patient?

22   A.  I think so.

23   Q.  Okay.  At this stage, and especially for this file,

24   Mr. de la Torre, who is determining the appropriateness of the

25   patient in partial hospitalization program?

1    A.  Blanca Ruiz --

2    Q.  Okay.

3    A.  -- is the person doing the admitting criterion screening.

4    Q.  And did you have any input in the admission criterion

5    screening?

6    A.  Not in that paperwork.  I mean, I didn't sign it.  I would

7    read it later on, but I didn't have any input.

8    Q.  Right.  So at this point, you're not involved at all.

9    A.  No.

10   Q.  Okay.  So the therapist -- using your words, a therapist is

11   the one determining the first step of appropriateness.

12   A.  Yes.

13          MR. MEDINA:  Ms. Zaferis, can you please pull up Bates

14   No. 023, ending in 023.  Thank you.

15   BY MR. MEDINA:

16   Q.  Are you aware of a document, the biopsychosocial?

17   A.  Yes.

18   Q.  What is that document for?

19   A.  Basically it's sent to understand better the background of

20   the patient, knowing the environment the patient is living at

21   the time of admission, and past problems and history that the

22   patient had.

23   Q.  And as the medical director and a doctor, why are you

24   looking at this document?

25   A.  It gives me a better understanding of the patient that I

 1   have in front of me.

 2           MR. MEDINA:  Ms. Zaferis, can you please look at Bates

 3   No. 025.

 4   BY MR. MEDINA:

 5   Q.  And who, according to this document -- I'm sorry, who,

 6   according to this document, completed the biopsychosocial for

 7   Manuel de la Torre?

 8   A.  Who signed it?

 9   Q.  Yes.

10   A.  Blanca Ruiz.

11   Q.  Now, in your experience as the medical director at Health

12   Care Solutions Network, were patients placed into group therapy

13   sessions prior to you evaluating them?

14   A.  Not that I know of.

15   Q.  Okay.  So when the patients came in for their

16   biopsychosocials, their admission screening criterion, to your

17   knowledge, the patients would go home if you weren't available?

18   A.  I don't think so.

19   Q.  They wouldn't go home?

20   A.  They wouldn't go home.  They needed treatment, so they had

21   to stay.

22   Q.  Okay.  So in those instances where a screening was done and

23   a biopsychosocial, was it common that there were times when you

24   wouldn't evaluate the patient on that same day?

25   A.  Yes, not on that same day.

1    Q.   Okay.  And patients would stay at the facility?

2    A.   I think so, because as far as I remember, they started to

3    give them some therapy to the patients.  Now that I'm

4    remembering, yes, I had some patients that did some therapy

5    before seeing me.

6    Q.   Okay.  And so the patients would go into their therapy

7    groups.  And at that point in time, you didn't -- you didn't

8    have a treatment team meeting, correct?

9    A.   No.

10   Q.   And you didn't meet with therapists to determine the

11   appropriate treatment for the patient at that time, right,

12   because you hadn't seen them?

13   A.   I hadn't seen them, so yes.

14   Q.   Okay.  So the patients were just placed in groups prior to

15   seeing you.

16   A.   Yes.

17   Q.   And at least for Mr. de la Torre, the patients would have

18   seen Blanca Ruiz for the screening process, the

19   biopsychosocials?

20   A.   Yes.

21   Q.   Okay.  Dr. Villamil, you said you were at Health Care

22   Solutions as medical director for about two years?

23   A.   Approximately.

24   Q.   Approximately two years?  And was that common throughout

25   your practice, that the therapists would determine the

1    treatment for the patients and then come back to you afterward?

2    A.  As far as I remember, yes.

3    Q.  Okay.  And is it, throughout the two years, the practice

4    that you didn't participate in any treatment team meetings?

5    A.  No, I was at no treatment meetings.

6    Q.  No treatment team meetings.

7    A.  No.

8    Q.  So it was the therapist determining the treatment?

9    A.  Along with me.  I mean, not in the meeting, but outside the

10   meeting.  Informally, at my office.

11   Q.  Dr. Villamil, how many patients did you refer to Health

12   Care Solutions Network?

13   A.  Two.

14   Q.  Two?  And the other ones, how many patients were you

15   essentially attending to during the two-year time frame?

16   A.  You mean the total amount of patients in two years?

17   Q.  Yeah, approximately.

18   A.  I have no idea.

19   Q.  Was it ten, hundreds?

20   A.  You mean per day?

21   Q.  Over the course of your time.

22   A.  Over the course of time, it must have been over a hundred.

23   Q.  Okay.

24   A.  Easily.

25          MR. MEDINA:  Your Honor, the government moves into

1  evidence by stipulation Government Exhibit 1003.  Request

2  permission to publish.  Oh, 1023.  It's not on the exhibit

3  list.  We're adding it.  It's 1023.

4          THE COURT:  All right.  Government Exhibit 1023 will

5  be received in evidence.

6          MR. MEDINA:  Can I use the ELMO?

7  BY MR. MEDINA:

8  Q.  Now, Dr. Villamil, I'm showing you a chart that's been

9  admitted into evidence, Government Exhibit 1023, and it

10  identifies percentages of submitted charges where you,

11  Dr. Villamil, are the attending physician for patients at

12  Health Care Solutions West.  Do you see that?

13  A.  Yes.

14  Q.  Now, according to the chart, you were the attending

15  physician for more than -- for 97 percent of the patients at

16  that facility; is that right?

17  A.  That's right.

18  Q.  And that amount for submitted charges, according to the

19  chart, is about $12,913,425.  Do you see that?

20  A.  Yes.

21  Q.  Now, during your time at Health Care Solutions West, did

22  you readmit patients on multiple occasions at Health Care

23  Solutions?

24  A.  Some of the patients had to come back.  Some of the

25  patients didn't have to come back.

1    Q.  And when they came back, under what circumstances?

2    A.  I'm sorry?

3    Q.  Under what circumstances would the patients come back?

4    A.  Decompensation, another stressor.

5    Q.  Did the patients ever go to the East location and then come

6    back to the West location?

7    A.  Not that I -- I don't remember.

8    Q.  You don't remember?

9    A.  No.

10            MR. MEDINA:  One moment, Your Honor.

11       (Off-the-record discussion.)

12            MR. MEDINA:  No further questions, Your Honor.

13            THE COURT:  All right.  Redirect?

14                        REDIRECT EXAMINATION

15   BY MS. LOPEZ:

16   Q.  Dr. Villamil, are you an investigator?

17   A.  If I am what?

18   Q.  Are you an investigator?  Are you an investigator?

19   A.  I have no idea.

20   Q.  Are you part of the FBI?

21   A.  Part of what?

22   Q.  Are you part of the FBI?  Have you ever been --

23   A.  Oh, no, no, never.

24   Q.  -- an investigator, part of the FBI?

25   A.  No.

1    Q.  Are you a cop?

2    A.  No.

3    Q.  Have you ever had any law enforcement training?

4    A.  No.

5    Q.  Did you know that people were forging your signature at

6    HCSN-West?

7    A.  No.

8    Q.  Did you know that people were using your stamp to admit

9    patients that were inappropriate to HCSN-West?

10   A.  No.

11   Q.  Did you know that people were admitting patients that

12   didn't actually attend HCSN-West using your signature?

13   A.  No.

14   Q.  Using your stamp?

15   A.  No.

16   Q.  Would you have any way of knowing whether or not people

17   were using your signature without -- were forging your

18   signature behind your back?

19   A.  No.

20   Q.  Would you have any way of knowing that people were using

21   your stamp behind your back?

22   A.  No.

23   Q.  Did you trust the people that worked at HCSN-West?

24   A.  Yes.

25   Q.  Did it look like a legitimate business every time you would

1  go there on Thursdays?

2  A.  Yes.

3  Q.  So when the government shows you that chart, could you tell

4  me right now all the people that you actually admitted versus

5  the people that were admitted because of fraudulent activity?

6  A.  I'm sorry, can you rephrase it?

7  Q.  The government just showed you a chart with all the people

8  that were billed for Medicare --

9      (Cell phone rings.)

10         THE COURT:  Hold on.  At least it's a good song.

11         All right.  Go ahead.

12  BY MS. LOPEZ:

13  Q.  The government just showed you a chart with all the

14  patients that were billed from Medicare, correct?

15  A.  Yes.

16  Q.  Do you have any way of knowing how many of those patients

17  were admitted because of fraudulent activity?

18  A.  No.

19  Q.  You don't have any training in investigative work?

20  A.  No.

21  Q.  Did you have any reason to investigate HCSN-West?

22  A.  No.

23  Q.  You mentioned in your private practice that it takes you

24  about 45 minutes to do the intake process --

25  A.  Yes.

1   Q.   -- of your patients.  Do you have nurses that work with you

2   in your private practice?

3   A.   No.

4   Q.   Do you have therapists that work with you in your private

5   practice?

6   A.   No.

7   Q.   Do you have anyone setting up biopsychosocials for you?

8   A.   No.

9   Q.   Background information?

10  A.   No.

11  Q.   So in your private practice, you do all the work on your

12  own.

13  A.   Yes.

14  Q.   Could that explain why it takes you 45 minutes?

15  A.   Yes.

16  Q.   If you didn't have to do all the initial work on your own,

17  would it be -- would 15 to 10 minutes be sufficient to diagnose

18  a patient or treat a patient?

19  A.   Without having to get all the background information, just

20  focusing on the symptoms and the past psychiatric history, yes.

21  Q.   Okay.  You say that you -- you mentioned that you went to

22  HCSN once a week, correct?

23  A.   Yes, that's correct.

24  Q.   On Thursdays?

25  A.   On Thursdays.

1    Q.   Is that typical as a medical director at a PHP?

2    A.   That I know of, yes.

3    Q.   Do you have -- as a medical director of a PHP, do you have

4    to go every single day?

5    A.   No.

6    Q.   You mentioned that the therapists would sometimes admit

7    patients without you being there.

8    A.   Yes.

9    Q.   Is it the medical director's last word on what patients

10   would actually stay in the PHP program?

11   A.   Yes.

12   Q.   So if, for instance, a therapist admitted a patient because

13   a patient was having a crisis, but you would come in on

14   Thursday and find out that the patient was not appropriate, it

15   would be your duty as medical director to have that patient go

16   home.

17   A.   Definitely.

18   Q.   Would it be unreasonable if a patient went into a PHP with

19   an acute crisis and a therapist would deny them into their

20   program?

21   A.   Yes.

22   Q.   Because as a therapist, you want to treat patients that

23   have an acute --

24   A.   Yes.

25   Q.   -- problem presented.

1    A.   Yes.

2    Q.   Okay.  Were you in charge of any of the billing at HCSN?

3    A.   No.

4    Q.   As a medical director, do you have to be in charge of any

5    of the billing?

6    A.   I would just bill the -- directly my visit with the

7    patient, but no further billing.

8    Q.   Did you bill group therapy notes to Medicare?

9    A.   Yes, my therapy notes.

10   Q.   No, the therapists' group therapy notes.

11   A.   No, no, never.

12   Q.   So for those patients that were admitted prior to you

13   admitting them into the PHP program, do you have any idea if

14   they were billed for Medicare?

15   A.   No.

16   Q.   You told the prosecutor that you would see about 40 to 45

17   patients at one point.  Would you say that that's the most

18   patients you saw?

19   A.   To the best of my knowledge, yes.

20   Q.   Was that typical?

21   A.   Some weeks were a little bit -- I had more patients.  Some

22   other weeks, I had less.  So it's not typical, I would say, but

23   at the very end, yes, it became typical, at the very end of my

24   stay -- of my work at the PHP.

25   Q.   And how many times -- at the very end, how many times a

1    week would you end up going to HCSN if there was a lot of

2    patients?

3    A.   Always once a week, plus I had to go back at times -- I

4    remember going back on Friday mornings, early in the morning.

5    Q.   Is there anything -- do you know if there's anything

6    fraudulent or illegal of admitting an elderly patient into a

7    PHP?

8    A.   No.

9    Q.   How about a patient that's an elderly patient that's hard

10   of hearing?

11   A.   Hard of hearing?  As long as the patient is able to answer,

12   there's nothing wrong with that.

13   Q.   So elderly people do have depression, acute phases of

14   depression.

15   A.   Yes, yes.

16   Q.   Would you have any idea of knowing that a receptionist was

17   doing the initial screenings at the PHP on Monday, Tuesday,

18   Wednesday, when you weren't at HCSN?

19   A.   No, no.

20   Q.   Is there anything illegal or against Medicare to finish

21   your notes -- your therapy notes with a patient that -- after

22   you meet with them?

23   A.   No, no.

24   Q.   Do you know how Health Care Solutions Network East was run?

25   A.   No.

```
1    Q.  Do you know how Dr. Rousseau was as medical director at
2    Health Care Solutions Network East?
3    A.  I know he was a director.
4    Q.  But do you know if -- do you know how it was -- how he ran
5    the program --
6    A.  No.
7    Q.  -- as medical director?
8    A.  No.
9    Q.  Did you work closely with the receptionist at Health Care
10   Solutions Network West?
11   A.  No.
12   Q.  When you came into work every day, did you have to sign in
13   with her?
14   A.  No.
15   Q.  Did you have to sign out with her?
16   A.  No.
17   Q.  Did you have a lot of communication with her?
18   A.  If I had what?
19   Q.  A lot of communication with her?
20   A.  No.
21   Q.  So she really had no idea when you would walk in and out.
22   A.  No.
23        MS. LOPEZ:  Okay.  One moment, Your Honor.
24   BY MS. LOPEZ:
25   Q.  When Dr. Rousseau recommended that you work at Health Care
```

1    Solutions Network West, did he tell you that there was fraud

2    going on?

3    A.  No.

4    Q.  Did he tell you, hey, this is an easy job, you know, you

5    don't even have to show up and you get paid because there's

6    fraud going on?

7    A.  No, never.

8    Q.  Did Armando Gonzalez tell you that there was fraud going

9    on?

10   A.  No.

11   Q.  Did anyone ever ask you to do any fraudulent activity?

12   A.  Never.

13   Q.  Would you have worked there if there was any fraudulent

14   activity going on?

15   A.  Never.

16          MS. LOPEZ:  No further questions.

17          THE COURT:  All right.  Thank you, sir.  You can step

18   down.

19          Who is your next witness?

20          MR. RABIN:  Raul Mesa, Judge.  He's outside, but

21   Judge, could I have a brief sidebar?  I need to make the Court

22   aware of something.

23          THE COURT:  Okay.

24      (Sidebar Conference:)

25          THE COURT:  The court reporter indicated she was

1    having trouble hearing people unless you're right at the

2    microphone, so if you're going to talk, then come right up to

3    the microphone.

4           MR. RABIN:  Yes, sir.

5           I don't know what Mesa looks like, but I went out to

6    check and see if he was here while Ms. Lopez was doing the

7    direct on the last witness, and somebody in the courtroom told

8    me that Mesa was sitting in the courtroom.  So apparently what

9    he did was he came here and sat in the courtroom.  I don't know

10   how long he was in here, maybe five minutes or so.

11          THE COURT:  Who is he?  What's his role?

12          MR. RABIN:  He has nothing to do with this last

13   witness.  He's a pharmaceutical rep who went to Health Care

14   Solutions twice a month and he's going to testify about the

15   observations he made there.  So I just wanted the Court to be

16   aware there was an unintentional violation of the rule.  That's

17   all I wanted the Court to be aware of.

18          THE COURT:  All right.

19          MR. MEDINA:  There's no objection.

20        (Before the Jury.)

21           RAUL MESA, DEFENDANT ROUSSEAU WITNESS, SWORN

22          COURT REPORTER:  Please state your full name for the

23   record, spell your last name, and please use the microphone.

24          THE WITNESS:  Good morning.  Raul Mesa, R-A-U-L,

25   M-E-S-A.

1        THE COURT:  All right.  Ms. Lopez?

2                  DIRECT EXAMINATION

3   BY MS. LOPEZ:

4   Q.  Good morning, Mr. Mesa.

5   A.  Good morning.

6        Good morning, jury.

7   Q.  What is your current occupation?

8   A.  I am a sales director for SMP Compounding.

9   Q.  And what is SMP compounding?

10  A.  SMP Compounding is a pharmacy that manufactures compounded

11  products for patients.

12  Q.  Are you a pharmaceutical representative?

13  A.  I used to be a pharmaceutical representative, yes.

14  Q.  And how long were you a pharmaceutical representative for?

15  A.  For about 11 years.

16  Q.  And as a pharmaceutical representative, did you get to work

17  at partial hospitalization programs?

18  A.  Absolutely.

19  Q.  How many partial hospitalization programs did you work for?

20  A.  Well, not that I worked for them --

21  Q.  I'm sorry, did you visit as a pharmaceutical

22  representative.

23  A.  Yeah, in my history, about two or three of them.

24  Q.  Are you familiar with Dr. Roger Rousseau?

25  A.  Yes.

1    Q.  How are you familiar with the doctor?

2    A.  I met him in -- when I was working for Pfizer

3    Pharmaceuticals back in 2002.  I used to call on him in his

4    office.

5    Q.  Are you familiar with Health Care Solutions Network?

6    A.  Yes.

7    Q.  How are you familiar with Health Care Solutions Network?

8    A.  He was working -- he was working there at that clinic, at

9    that PHP.

10   Q.  Did you serve as a pharmaceutical representative or did you

11   visit Health Care Solutions Network as a pharmaceutical

12   representative?

13   A.  Yes.

14   Q.  How often would you visit Health Care Solutions Network?

15   A.  I would go like twice a month.

16   Q.  When you visited Health Care Solutions Network, did you see

17   Dr. Rousseau?

18   A.  Yes.

19   Q.  Did you see him seeing patients?

20   A.  Yes.

21   Q.  Where did you see him seeing patients?

22   A.  In his office in the back room there.

23   Q.  Do you know for sure if it's his office or was it just a

24   back room?

25   A.  No, it seemed to be an office, his office.

1    Q.   When you went to Health Care Solutions Network, were you

2    able to see the patients that were there?

3    A.   Well, I wouldn't interact with the patients, but yeah, I

4    would see patients.  I would see patients like in their group

5    meetings and patients coming out of his office as well.

6    Q.   Did any of the patients appear to be drooling on

7    themselves?

8    A.   There was very sick patients there.

9    Q.   But were they drooling?

10   A.   I mean, I've been -- I've been in health care for many

11   years and I've seen a lot of psychiatric patients and I would

12   say, yes, I mean, they're psychiatric patients.

13   Q.   Was that inappropriate for a partial hospitalization

14   program?

15   A.   I'm not one -- I'm not qualified enough to be able to say

16   that, but I know psychiatric patients can drool.

17   Q.   Did you see any patients soiling themselves or going to the

18   bathroom on themselves?

19   A.   Not that I saw with my own eyes.

20   Q.   Did the patients look appropriate for a partial

21   hospitalization program --

22            MR. MEDINA:  Objection, speculation.

23            THE COURT:  Sustained.

24   A.   In my opinion, yes.

25            THE COURT:  Hold on a second.  If I sustain the

 1    objection, don't answer.

 2              What's the next question?

 3    BY MS. LOPEZ:

 4    Q.  With your experience in going to other partial

 5    hospitalization programs, was there anything unusual about

 6    Health Care Solutions Network?

 7    A.  No.

 8    Q.  Did it seem legitimate to you?

 9    A.  Yes.

10    Q.  Did you see Dr. Rousseau seeing patients at Health Care

11    Solutions Network?

12    A.  Yes.

13    Q.  Did you see group therapy sessions going on at Health Care

14    Solutions Network?

15    A.  Yes.

16    Q.  Did it look like any fraudulent activity was going on in

17    Health Care Solutions Network?

18    A.  No.

19    Q.  Was there anything suspicious about the facility?

20    A.  No.

21              MS. LOPEZ:  May I have a moment, please?

22              THE COURT:  Yes.

23              MS. LOPEZ:  No further questions.

24              THE COURT:  Mr. Palomino?

25              MR. PALOMINO:  I have no questions of this witness,

1    Your Honor.

2              THE COURT:  Mr. Hermida?

3              MR. HERMIDA:  No questions on behalf of Ms. Salafia.

4              MR. PRIETO:  No questions, Your Honor.

5              MR. GONZALEZ:  No questions, Judge.

6              MR. LEVIN:  No questions.

7              THE COURT:  Mr. Medina?

8              MR. MEDINA:  Yes, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. MEDINA:

11   Q.  Good afternoon.

12   A.  Good afternoon.

13   Q.  Now, you testified you were or are a sales representative

14   for pharmaceuticals?

15   A.  Well, currently I'm a sales director for SMP Compounding.

16   At the time that we're discussing now, I was a pharmaceutical

17   sales representative for Pfizer.

18   Q.  So you were never a medical doctor?

19   A.  No, I was not.

20   Q.  Never a therapist in any way?

21   A.  No, I was not.

22   Q.  And ever a nurse?

23   A.  No.

24   Q.  So one way or the other, you're not familiar with what the

25   admissions or discharge procedures are for a partial

1   hospitalization program?

2   A.  I'm not familiar with that.

3   Q.  Now, what day of the week, sir, did you visit Health Care

4   Solutions Network?  Was it always the same or did it vary?

5   A.  No, it varies.  It varied.

6   Q.  And what other partial hospitalization programs would you

7   visit?

8   A.  I believe there was another partial hospitalization program

9   down south as well.  I forget the name of it, but I think it

10  might have been in association with the gentleman that owned

11  this one.

12  Q.  Excuse me, the last part?

13  A.  The gentleman that owned this partial hospitalization

14  program, I think there was another facility nearby down south.

15  I can't recall the name of it, though.

16  Q.  Are you familiar with the admission process at Health Care

17  Solutions Network?

18  A.  No, I'm not.

19  Q.  What about the discharges?

20  A.  No, I'm not.

21  Q.  Were you familiar with the treatment plan meetings at

22  Health Care Solutions Network?

23  A.  No, I was not.

24  Q.  Do you know, one way or the other, whether Dr. Rousseau

25  participated in treatment plan meetings?

1   A.  Well, from what I gathered in visiting him, he would always

2   be seeing patients, and one thing he would do is use my samples

3   to treat the patients.

4   Q.  Do you know one way or the other whether Dr. Rousseau would

5   sit down with therapists to discuss the treatment team

6   meetings?

7   A.  I believe so, yeah.  He had talked to me like sometimes he

8   couldn't see me because he was with therapists or with a

9   patient.  He'd say come back later on, I don't have time right

10   now.

11   Q.  Did he say he was meeting with the therapists to go over a

12   plan?

13   A.  Yes.

14   Q.  He would say that.

15   A.  Yeah.

16           MR. MEDINA:  No questions, Your Honor.

17           THE COURT:  Do you have any redirect?

18           MS. LOPEZ:  No, Your Honor.

19           THE COURT:  All right.  Thank you, sir.

20           Who is your next witness?

21           MR. RABIN:  We're checking to see if we have

22   additional witnesses who have arrived.

23           MS. LOPEZ:  Dr. Rousseau calls Dr. Magdalena Averhoff.

24    MAGDALENA AVERHOFF, M.D., DEFENDANT ROUSSEAU WITNESS, SWORN

25           COURT REPORTER:  Please be seated.  Please state your

1  full name, spell your name for the record, and please use the

2  microphone.

3          THE WITNESS:  My name is Magdalena Averhoff.  First

4  name Magdalena, M-A-G-D-A-L-E-N-A, last name is Averhoff,

5  A-V-E-R-H-O-F-F.

6                    DIRECT EXAMINATION

7  BY MS. LOPEZ:

8  Q.  Good afternoon, Dr. Averhoff.  Can you please introduce

9  yourself to the jury?

10 A.  Good afternoon, good morning, I don't know what it is.

11 Good afternoon.

12 Q.  Okay.  What is your current occupation?

13 A.  I'm sorry, I can't hear you.

14 Q.  What is your current occupation?

15 A.  I am a physician.

16 Q.  Where are you a physician at?

17 A.  I am the chief medical officer at Jackson South Community

18 Hospital.

19 Q.  Where did you go to medical school?

20 A.  I went to medical school in the University of Salamanca in

21 Salamanca, Spain.

22 Q.  And where did you complete your residency?

23 A.  I completed my entire internship, residency, and fellowship

24 at Mount Sinai Medical Center in Miami Beach.

25 Q.  As a physician, have you received any awards or

1    recognitions as a doctor?

2    A.  Well, I'm a member of the Florida Board of Medicine.  I was

3    appointed in 2012, in February, for a three-year term.

4    Q.  Doctor, are you familiar with Dr. Roger Rousseau?

5    A.  I am.

6    Q.  How are you familiar with him?

7    A.  I have known Dr. Rousseau since approximately 1976 or '77,

8    so that pretty much makes it more than 30 years.  Dr. Rousseau

9    was training in psychiatry when I met him and he, at that

10   time -- with my ex-husband, they were in the same year, and

11   that's how I got to meet Dr. Rousseau and his wife.

12   Q.  Are you familiar with Dr. Rousseau's reputation as a

13   psychiatrist?

14   A.  I am.

15   Q.  What is that reputation?

16   A.  He has a reputation as being a professional individual,

17   very dignified and very competent.

18   Q.  Are you familiar with Dr. Rousseau's reputation for

19   honesty?

20   A.  I am.

21   Q.  What is that reputation?

22   A.  In these 30-plus years that I have known Dr. Rousseau, he

23   has never been anything but honest, from what I've known him.

24   Q.  Have you formed an opinion about his -- whether or not he's

25   an honest person?

1    A.  He is an honest person, in my opinion.

2    Q.  In your opinion, is Dr. Rousseau a conscientious doctor?

3    A.  He is.

4    Q.  In your opinion, is he diligent with his patients?

5    A.  He is.

6    Q.  In your opinion, is Dr. Rousseau a law-abiding individual?

7    A.  Yes, he is, in my opinion.

8    Q.  In your opinion, is Dr. Rousseau an ethical doctor?

9    A.  He is, in my opinion.

10   Q.  Are you familiar with his reputation in the community as

11   far as being an ethical doctor?

12   A.  Yes, I am.

13   Q.  And what is that reputation?

14   A.  He is an ethical doctor.

15            MS. LOPEZ:  One moment, please.  No further questions.

16            THE COURT:  Any defense counsel have any questions?

17            MR. PALOMINO:  No, Your Honor.

18            MR. HERMIDA:  No, Your Honor.

19            MR. PRIETO:  No, Judge.

20            MR. GONZALEZ:  No questions, Your Honor.

21            MR. LEVIN:  No questions, Your Honor.

22            THE COURT:  All right.  Mr. Medina?

23            MR. MEDINA:  Thank you, Your Honor.

24                          CROSS-EXAMINATION

25   BY MR. MEDINA:

1    Q.   Good afternoon.

2    A.   Good afternoon.

3    Q.   Where is it that you work again?

4    A.   I am the chief medical officer at Jackson South Community

5    Hospital at the present time.

6    Q.   Now, did you learn that Jackson South had a policy to no

7    longer make referrals to partial hospitalization programs in

8    South Florida?

9    A.   No.

10   Q.   Did you ever work at Health Care Solutions Network?

11   A.   No.

12   Q.   Were you aware, one way or the other, of Dr. Rousseau's

13   role at Health Care Solutions Network?

14   A.   No.

15   Q.   Or what he did when he was there?

16   A.   No.

17   Q.   Who he interacted with?

18   A.   No.

19   Q.   Do you know any individuals who worked at Health Care

20   Solutions Network?

21   A.   No.

22   Q.   Is it all right for a partial hospitalization program to

23   pay for a referral -- or I'm sorry, for a hospital to pay --

24   strike that.

25        Is it ever appropriate for a partial hospitalization

1  program to pay for a referral?

2  A.  You're saying to pay for a referral?

3  Q.  Correct.

4  A.  That is against the law.

5  Q.  Now, if someone participated in that, would it affect your

6  opinion as to the person's honesty?

7  A.  Yes.

8          MR. MEDINA:  No further questions, Your Honor.

9          THE COURT:  All right.  Any redirect?

10         MS. LOPEZ:  No, Your Honor.

11         THE COURT:  All right.  Thank you, Doctor.  You are

12  excused.

13         All right.  It's 12:10.  Let's take our luncheon

14  recess and come back at 1:40.  See everybody in an hour and a

15  half.  Have a good lunch.

16      (Luncheon Recess, 12:09 p.m. to 1:38 p.m.)

17         MR. RABIN:  Judge, do you want me to give you the

18  schedule?

19         THE COURT:  Okay.

20         MR. RABIN:  I have one character witness here, so

21  we're ready to go with a character witness.  Our last witness

22  is another character witness who will not be able to get here

23  till 3:00.

24         Mr. Levin has one or two character witnesses that he

25  will be able to go with after our first character witness, and

1    then I think we're done for everything we could put on today.

2    And I think the only thing that would be left would be

3    Mr. Prieto has one or two first thing in the morning.

4           THE COURT:  You say everything for today.  What does

5    that mean, you're not having any more witnesses?

6           MR. RABIN:  That's it.  We only have two more

7    character witnesses and we're done.

8           THE COURT:  Is Dr. Rousseau going to testify?

9           MR. RABIN:  He is not.

10          THE COURT:  Okay.  And this is all for all the

11   cumulative witnesses?  So we could be done tomorrow with all

12   the testimony?

13          MR. RABIN:  We're going to be done first thing in the

14   morning.  I don't believe any defendant is going to be

15   testifying and I don't believe there's going to be any more

16   than the two character witnesses first thing in the morning.

17          MR. GONZALEZ:  Wait a minute.  What about Prieto?  He

18   has a witness.

19          MR. HERMIDA:  Yes, they're coming in tomorrow morning.

20          MR. RABIN:  I included him.  One or two in the

21   morning.

22          THE COURT:  So we need to do the jury instructions

23   today then.

24          MR. RABIN:  I guess we could do that this afternoon.

25          MR. MEDINA:  Your Honor, the government might also

1  have one or two rebuttal witnesses that should be fairly quick,

2  but --

3          THE COURT:  Okay.  All right.  Let's bring in the

4  jury.

5          MR. GONZALEZ:  Remember that you loaned me out to

6  Judge Bloom on Friday.

7          THE COURT:  I'm afraid she's going to send you back.

8      (Jury Present.)

9          THE COURT:  All right.  Welcome back, everyone, and

10  please be seated.

11          Could you remain standing for a second and raise your

12  right hand to be sworn?

13      JOSEPH THEVENIN, M.D., DEFENDANT ROUSSEAU WITNESS, SWORN

14          COURT REPORTER:  Please state your full name for the

15  record, spell your last name, and please use the microphone.

16          THE WITNESS:  My name is Joseph Thevenin, T, like in

17  Tom, H-E-V-E-N-I-N.  First name Joseph.

18                      DIRECT EXAMINATION

19  BY MS. LOPEZ:

20  Q.  Good afternoon, Dr. Thevenin.

21  A.  Good afternoon.

22  Q.  Dr. Thevenin, what is your current occupation?

23  A.  I'm an internist, internal medicine.

24  Q.  And where did you go to medical school?

25  A.  I went to medical school in Haiti.  I graduated there and I

 1  trained at Columbia University in New York.

 2  Q.  And how long have you been a doctor?

 3  A.  Since 1984.

 4  Q.  Are you familiar with Dr. Roger Rousseau?

 5  A.  Very familiar.

 6  Q.  How are you familiar with Dr. Rousseau?

 7  A.  Well, I've known him for the past 20 -- 23 years at least.

 8  Q.  And how have you known him?

 9  A.  Both professionally and socially.  We refer patients to --

10  we've been referring patients to each other for the past 20

11  years or more, and I know him as a friend also.

12  Q.  And in the past 20 years, have you been able to form an

13  opinion as to Dr. Rousseau's truthfulness and his honesty?

14  A.  I think he's one of the most honest people I've met.

15  Q.  And are you familiar with his reputation in the community

16  for being an honest person?

17  A.  To my knowledge, he has the best reputation and I've never

18  heard anything to the contrary to make me think that anything

19  outstands in the past 22 years.

20  Q.  Have you formed an opinion as to his professionalism as a

21  doctor?

22  A.  Well, as I've said, we've been sharing patients for the

23  past 22 years and he's been one of the most competent doctors

24  that I've had to deal with in my practice and one of the most

25  honest that I know for a fact coming from patients, from other

1   colleagues, so yes, I -- I think he's very honest.

2   Q.  In your opinion, is Dr. Rousseau a law-abiding person?

3   A.  I believe so, yes.

4   Q.  Is Dr. Rousseau a conscientious doctor?

5   A.  Definitely.

6   Q.  And you said that Dr. Rousseau -- you guys refer patients

7   to each other?

8   A.  Yes, we do.

9   Q.  In your opinion, have those patients been happy with

10   Dr. Rousseau's services?

11   A.  Well, I can't -- I can't recall any instance where any

12   patient has told me that they had a problem with Dr. Rousseau,

13   so I've never heard anything -- anything bad, as far as his

14   practice, his professionalism, and his competence.

15          MS. LOPEZ:  One moment, Your Honor.  No further

16   questions.

17          THE COURT:  All right.  Any other defense counsel have

18   any cross?

19          MR. PALOMINO:  No, Your Honor.

20          MR. HERMIDA:  No, Your Honor.

21          MR. PRIETO:  No, Your Honor.

22          MR. GONZALEZ:  No, Judge.

23          MR. LEVIN:  No, Your Honor.

24          THE COURT:  All right.  Mr. Medina.

25                    CROSS-EXAMINATION

1    BY MR. MEDINA:

2    Q.  Good afternoon, Doctor.

3    A.  Good afternoon.

4    Q.  Did you ever work for a company, Health Care Solutions

5    Network?

6    A.  No.

7    Q.  Are you aware of anything that took place in the admissions

8    or discharging process of Health Care Solutions Network?

9    A.  No.

10   Q.  Do you know anyone who saw patients -- strike that.

11       Do you know anyone -- what the day-to-day procedures were

12   at Health Care Solutions Network?

13   A.  No.

14   Q.  Anything whatsoever?

15   A.  No.

16   Q.  Now, if someone arranged for a kickback arrangement, would

17   that change your view about their law-abidingness?

18   A.  Yes.

19           MR. MEDINA:  No further questions, Your Honor.

20           THE COURT:  All right.  Anything further?

21           MS. LOPEZ:  No, Your Honor.

22           THE COURT:  All right.  Thank you, sir.  You can step

23   down.

24           Who is the next witness?

25           MR. RABIN:  Judge, we have one more character witness

1    who is not going to be able to be here till 3 o'clock, so other

2    than that, we rest, with the exception of that one witness who

3    will be here at 3:00.

4         THE COURT:  All right.  Anybody else have anybody here

5    and ready to go?

6         MR. PRIETO:  No, Judge.  In the morning, I have my

7    witnesses here.

8         MR. LEVIN:  I have a witness, Your Honor.

9         THE COURT:  Okay.  On behalf of Ms. Ruiz.

10        MR. LEVIN:  Thank you, Your Honor.

11        THE COURT:  Okay.

12        MR. LEVIN:  Blanca Ruiz would call Dr. Melissa --

13   Blanca Ruiz would call Dr. Melissa Becher.

14        THE COURT:  Okay.

15        MR. LEVIN:  If I may have permission to go get her.

16   Thanks.

17        MELISSA BECHER, DEFENDANT RUIZ WITNESS, SWORN

18        COURT REPORTER:  Please state your full name for the

19   record, spell your last name, and please use the microphone.

20        THE WITNESS:  Melissa Becher, B-E-C-H-E-R.

21        THE COURT:  All right.  Go ahead, Mr. Levin.

22        MR. LEVIN:  Thank you, Your Honor.

23                       DIRECT EXAMINATION

24   BY MR. LEVIN:

25   Q.  Dr. Becher, do you know a lady named Blanca Ruiz?

2623

1    A.   Yes, I know.

2    Q.   Do you see Blanca in the courtroom?

3    A.   Yes.

4    Q.   Can you identify her?

5    A.   Yes.  It's her with the peach jacket.

6         MR. LEVIN:  For the record, indicating Ms. Ruiz.

7         THE COURT:  Okay.

8    BY MR. LEVIN:

9    Q.   And how do you know Blanca Ruiz?

10   A.   I met her like 15 years ago when I first got my second

11   opportunity, a job in Florida after I moved from Puerto Rico,

12   and it was my first job as a therapist or a mental health

13   counselor in the state of Florida, and she was introduced to me

14   by my supervisor and she basically took me under her wing to

15   introduce me to people in the community and especially in the

16   school system, where we used to work with children and

17   families.

18   Q.   You worked with her in the Miami-Dade public school system?

19   A.   We worked at the school system, but we were part of an

20   agency called Miami Behavioral Health Center.  But mostly our

21   services were rendered at the school or at home.

22   Q.   Okay.  Now --

23   A.   In the patients' homes.

24   Q.   Okay, sure.  Tell the ladies and gentlemen of the jury

25   about your educational background.

1    A.   I have a master's degree in psychology and I am a licensed

2    mental health counselor.  After that, I completed my doctoral

3    degree in clinical psychology with a concentration in

4    neuropsychology, and I'm a licensed psychologist working as a

5    neuropsychologist.

6    Q.   Now, you indicated that you met Blanca Ruiz about 15 years

7    ago?

8    A.   Pretty much, yes.

9    Q.   And that was at Miami Behavioral?

10   A.   Miami Behavioral Health Center, yes.

11   Q.   Okay.  And were you working with children?  Was she working

12   with children at that time?

13   A.   Yes, we used to work with children and families, providing

14   psychotherapy, specifically play therapy.

15   Q.   And how long did you work with her there?

16   A.   With her, probably like two years.  I stayed I think a year

17   after, so in total I was there for like three years.

18   Q.   And have you kept in contact with her over the last 15

19   years?

20   A.   Yes.

21   Q.   Do you see her socially?

22   A.   Yes.  I consider -- I'm sorry, I consider her the

23   grandmother of my children.  That's close that we always been

24   since we first met.

25   Q.   Okay.  Now, do you have an opinion with regard to her

1  reputation in this community as to her being an honest person

2  and a person of great integrity?

3  A.  Yes, I do have an opinion.

4  Q.  And what is that opinion?

5  A.  I believe and, you know, I know, knowing her for 15 years,

6  that she's a very honest and ethical person.  I have -- I have

7  never met someone that we get in contact through the school

8  system or through that agency that has a different opinion

9  about her.

10  Q.  And prior to today, we had never -- we had never had the --

11  A.  No.

12  Q.  -- pleasure of meeting, right?

13  A.  No, we never met.

14  Q.  You're licensed by the State of Florida?

15  A.  I am licensed by the State of Florida.

16  Q.  Would you lie for Blanca Ruiz?

17  A.  No.

18  Q.  If you were to lie, would you lose your license?

19  A.  I would lose my license -- I have two licenses that I need

20  to protect.  I have a family, I have two babies, small

21  children, and I have a husband, I have a life, and I think

22  that, you know, that would be put into jeopardy and I would

23  never lie for her or anybody else.

24       MR. LEVIN:  Thank you, ma'am.  I have no further

25  questions.

2626

1     THE COURT:  All right.  Unless I hear somebody from

2   the defense, you don't have to say no five times.

3     All right.  Mr. Stewart.

4                   CROSS-EXAMINATION

5   BY MR. STEWART:

6   Q.  Good afternoon.

7   A.  Good afternoon.

8   Q.  If I heard your testimony correctly, the last time you

9   worked with Blanca Ruiz was approximately 13 years ago; is that

10  correct?

11  A.  I would say so, yes.

12  Q.  So you haven't worked with her since?

13  A.  Not in the same place, no, but mostly, we continue our

14  friendship.

15  Q.  Are you familiar with a company called Health Care

16  Solutions Network?

17  A.  I heard about it.

18  Q.  Have you ever actually been there?

19  A.  No.

20  Q.  Are you familiar with the company's admissions or discharge

21  practices?

22  A.  Say that again?  I couldn't hear you.

23  Q.  Are you familiar with the company's admission or discharge

24  practices?

25  A.  Admission and discharge practices?

2627

 1   Q.   Exactly.  The practices that they use in admitting and

 2   discharging patients.

 3   A.   Meaning like their requirements to admit a patient and to

 4   make the discharge of that patient?

 5   Q.   Yes.  I'm asking whether or not you know how things work at

 6   Health Care Solutions.

 7   A.   No, I don't know what the policies of that place were.

 8   Q.   Because you'd never been there, correct?

 9   A.   No, I'd never been there.

10   Q.   Do you know anyone other than Ms. Ruiz who works there?

11   A.   I knew someone that was the director, I believe, for that

12   place when they first started and she was a previous intern at

13   a place that I completed my internship.

14   Q.   But you've never worked there yourself?

15   A.   I never worked there myself, no.

16   Q.   And you've never been to the facilities.

17   A.   No.

18   Q.   So if I were to tell you that someone was intentionally

19   fabricating documents that contained false information about

20   patients without actually ever meeting with the patient

21   themselves, would that change your opinion of that person's

22   character?

23   A.   If you're talking about my opinion about Blanca

24   specifically?

25   Q.   I'm asking actually a hypothetical now.  So not

1    specifically Ms. Ruiz.  I'm asking, if you were to learn that

2    someone was intentionally fabricating documents that contained

3    false information about a patient without actually seeing the

4    patient, would that change your opinion of that person's

5    character?

6    A.   Okay.  I want to make sure that I don't know anybody that

7    works there, so I don't have any opinion about the other

8    people.  I can tell about my friendship with Blanca Ruiz and my

9    opinion would not change.

10   Q.   So it's your testimony that if you learned that Ms. Ruiz

11   was intentionally fabricating documents while working at Health

12   Care Solutions, your opinion of her character would not change.

13   A.   It would not change.  And can I explain why?

14   Q.   Please.

15   A.   Okay.  I've known her for more than 15 years and I know her

16   to be an ethical and honest person, so I will have to hear

17   where those rumors come from or the evidence that that person

18   that is telling me that she fabricated those type of documents

19   are coming from.  But not knowing -- never been in that place,

20   not knowing what are the evidence against that person, and

21   knowing her as a person, as a friend, I wouldn't change my

22   opinion.

23   Q.   Just to clarify, you've never been to the facility,

24   correct?

25   A.   No.

```
1    Q.  And you don't know anything about what was going on there.

2    A.  No.

3               MR. STEWART:  No further questions.

4               MR. LEVIN:  Briefly, Your Honor.

5                         REDIRECT EXAMINATION

6    BY MR. LEVIN:

7    Q.  Just so it's real clear, you only worked with Blanca for

8    two years, right?

9    A.  I only worked with her for two years at Miami Behavioral

10   Health Center.

11   Q.  But over the course of the last 15 years, you've socialized

12   with her, correct?

13   A.  Yes.

14   Q.  You've gone out to dinner with her, correct?

15   A.  Yes.

16   Q.  She's been to your home?

17   A.  Yes, many times.

18   Q.  You've been to her home?

19   A.  Yes.

20   Q.  You speak to her on the telephone on a regular basis?

21   A.  Yes.

22   Q.  You see each other on a regular basis?

23   A.  Yes.

24   Q.  And based on that interaction over the last 15 years, is

25   it -- is that how you formed your opinion about her?
```

1   A.   Definitely.

2   Q.   And your opinion is that she's an honest person?

3   A.   Honest and ethical person.  That's the Blanca I know and

4   that's the Blanca -- that's why I'm here to validate my opinion

5   toward, you know, about her.

6           MR. LEVIN:  Thank you, ma'am.  I have no further

7   questions.

8           THE COURT:  All right.  Thank you, ma'am.  You can

9   step down.

10          Any other witnesses here right now?

11          MR. LEVIN:  Yes, but I would need about five minutes.

12          THE COURT:  Okay.  All right.  If you can all go into

13  the jury room for a few minutes.  I'll start -- I need to talk

14  about the scheduling now since we're getting closer to the end.

15  I need to talk about some other legal matters, so...

16      (Jury not present.)

17          THE COURT:  You need to go talk to the witness?  Is

18  that why you need a few minutes?

19          MR. LEVIN:  I've never met her.

20          THE COURT:  Before you do that, let me just --

21  assuming that we have, what, two short witnesses in the

22  morning?

23          MR. LEVIN:  Yes.

24          THE COURT:  Two brief witnesses in the morning.

25          MR. PRIETO:  Yes, sir.

 1          THE COURT:  Okay.  So how much time does the

 2    government want for its closing arguments?

 3          MR. MEDINA:  Your Honor, we also have one to two

 4    rebuttal witnesses.

 5          THE COURT:  How long are they going to take?

 6          MR. MEDINA:  Probably 30 minutes total, 15 minutes

 7    each.

 8          About an hour for closing.

 9          THE COURT:  For opening and rebuttal?

10          MR. MEDINA:  I'd say an hour and a half.

11          THE COURT:  And how much time does the defense want?

12          MR. RABIN:  I would request an hour, but I won't use

13    it all.

14          MR. PALOMINO:  No more than 40 minutes, 30 minutes.

15          MR. HERMIDA:  30 minutes.

16          MR. PRIETO:  About a half an hour, Judge.

17          MR. GONZALEZ:  I think about three hours, Judge.  An

18    hour at most, Your Honor.

19          MR. LEVIN:  45 minutes.

20          THE COURT:  Okay.  All right.  Well, go ahead and talk

21    to your witness and I'm just going to stay here.  If anybody

22    needs to use the restroom or whatever, you can go, but don't go

23    far.

24          MR. MEDINA:  Your Honor, just to be conservative,

25    could we actually have two hours total?  We're probably not

1  going to use all of it.  Just to be certain.

2          THE COURT:  Okay.

3          MR. MEDINA:  Thank you.

4      (In-place recess, 1:57 p.m. to 2:00 p.m.)

5          THE COURT:  Is everybody back now?

6          MR. LEVIN:  Yes.

7          THE COURT:  All right.  Bring the jury in, please.

8      (Jury Present.)

9      MARIA DE LA MERCEDES GIOL, DEFENDANT RUIZ WITNESS, SWORN

10          COURT REPORTER:  Please state your full name for the

11  record, spell your last name, and please use the microphone.

12          THE WITNESS:  Maria de la Mercedes Giol, G-I-O-L.

13          THE COURT:  All right.  Go ahead, Mr. Levin.

14          MR. MEDINA:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16  BY MR. LEVIN:

17  Q.  Ma'am, how are you employed?

18  A.  I'm a licensed mental health counselor.  I work for an

19  insurance company.

20  Q.  Do you know Blanca Ruiz?

21  A.  Yes, I do.

22  Q.  Do you see Blanca in the courtroom?

23  A.  Yes.

24  Q.  Can you just describe an article of clothing that she's

25  wearing?

2633

1   A.   She's wearing a jacket, color orange, peach.

2          MR. LEVIN:   For the record, indicating Blanca Ruiz.

3   BY MR. LEVIN:

4   Q.   And how do you know Ms. Ruiz?

5   A.   We met through a mutual friend, Dr. Melissa Becher.

6   Q.   Would that be Dr. Becher who just testified?

7   A.   Yes.

8   Q.   Okay.   Now, prior to today, we've never actually met, have

9   we?

10  A.   No.

11  Q.   We spoke on the phone on Sunday?

12  A.   Correct.

13  Q.   Now, how do you know Blanca?   I think I just asked you

14  that?

15  A.   Yeah, through Dr. Becher.

16  Q.   Okay.   So tell us how that relationship evolved.

17  A.   We have been friends for over 15 years.   We have both been

18  in the counseling psychology field, so we socialize, we're

19  friends, very good friends.

20  Q.   And how often do you socialize?

21  A.   Usually once a month or once every two months.

22  Q.   Do you typically go out with Dr. Becher and Blanca Ruiz,

23  like a girl's group?

24  A.   Correct.

25  Q.   You go to places such as South Beach and things like that?

1    A.  Correct.

2    Q.  Okay.  Let me ask you this:  Knowing Blanca over the course

3    of the last 13 or 14 years, whatever you said it was, do you

4    have an opinion as to her reputation in this community for

5    being an honest person and being a person of high integrity?

6    A.  Yes.

7    Q.  What is that opinion, ma'am?

8    A.  I think Blanca has always been very committed to her

9    profession, just like Dr. Becher and I, very ethical.  I think

10   that she was definitely born to serve others, just like she has

11   been doing for years.  Very committed to what she was doing.

12   Q.  Now, the fact that you're friends with her and socialize

13   with her, would you come into a court of law and lie for her?

14   A.  Absolutely not.

15          MR. LEVIN:  I have no further questions.  Thank you.

16          THE COURT:  All right.  Nobody else?  Then let's hear

17   from the government.

18                      CROSS-EXAMINATION

19   BY MR. STEWART:

20   Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  I believe you testified that you met Ms. Ruiz through

23   Dr. Becher and that you had known Dr. Becher for about 15

24   years; is that correct?

25   A.  More.

1  Q.  Okay.  How long have you known Ms. Ruiz?  I wasn't sure

2  about that.

3  A.  15 years.

4  Q.  And have you ever actually worked with her, like

5  professionally?

6  A.  We worked together.  I don't know for how long.  The

7  company had two locations.  I was at one, she was at the other.

8  I don't know for how long.

9  Q.  Which company was this?

10  A.  Turning Point.

11  Q.  And what kind of company is Turning Point?

12  A.  Community mental health center.

13  Q.  I believe you said she worked at one location, you at the

14  other.  Did you actually ever work together?

15  A.  No, sir.

16  Q.  Are you familiar with a company called Health Care

17  Solutions Network?

18  A.  No.

19  Q.  If you're not familiar with it, I assume you've never been

20  to the Health Care Solutions Network facilities.

21  A.  No.

22  Q.  Do you know anything about that company?

23  A.  No.

24  Q.  So I'd like to ask you a hypothetical question.  If you

25  were to learn that someone was intentionally fabricating

1    documents, putting false information into those documents about

2    patients who they had never met, would that change your opinion

3    of their character?

4    A.  I would like to see where that information is coming from.

5    Q.  Understood.  But let's assume for a minute that the

6    information is accurate and the information indicates that that

7    person was knowingly creating false documents about patients

8    whom they had never met.  Assuming all those things are true,

9    would that change your opinion of that person's character?

10   A.  Can I ask you a question?

11          THE COURT:  You can ask him.  He may not be able to

12   answer, but go ahead.

13          THE WITNESS:  Okay.

14   A.  Would that person be Blanca?

15          THE COURT:  Assuming it's Blanca.

16   A.  No.

17   BY MR. STEWART:

18   Q.  So that would not change your opinion of her character.

19   A.  No, sir.

20   Q.  And why not?

21   A.  Because I know her and I know that she's extremely ethical

22   with her job.

23   Q.  Understood.  But if you were to assume that she had acted

24   unethically, are you saying that your testimony here today is

25   that you would not change your opinion of her character?

1   A.   I doubt so much that she will behave not ethically, and I

2   think that's part of why we have bonded very well, because we

3   are ethical in our profession, so I wouldn't change my opinion.

4           MR. STEWART:  Thank you.  No further questions.

5           MR. LEVIN:  No redirect, Your Honor.

6           THE COURT:  All right.  Thank you.  You can step down.

7           THE WITNESS:  Okay.

8           THE COURT:  Is there anybody outside that's available

9   now?  So the next witness is available at 3:00.

10          Okay.  Well, members of the jury, probably way too

11  often trials go more slowly than everybody wants and sometimes

12  they go more quickly, so we're moving at a faster pace than

13  people anticipated, so the next witness is not going to be here

14  till 3:00.  So again, I'm going to take advantage of this time

15  and meet with the lawyers to go over jury instructions and

16  other matters so that when we get to the end of all the

17  evidence, we can quickly move into the closing arguments, which

18  will probably be sometime tomorrow morning.

19          So let's -- I'll give you all a break and hopefully,

20  if the witness gets here before 3:00, then we'll start.

21  Otherwise we'll start at 3:00 if they're here, okay?  Don't

22  discuss the case.  We'll see you all back at 3:00.

23      (Jury not present.)

24          THE COURT:  All right.  Please be seated, everyone.

25  Do you all need a second to get your jury instructions out?

1    And again, we're here in open court outside the presence of the

2    jurors, but all of the attorneys and all of the defendants are

3    here.  And I had asked -- well, I guess ordered the parties to

4    meet and to prepare a joint set of jury instructions where all

5    instructions that are agreed to by everybody would be in just

6    regular font, and then the instructions that only the

7    government wants I think are underlined, and the instructions

8    only the defense wants are bold or vice versa, so it's readily

9    apparent what instructions are in conflict.  So let's just go

10   through there page by page and make sure...

11        Okay.  So the first decision is under jury instruction

12   1A or 1B.  One of them is if the defendant testifies and one is

13   if the defendant does testify?  So it's my understanding that

14   none of the defendants are going to testify; is that correct?

15        MR. HERMIDA:  That's correct, Your Honor.

16        THE COURT:  So we'll leave in 1A for now.  We'll take

17   out 1B.  Obviously, if one or more of the defendants change

18   their mind about that, we'll revisit it before the final

19   instructions.

20        All right.  Jury instruction 2 is reasonable doubt.

21        Jury instruction 3, direct and circumstantial

22   evidence.

23        No. 4 was the credibility of the witnesses.  Were

24   there any other factors that came out during the trial that are

25   not here or anything that's here that didn't come out, even

1   though you anticipated that it would?

2          MR. RABIN:  Has anything been removed from this

3   pattern?

4          THE COURT:  What do you mean?  You're the ones that

5   gave it to me.

6          MR. RABIN:  I know, but I'm just trying to shortcut

7   it.

8          I don't know, does the government know if anything was

9   removed from the pattern?

10         THE COURT:  From the pattern instruction?  I have the

11  pattern instruction.  It's identical to the pattern.

12         MR. RABIN:  Okay.

13         THE COURT:  Next is impeachment of witness because of

14  inconsistent statements or felony convictions.  Again, there's

15  two different versions of that, depending on whether or not a

16  defendant testifies.  So since we're anticipating that none of

17  the defendants are going to testify, then we'll take out 5B and

18  leave in 5A.  And 5C would also come out since none of the

19  defendants are testifying.

20         All right.  No. 6 is expert witness.

21         No. 7 is the testimony of an accomplice or codefendant

22  with a plea agreement.

23         No. 8 is a statement of the defendant.

24         No. 9.  You didn't want me to read the similar act

25  evidence at the time it came in.  Do you want me to read it

 1    now?

 2              MR. RABIN:  We're not requesting it, Judge.

 3              THE COURT:  Any of the other defendants requesting it?

 4              MR. GONZALEZ:  You're talking about No. 9, correct,

 5    Judge?  I'm not requesting that.

 6              MR. PRIETO:  No, Judge.

 7              THE COURT:  I didn't hear what you said, Mr. Gonzalez.

 8    You're not requesting it?

 9              MR. GONZALEZ:  Not.

10              THE COURT:  Not.  And so no one is requesting No. 9.

11    So I'll take out No. 9.

12              All right.  No. 10 is note taking.

13              No. 11 is the introduction to the offense

14    instructions.

15              Okay.  No. 12 is conspiracy to commit health care

16    fraud, and that's underlined.  So is that the government's

17    requested instruction if it's underlined?  And then the bold

18    that follows are the defendants'.  So what is the difference?

19              MR. RABIN:  Judge, our objection is, health care fraud

20    is defined -- the crime of health care fraud is defined in the

21    substantive count.  What the government essentially is asking

22    you to do is read the definition of health care fraud twice,

23    once as a part of the conspiracy instruction and then again as

24    part of defining health care fraud.  We think it's sufficient

25    just to define it once.  And when it comes to conspiracy, just

1    say it's also conspiracy to commit the crime of health care

2    fraud, which I'll now define for you.  But you don't need to go

3    through the entire health care fraud statute twice, which is

4    what the government is seeking.

5         MR. STEWART:  And Your Honor, it's the government's

6    position that in order to properly instruct the jury on the

7    crime of conspiracy, we need to explain that it's a conspiracy

8    to commit a crime and then lay out what the crime is,

9    specifically health care fraud.  And so the elements should be

10   listed twice because it is in fact two different crimes.

11        MR. RABIN:  And the pattern doesn't list it.

12        MR. STEWART:  And this is also a standard instruction

13   that we've used in other health care fraud cases.

14        MR. RABIN:  The pattern in the Eleventh Circuit does

15   not list it.

16        MR. STEWART:  Also, just to clarify, there is no

17   pattern for 1349.

18        MR. RABIN:  Just to clarify, the pattern conspiracy

19   instruction does not list going through the elements of the

20   substantive crime.

21        THE COURT:  Okay.  That's the only difference, so I'm

22   going to give the defendants' version.  My custom is when

23   there's a conspiracy count and a substantive count, I tell the

24   jurors, look, you have to consider that definition twice, once

25   in deciding whether somebody conspired to commit the crime and

1   once whether they actually committed it.  Particularly since

2   the jurors are given -- each individual juror has their own

3   full set of the instructions and I really don't think it's

4   necessary to read it twice, so...

5          So if I use the bolded language, does that fully set

6   forth the conspiracy instruction, except for the definition of

7   the health care fraud?  Let me put it a different way.  So if I

8   give the government's instruction, which is Jury Instruction

9   No. 12, and just end it about halfway down the second page

10  before the paragraph that says, "In this case, the defendants

11  are charged with."

12         MR. STEWART:  The government's fine with that, Your

13  Honor.

14         THE COURT:  Okay.  Then that takes us to Jury

15  Instruction No. 13, health care fraud, which applies to

16  Counts 2 through 5.  It looks like there's no objections to

17  that by anybody.

18         Then there's Jury Instruction 14, false statements

19  related to health care matters.  That applies to Counts 6

20  through 11.  There's no objections to that.

21         All right.  That brings us to Instruction No. 15,

22  which is a defense requested good faith defense instruction.

23         And what is the government's objection to this?

24         MR. STEWART:  So the government's objection is that

25  the defendants have not put into the record any factual basis

2643

1    from which you can infer that there was some sort of honestly

2    held opinion or belief that might counter the evidence that the

3    government has put in the record that they actually had

4    fraudulent intent in this case.

5           And I pointed out that the defendants have not put any

6    evidence on the record, because our view of the case law in the

7    case is that, typically, this instruction is given in the case

8    where in fact defendants do testify and do lay the groundwork

9    for the basis for their opinion or belief or, you know, some

10   sort of honestly held opinion, right, about their understanding

11   of the facts and their good faith.  Without that factual

12   predicate, we just see no reason for this instruction.

13          THE COURT:  So let's start with Dr. Rousseau.  Even

14   the case law that you cite to support your request says there

15   has to be some evidence presented.  So what is the evidence

16   that was presented from which Dr. Rousseau would be entitled to

17   this instruction?

18          MR. RABIN:  Judge, we believe that through the

19   testimony of the witnesses who have testified, both government

20   witnesses and defense witnesses, it's clear that Dr. Rousseau

21   went to Health Care Solutions under the belief that it was a

22   legitimate enterprise, did the things he was supposed to do,

23   and that any criminal activity was kept from him, if you will.

24          And essentially, this is -- this boils down to our

25   theory of defense that there may have been fraud going on

2644

1    there, but he wasn't a party to it.  He worked there and acted

2    in good faith and we think that there's an evidentiary basis,

3    based upon the evidence that's been presented.  I mean, the

4    collective evidence is that the jury either believes he was

5    part of the fraud or they believe that it was going on around

6    him and he was oblivious to it, which, quite frankly, is our

7    position.

8              THE COURT:  All right.  Mr. Palomino, what evidence is

9    there to support this for your client?

10             MR. PALOMINO:  Judge, we're in a similar situation as

11   far as evidence presented through government witnesses shows

12   that Mrs. Crabtree was there, she was there as an independent

13   contractor during the morning hours.  She was working, she was

14   conducting group therapy sessions.  She wasn't just filling out

15   forms.  She was with actual live patients, doing therapy.  And

16   we believe that that shows that she was there for a legitimate

17   purpose and any fraud that was going on was certainly going on

18   behind her.  She was certainly not aware of it.  And we believe

19   that that is a basis for this instruction.

20             THE COURT:  All right.  Mr. Hermida?

21             MR. HERMIDA:  Judge, I would adopt what Mr. Palomino

22   said and just add specifically to -- specifically as to

23   Ms. Salafia, if you recall the cross, I believe, of Agent Cox,

24   she was never given an opportunity to examine the documents

25   that formed the basis of her substantive counts, i.e., the

1    cloned notes belonging to a patient by the name of Reinaldo

2    Rodriguez and Divina Garcia.  She was never told the existence

3    of those notes.  She was never able to admit or deny the

4    authenticity of that signature.  The only document that was

5    ever shown to her was in the initial interview by special -- or

6    Agent Garcia -- Rivera, and that belonged to a Ms. Dulce

7    de la Torre, which was, I guess, the government's poster

8    patient for this case going in, and certainly not one of the

9    substantive counts as to Ms. Salafia.

10            But just to close the loop on de la Torre, Judge,

11    that's the one where I was able to introduce the patient

12    sign-ins for those particular days -- I believe it was

13    November 17th and November 20th or November 20th or

14    November 27th of 2007 -- and the patient sign-in sheets for

15    those particular days indicate that Ms. de la Torre was, in

16    fact, at Health Care Solutions East and receiving treatment,

17    but not by Mrs. Salafia, but by Ms. Crabtree.  And our

18    presentation to the jury would in fact show them that one of

19    these two documents was an obvious forgery.

20            THE COURT:  All right.  Mr. Prieto?

21            MR. PRIETO:  Yes, Judge.  I would adopt Mr. Palomino's

22    argument as well, and to give the Court specific instances,

23    even the government, through their agent, indicated in their

24    302, which was testimony that came out, that Ms. Marks, in

25    fact, denied any involvement or that she was acting in good

1    faith.

2           Then there's a contradiction later through the

3    interview by the agent, but the good faith is also buttressed

4    by the statement of government witness John Thoen, where in

5    fact he stated that he heard the rumor that Ms. Marks and

6    others were not part of any kind of conspiracy and were just

7    doing their notes.

8           In addition, Judge, I believe defense witness Feas

9    indicated that they were not involved in anything and did not

10   know of anything, and I believe that our defense witnesses will

11   also touch on a good faith defense.

12          THE COURT:  Mr. Gonzalez?

13          MR. GONZALEZ:  Judge, I'd like to add that a lot of

14   the things that the government has suggested that are improper

15   here are recordkeeping matters.  Whether group therapy notes

16   were turned in two days later or three days later or a week

17   later.  Whether during a review some documents that were

18   missing were replaced, things of that nature.  Dr. Triplett, if

19   I remember correctly, stated that these matters are normal and

20   sometimes are necessary and they're part of the ordinary course

21   of some -- of psychiatric offices.

22          Therefore, I think this instruction will be able to, I

23   think, instruct the jury that some of the things that were

24   being done there, even though they turned out to be maybe later

25   to be falsified by others, were done in good faith.  The

1    preparation of group therapy notes a few days afterwards or the

2    repair of a file in order so that it could be fit for review,

3    those things are not necessarily criminal conduct.  The

4    government did suggest generally that these things are a

5    problem.  Your good faith belief that you did this in good

6    faith, I think it's important for the defense.

7                THE COURT:  All right.  Mr. Levin?

8                MR. LEVIN:  Your Honor, I would adopt the arguments of

9    prior counsel.  But the evidence in this case with regard to

10   Ms. Ruiz would support giving this good faith instruction in

11   that Ms. Ruiz, the government's theory seems to be that she

12   fabricated notes and also was responsible for admitting

13   patients that were not properly treatable at a PHP.

14               That issue came up today with Dr. Villamil on

15   cross-examination where they made a big to-do about the fact

16   that Blanca was the one that had admitted this patient.  And I

17   think this instruction is important because if in fact -- I

18   should be able to argue that she made a mistake in judgment or

19   it was an error in management or carelessness, and that's a

20   fact that I believe supports the giving of this instruction.

21               THE COURT:  All right.  I'll give the government the

22   last word.

23               MR. STEWART:  Yes, very briefly, Your Honor.  We've

24   heard a number of different arguments about what the defendants

25   might have thought, what they might have known, why they stayed

1    at the company, what they saw, what they observed, but we

2    actually don't know, right, whether the defendants were acting

3    in good faith, what they thought about the company they were

4    working at, whether or not, you know, what they saw, you know,

5    rose to the level that they felt that they needed to contact

6    Medicare.  It's the government's position that you need to have

7    in evidence some sort of opinion or belief from the defendants,

8    right, from which you can infer that they are acting in good

9    faith.  We just don't see that record.

10            One further point.  There are other instructions,

11   specifically as to willfulness and intent to defraud, and we

12   think that those are essentially ample in this situation as

13   outlined in the footnote here to this good faith defense

14   instruction.

15            THE COURT:  Okay.  Well, I don't think the defendants

16   have to put on evidence.  There has to be evidence in the

17   record.  I think it's probably a stretch, but in an abundance

18   of caution, I'm going to give that instruction.

19            All right.  Next is Jury Instruction No. 16, aiding

20   and abetting an agency.  Nobody objects to that.

21            Next is No. 17, deliberate ignorance as proof of

22   knowledge.  No objection to that.

23            No. 18 is the fact that civil or regulatory violations

24   do not constitute a crime.

25            19 is on or about and knowingly and willfully.

1           20 is multiple defendants, multiple counts.

2           21 is duty to deliberate.

3           22 is the verdict and the verdict form.

4           All right.  And the government also has filed a

5    supplemental instruction known as the Pinkerton instruction.

6    Does the defense object to that?

7           MR. RABIN:  Yes, Judge.

8           THE COURT:  What is the objection?

9           MR. RABIN:  I don't like the instruction.

10          THE COURT:  Okay.  Any authority for that?

11          MR. RABIN:  It was late.

12          THE COURT:  Any authority that your mom doesn't like

13   it either, so...

14          MR. RABIN:  If I don't like it, she probably will like

15   it.

16          THE COURT:  All right.  So I will overrule that

17   objection.  The question is where does that go?  Does it go

18   after the substantive -- I think it makes sense to go after the

19   substantive counts, maybe after aiding and abetting an agency

20   and before deliberate ignorance.

21          MR. STEWART:  That makes sense, Your Honor.

22          THE COURT:  So does the government have any other

23   objections -- any other instructions?

24          MR. STEWART:  No, Your Honor.

25          THE COURT:  Any of the defendants have any other

```
 1    instructions?

 2              MR. LEVIN:  No, Your Honor.

 3              MR. PALOMINO:  No, Your Honor.

 4              MR. HERMIDA:  No, Your Honor.

 5              MR. PRIETO:  No, Judge.

 6              THE COURT:  And other than what has already been

 7    voiced in terms of objections, are there any other objections

 8    to these instructions?  All right, hearing none.

 9              So let me make inquiry of each of the defendants.

10    Maybe we can have the defendants that are not at the table get

11    closer to the table so they can use the microphone.

12              And Mr. Rabin, what is the name of the witness that

13    you are about to call about Dr. Rousseau?

14              MR. RABIN:  I'm sorry?

15              THE COURT:  What's the name of the witness you are

16    about to call?

17              MS. LOPEZ:  Dr. Mario Cuervo.

18              THE COURT:  Dr. Rousseau, understanding that Dr. Mario

19    Cuervo is going to be your next and last witness, are there any

20    other witnesses that have not been presented that you would

21    want your attorneys to present on your behalf?

22              DEFENDANT ROUSSEAU:  No, sir.

23              THE COURT:  All right.  And Ms. Crabtree, I think

24    Marjorie Deza has already testified on your behalf.  Are there

25    any other witnesses that you want your attorney to call on your
```

1    behalf?

2              DEFENDANT CRABTREE:  No, sir.

3              THE COURT:  And Ms. Salafia, are there any witnesses

4    that you want Mr. Hermida to call on your behalf that have not

5    been called?

6              DEFENDANT SALAFIA:  No, sir.

7              THE COURT:  All right.  And let me start with

8    Mr. Prieto.  What are the two witnesses that you're planning on

9    calling tomorrow?  What are their names?

10             MR. PRIETO:  Judge, we anticipate calling JoAnn Calvin

11   Miniea and William Maynard.

12             THE COURT:  And Ms. Marks, other than those two

13   people, are there any other witnesses that you want Mr. Prieto

14   to call on your behalf?

15             DEFENDANT MARKS:  No, sir.

16             THE COURT:  And Ms. Fonts, are there any witnesses

17   that you want Mr. Gonzalez to call on your behalf?

18             DEFENDANT FONTS:  No, Your Honor.

19             THE COURT:  And Mr. Ruiz, other than the witnesses we

20   have heard from today, are there any additional witnesses that

21   you want Mr. Levin to call on your behalf?

22             DEFENDANT RUIZ:  No.

23             THE COURT:  Okay.  Now, as to each of the defendants,

24   you don't have to make your final decision right now, but I

25   want to explain to each of you that each of you has the right

1    to testify at this trial and you also have the right not to

2    testify.  And unlike many other decisions that happen during a

3    trial, the right or decision whether to testify or not is up to

4    each individual defendant.

5         So for example, if, during the trial, there was a

6    question that you wanted your attorney to ask a witness, the

7    attorney could ask it if he wanted to, but the attorney could

8    overrule you and say, you know what, I don't want to ask that

9    question, and the attorney wouldn't have to ask the question,

10   even though you wanted him to do that.

11        And the decision to testify is the defendant's own

12   personal decision.  Obviously, you should consult with your

13   attorney and listen to your attorney's advice, because they are

14   very experienced in these matters, but ultimately, if you

15   disagree with your attorney, you can overrule him in this case

16   and you can testify if he thinks you shouldn't testify, and you

17   can not testify if he thinks you should testify.

18        So first of all, do you each understand that it is

19   your own personal decision to make as to whether to testify or

20   not testify?

21        Dr. Rousseau?

22        DEFENDANT ROUSSEAU:  Yes, Your Honor.

23        THE COURT:  All right.  Ms. Crabtree?

24        DEFENDANT CRABTREE:  Yes, Your Honor.

25        THE COURT:  Dr. Salafia?

 1           DEFENDANT SALAFIA:  Yes, Your Honor.

 2           THE COURT:  Ms. Marks?

 3           DEFENDANT MARKS:  Yes, Your Honor.

 4           THE COURT:  Ms. Fonts?

 5           DEFENDANT FONTS:  Yes, Your Honor.

 6           THE COURT:  And Ms. Ruiz.

 7           DEFENDANT RUIZ:  Yes, Your Honor.

 8           THE COURT:  And is it your own personal decision to

 9   not testify as a witness in this case?

10           Dr. Rousseau?

11           MR. RABIN:  Judge, if I can have a moment, please?

12           THE COURT:  Yes.

13         (Off-the-record discussion.)

14           MR. RABIN:  Judge, the government indicated that they

15   have -- or may have some rebuttal witnesses.  Dr. Rousseau and

16   I have just conferred and what we'd like to do is wait until

17   after we know who the rebuttal witnesses are to decide whether

18   or not he's going to testify, quite frankly.

19           THE COURT:  I don't know what that means.  Like in

20   surrebuttal?

21           MR. RABIN:  No, not in surrebuttal, but knowing in

22   advance who the rebuttal witnesses are -- obviously, they'll

23   advise us before the end of the day -- that will be the best --

24           THE COURT:  Tell us now, who are your rebuttal

25   witnesses?

 1          MR. MEDINA:  Your Honor, we're not sure because it

 2   depends whether or not they're going to be testifying.  That

 3   would be a factor on who our rebuttal witnesses are going to

 4   be.

 5          THE COURT:  Well, if they don't testify -- right now,

 6   they've all said they're not testifying.  So if they don't

 7   testify, based on what's happening now --

 8          MR. MEDINA:  It will be Special Agent Terence Reilly

 9   and Mark Egleston -- Scott Egleston, sorry.

10          THE COURT:  And Reilly already testified.  What is he

11   going to testify about that he hasn't testified about?

12          MR. MEDINA:  With respect to an interview with Alina

13   Feas.

14          THE COURT:  Okay.  And what is Mr. Egleston going to

15   testify about?

16          MR. MEDINA:  He's Mrs. Feas's lawyer.

17          THE COURT:  I know who he is.  Are we going to have a

18   2255 hearing?

19          MR. MEDINA:  He was present at the interview.

20          THE COURT:  He was present at the interview.

21          MR. MEDINA:  Correct.

22          MR. LEVIN:  At what?

23          MR. MEDINA:  The Alina Feas interview.  That was the

24   lawyer present.

25          THE COURT:  So he's going to testify about a prior

 1   inconsistent statement of his former client.

 2             MR. MEDINA:  Correct.

 3             THE COURT:  Okay.  So would that change Dr. Rousseau's

 4   decision whether or not to testify?

 5             MR. RABIN:  Now I can discuss it intelligently with

 6   him.

 7        (Off-the-record discussion.)

 8             MR. RABIN:  Judge, you can inquire.

 9             THE COURT:  And Dr. Rousseau, is it your own personal

10   decision to not testify as a witness in the case?

11             DEFENDANT ROUSSEAU:  Yes, Your Honor.

12             THE COURT:  Has anybody forced you, threatened you, or

13   coerced you in any way to get you to come to that decision?

14             DEFENDANT ROUSSEAU:  No, Your Honor.

15             THE COURT:  You remember when Dr. Feas testified, that

16   she just said whatever she thought her lawyers wanted her to

17   say to the judge?  Do you remember when she said that?

18             DEFENDANT ROUSSEAU:  Yes, sir.

19             THE COURT:  Okay.  Is this your telling me what you

20   really want and not because some other person told you and

21   you're just listening to your lawyers and answering the judge

22   the way you think your lawyers want you to?

23             DEFENDANT ROUSSEAU:  Your Honor, I'm fully aware of my

24   decision.

25             THE COURT:  Okay.  All right.  And Mrs. Crabtree, is

1  it your own personal decision to not testify as a witness in

2  the case?

3          DEFENDANT CRABTREE:  Correct, Your Honor, not testify.

4          THE COURT:  And has anybody forced you, threatened

5  you, or coerced you in any way to get you to come to that

6  decision?

7          DEFENDANT CRABTREE:  No, sir.

8          THE COURT:  And Dr. Salafia, is it your own personal

9  decision to not testify as a witness in the case?

10          DEFENDANT SALAFIA:  Correct, Your Honor.

11          THE COURT:  Has anybody forced you, threatened you,

12  coerced you in any way to get you to come to that decision?

13          DEFENDANT SALAFIA:  No, sir.

14          THE COURT:  And Ms. Marks, is it your own personal

15  decision to not testify as a witness in the case?

16          DEFENDANT MARKS:  Yes, it is.

17          THE COURT:  Has anyone forced you, threatened you,

18  coerced you in any way to get you to come to that decision?

19          DEFENDANT MARKS:  No, sir.

20          THE COURT:  And Ms. Fonts, is it your personal

21  decision to not testify as a witness in the case?

22          DEFENDANT FONTS:  That's correct, Your Honor.

23          THE COURT:  Has anybody forced you, threatened you,

24  coerced you in any way to get you to come to that decision?

25          DEFENDANT FONTS:  Absolutely not, Your Honor.

1          THE COURT:  All right.  And Ms. Ruiz, is it your

2   personal decision to not testify as a witness in the case?

3          DEFENDANT RUIZ:  Yes, Your Honor.

4          THE COURT:  Has anybody forced you, threatened you, or

5   coerced you in any way to get you to come to that decision?

6          DEFENDANT RUIZ:  Not at all.

7          THE COURT:  Okay.  Do each of you understand that you

8   can change your mind overnight, okay, or later in the day, and

9   if you change your mind and you want to testify, I'm telling

10  you right now, stand up, yell, scream, whatever it takes.

11  Don't say, well, I was going to tell my lawyer, but then things

12  were happening.  So let your lawyer know, let me know that

13  you've changed your mind, because I'm just letting you know

14  that you can change your mind before all the evidence comes in.

15  Okay?  Do you each understand that?

16          Dr. Rousseau?

17          DEFENDANT ROUSSEAU:  Yes, sir.

18          THE COURT:  Crabtree?

19          DEFENDANT CRABTREE:  Yes, sir.

20          THE COURT:  Salafia?

21          DEFENDANT SALAFIA:  Yes.

22          THE COURT:  Marks?

23          DEFENDANT MARKS:  Yes.

24          THE COURT:  Fonts?

25          DEFENDANT FONTS:  Yes.

2658

1        THE COURT:  And Ruiz?

2        DEFENDANT RUIZ:  Yes, Your Honor.

3        THE COURT:  Okay.  You want to check and see if your

4    witness got here a little bit early?

5        MS. LOPEZ:  Your Honor, I just spoke with Dr. Cuervo.

6    He said he's about 10 to 15 minutes away.  He's on the Dolphin

7    Expressway.

8        THE COURT:  All right.  So let's take a ten-minute

9    recess and start when he gets back.

10     (Recess, 2:44 p.m. to 3:12 p.m.; Jury Present:)

11        THE COURT:  Welcome back, everyone.  Please be seated.

12    Thank you for your patience.

13     MARIO CUERVO, M.D., DEFENDANT ROUSSEAU WITNESS, SWORN

14        COURT REPORTER:  Please be seated.  Please state your

15    full name, spell your last name for the record, and please use

16    the microphone.

17        THE WITNESS:  My name is Mario Cuervo, C-U-E-R-V-O,

18    Mario, M-A-R-I-O.

19                    DIRECT EXAMINATION

20    BY MS. LOPEZ:

21    Q.  Good afternoon, Dr. Cuervo.

22    A.  Good afternoon.

23    Q.  Dr. Cuervo, can you please tell the jury how you're

24    currently employed?

25    A.  Where am I currently employed?

1   Q.  Yes.

2   A.  Well, right now, I'm working for Psych Care as a physician

3   advisor.

4   Q.  Are you a psychiatrist?

5   A.  I am a psychiatrist.

6   Q.  Where did you go to medical school?

7   A.  University of Zaragosa in Spain.

8   Q.  And where did you complete your residency?

9   A.  At University of Miami.

10  Q.  Dr. Cuervo, are you familiar with Dr. Roger Rousseau?

11  A.  Yes, I am.

12  Q.  How are you familiar with Dr. Rousseau?

13  A.  Well, I met him during my residency and I've been honored

14  by his friendship since then, both as -- I've worked with him

15  as a physician and I've known his family and I feel honored to

16  be here to talk about him.

17  Q.  Have you been able to follow Dr. Rousseau's career as a

18  psychiatrist?

19  A.  Yes, I have.

20  Q.  Have you formed an opinion as to his professionalism as a

21  psychiatrist?

22  A.  I do every day.  And I'll tell something that I mentioned

23  before.  I also worked at Leon, where he used to work, and I'm

24  seeing his patients and every day I am reminded by his patients

25  how much they love him and how much they care, and they cry to

1    me every day, when I talk to them.  This is not an

2    exaggeration.  I feel so good about coming here because there's

3    really nothing bad I can say, but good things.

4    Q.  So it's fair to say that Dr. Rousseau is a conscientious

5    doctor?

6    A.  Extremely.

7    Q.  Who cares about his patients?

8    A.  Very much.

9    Q.  Have you been able to form an opinion as to Dr. Rousseau's

10   propensity for truthfulness?

11   A.  I'm sorry, can you say that again?

12   Q.  Have you formed an opinion on whether or not Dr. Rousseau

13   is an honest person?

14   A.  Extremely honest, and I've been able to witness that in

15   many ways.

16   Q.  Are you familiar with Dr. Rousseau's reputation in the

17   community for honesty?

18   A.  Very much.

19   Q.  And what is that reputation in the community?

20   A.  You could get a line of doctors to come here and talk.  I

21   mean, I've been called every time, is there any way I can go

22   and say something about Roger's reputation.  I mean,

23   everybody -- I haven't heard anybody -- this is the only doctor

24   in Miami, and I've been practicing 30-some years, that I

25   haven't ever heard anybody say a bad thing about him, whether

1   patients -- you know, I think of myself as a very good

2   physician and I know there are some patients that might hate me

3   because that's the way it is in practice.

4       I haven't heard of one patient -- and I'm treating most of

5   his patients at Leon, and not one has ever said anything bad

6   about him.  They all miss him, they all love him, they all ask

7   me to say that they're praying for him.  I mean, everything is

8   positive about him.

9   Q.  In your opinion, is Dr. Rousseau a law-abiding person?

10  A.  Yes, very much.

11       MS. LOPEZ:  One second, Your Honor.  No further

12  questions.

13       THE COURT:  All right.  Mr. Medina?

14                    CROSS-EXAMINATION

15  BY MR. MEDINA:

16  Q.  Good afternoon.

17  A.  Good afternoon.

18  Q.  Dr. Cuervo, have you ever served as a medical director for

19  any partial hospitalization programs?

20  A.  I have.

21  Q.  And where?

22  A.  It's been many years ago.  Different names.  Larkin

23  Hospital, for example.

24  Q.  Where else, if you recall?

25  A.  It's hard to remember names, but there's been at least a

1    couple more.  I don't recall the names because they're not like

2    hospital -- Southern Winds Hospital as well.  I did practice

3    there.

4            THE COURT:  I'm sorry, what was the name of it?

5    A.  Southern Winds Hospital.

6    BY MR. MEDINA:

7    Q.  Southern Winds.  Now, with respect to a partial

8    hospitalization program, do you know that partial

9    hospitalization programs are different from an inpatient

10   facility?

11   A.  That partial -- can you repeat the question again?

12   Q.  A partial hospitalization program is different from an

13   inpatient facility, correct?

14   A.  Yes.

15   Q.  And it's different from an outpatient -- a regular

16   outpatient facility?

17   A.  Right.

18   Q.  Partial hospitalization programs are for treating patients

19   with acute psychiatric issues?

20   A.  For acute -- it's to treat patients short of going to the

21   hospital.

22   Q.  It's an intensive treatment center?

23   A.  Right.  More intensive than outpatient.  It's in between

24   inpatient and outpatient.

25   Q.  And the goal of treating a patient with an acute illness is

1   to get them better, correct?

2   A.   Get them better, yes.

3   Q.   And the idea is not to keep a person in a partial

4   hospitalization program for years on end; is that right?

5   A.   That's not the idea, except it's not clear by Medicare

6   standards what they want.

7            MS. LOPEZ:   Objection, Your Honor.

8            THE COURT:   Grounds?

9            MS. LOPEZ:   Beyond the scope of my direct.

10           THE COURT:   Overruled.

11  A.   I don't know if I'm supposed to be giving my opinion, but

12  Medicare has never made it clear, and that's consistent for

13  every doctor in the state of Florida, especially South Florida,

14  and what is it that they want done in regards to PHP.  So it's

15  been always a gray area, but, you know, you might know better

16  than I do.

17  BY MR. MEDINA:

18  Q.   But patient need is what dictates, correct?

19  A.   Yes.

20  Q.   Regardless.

21  A.   Regardless, yes.

22  Q.   Now, with respect to your experience in partial

23  hospitalization programs, do you meet with every single patient

24  prior to the admission in a partial hospitalization program?

25  A.   I have met with every patient that I saw.

2664

 1    Q.   And it's important to you --

 2    A.   That I follow, I mean.

 3    Q.   Sorry?

 4    A.   For every patient that I follow, correct.

 5    Q.   And it's important to meet with every patient prior to

 6    being admitted into a partial hospitalization program, correct?

 7    A.   Well, I listen, but then you admit him.  I mean, I admit

 8    patients to the hospital, which is more intense, and I might

 9    meet him at the time that he's being admitted, because somebody

10    brought him there for whatever reason.

11    Q.   Right.  But prior to a patient getting treatment in a

12    partial hospitalization program, they have to meet with a

13    psychiatrist, correct?

14    A.   You have to be a little bit more specific because if

15    you're -- and I'll give you an example of how I'm getting

16    confused.  For example, if I get a patient that it's brought

17    into the hospital, he starts getting treatment and I'm not

18    there to see him yet.

19    Q.   Correct.  In a partial hospitalization program, not in the

20    hospital.

21    A.   Right.

22    Q.   So prior to a patient going to group therapy, actually

23    getting treatment in a partial hospitalization program, the

24    psychiatrist needs to see that patient, correct?

25    A.   That's usually the way it works.

1    Q.   Okay.  And prior to a patient going into treatment, there

2    has to be a treatment plan, correct?

3    A.   There has to be -- prior to getting treatment?

4    Q.   Has to be a treatment plan.

5    A.   Yeah, but treatment plan is an ongoing thing.  I mean, you

6    might make it the first day and you can keep changing it.

7    Q.   Absolutely.  But prior to treatment actually occurring,

8    there needs to be a treatment plan, correct?

9    A.   Well, but it's pretty black and white what you're going to

10   do.  I mean, I don't know that there's any mystery or, I mean,

11   something -- you're not going to discover anything.  It's

12   almost everything that is done in every PHP so, I mean, I'm not

13   sure I'm understanding the question.

14   Q.   I'm just asking, when a patient goes to a partial

15   hospitalization program to get treatment, that there has to be

16   a plan, correct?

17   A.   There has to be -- yeah, there has to be a plan.

18   Q.   And the plan needs to include the psychiatrist's input,

19   correct?

20   A.   The psychiatrist's input, yes.  Yes.

21   Q.   The therapists?

22   A.   Therapists.

23   Q.   Nurses?

24   A.   Nurses.

25   Q.   Any other clinical staff who are going to be treating the

1   patient, correct?

2   A.   Yes.

3   Q.   And the idea is because a PHP is intensive therapy; is that

4   right?

5   A.   It's intensive, yes, it's intensive therapy.

6   Q.   And these people are suffering from acute illnesses, so the

7   treatment plan or the individualized plan for the patient is

8   important.

9   A.   Yeah.

10  Q.   Now, as medical director, you've had to sign initial psych

11  evaluations, correct?

12  A.   Yes.

13  Q.   And prior to signing initial psych evaluations, is it

14  important to review what's written there prior to signing them?

15  A.   Yeah, I would -- if I'm going to sign it, yes, I would look

16  at it.

17  Q.   Why do you say that, if you're going to sign it, you have

18  to look at it?

19  A.   Because I'm responsible.

20  Q.   What do you mean by that?

21  A.   I'm responsible for that admission.  As a physician, I'm

22  the person responsible for the treatment of that patient.

23  Q.   Right.  It's not a psychologist or anyone else.  If you're

24  signing it, that is your responsibility, correct?

25  A.   Right.  I mean, I might get information from a psychologist

1    and that might be part of the whole evaluation, but yeah,

2    I'm -- at the end of the day, I'm responsible for the

3    psychiatric evaluation.

4    Q.   Right.  And it's because you're signing that document,

5    correct?

6    A.   That's right.

7    Q.   Doctor, if you were to learn that someone was not reviewing

8    initial psych evaluations, but were simply signing them without

9    reviewing, would that change your opinion as to their

10   conscientiousness or professionalism?

11   A.   I would think that there would be a problem with that, yes.

12   Q.   Now, if you learned that someone -- well, let me back up.

13   Are you aware that it's illegal to pay for referrals?

14   A.   Yes.

15   Q.   Pay assisted living facilities for referrals?

16   A.   Yes.

17   Q.   If you learned that someone negotiated a kickback

18   arrangement for a referral, would that change your view toward

19   law-abidingness?

20   A.   If the person -- if I knew that the person did it, yes.

21            MR. MEDINA:  No further questions.

22            THE COURT:  All right.  Do you have any redirect?

23            MS. LOPEZ:  Briefly.

24                         REDIRECT EXAMINATION

25   BY MS. LOPEZ:

1    Q.   Dr. Cuervo, you said that you were a medical director of

2    PHPs in the past?

3    A.   Yes.

4    Q.   Are medical directors required to go to the PHP every

5    single day?

6    A.   No.

7    Q.   So on a day where the medical director is not present, if a

8    patient -- if a patient comes up -- comes to the PHP with a

9    crisis or an acute crisis, would it be reasonable for the

10   therapist to deny that patient?

11   A.   No.  I mean, usually that didn't happen.  As a matter of

12   fact, most of the physicians have a physician assistant that

13   helps them and it's -- I think Medicare is in agreement with

14   that, the use of those people to help in the care of patients.

15   And then I've had patients hospitalized I haven't been able to

16   see on the same day that they're hospitalized, but my assistant

17   saw them and I might have seen them the next day.

18   Q.   So is it fair to say that a patient can be admitted into

19   the partial hospitalization program on a day that the medical

20   director is not there and then on the day the medical director

21   is present, decides whether or not that patient should stay or

22   leave or is appropriate or not for the partial hospitalization

23   program?

24   A.   That is -- that was constantly -- has been constantly done.

25   I don't know how it's done now.  I don't do it -- I don't cover

1    PHPs anymore.  I don't know if that's changed, but it's always

2    been like that.

3    Q.  So that's the norm?

4    A.  That was the norm when I was in PHPs.

5    Q.  And then is it normal for therapists, nurse, and the

6    psychiatrist to collaborate with each other in making the

7    treatment plans for the patients?

8    A.  You have to.  I mean, I don't see how you could work any

9    other way.

10             MS. LOPEZ:  Thank you.  Can I have one moment, Your

11   Honor?

12             THE COURT:  Yes.

13             MS. LOPEZ:  No further questions.

14             THE COURT:  All right.  Sir, you can step down.  Thank

15   you.

16             All right.  Does anybody else have any other witnesses

17   for this afternoon?

18             ALL COUNSEL:  No.

19             THE COURT:  Okay.  So members of the jury, we're going

20   to end a little bit early today.  I have an 8:30 hearing that

21   shouldn't take more than 15 or 20 minutes, so we should be able

22   to start promptly at 9:00.  We should be able to commence the

23   closing arguments sometime tomorrow morning.  So please, you

24   haven't heard all the evidence in the case, you haven't heard

25   the arguments of the attorneys, and more importantly, you

```
 1    haven't heard my instructions on the law.  So please don't

 2    discuss the case.  Have a safe trip home and back and we'll see

 3    you at 9 o'clock tomorrow morning.

 4         (Jury not present.)

 5         THE COURT:  All right.  Please be seated.  We're here

 6    outside the presence of the jury, but everybody else is here.

 7    Before you leave, I have the verdict form and the jury

 8    instructions based upon our discussion earlier this afternoon.

 9    So before you leave, we're going to hand out a copy to

10    everybody so you can look at it tonight to confirm that what's

11    there is consistent with what we discussed in court.  So

12    they're being copied right now, they should be out in another

13    minute, so don't leave until you get that.

14         Are there any other matters that we can take up this

15    afternoon?

16         MR. MEDINA:  Nothing from the government, Your Honor.

17         ALL DEFENSE COUNSEL:  No, sir.

18         THE COURT:  All right.  Have a good evening, everyone.

19    We'll see you at 9:00.

20         MR. GONZALEZ:  Judge, before we leave, before we

21    leave, I'm sorry, do you expect to finish this tomorrow as late

22    as it takes?  Or are you going to finish tomorrow at 5:30?

23         THE COURT:  I know you're not good at math, but if you

24    add up two hours and even if you give everybody 45 minutes,

25    what's six times 45?
```

1          MR. GONZALEZ:  All right.

2          THE COURT:  That's six and a half hours.

3          MR. GONZALEZ:  Right.

4          THE COURT:  So even if all those witnesses are done

5   before 10:00, we still have six and a half hours plus lunch

6   plus recess, so no, we're not going to finish tomorrow, unless

7   you take ten minutes instead of 45 minutes.  But I'm not going

8   to go -- the one thing I don't want to do is have one side only

9   giving an argument on a particular day.  So it gets to the end

10  of the day and there's an hour left, then maybe we'll have

11  Mr. Levin do his Friday morning with the government or

12  something, so it's not -- but we'll see.  I highly doubt we're

13  going to finish tomorrow, and I'm not going to go super late to

14  finish.

15          MR. GONZALEZ:  Thank you, Judge.

16          THE COURT:  Okay?  They got them all?

17          You have all the instructions now, so please review

18  them.  Make sure they're done correctly.  Let me know so I can

19  fire my law clerk if they're not.

20      (Proceedings adjourned at 3:29 p.m.)

21                      *   *   *   *   *

22

23

24

25

1  UNITED STATES OF AMERICA                    )
                                               ) ss:
2  SOUTHERN DISTRICT OF FLORIDA                )

3

4                  C E R T I F I C A T E

5      I, Carly L. Horenkamp, Certified Shorthand

6  Reporter in and for the United States District Court for the

7  Southern District of Florida, do hereby certify that I was

8  present at and reported in machine shorthand the proceedings

9  had the 19th day of November, 2014, in the above-mentioned

10 court; and that the foregoing transcript is a true, correct,

11 and complete transcript of my stenographic notes.

12     I further certify that this transcript contains

13 pages 2484 - 2672.

14     IN WITNESS WHEREOF, I have hereunto set my hand at Miami,

15 Florida, this 24th day of April, 2015.

16

17
                    /s/ Carly Horenkamp
18
                    Carly L. Horenkamp, RMR, CRR
19                  Certified Shorthand Reporter

20

21

22

23

24

25